```
 1                UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF WISCONSIN

 3  --------------------------------------------------------------

 4   UNITED STATES OF AMERICA,          )
                                        )
 5                  Plaintiff,          )    Case No. CR 10-288
                                        )    Milwaukee, Wisconsin
 6        vs.                           )
                                        )    December 5, 2011
 7   JAMES A. STUART, JR.,              )    2:11 p.m.
                                        )         VOLUME 1
 8                  Defendant.          )    AFTERNOON SESSION

 9  --------------------------------------------------------------

10                  TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11           UNITED STATES DISTRICT JUDGE, and a jury.

12  APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:     Office of the US Attorney
14                                 By: MATTHEW L. JACOBS
                                   517 E Wisconsin Ave- Rm 530
15                                 Milwaukee, WI 53202
                                   Ph: 414-297-4106
16                                 Fax: 414-297-1738
                                   matthew.jacobs@usdoj.gov
17   For the Defendant
     JAMES A. STUART, JR.:         The Law Office of Robert G
18   (Present)                     Bernhoft SC
                                   By: ROBERT G. BERNHOFT
19                                 207 E Buffalo St - Ste 600
                                   Milwaukee, WI 53202
20                                 Ph: 414-276-3333
                                   Fax: 414-276-2822
21                                 rgbernhoft@bernhoftlaw.com

22
     U.S. Official Reporter:       JOHN T. SCHINDHELM, RMR, CRR,
23                                 johns54@sbcglobal.net

24  Proceedings recorded by computerized stenography, transcript
    produced by computer aided transcription.
25
```

1       AFTERNOON SESSION

2              (Trial resumed at 2:11 p.m.)

3              THE COURT:  Ready to proceed?

4              MR. JACOBS:  Judge, we had questions about technology.

02:11   5      THE COURT:  All right.

6              MR. JACOBS:  As I say, there is no outlet for the

7       laptop.

8              THE COURT:  Be seated, please.

9              (Discussion off the record.)

02:15   10     (Jury in at 2:15 p.m.)

11             THE COURT:  Mr. Jacobs, you may proceed.

12                  GOVERNMENT OPENING STATEMENT

13             MR. JACOBS:  May it please the Court, Mr. Stuart,

14      Mr. Bernhoft.

02:16   15            Ladies and gentlemen of the jury, my name is Matt

16      Jacobs.  And as I indicated at the beginning, I represent the

17      plaintiff in this case, the United States of America.  Because

18      this is a criminal case, I represent the prosecution.

19             This is my opportunity to initially address you and

02:17   20     give you some sense of what's going to happen in this trial

21      because, you know, as we tell people, you get on a jury because

22      you don't know anything about the case.  So this is my

23      opportunity to give you a roadmap, a layout of what I expect the

24      evidence in this case will establish.

02:17   25            This case is called United States vs. James A. Stuart,

1   Jr., and it involves three charges.  If I can get this done

2   right here.

3         Mr. Stuart is charged with three counts, three

4   offenses, three charges, each of which is a violation of federal

5   law.  And the specific federal law is called Title 26 of the

6   United States Code, Section 7201.  That's just a name for a

7   statute that Congress passed, but it's commonly referred to as

8   tax evasion.  And the charges in the indictment are that

9   Mr. Stuart attempted to evade the federal income taxes he owed

10  for the years 2005 through 2007.  And each one of those years is

11  a separate charge, so the three counts are 2005, 2006, and 2007.

12        The evidence I expect that you'll hear during this

13  trial will first establish some background about Mr. Stuart.

14  Mr. Stuart, during the years in question, 2005 through 2007, he

15  was married, lived in Hartland, Wisconsin.  He was the president

16  and majority owner of a company called New Age Chemical,

17  Incorporated, which was located out in Delafield, Wisconsin.

18  And as a result of working and owning part of New Age Chemical,

19  Mr. Stuart received income primarily in two forms.  He got

20  compensation from New Age Chemical as its president, but he

21  also, because he was an owner, received the profits, a portion

22  of the profits.  He was the 70 percent owner, so if the company

23  made money he received 70 percent of the profits of the company.

24        As I say, the charges concern the years 2005 through

25  2007.  But you'll hear evidence concerning Mr. Stuart's filing

1    history to give a sense of what his prior activities were prior

2    to the years that he's charged with.

3            And so we start with the years 2002 through 2004.  And

4    you'll hear that Mr. Stuart, he filed timely personal federal

02:19  5    income tax returns for himself and his wife.  He reported those

6    wages I was talking about that he was getting from New Age

7    Chemical.  You know, he got a W-2, he attached the W-2 on his

8    tax returns, he filed that, he reported that.

9            He also reported the profit, his share of the profit.

02:19  10   Or sometimes the business had a loss, he gets to report that

11   loss also.  And he did that for those years 2002, 2003, 2004.

12   He reported the income, and he paid whatever taxes he had owed

13   for those years.  And, in fact, you'll see those tax returns and

14   a summary of Mr. Stuart's prior tax history.

02:20  15           As you see here, the wages he got from New Age

16   Chemical during years '02 '03 and '04, they range from a little

17   more than $136,000 in '04 to a little more than 190,000 in '02.

18   In some of those years he had a profit or a loss from New Age

19   Chemical, and in one year he had a capital gain.  And so he had

02:20  20   taxable income in those years ranging anywhere from 66,000 to

21   more than $285,000, and he had federal tax obligations, and you

22   see it there, and he reported and paid that -- those taxes.

23           But this case concerns what happened after 2004.  And

24   so we look next at the filing history for 2005 through 2010.

02:21  25   And the conduct that forms the basis of this case began

1    approximately September of 2005, when Mr. Stuart -- he filed

2    what's called an amended tax return.  He filed an amended -- a

3    -- it's called a Form -- you know, your individual tax return,

4    that's a 1040, if you file an amended one, a replacement one,

5    it's called a 1040X.  And he filed this -- he and his wife filed

6    this, and he claimed that he was mistaken, he actually had no

7    wages in 2002 versus the 190 some-odd thousand he reported on

8    the original return.  He said because I've actually had no

9    wages, I want a refund of all of the federal income taxes that

10   had been withheld and paid for 2002.  And, in fact, I also want

11   a refund of the Medicare taxes and I want a refund of the

12   payroll taxes that I had paid in the Medicare and Social

13   Security taxes.

14          That starts, as I say, September of 2005.  Then, in

15   April of 2006, Mr. Stuart filed his 2005 tax return.  This is

16   the basis of count one.  And that again, that's a Form 1040.

17   And on this return — he only filed it for himself — he claimed

18   he had no wages; he claimed he had no income from New Age

19   Chemical; that the only income he had was $631 in interest and

20   penalties.  And, as a result, because during 2005 Mr. Stuart had

21   been getting wages paid through New Age Chemical and taxes had

22   been withheld, when he filed his tax return he said I want a

23   refund of all those taxes that have been withheld, and I also

24   want a refund of all the Medicare taxes and all the Social

25   Security taxes that were withheld for that year.

1    Later in 2006, Mr. Stuart filed amended returns for

2  the years 2003 and 2004.  Again, those Forms 1046.  And again,

3  consistent with what had happened for the 2002 tax year, he

4  claimed he had no wages — you know, contrary to the original

5  returns — "I don't have any wages, I don't have any income for

6  New Age Chemical."  And, again, all he claimed was small amounts

7  of interest or dividends for those years.  And, again, he said,

8  "So, really, I want a refund of all those withheld taxes, I want

9  a refund of all the Medicare taxes, I want a refund of all those

10 Social Security taxes."

11    You'll also hear evidence that affidavit the 2005 tax

12 year, Mr. Stuart filed no federal income tax returns for 2006 or

13 2007.  And those are the years that are the basis of the charges

14 in counts two and three of the indictment.  And he has not filed

15 federal income tax returns through the year 2010 which would

16 have been due, I guess, April of 2011.

17    So, you'll hear evidence about the IRS's response to

18 these tax returns, these amended tax returns that Mr. Stuart

19 filed.  And what you'll hear is that the IRS sent letters to

20 Mr. Stuart.

21    First, in July of 2006, they sent him a letter denying

22 his claim for a refund for those 2002 taxes.  They told him,

23 "There's no basis to allow any part of your claim.  The income

24 you received in 2002 is clearly wages and is taxable; that if

25 you want to pursue this, you have to file a claim in court."

1  Mr. Stuart responded to that and he said, "I disagree."

2  The IRS sent further correspondence to Mr. Stuart. It

3  sent him a series of letters starting in March of 2007. They

4  sent one for the 2002 amended tax return he filed, they sent one

5  for the amended 2003 tax return he filed, and they sent one for

6  the 2005 regular tax return he filed where again he claimed he

7  had no wages. And the IRS told him, "The information you're

8  supplying to us is frivolous. It has no basis in law. It's

9  been repeatedly rejected by courts as without merit. And that

10  you face the potential for criminal prosecution if you continue

11  to pursue this avenue."

12  They included with these letters a publication

13  explaining, it's called, "Why Do I Have to Pay Taxes?" And they

14  explained various arguments that people have put forth and why

15  those are baseless and why you have to pay federal income taxes.

16  Mr. Stuart responded with more correspondence of his

17  own. And there are several letters. I expect that you'll see

18  at least a few of them that Mr. Stuart sent in to the IRS.

19  He indicated that the Internal Revenue Code was too

20  complex. That he was relying on his own research. And he

21  described a dichotomy between James A. Stuart, spelled with just

22  initial capital letters, and a James A. Stuart, spelled with all

23  capital letters. He said the one without all capital letters

24  was a natural person, and the James A. Stuart, with all capital

25  letters, was a legal entity. That the James A. Stuart, with

02:24
02:24
02:25
02:25
02:25

7

1    only initial capital letters, was the trustee with no Social

2    Security number or no tax information number; whereas, the

3    capital letter James A. Stuart, that was a trust that had a

4    Social Security number.

5         He said that New Age Chemical had hired Stuart,

6    capital letters, not Stuart, small letters except for initial

7    capital letter.  He said, therefore, Stuart, with all capital

8    letters, received income, not Stuart, just one capital letter.

9    And, in fact, he cited to his support for this, English grammar

10   rules.

11        In addition, you'll see Mr. Stuart did a number of

12   actions.  Because, as I think I mentioned to you, during 2005,

13   he was being paid wages, got a W-2, they were withholding taxes,

14   the taxes were being paid over to the IRS.  So Mr. Stuart took a

15   number of actions.

16        First, in September of 2005, he changes employment

17   status from a W-2 wage earner where withholding was taken out of

18   his income, his wage payments, to an independent contractor so

19   that the payroll service that was handling payroll for New Age

20   Chemical didn't withhold any taxes from his wages and didn't pay

21   any over to the IRS.

22        Nonetheless, the payroll service, a company called

23   Payroll Data Services, you'll hear from a person who used to

24   work there, they generated a W-2 for that period of time when he

25   was getting withholding and payments as an employee, and they

8

1    generated what's called a Form 1099.  Because when you're an

2    independent contractor you get your income reported without

3    withholding reported to you on a 1099.  And those forms got sent

4    to the IRS.

5    02:27          So, in April of 2006, Mr. Stuart acted again.  And in

6    this case, he directed New Age Chemical — I think I may have

7    mentioned he was the president and a 70 percent shareholder so

8    he controlled the company.  The minority interest was owned by

9    his sister Beverly Schlipp.  He directed them to start paying

10   02:27   him directly.  Don't go through that payroll company because, as

11   I've mentioned, the payroll company generates W-2s or 1099s and

12   sends those to the IRS.

13          And as a result, the company started to pay him

14   directly with checks out of their own payroll account or their

15   02:28   operating account.  And there was no withholding for taxes for

16   the money that he was getting, and there was no W-2 generated

17   and filed with the IRS, and there was no 1099 generated and

18   filed with the IRS.

19          And then, finally, in August of 2007, Mr. Stuart

20   02:28   opened a bank account in the name of New Age Chemical Ltd.

21   Drawing Account for the Benefit of the Delafield Trust, and he

22   directed New Age Chemical not to send his payments to him in the

23   name of James A. Stuart, but to send it to him in the name of

24   this drawing account and he would deposit those into this bank

25   02:28   account he opened in the name of the trust.

9

1    Now, despite that, you'll hear that the IRS conducted

2    a search of New Age Chemical in February of 2009, and got hold

3    of the records from there.  Obtained records from the various

4    bank accounts.  And so the IRS has been able to put back

02:29  5    together the monies, the income that Mr. Stuart earned during

6    2005, 2006 and 2007.  And the evidence you'll hear will reflect

7    that in 2005, I may have mentioned, he was paid through this

8    payroll service, this Payroll Data Services is the name of the

9    company, and that all of those payments were directly deposited.

02:29  10    Now, some were paid as an employee with withholding.  It was

11    about $100,000 paid to Mr. Stuart with withholding and the W-2

12    was generated.  And, in fact, 18,000 -- little more, almost

13    $19,000 was withheld, paid over to the IRS.  But I mentioned to

14    you, he changed to an independent contractor and he received

02:29  15    another $53,000 in payments to New Age Chemical, but no

16    withholding, but a Form 1099 was sent to the IRS.

17    In addition, New Age Chemical generated a profit for

18    the year 2005, and as the 70 percent owner Mr. Stuart was

19    responsible for reporting and paying taxes on that.  And that's

02:30  20    another $94,000.

21    In 2006, you'll hear, again, he was initially paid

22    through that payroll service, direct deposits, but as an

23    independent contractor with no withholding, and he received a

24    little more than $40,000.  Again, no withholding.  But there was

02:30  25    a Form 1099 for that portion of the year.  But as I mentioned

1  earlier, the evidence will show that he then had the New Age

2  Chemical pay him directly so there would be no withholding, no

3  W-2s, no 1099, and he received more than $130,000 more for that

4  year.  And, again, no withholding, no W-2, no 1099.  And then he

5  received business income as the 70 percent owner for New Age

6  Chemical of more than $75,000.

7  In 2007, at that point Mr. Stuart was being paid

8  directly by New Age Chemical, not through a payroll date

9  service.  And he was being paid by checks.  And, in fact, he was

10  paid more than $227,000 during 2007.

11  For the first part of the year those checks were

12  issued to Stuart in his own name, and then at his direction it

13  was changed and they were paid to this New Age Chemical Ltd.

14  drawing account, another $87,000, all of which go to bank

15  accounts controlled by Mr. Stuart.  But, again, no withholding,

16  no W-2s, no 1099s and, as I had mentioned earlier, no tax

17  returns, no income reported, no taxes reported, no taxes paid.

18  Based on that evidence, you'll hear that for those

19  three years, for '05 Mr. Stuart had income in excess of

20  $230,000.  He had total taxes owed of $62,000.  And as I

21  mentioned, there was some withholding at the beginning of the

22  year, about $19,000, but obviously not nearly the taxes he owed

23  for that year.

24  In 2006 he had income of more than $245,000, he owed

25  taxes on more than $68,000, and he paid zero.

02:30
02:31
02:31
02:31
02:31
02:31

11

1        In 2007 he had income of more than $400,000, total

2   taxes of more than $126,000, and he paid zero.

3        You'll hear testimony that during this period of time

4   Mr. Stuart received advice from, was contacted by a series of

5   people.  As I mentioned earlier, the IRS sent him letters saying

6   this is baseless, this is frivolous, it's been rejected by the

7   courts, you may find yourself being criminally prosecuted if you

8   continue in this direction.  But he also received advice from

9   other third parties.

10        You'll hear from an accountant, a Patrick Walsh,

11   long-time family accountant.  He'll discuss with you that, yes,

12   Mr. Stuart was not happy with paying taxes in the years that

13   Mr. Walsh had helped prepare his individual tax returns.  And

14   that when he started down this avenue Mr. Walsh tried to

15   convince him not to do it.  Gave him articles discussing why

16   this was a problem and that he should stop it.

17        You'll hear from another accountant that Mr. Stuart

18   went to, a Daniel Hau who again tried to tell him.  I believe he

19   told him there was a special place in IRS hell for people who

20   pursue these arguments.  That didn't stop Mr. Stuart.

21        You'll hear from a woman named Allison, as I say, I

22   think her married name now is Putland.  She's an accountant by

23   education and Mr. Stuart's niece.  She'll discuss how she,

24   again, approached Mr. Stuart, tried to convince him not to do

25   this, that he was wrong, that he should pay taxes, he should

12

1    report this income.

2            You'll hear -- there'll be documents introduced that

3    he tried similar arguments with the Wisconsin Department of

4    Revenue; that he also tried to claim he had no wages for 2005;

5    that the Wisconsin Department of Revenue and their Tax Appeals

6    Commission rejected it, and; that in June of 2007, they rejected

7    Mr. Stuart's claims, told him they were groundless, frivolous,

8    and a waste of state resources.

9            Nonetheless, as I've mentioned, you'll hear that

10   Mr. Stuart didn't file tax returns for '06 and '07, filed a tax

11   return claiming essentially no income in 2005, and didn't pay

12   any taxes for '06 or '07, and, in fact, hasn't filed tax returns

13   through 2010.

14           At the end of the trial I'll have another opportunity

15   to address you, and at that time I'll indicate that the evidence

16   in this case as I've outlined there establishes that Mr. Stuart

17   had a tax due and owing for the years 2005 through 2007; that he

18   intended to evade and defeat the ascertainment, assessment,

19   computation or payment of these taxes; that he acted willfully

20   to evade the payment of these taxes and, that is, that he had a

21   voluntary and intentional violation of a known legal duty.  And

22   based upon that, I'll ask you to return verdicts of guilty

23   against Mr. Stuart.

24           Thank you.

25           THE COURT:  Mr. Bernhoft?

13

1    MR. BERNHOFT:  Thank you, Judge.

2              DEFENDANT OPENING STATEMENT

3    MR. BERNHOFT:  Your Honor.  Counsel.  Ladies and

4    gentlemen of the jury.

5    First, as I believe you already know, it's my

6    privilege to represent Jim Stuart in this federal criminal tax

7    prosecution.  And as Mr. Jacobs has talked about, this is my

8    opportunity from a defense perspective, from Mr. Stuart's

9    perspective, to survey what we believe the testimony and

10   evidence will show in this case.

11   As to certain significant categories of evidence and

12   documents, there's no dispute.  There is a dispute between the

13   prosecution and Mr. Stuart over what some of the evidence means.

14   It also bears noting that the prosecution and the

15   defense have stipulated that all of Mr. Stuart's letters,

16   correspondence with the IRS are going to come into evidence.

17   Now, only a few of these select portions of these letters will

18   be talked about in the actual trial of the case.  I expect that

19   Mr. Jacobs is going to talk to an IRS witness about certain of

20   those letters, and I'm certainly going to be talking to that IRS

21   witness about other portions of those letters.  But I wanted you

22   folks to know that all of the letters that Mr. Stuart sent to

23   the IRS and all of the IRS responses are coming into evidence,

24   and you'll be able to examine them for yourselves.

25   That said, in late 2004/early 2005, the evidence will

1      show that Jim Stuart began a tax journey.  And he began

2      researching the Internal Revenue Code and the tax law.  I

3      suspect something most of us have never had occasion or wanted

4      to do.

02:36   5          The evidence will show that he had met some people at

6      his church who were questioning whether there was an actual law

7      which made ordinary American citizens liable for the income tax

8      and required them to file the Form 1040.

9              Now, as the prosecution has already indicated,

02:37  10      Mr. Stuart had faithfully filed tax returns and paid income tax

11      all of his working life, as most of us do every year, without

12      actually knowing what specific law required it.  So the evidence

13      will show that Mr. Stuart set out to find the actual laws that

14      first made him liable for the individual income tax; second,

02:37  15      required him to file a Form 1040, and; third, and importantly

16      for this case as well, subjected the money he made from his

17      company New Age Chemical to withholding.  Those are the three

18      issues he set out to research and resolve in his own mind.

19              The evidence will show that Mr. Stuart researched

02:37  20      extensively into the Internal Revenue Code itself, the actual

21      holy book of tax law.  There's a copy on defense counsel table,

22      the big orange book there.  And also the tax regulations.  He

23      performed Internet research.  And he also read books on the

24      subject of tax law.

02:38  25              Now, in September or thereabouts in 2005, and for

15

1    several months thereafter, the evidence will show that after

2    about a year or so of doing this research Mr. Stuart directly

3    engaged the IRS by filing these 1040X amended tax returns for

4    the three previous years for which he filed 1040s.  The 1404X is

5    an IRS form which allows taxpayers to amend or correct

6    misinformation, misstatements, erroneous positions taken on 1040

7    returns.

8         And what Mr. Stuart did as well, is he filed an

9    attachment to these 1040Xs, which is another IRS form, and you

10   will see these come into evidence, and you will be able to see

11   the positions Mr. Stuart took on these forms that he sent right

12   to the IRS disclosing his position.  And that was called a

13   Form 4852, which is a mechanism to correct a defective W-2.

14        And what you'll see on these returns, these 1040X

15   returns for '02, '03, '04, and on the attachment forms, the

16   4852s, is Mr. Stuart's taking a position -- it's an

17   unconventional position -- he's taking the position that there's

18   no specific law which subjects the money he makes to withholding

19   tax.  And he files these forms directly with IRS.

20        Now, the IRS indeed responds to Mr. Stuart's letters

21   with form letters regarding these amended returns, asking for

22   more information on the amended returns and his W-2 withholding

23   position.  And he cites code sections in his Form 4852.  He

24   cites Code Section 3401 and 3121 for the proposition that the

25   money he makes is not taxable income and, therefore, not subject

1    to withholding tax.  An unconventional position, to be sure.

2         Now, also what you'll see in Mr. Stuart's letters that

3    will come into evidence, he's asking the IRS where he's wrong

4    about his legal conclusion that there's no law making him liable

5    for the tax or requiring him to file returns, and also his

6    conclusion that there's -- the money he makes from New Age

7    Chemical or otherwise is not subject to withholding.  And he's

8    asking the IRS to show him where he's wrong.  He sets forth his

9    legal positions in fairly lengthy letters and legal memorandum,

10   citing various code sections and other tax authority.

11        Now, in the IRS response letters you will ultimately

12   be the judge, and it's an important part of this case, whether

13   the IRS actually ever answers Mr. Stuart's specific questions

14   with actual real answers citing to relevant legal authority and

15   showing Mr. Stuart what section of the code makes him liable for

16   that tax and requires him to file that Form 1040.

17        I submit to you that the testimony and evidence will

18   show that the IRS never provided those sorts of specific

19   answers.  You can review the IRS letters for yourselves, and

20   you'll see some of them come into evidence in certain witnesses,

21   and you'll be able to make your own determination as to what

22   sort of letters these were.

23        Now, in early 2006, Mr. Stuart's 2005 1040 return

24   filing date is coming around.  And he timely files a 2005 1040

25   return.  And he takes the identical position, the same

17

1    consistent position with the IRS that the money he makes from

2    New Age is not taxable income subject to withholding, therefore

3    his employer shouldn't be filing a W-2, and there's no law that

4    requires him to file the return or making him liable for the

5    tax.  And this is the same consistent position that he took with

6    these 1040X amended returns.  Again, an unconventional position.

7    The evidence will show that Mr. Stuart took these positions by

8    directly engaging the IRS and disclosing his positions to

9    various service centers in Kansas City, Cincinnati, or Ogden,

10   et cetera.

11          Now, the IRS responds to his 2005 return in an

12   interesting way.  And the IRS sends several letters to

13   Mr. Stuart, and each one of these letters asks Mr. Stuart -- or

14   tells Mr. Stuart -- advises him to be fair; that the IRS needs

15   45 or 60 days more to respond to his questions so that they can

16   perform necessary research.  And that sometimes it requires

17   extensive research, they require more time, the letters are

18   saying be patient, Mr. Stuart, we're gonna do that research and

19   get back to you.

20          Now, during this period in '06 and early '07, much

21   time passes.  And after some additional letter prodding from

22   Mr. Stuart, the IRS indeed issues a form letter.  And these are

23   all form letters with form numbers on there.  And, indeed, in

24   March of 2007, they issue a letter and they tell Mr. Stuart that

25   he's frivolous.  "You're frivolous.  Your legal theories, your

1    legal conclusions, they have no merit.  There's no basis in law.

2    The federal courts have consistently rejected your positions.

3    We're not talking to you anymore about the subject."

4            And the IRS sends three such letters to him telling

5    him that he's frivolous and that they won't be responding to his

6    specific legal questions about what law makes him liable for the

7    tax, what law requires him to file the 1040, and what part of

8    the Internal Revenue Code subjects the money he makes to

9    withholding.

10           What these IRS letters do not do, again, is to answer

11   Mr. Stuart's specific questions with specific citations to legal

12   authority showing him the law.  And yes, I think it's fair to

13   say that, in a sense, Mr. Stuart was saying, you know, prove me

14   wrong, or prove me right, but answer my questions, and do it

15   with specificity.  And I think that's a fair survey of what the

16   character of these letters back and forth is.

17           Now, very interestingly, in this letter correspondence

18   — and this is important, we think — Mr. Stuart tells the IRS

19   that he stands ready to file any return required to be filed by

20   law, and to file any -- and to pay any tax that he is legally

21   liable for.  So in this letter correspondence he's asking the

22   IRS to answer these questions and, you know, "Show me where the

23   law is, and I stand ready to file the form and pay the tax."

24   And this is his engagement with IRS.  And this is what he says

25   in his letters.

19

1    Also importantly, Mr. Stuart tells the IRS -- and

2  you'll see a particular highlighted portion of a letter that I'm

3  going to query an IRS witness on, where he says, "Look, I want

4  to be clear, I'm not questioning the legality of the Internal

5  Revenue Code, I am questioning the interpretation of the code as

6  it applies to me.  I don't want to be mistaken, I don't want to

7  be misunderstood."

8    Now, after the IRS's two or three "you are frivolous"

9  letters in 2007, Mr. Stuart continues to write letters to the

10  IRS asking the IRS to resolve his refund claims and to answer

11  his specific questions.

12    Now, in 2008, some of Mr. Stuart's letters take on a

13  different character.  And the evidence will show that having

14  gotten no specific answers from IRS about what law makes him

15  liable for the tax in the first place, what law requires him to

16  file the form, et cetera, he starts doing additional research

17  trying to figure out what the heck is going on.  And he engages

18  the IRS, the system out there that seems not to be specifically

19  responding to him, and he sets forth additional legal arguments

20  regarding complex areas such as federal jurisdiction, adhesion

21  contracts, Social Security trusts, and the legal meaning of

22  names in all capital letters, which we all may have a common

23  experience that we see some of those things in certain legal

24  letters.

25    Now, again, all of these letters will be admitted into

1    evidence.  You'll be able to see them.  You'll be able to draw

2    your own conclusions about the things that I'm saying, and the

3    things that Mr. Jacobs has said, about the content of these

4    letters and what these letters mean in terms of Mr. Stuart's

5    position.

6         Now, at this point I'd like to talk to you briefly

7    about something that's crucially important in your

8    deliberations, and that's the prosecution's burden of proof

9    beyond a reasonable doubt on the all important willfulness

10   issue.  The government has the burden of proving that Mr. Stuart

11   acted intentionally.  And that means that he had to have acted

12   willfully in violation of a known legal duty.

13        And in income tax cases, most income tax cases, and in

14   this one, the court will issue a jury instruction called the

15   good faith jury instruction.  And you all may recall when the

16   entire jury pool was in here there were some questions and

17   answers about the importance of jury instructions.  And, of

18   course, you've all taken an oath to discharge your duties as

19   jurors to obey the jury instructions, the law as the court gives

20   it to you.

21        Now, there's a reason that we have jury instructions.

22   There's a reason that the court instructs on the law.  It

23   provides the jury the legal guidance.  Provides you the legal

24   guidance.  You're the judges of the facts.  You weigh the

25   evidence.  You're ultimately going to judge Mr. Stuart's intent,

1    which is the core crucial component of this case.

2              Now, what that good faith instruction says is you're

3    called upon to determine whether Mr. Stuart sincerely believed

4    what he says he did.  And it sounds simple, and it may be simple

5    in this case, but you do have to think about that.  And this is

6    a subjective determination in terms of whether Mr. Stuart

7    sincerely believed that there was no law that required him to

8    file a return, that the Internal Revenue Code had no section

9    that imposed an income tax liability on him, nor subjected the

10   money he made to the withholding tax.

11             Now, you might not agree with Mr. Stuart's beliefs.

12   You're not called upon to tender your opinion on whether you

13   agree with him or not.  You might not approve of the way he

14   tried to get his questions answered.  And whether or not you

15   approve of the way he tried to get his questions answered is,

16   frankly, irrelevant.

17             You might even think that what he did was unwise.

18   There's the old maxim of not fighting city hall, not tugging on

19   Superman's cape.  You might even think that what he did was

20   stupid from a practical perspective.  You might even think that

21   some of his ideas and his theories are kooky, but kooky ain't

22   criminal.

23             Your duty here, which you've all sworn to discharge,

24   is to judge the sincerity of Mr. Stuart's beliefs.

25   Subjectively.  Not according to what you would have thought or

1    what you would have done.  And you have a duty to put yourself

2    in Mr. Stuart's shoes and get inside of his heart and mind.  And

3    frankly, it's a fairly awesome responsibility to judge another

4    human being regarding issues of intent and what that man or

5    woman believes.  And determine from his perspective whether he

6    sincerely believed what he says he believed.

7         Now, your judgment as to the sincerity of Mr. Stuart's

8    beliefs forms the core of his case.  And if you determine that

9    he sincerely believed what he says he believed regarding his

10   obligations under the tax code, our law compels a not guilty

11   verdict on all counts.

12        Now, going back to a little bit of the historical

13   chronology, if you will.  During the entire period of three or

14   four years where Mr. Stuart is engaging the IRS with his letter

15   writing, asking his questions, the IRS is responding to him,

16   indeed Mr. Stuart is engaging directly, dealing with a number of

17   CPAs and accountants.  And you will hear -- they will testify at

18   this trial, a majority of them, and they will testify about

19   conversations they had with Mr. Stuart.  And the evidence will

20   show that, as with the IRS, Mr. Stuart was eager to discuss his

21   research, conclusions, and to ask questions of these CPAs and

22   tax professionals.

23        The evidence will show that Mr. Stuart was fairly

24   eager to talk to anybody who would listen to him about his

25   position on tax.  And I think that Mr. Jacobs' admonition and

23

1    some of the Court's comments about tapping into your own

2    personal experience, we all come from a different perspective,

3    we all think differently, but we all have experience -- whether

4    we're fathers, mothers, brothers, sons, daughters, aunts,

02:51    5    nieces, we all I think get a pretty good idea, particularly as

6    we get a little bit older, about why people do the things they

7    do.

8          And so, I would ask you to take a look at the

9    testimony and evidence in this case from that perspective, that

02:51    10    human perspective, and ask yourself, what does a garden variety

11    tax cheat do?  You know, does a garden variety tax cheat who

12    wants to cheat the IRS out of money, does he start writing

13    letters to the secretary of the Treasury, the Commissioner of

14    IRS, the Ogden, Cincinnati and Kansas City Service Centers?  And

02:52    15    essentially putting a target on his back, and on his front, and

16    on his forehead for that matter, for special IRS attention which

17    he ultimately got.

18          And I think that bears, your common experience about

19    why people do what they do, and then you examine what Mr. Stuart

02:52    20    did and his engagement with the IRS in determining whether he

21    really believed what he says he believed.

22          Now, these CPAs and accountants will testify.  I think

23    you might be surprised by some of the testimony.  And as with

24    all the evidence in the case I would invite and implore you to

02:52    25    pay close attention to the testimony from these CPAs and

1    accountants who will relate their conversations with Mr. Stuart

2    and what advice they may or may not have given him.

3        You will also hear testimony from Beverly Schlipp.

4    This is Mr. Stuart's sister.  She owns about 30 percent of the

5    New Age Chemical Corporation.  She's a minority owner.  This is

6    the company that Jim and Beverly's father started many decades

7    ago.  Mr. Stuart joined his father early on.  The evidence will

8    show that together they made New Age Chemical a successful

9    entrepreneurial company.  And they manufactured and sold

10    specialty lubricating oils and rust inhibitors to small machine

11    shops and tool and die companies.  Now, Beverly Schlipp came on

12    later, after her father's death, and she has served as the

13    company's controller, keeping all the books and records of the

14    company.

15        You are going to hear testimony from Allison Reese.

16    This is Beverly Schlipp's daughter, Mr. Stuart's niece, one of

17    his nieces.  And you're gonna hear how she was concerned that

18    Mr. Stuart's beliefs and his conduct might negatively impact her

19    mother, Beverly Schlipp, her employment, or even harm the

20    company.

21        You will also hear testimony that Mr. Stuart did not

22    file 1040 returns after 2005.  And he directed the company to

23    pay him through draw checks, straw accounts and other checks so

24    that withholding taxes would not be taken out.

25        One thing that I believe is important as you hear the

1   testimony and evidence and deliberate on it, is that all of

2   these transactions, all of these checks, whether they were

3   paychecks that had withholding taxes taken out, or a draw check

4   to a shareholder in a company -- which, by the way, there's

5   nothing per se wrong with taking a draw check -- and other

6   mechanisms of payment to his trust, the Delafield trust, these

7   were all recorded in the books and records of New Age Chemical.

8   And you'll hear some of the CPAs talk about how Beverly Schlipp

9   was a scrupulous bookkeeper and set forth all of these checks

10  and all of these payments in the internal books and records of

11  New Age Chemical.  And you will hear no evidence whatsoever,

12  because there isn't any, that Mr. Stuart ever tried to inhibit

13  or preclude or stop or alter Mrs. Schlipp from entering all of

14  these payments to him in the books and records of the company.

15        You will also hear some testimony from the CPAs that

16  in spite of the fact that Mr. Stuart took this unconventional

17  position, that his money wasn't subject to withholding tax, he

18  allowed and gave his employees at New Age the choice as to

19  whether they wanted to continue to have withholding taxes taken

20  from their checks.  He did not try and force his beliefs and

21  will on them, and, in fact, you'll hear testimony that indeed

22  New Age Chemical continues to withhold taxes and pay those taxes

23  over to any employee at New Age who wants that done.

24        Now, in closing -- and again, I'll have an opportunity

25  to speak to you again in closing argument after the prosecution

1    and Mr. Jacobs gives his closing argument after the close of all

2    the evidence and testimony in this case, and talk further about

3    what actually comes out here in this trial, the actual testimony

4    of these witnesses and the actual documents.  And it's your

5    obligation to determine whether Stuart did this to try and cheat

6    the IRS out of money, or because he sincerely believed the law

7    didn't make him liable for the tax and didn't require them to

8    file the form.  This is the core issue in the case.

9            At the close of all evidence and after you've

10   completed conscientious and considered deliberations, I have

11   confidence that you will return the only verdict supported by

12   the evidence — not guilty on all counts.

13           I thank you for your attention.  Thank you.

14           THE COURT:  We will take a short break at this time.

15           (Jury out at 2:56 p.m.)

16           THE COURT:  We'll take a short break.  Counsel, you

17   may work with the staff.

18           MR. BERNHOFT:  Thank you.

19           (Recess taken at 2:57 p.m., until 3:10 p.m.)

20           THE COURT:  Before the jury comes in, I'm curious

21   whether or not there is any need for sequestration of witnesses.

22           MR. BERNHOFT:  The defense moves to sequester, Your

23   Honor.  I'm sorry, I should have done that.

24           MR. JACOBS:  And, Judge, I would like a couple

25   exceptions.  One would be the case agent.

1    THE COURT:  That request is granted.  That is

2  standard.

3    MR. JACOBS:  And one would be the summary witness

4  Revenue Agent Kathleen Bashaw who will be testifying at the end

03:10  5  summarizing her tax calculations based on the evidence that

6  comes in at trial.

7    THE COURT:  Counsel?

8    MR. BERNHOFT:  No objection, Judge.

9    THE COURT:  Very well.  Those exceptions are noted.

03:11  10  Please instruct your witnesses appropriately so that they do not

11  communicate with each other respecting their testimony.

12    All right, are we ready to proceed?

13    MR. JACOBS:  Judge, if I've understood it correctly, I

14  think Mr. Bernhoft -- do I understand this right?  -- he's going

03:11  15  to be questioning the witnesses from --

16    MR. BERNHOFT:  A standing position right behind the

17  Elmo machine.

18    THE COURT:  Correct.

19    MR. BERNHOFT:  Back to the window.

03:11  20    THE COURT:  Yes.

21    MR. BERNHOFT:  And Mr. Tollefson will be sitting at

22  counsel table assisting with documents as necessary?

23    THE COURT:  Yes.

24    MR. JACOBS:  Okay.  The reason I ask that, Judge, in

03:11  25  lieu of -- in view of that, I should say, is it possible that I

1    can then question from here?  You know, we're at this position

2    where we're all at this corner.  And at least at this point we

3    don't have a cable hooked up here to bring a laptop up to here

4    to work from here.

5    03:11        THE COURT:  All right, fine.  If it becomes an issue

6    it will be noted.  I will inquire of the jury whether or not

7    it's problematic.

8            MR. JACOBS:  Okay.

9            THE COURT:  All right.  Bring in the jury, please.

10   03:12        (Jury in at 3:12 p.m.)

11           THE COURT:  You may call your first witness.

12           MR. JACOBS:  Judge, for our first witness the United

13   States calls Kristy Morgan.

14           Ms. Morgan, if you would step up to the witness

15   03:13   stands, remain standing and be placed under oath.

16           THE REPORTER:  Raise your right hand, please.

17           KRISTY MORGAN, GOVERNMENT WITNESS, SWORN

18           THE REPORTER:  Please state your name and spell your

19   name for the record.

20   03:13        THE WITNESS:  Kristy Morgan.  K R I S T Y.

21   M O R G A N.

22                      DIRECT EXAMINATION

23   BY MR. JACOBS:

24   Q.  Good afternoon, Ms. Morgan.

25   03:13   A.  Good afternoon.

1    Q.  Ms. Morgan, in what city do you live?

2    A.  I live in Ogden, Utah.

3    Q.  How long have you lived in Ogden?

4    A.  My entire life.

03:13   5    Q.  And are you employed?

6    A.  Yes, I am.

7    Q.  How are you employed?

8    A.  I'm employed with the Internal Revenue Service.

9    Q.  How long have you worked for the Internal Revenue Service?

03:13   10   A.  For 27 years.

11   Q.  And has that always been out in Ogden, Utah?

12   A.  Yes.  My employment has always been in Ogden.

13   Q.  And what is your current position with the IRS?

14   A.  I am the court witness coordinator in criminal

03:14   15   investigations for the Ogden campus.

16   Q.  How long have you had that position?

17   A.  I was selected as the coordinator approximately a year ago.

18   I have served on the cadre as a witness for 10 years.

19   Q.  Would you explain to the jury what your responsibilities are

03:14   20   as -- in your current position?

21   A.  As the coordinator I secure documents and records that are

22   maintained by the IRS for the agents and attorneys as we prep

23   for trial.  I certify those documents and then testify regarding

24   the documents as a custodian of record on behalf of the

03:14   25   Commissioner.

30

1    Q.  That's the Commissioner of the IRS?

2    A.  Correct.

3    Q.  Have you ever testified before?

4    A.  Yes, I have.

5    Q.  About how many times?

6    A.  Over 60 trials.

7    Q.  I'd like to show you a series of documents.  First I'm going

8    to start with what have been marked as Exhibits 1, 2 and 3.

9    A.  Thank you.

10   Q.  Ms. Morgan, you do recognize what those three exhibits are?

11   A.  Yes, I do.

12   Q.  What are they?

13   A.  These are Form 1040s for tax years 2002, 2003, and 2004,

14   filed by James and Marjorie Stuart.  All three years for James

15   and Marjorie.

16   Q.  Okay.

17           Your Honor, I'd move into evidence Exhibits 1, 2

18   and 3.

19           THE COURT:  Is there any objection?

20           MR. BERNHOFT:  None, Your Honor.

21           THE COURT:  They're received.

22           (Exhibits 1, 2 and 3 offered and received.)

23           MR. JACOBS:  Judge, do I be permitted to publish

24   exhibits to the jury once they're admitted?

25           THE COURT:  Yes, proceed.

Case 2:10-cr-00288-CNC   Filed 12/08/11   Page 31 of 64   Document 60

1   BY MR. JACOBS:

2   Q.  Again, Ms. Morgan, do you also have a monitor in front of

3   you?

4   A.  Yes.

5               THE COURT:  One second.  You have an arrow on the

6   screen.  I'm not sure whether that's from the Elmo or something

7   else.

8               MR. JACOBS:  That's weird.  I don't have it on my

9   laptop.

10              THE COURT:  Hopefully it's not too much of a

11  distraction.  I see it on mine.  And I see it on the clerk's

12  screen as well.

13              MR. JACOBS:  I assume that -- I don't know what that

14  is.

15              THE COURT:  We'll deal with it later.

16              MR. JACOBS:  Thanks.  I don't know what that is.

17  BY MR. JACOBS:

18  Q.  All right.  Except for the white arrow, is what's on that

19  display screen the same document you're looking at?

20  A.  Yes, it is.

21  Q.  I'm just going to try to highlight a portion of that to make

22  it a little easier to view parts of it.  And can you tell me,

23  what filing status was used by Mr. and Mrs. Stuart for this 2002

24  tax return, Exhibit 1?

25  A.  They were married filing jointly.

1    Q.  And is that the same with respect to returns filed for 3

2    and 4?

3    A.  Yes, that's correct.

4    Q.  Let me show you next what's been marked for identification

5    as Exhibit 4.  Do you recognize what that exhibit is?

6    A.  Yes, I do.

7    Q.  Now, what is that?

8    A.  This is the 2005 1040 filing for James A. Stuart.

9             MR. JACOBS:  I move into evidence Exhibit 4, Your

10   Honor.

11            MR. BERNHOFT:  No objection, Judge.

12            THE COURT:  Received.

13            (Exhibit 4 offered and received.)

14   BY MR. JACOBS:

15   Q.  And, first of all, with respect to that exhibit, what's the

16   filing status on that exhibit?

17   A.  This is married filing separately.

18   Q.  Just bear with me one second.  I'm sorry.

19            Now, do you know, Ms. Morgan, if any individual tax

20   returns were filed by Mr. Stuart for the years 2006, 2007, 2008,

21   and 2009 and 2010?

22   A.  There was no tax returns filed.

23   Q.  And let me next hand you what have been marked for

24   identification as Exhibits 5 through 10.  I guess they're in

25   reverse.  I have them in reverse order there.  But would you

1  review those and then I'll ask you a couple of questions.

2  (Witness peruses documents.)

3  A.  Okay.  I've reviewed those.

4  BY MR. JACOBS:

5  Q.  Can you describe, what are Exhibits 5 through 10?

6  A.  They are Form 1120S's, filed for the New Age Chemical, Inc.

7  company, for 2001, 2, 3, 2004, 5, and 2006.

8  MR. JACOBS:  Judge, I'd move into evidence Exhibits 5,

9  6, 7, 8, 9, and 10.

10  MR. BERNHOFT:  No objection.

11  THE COURT:  Each is received.

12  (Exhibits 5-10 offered and received.)

13  BY MR. JACOBS:

14  Q.  Now, going pack to the individual returns that were filed

15  for Mr. Stuart, can you tell me, did Mr. Stuart, for the years

16  2002, 3 and 4, report any income?

17  A.  Yes, he did.

18  Q.  Can you describe what type of income he reported?

19  A.  On all three of the returns filed there was wages.  There

20  was interest that was reported.  There was capital gains on one

21  year.  There was also either an income or loss from a

22  partnership.

23  Q.  How about for the tax return filed for the year 2005?  I

24  guess that's Exhibit 4.

25  A.  On Exhibit 4 there was shown some interest and some

1    dividends, I believe.  Yes.  Dividends.

2    Q.  Any wages?

3    A.  No wages were reported, no.

4    Q.  So is -- on the monitor there in front of you, is that that

5    2005 return filed by Mr. Stuart individually?

6    A.  Yes, it is.

7    Q.  And I think you said by way of income there's -- well,

8    that's probably not very helpful.

9         No wages.  Just taxable interest, dividends.  About

10   $631.

11   A.  That's correct.

12   Q.  Now, turning to the New Age Chemical forms, you said what

13   form is that?

14   A.  It's a Form 1120S.

15   Q.  And what is that?

16   A.  An 1120S is an information return filed by the corporation.

17   It shows the income and any deductions.  And then this

18   information that's reported on the return would flow to the

19   shareholders' tax returns.

20   Q.  That is, this New Age Chemical, Inc., does it pay taxes

21   itself?

22   A.  No.  That flows to the responsibility of the shareholders.

23   Q.  Is that -- let me strike that.

24        Now, I notice this form, this Exhibit 5, it says it's

25   for the year -- I'm sorry, what year is this for?

1  A.  It shows on the filing for a time between October 1st, 2001

2  to September 30th of 2002.

3  Q.  Now, why is that?

4  A.  Some of the companies file what is called a fiscal year.  It

5  depends on when their business starts up and when they finalize

6  that year.

7  Q.  Okay.  And what fiscal year would you call this then?

8  A.  It's basically reported for the 2002 tax year.  Because of

9  the time ending in September of 2002.

10  Q.  But I notice the form says 2001, why is that?

11  A.  The forms for 2002 would not be available through the IRS at

12  this point.

13  Q.  Then for the fiscal year ending in September 2002, did New

14  Age Chemical report having any income that year?

15  A.  Yes.  They show gross receipts, yes.

16  Q.  And would someone have to report that income and pay taxes

17  on it?

18  A.  Yes.

19  Q.  And who would that have been?

20  A.  That would be the shareholders that's identified on the

21  K-1s.

22  Q.  Okay.  And does that reflect somewhere in this tax return?

23  A.  That should be attached to the tax return.  They would file

24  showing who is the owners or the shareholders from this

25  corporation.

1    Q.  Okay.  Just bear with me one second.

2         I'd like to turn your attention just to Exhibit 9.  Do

3    you have Exhibit 9 there?

4    A.  I do.

03:26  5    Q.  And I bring it up on the screen, and can you describe for

6    the jury what Exhibit 9 is?

7    A.  This is the 1120S for New Age Chemical for the filing season

8    ending 2006-09.

9    Q.  I'm sorry, ending when?  I'm sorry.

03:26  10   A.  2006-09.

11   Q.  I'm sorry, so that's like the September of 2006?

12   A.  Right.  That's when it was filed.

13   Q.  And did New Age Chemical make any profit or income that

14   year?

03:26  15   A.  Yes.  They show a business income.  $107,998.

16   Q.  That's this entry here on line 21?

17   A.  That's correct.

18   Q.  I see.  And again, did New Age Chemical have to pay taxes on

19   this income?

03:26  20   A.  No.  It would flow to the shareholders.

21   Q.  And does the return indicate who those shareholders are?

22   A.  The K-1s attached should identify who the shareholders are.

23   Q.  Okay.  And we'll get -- do you find that document?

24   A.  Yes.  It's towards the end of the exhibit.

03:27  25   Q.  Okay.

1   A.  And one of the shareholders is Beverly Schlipp.

2   Q.  Okay.  And I think that must be the form I have here up on

3   the screen; is that right?

4   A.  That is correct.  Yes.

03:27  5   Q.  Okay.  And how much income did she have to report and pay

6   taxes on?

7   A.  On item 1, ordinary business income, her tax return should

8   show $32,068.

9   Q.  And I think you mentioned the company made a little over

03:27  10  $100,000, how come she's only reporting $32,000?

11  A.  Because on the K-1 she's identified as owning a little over

12  29 percent of the company.

13  Q.  Okay.  Now, this form, you keep calling it a K-1, can you

14  explain to the jury what is a K-1?

03:28  15  A.  That's an actual schedule that is used to identify

16  shareholders in partnerships or in corporations.  It's filed

17  with the tax return for records with the IRS.

18  Q.  Are there any other K-1s associated with this tax return for

19  New Age Chemical for the fiscal year ending September 30 of

03:28  20  2006?

21  A.  Yes.  There is another K-1 attached.

22  Q.  Let's see.  Going the right way or not.  All right.  Here we

23  go.  All right.  And who is the other shareholder?

24  A.  That is James A. Stuart, owing over 70 percent of the

03:28  25  company.

38

1    Q.   That's this entry in Box H?

2    A.   Correct.

3    Q.   Okay.  And how much income is he supposed to report?

4    A.   On ordinary business income, $75,930.

5    Q.   Okay.  Now, you say this -- what period of time did this tax

6    return pertain to?

7    A.   It's the period ending September 30th of 2006.

8    Q.   Now, when an individual files their tax return what period

9    do they cover?

10   A.   Usually it's from January 1st through December 31st of the

11   tax year.

12   Q.   So when would Mr. Stuart have to report this income?

13   A.   This amount should be on his 2006 tax return.

14   Q.   And when would that have been due?

15   A.   It would have been due April 15th of 2007.

16   Q.   I suppose unless that's a Sunday or something.

17   A.   Right.  Right.

18   Q.   Okay.  I'd like to show you next what have been marked for

19   identification as Exhibit --

20        Oh, by the way, do you know -- I think you mentioned

21   you have New Age Chemical tax returns for the years -- fiscal

22   years ending in 2002 through 2000 -- what's the last year you

23   have a tax return for for New Age Chemical?

24   A.   2007-09.

25   Q.   So ending September 30th of 2007?

39

1    A.   Correct.

2    Q.   Okay.  Do you know, did New Age Chemical file any tax

3    returns for later years, 2008, 2009, 2010?

4    A.   No, there was no returns filed.

5    Q.   And did you also look for -- now, this is New Age Chemical,

6    Inc. or Incorporated; is that right?

7    A.   Correct.

8    Q.   Did you also look for an entity called New Age Chemical

9    Limited or Ltd?

10   A.   Yes, I did.

11   Q.   And did that entity file any tax returns for the years 2008,

12   2009, or 2010?

13   A.   No.  The records show there was no returns filed.

14   Q.   Let me show you next what have been marked for

15   identification as Exhibits 16 and 17.

16              (Witness peruses document.)

17   BY MR. JACOBS:

18   Q.   Do you recognize what those two exhibits are, Ms. Morgan?

19   A.   Yes, I do.

20   Q.   What are those?

21   A.   This is a spreadsheet that's showing the filing history,

22   Exhibit Number 16, for James A. Stuart, for years 2002 through

23   2010.

24   Q.   Okay.

25   A.   Exhibit 17 is the filing history for New Age Chemical, a

1    spreadsheet also, for filing years 2002 through 2010.

2    Q.  Now, with respect to Exhibit 16, the one for Mr. Stuart,

3    does that summary accurately summarize information obtained from

4    the tax returns Mr. Stuart filed for the years reflected on the

5    summary or that he didn't file any at all?

6    A.  Yes.  This is correct.  I checked them to the tax returns.

7            MR. JACOBS:  Your Honor, I move into evidence

8    Exhibit 16.

9            THE COURT:  Is there any objection?

10           MR. BERNHOFT:  None, Your Honor.

11           THE COURT:  Received.

12           (Exhibit 16 offered and received.)

13   BY MR. JACOBS:

14   Q.  And Exhibit 17, what's that?

15   A.  17 is the filing history for New Age Chemical for the tax

16   returns filed from 2002 through 2010.

17   Q.  And again, have you confirmed that that summary accurately

18   summarized the information on the tax returns?

19   A.  Yes, I reviewed the tax returns and this is correct.

20   Q.  Okay.  So let's first turn to Exhibit 16, see if I can just

21   focus in.  Got the wrong thing on there, obviously.

22           Let's look at the years 2002 through 2005.  And would

23   you just run down the column and explain to the jury the

24   information that's summarized in -- I guess it's actually the

25   second column of Exhibit 16?

1    A.   For the 2002 tax year?

2    Q.   Yes, please.

3    A.   The first column shows that the return was filed.  That the

4    filing joint status was used on that tax return.  There was a

5    tax preparer by the last name of Kippenhan.  It was signed by

6    both Mr. Stuart and his wife.  The wages reported on that tax

7    return was $190,275.  There was a income from NAC, which is New

8    Age Chemical, for $126,710.  No capital gains that year.

9    Finally, the adjusted gross income reported on the tax return

10   was $272,674.  Computing the taxable income of $248,299.  And

11   the self-assessment tax made by Mr. Stuart was $68,718.

12   Q.   So again, like you say, it's self-assessment.  This all

13   comes from the tax returns Mr. Stuart filed.

14   A.   Correct.

15   Q.   And then the full document itself extends for the later

16   years, 2006 through 2010.  And I gather there's just no

17   information for those years?

18   A.   That's correct.  There was no returns filed.

19   Q.   Okay.  Now, similarly, if we turn to Exhibit 17, and we'll

20   focus on -- this is fiscal year ending, so September of the

21   years indicated.  Would you just run through what's in column

22   for 2002?

23          MR. BERNHOFT:  Your Honor, I must point out that 17

24   hasn't been moved in.

25          MR. JACOBS:  Oh, my --

1    THE COURT:  That's correct.

2    MR. JACOBS:  I'm sorry.  Your Honor, I move into

3  evidence Exhibit 17.

4    THE COURT:  Is there any objection?

03:35  5    MR. BERNHOFT:  None, Your Honor.

6    THE COURT:  It's now received.

7    (Exhibit 17 offered and received.)

8    THE COURT:  You may proceed.

9  BY MR. JACOBS:

03:35  10  Q.  Do you see the 2002 column?

11  A.  Yes, I do.

12  Q.  Run through with the jury the information reflected on that

13  column for 2002.

14  A.  It shows a Form 1120S was filed by the corporation.  The

03:35  15  preparer was Clifton Gunderson.  It's signed by a person with

16  last name of Schlipp.  The gross receipts for the company was

17  $1,368,591.  Officer compensation paid was $119,975.  The

18  business income was $180,224.  Shows on the K-1, the partnership

19  owned by Mr. Stuart, was 70.3 percent.  And the income per the

03:35  20  K-1 was $126,710.

21  Q.  Okay.  And I gather you summarized the information for all

22  of the returns through the one filed in '07.

23  A.  Correct.

24  Q.  Okay.  And again, none filed for the years 2008 through

03:36  25  2010.

43

1    A.   That's correct.

2    Q.   Okay.  I would next like to show you what have been marked

3    for identification as Exhibits 12, 13, and 14.  Do you recognize

4    what each of those exhibits is, Ms. Morgan?

03:36   5    A.   Yes.  Yes.

6    Q.   And what are each of Exhibits 12, 13 and 14?

7    A.   These are amended returns filed on a Form 1040X for James

8    and Marjorie Stuart for the tax years 2002, 2003, and 2004.

9         MR. JACOBS:  Your Honor, I'd move into evidence

03:37   10   Exhibits 12, 13, and 14.

11        MR. BERNHOFT:  No objection, Your Honor.

12        THE COURT:  They're received.

13        (Exhibits 12, 13, and 14 offered and received.)

14        MR. JACOBS:  Bear with me one second.  I'll bring that

03:37   15   up.

16   BY MR. JACOBS:

17   Q.   Ms. Morgan, let's just take a look first at Exhibit 12.  If

18   you have that in front of you?

19   A.   I do.

03:38   20   Q.   Can you describe what this document is?

21   A.   The 1040X is a claim usually for a refund or a changing of

22   your tax information previously filed.  So this actual claim is

23   changing the amount of income, reducing it down and requesting a

24   refund of taxes previously paid.

03:38   25   Q.   For what period of time does this particular return pertain

1  to?

2  A.  This is for the 2002 tax year.

3  Q.  And can you explain the amendment or the change proposed by

4  this filing?

03:38  5  A.  On the second page of the return the preparer has actually

6  asked for us to look at a document that's attached, and it's a

7  Form 4852, which is a substitute for a W-2, or to correct W-2

8  information.  And according to this there was no wages actually

9  earned.  However, there is a reporting of federal income tax

03:39  10  that is still being reported.  And so they're adjusting that tax

11  return based on that form that they filed.

12  Q.  Now, do you have the 2002 tax return up there, Exhibit 1?

13  A.  I do.

14  Q.  And does it indicate the amount of taxes that were withheld

03:39  15  for 2002 for Mr. and Mrs. Stuart?

16  A.  According to the tax return, the federal income tax withheld

17  was $26,431.

18  Q.  Okay.  And so is that the money that this form, this 1040X

19  seeks to have refunded?

03:40  20  A.  That, plus some additional amounts, yes.

21  Q.  Okay.  And can you tell what those additional amounts are?

22  A.  According to the attachments it does not show what the

23  additional amount is.

24  Q.  What's the total refund sought by this amended tax return

03:40  25  for 2002?

1    A.   The taxpayer is asking for $68,543 to be refunded.

2    Q.   And how about -- and do you know when this return was filed

3    with the IRS?

4    A.   It was signed September 17th, 2005, by the taxpayer.

03:40    5    Q.   And if we turn to Exhibit 13, what is Exhibit 13?

6    A.   13 is also a claim, an amended return for the 2003 tax year,

7    filed by the taxpayer, James and Marjorie Stuart.

8    Q.   And what's the amendment or change proposed by this amended

9    tax return?

03:41    10   A.   Also, again, they're reducing their income from 377,213 down

11   to I believe it's $1,456.

12   Q.   And as a result of that change what does this return seek?

13   A.   It's seeking a refund for $62,745.

14   Q.   And is there also supporting documents for this amended

03:41    15   return?

16   A.   Yes, there is.

17   Q.   And what are those documents?

18   A.   Once again, it's the 4852, showing that the W-2 information

19   was incorrect.  There's also attached a handwritten -- it's a

03:41    20   1099 Miscellaneous from New Age Chemical.

21   Q.   And finally, Exhibit 14, what is Exhibit 14?

22   A.   This is a 2004 claim filed by James and Marjorie Stuart,

23   again reducing their income, requesting a refund.

24   Q.   And what's the change that's proposed by this filing?

03:42    25   A.   They're reducing their adjusted gross income from $96,872

1   down to $619.

2   Q.   And as a result of that change what does this amended tax

3   return propose?

4   A.   They're requesting a refund of $17,165.

03:42   5   Q.   Now, what tax year does this return pertain to?

6   A.   2004.

7   Q.   And how about Exhibit 13, what tax year was that?

8   A.   That was concerning the 2003 tax year.  Return year.

9   Q.   When were these amended tax returns filed, the 2003 and 2004

03:43   10  tax returns?

11  A.   2003 was signed September 16th, '06, received at the IRS

12  September of 2006.  The 2004 was signed September 18th, '06, and

13  received at the Internal Revenue Service September 22nd, '06.

14  Q.   Now, do you know if the IRS responded to any of these

03:43   15  filings, these amended tax returns?

16  A.   Yes, they did.

17  Q.   And I'd like to hand you what's been marked for

18  identification as Exhibit 27.  Ms. Morgan, do you recognize what

19  Exhibit 27 is?

03:44   20  A.   Yes, I do.

21  Q.   What is that?

22  A.   This is a letter from the Internal Revenue Service to James

23  and Marjorie Stuart.  It's from the Appeals Team regarding a

24  claim that they received.

03:44   25  Q.   Okay.  And what's the date of that letter?

47

1    A.   July 27th, 2006.

2    Q.   And do you know what claim it refers to or pertains to?

3    A.   The letter stating it's regarding the 2002 claim that was

4    filed.

5    Q.   That is the amended tax return?

6    A.   Yes.

7    Q.   I see.

8            Your Honor, I'd move into evidence Exhibit 27.

9            MR. BERNHOFT:  No objection, Your Honor.

10           THE COURT:  It's received.

11           (Exhibit 27 offered and received.)

12   BY MR. JACOBS:

13   Q.   What's the essence of the letter?

14   A.   Basically, it's saying that we received your claim for

15   refund, and there's no basis in law to any part of your claim

16   that; that your wages are clearly taxable, and the Appeals

17   Office is not going to entertain any arguments of this type.

18   Q.   Now, does it tell the taxpayer or tell Mr. and Mrs. Stuart

19   what to do if they disagree with the IRS?

20   A.   Yes, it tells them in the third paragraph that you can file

21   suit, either in the District Court or the United States Federal

22   Claims.

23   Q.   Do you know if the IRS responded to any of the other amended

24   tax returns filed by Mr. Stuart?

25   A.   Yes, they did.

1    Q.   And do you know, did they respond to also his 2005 tax

2    return where he just reported interest and dividends?

3    A.   Yes, they did.

4    Q.   And in that regard let me hand you what have been marked for

5    identification as Exhibits 34, 37, and 40.

6              (Witness peruses documents.)

7    BY MR. JACOBS:

8    Q.   Ms. Morgan, you recognize what each of those exhibits is?

9    A.   Yes, you do.

10   Q.   Could you describe generically what each of them is?

11   A.   This is a letter called the 3176C, letter sent to James A.

12   Stuart for the 2005 year, to James and Marjorie Stuart for the

13   2003, and to James and Marjorie Stuart for the 2002 tax years.

14   Q.   I gather for the 2002 and 2003, do they pertain to those

15   amended returns?

16   A.   Yes, they do.

17   Q.   But the 2005, does that pertain to the initial return?

18   A.   The actual 1040, yes.

19             MR. JACOBS:  Your Honor, I'd move into evidence

20   Exhibits 34, 37, and 40.

21             MR. BERNHOFT:  No objection, Judge.

22             THE COURT:  They're received.

23             (Exhibits 34, 37 and 40 offered and received.)

24   BY MR. JACOBS:

25   Q.   And is the substance of the letters essentially the same?

49

1   A.   Yeah.  All three of the letters say approximately the same

2   thing.

3   Q.   And are you familiar with this letter?

4   A.   Yes, I am.

5   Q.   How are you familiar with it?

6   A.   I worked in the Frivolous Filer Department for 10 years as

7   the penalty coordinator.  I was actually on the team that

8   developed the letter to put the taxpayers on notice of the types

9   of returns they're filing and what the consequences could be.

10  Q.   So let's look at Exhibit 40.  Do you have that one?

11  A.   I do.

12  Q.   And what filing does Exhibit 40 pertain to?

13  A.   This is -- according to this letter it's for the 2005 1040

14  that was filed by Mr. Stuart.

15  Q.   And when did this letter go out?

16  A.   The letter is dated June 8, 2007.

17  Q.   Just going to enlarge the -- by the way, how many pages are

18  in that letter?

19  A.   This letter is actually a four-page document.

20  Q.   And what does the letter tell Mr. Stuart about -- this

21  pertains I think you said to the 2005 tax return?

22  A.   That's correct.

23  Q.   What does it tell Mr. Stuart?

24  A.   It informs him that the tax return he has filed is frivolous

25  and can be subject to a penalty.  It informs him of the

1   consequences about filing these types of returns.  Advises him

2   that people who violate tax laws may be subject to federal and

3   criminal prosecution and maybe even imprisonment.  And also

4   tells him to seek competent counsel as far as a tax attorney if

5   he has questions regarding the tax laws.  It includes a

6   Publication 105 that also goes into more detail about your

7   requirements to file a tax return.

8   Q.  Now, the first paragraph, just look at that first paragraph.

9   I notice that it indicates that the IRS isn't going to respond

10  to future correspondence concerning these issues.

11  A.  That's correct.

12  Q.  Why is that?

13  A.  Because of the tax dollars it takes to communicate back and

14  forth with someone that keeps the same attitude as far as filing

15  these types of returns.  It's very costly.  They've been put on

16  notice and then we go forward with our enforcement actions.  We

17  don't communicate back and forth and discuss tax laws.  That's

18  not part of the IRS's requirement to discuss tax laws, it's to

19  process tax returns.

20  Q.  Do you know in a given year how many tax returns does the

21  IRS have to process?

22  A.  I did some research and in the 2008 tax year the IRS

23  received 142.5 million individual income tax returns for that

24  year alone.  Just individual.  Not business, not claims.

25  Q.  Now, I gather, you say this went to Mr. Stuart, that's the

1    same address that's on the other tax returns?

2    A.  Yes, it is.

3    Q.  Okay.  And you mentioned -- did anything come with this

4    letter?

03:50    5    A.  Yes.  There's a publication, it's called, "Why Do I Have to

6    Pay Taxes?"  Publication 2105.

7    Q.  And was that included with the letters that are in

8    Exhibit 34 and 37 as well?

9    A.  Yes.  It's a requirement with this letter.

03:51   10    Q.  And let me hand you what's been marked for identification as

11    Exhibit -- I have 18A, 18B, and 18C.  Do you recognize what

12    those three exhibits are?

13    A.  Yes, I do.

14    Q.  And are they essentially the same thing?

03:51   15    A.  They are.

16    Q.  And can you describe generically what they are?

17    A.  Yes.  It's the Publication 2105, "Why Do I Have to Pay

18    Taxes?"  Each one has a different revision year.  We'll update

19    the publications every now and again.  It just depends on what

03:52   20    the tax laws are whether the publications are updated.

21    Q.  Would one of these versions have been included with the

22    letters going out to Mr. Stuart?

23    A.  Yes, they would.

24          MR. JACOBS:  Your Honor, I move into evidence

03:52   25    Exhibits 18A, B and C.

52

1          MR. BERNHOFT:  No objection, Your Honor.

2          THE COURT:  They're received.

3          (Exhibits 18A-C offered and received.)

4    BY MR. JACOBS:

5    Q.  Could you describe the substance of that publication.

6    A.  Each one of the publications basically states some of the

7    common arguments that are frivolous that are used on tax returns

8    received by the taxpayers.

9          It also gives the truth about what taxes truly are.

10   It actually goes into some websites, refers the taxpayers to the

11   websites where they can research and find out for themselves

12   different positions the IRS have and also gives them court cases

13   that they can look at.

14   Q.  Now, do you know, did the IRS receive correspondence back

15   from Mr. Stuart?

16   A.  Yes, he responded back.

17   Q.  Is it fair to say the IRS received several letters back from

18   Mr. Stuart?

19   A.  That is correct.

20         THE COURT:  Please approach.

21         (At side bar on the record.)

22         THE COURT:  I note the witness has testified several

23   times respecting arguments that the IRS deems frivolous and that

24   there has been no objection.  And I assume that's a tactical

25   decision; however, I would certainly request that you speak with

1    the witness before continuing so that she does not offer

2    opinions respecting such matters at this point in time.

3              MR. JACOBS:  I think that's what the letter says.

4    She's reading from the letter that that's what it says.

5              THE COURT:  That should be clear.

6              MR. JACOBS:  It's not her opinion, it's just that the

7    publication states that.

8              THE COURT:  Correct.  Thank you.

9              (End of discussion at side bar.)

10   BY MR. JACOBS:

11   Q.  Ms. Morgan, I just want to make one thing --

12             THE COURT:  One second, please.

13             MR. JACOBS:  I'm sorry.

14             (Brief pause.)

15             (Discussion off the record.)

16             THE COURT:  You may proceed.

17   BY MR. JACOBS:

18   Q.  Ms. Morgan, I just want to make sure that it's clear, you're

19   not giving your personal opinion as to whether the arguments are

20   frivolous, the documents refer to them as frivolous arguments,

21   correct?

22   A.  Correct.  And counsel approves that with the IRS.  We don't

23   make determinations ourselves.

24   Q.  It's just, again, you're not giving your opinion, you're

25   reading what the document says.

1    A.  Correct.

2    Q.  It calls them commonly used frivolous arguments.

3    A.  Correct.

4    Q.  In the document.  Okay.

5            You mentioned that the letter talked about a penalty.

6    Can you explain that, what type of penalty you're talking about?

7    A.  It's a frivolous return penalty that's assessed from the --

8    it's Internal Revenue Code 6702.  Basically says if you file

9    what purports to be a tax return intending to impede the

10   assessment of tax, then you could be subject to the penalty.

11   That's why the letter goes out to inform the taxpayer prior to

12   the assessment, so they totally understand what they're doing.

13   Q.  Do you know, were penalties assessed against Mr. Stuart for

14   filing frivolous documents?

15   A.  Yes, there was.

16   Q.  And how much is the penalty?

17   A.  It was at that time $500.  It's now been increased to

18   $5,000.

19   Q.  And do you know for what years that penalty was imposed on

20   Mr. Stuart?

21   A.  They were assessed on 2002, 2003, and 2004.

22   Q.  And do you know if any of those penalties were paid?

23   A.  Yes.  There was a payment made and paid, the 2002 and the

24   2003.

25   Q.  And if I can show you what's marked as Exhibit 46, do you

55

1  recognize what that document is?

2  A.  Yes, I do.

3  Q.  And generically what is it?

4  A.  It's a check to the United States Treasury from James A.

5  Stuart.

6          MR. JACOBS:  Your Honor, I would move into evidence

7  Exhibit 46.

8          MR. BERNHOFT:  No objection.

9          THE COURT:  Received.

10          (Exhibit 46 offered and received.)

11  BY MR. JACOBS:

12  Q.  And how much is the check for?

13  A.  For $1,007.70.

14  Q.  And do you know what this check was in payment for?

15  A.  It was applied to the frivolous return penalties.

16  Q.  When was that check received?

17  A.  The date on the check is August 6, 2007.

18  Q.  And do you know, was it processed or received by the IRS

19  somewhere around that date?

20  A.  Yes.

21  Q.  Now, I gather, Ms. Morgan, you've located a number of other

22  mailings to Mr. Stuart as well as correspondence from Mr. Stuart

23  in this matter?

24  A.  Yes.

25  Q.  And was he sent other notices and other letters besides

1    these -- I think you said the letters are called 3176 letters?

2    A.  Yes, he was.

3    Q.  What other type of correspondence was sent to him?

4    A.  There was also a letter 3175 that has basically the same

5    language only it's regarding the correspondence that's sent in.

6    He also received notices of the penalty charged and bills for

7    those penalties.

8    Q.  And then I gather the IRS received a series of letters from

9    him.

10            Let me show you, for example, what's marked for

11    identification as Exhibit 41.

12            THE COURT:  Let me note for the record that the court

13    has received various exhibits subject to redaction consistent

14    with the rules that are in effect in this court.

15            MR. JACOBS:  I'm sorry, Judge, we tried very hard to

16    get all of it but I can tell, as the court notes, obviously they

17    didn't get it on that particular document.

18            (Witness peruses document.)

19            MR. JACOBS:  If I could just have a moment I can --

20            (Brief pause.)

21    BY MR. JACOBS:

22    Q.  Ms. Morgan, do you recognize what Exhibit 41 is?

23    A.  Yes, I do.

24    Q.  And what is it?

25    A.  This is a letter to Mr. Dennis Parizek from the taxpayer.

57

1  Signature line shows it's from James A. Stuart.  Mr. Parizek at

2  the time was the compliance chief in the Frivolous Filer

3  Department.

4  Q.  And can you tell if this letter pertains to correspondence

04:02  5  sent out by the IRS?

6  A.  Yes.  It's regarding correspondence dated June 8, 2007.

7  Q.  And, in fact, is that Exhibit 40 that was previously

8  admitted?

9  A.  Correct.

04:02  10  MR. JACOBS:  Your Honor, I'd move into evidence

11  Exhibit 48.  41.  I misspoke.

12  THE COURT:  41?

13  MR. BERNHOFT:  Yes, no objection.

14  THE COURT:  Received.

04:03  15  (Exhibit 41 offered and received.)

16  BY MR. JACOBS:

17  Q.  Now, have you read this letter previously?

18  A.  Yes, I have.

19  Q.  Could you summarize the substance of the letter?

04:03  20  A.  Basically, it's in regards to the letter that was sent out

21  telling Mr. Stuart that the return is frivolous, subject to the

22  penalty, and then it comes in with different tax arguments and

23  reasons as far as why that return was filed.

24  Q.  And when we look at the last page of that letter, the last

04:03  25  paragraph, is it fair to say essentially Mr. Stuart is asking

58

1    the IRS to prove its position to him?

2    A.  That is --

3              MR. BERNHOFT:  Objection.  Form.

4              THE COURT:  Sustained.  The previous response is

5    stricken.  It must be disregarded.

6              You may ask another question, please.

7    BY MR. JACOBS:

8    Q.  Can you read the last paragraph of Mr. Stuart's letter?

9    A.  The last paragraph says:

10             "If the IRS is able to satisfactorily provide answers

11   to the questions posed above and can demonstrate where the Trust

12   does lawfully owe an income tax, said tax will be paid.  The

13   Trustee believes that since it is the IRS that enforces the

14   Internal Revenue Code, it should then be best able to answer

15   these questions, as the natural person acting as the Office of

16   Trustee has not been able to find any other independent party

17   that can do so."

18   Q.  I'm sorry, what was the date of that letter?

19   A.  The date is June 22nd, 2007.

20             MR. JACOBS:  Judge, that's all the questions I have

21   for this witness.

22             THE COURT:  Very well.  You may cross.

23             MR. BERNHOFT:  Judge, may we approach very briefly?

24             THE COURT:  Surely.

25             (At side bar on the record.)

59

1      (Discussion off the record.)

2      THE COURT:  Members of the jury, we're going to

3  truncate our day, which means we end at this point.  It also

4  means that my admonition from earlier goes into effect.  Do not

5  communicate with anyone, directly or indirectly, by e-mail,

6  Twitter, blog or any other means.  Do not do any research.

7      Keep an open mind.  And, of course, do not discuss any

8  aspect of this case in the jury room or outside of the jury room

9  until we have concluded all proceedings respecting this matter

10  and the case has been concluded — except, of course,

11  deliberations which you'll be instructed on later.

12      You may take with you your notebooks which Mr. Hill

13  will lock up until tomorrow.  We will see you at 8:30.

14      (Jury out at 4:07 p.m.)

15      THE COURT:  You may be seated.

16      Is there anything that needs to be attended to before

17  we break?

18      MR. BERNHOFT:  Not from the defense, Your Honor.

19      THE COURT:  Ms. Morgan, please, of course, do not

20  discuss your testimony with anyone.  The admonition that applies

21  to the jury applies to you as well.

22      THE WITNESS:  Thank you.

23      THE COURT:  I'll see you tomorrow at 8:30.

24      MR. JACOBS:  I'm sorry, 8:30, Judge?

25      THE COURT:  8:30.  You can get here at 7:30 but I

1    won't be here.

2              (General laughter.)

3              (Proceedings concluded for the day at 4:08 p.m.)

4                        *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN


          I, JOHN T. SCHINDHELM, RMR, CRR, Official Court
Reporter for the United States District Court, Eastern District
of Wisconsin, do hereby certify that I reported the foregoing
proceedings, and that the same is true and correct in accordance
with my original machine shorthand notes taken at said time and
place.

Dated this 5th day of December, 2011,

Milwaukee, Wisconsin.

_____
Official Court Reporter
United States District Court

```
1                        I N D E X
2      OPENING STATEMENT
3          BY MR. JACOBS...................................    2
4      OPENING STATEMENT
5          BY MR. BERNHOFT................................   14
6
7      WITNESS   EXAMINATION                            PAGE
8      KRISTY MORGAN, GOVERNMENT WITNESS
9          DIRECT EXAMINATION BY MR. JACOBS.................   29
10
11                        * * * * *
12                      E X H I B I T S
13     NUMBER              DESCRIPTION          OFFERED ADMITTED
14  1     Jim/Marjorie Form 1040 for tax year 2002........ 31      31
15  2     Jim/Marjorie Form 1040 for tax year 2003........ 31      31
16  3     Jim/Marjorie Form 1040 for tax year 2004........ 31      31
17  4     James Stuart Form 1040 for tax year 2005........ 33      33
18  5     New Age, Inc. Form 1120S filed for 2001 ........ 34      34
19  6     New Age, Inc. Form 1120S filed for 2002......... 34      34
20  7     New Age, Inc. Form 1120S filed for 2003 ........ 34      34
21  8     New Age, Inc. Form 1120S filed for 2004 ........ 34      34
22  9     New Age, Inc. Form 1120S filed for 2005 ........ 34      34
23  10    New Age, Inc. Form 1120S filed for 2006 ........ 34      34
24  12    Form 1040X for James/Marjorie Stuart for 2002... 44      44
25  13    Form 1040X for James/Marjorie Stuart for 2003... 44      44
```

```
 1  14    Form 1040X for James/Marjorie Stuart for 2004... 44    44

 2  16    Filing history for James A. Stuart 2002-2010.... 41    41

 3  17    Filing history for New Age Chemical, Inc. ...... 43    43

 4        2002-2010

 5  18A   Publication 2105................................ 53    53

 6  18B   Publication 2105................................ 53    53

 7  18C   Publication 2105................................ 53    53

 8  27    July 27, 2006 IRS letter to Stuart.............. 48    48

 9  34    3176C, letter sent to James A. Stuart for 2005 . 49    49

10        year

11  37    April 23, 2007 letter from IRS to Stuart....... 49     49

12  40    June 8, 2007 letter from IRS to Stuart......... 49     49

13  41    6/22/2007 Stuart to IRS letter................. 58     58

14  46    $1,007.70 James A. Stuart check payable to ..... 56    56

15        IRS, dated 8/6/2007
```

```
16

17

18

19

20

21

22

23

24

25
```

Case 2:10-cr-00288-CNC   Filed 12/08/11   Page 64 of 64   Document 60