1        UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF WISCONSIN

3  ----------------------------------------------------------------

4  UNITED STATES OF AMERICA,              )
                                          )
5                    Plaintiff,           )     Case No. CR 10-288
                                          )     Milwaukee, Wisconsin
6       vs.                               )
                                          )     December 6, 2011
7  JAMES A. STUART, JR.,                  )     8:30 a.m.
                                          )
8                    Defendant.           )     VOLUME 2 OF 3

9  ----------------------------------------------------------------

10                **TRANSCRIPT OF JURY TRIAL**
            BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11           UNITED STATES DISTRICT JUDGE, and a jury.

12  APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:        Office of the US Attorney
14                                    By: MATTHEW L. JACOBS
                                      517 E Wisconsin Ave- Rm 530
15                                    Milwaukee, WI 53202
                                      Ph: 414-297-4106
16                                    Fax: 414-297-1738
                                      matthew.jacobs@usdoj.gov
17   For the Defendant
     JAMES A. STUART, JR.:            The Law Office of Robert G
18   (Present)                        Bernhoft SC
                                      By: ROBERT G. BERNHOFT
19                                    207 E Buffalo St - Ste 600
                                      Milwaukee, WI 53202
20                                    Ph: 414-276-3333
                                      Fax: 414-276-2822
21                                    rgbernhoft@bernhoftlaw.com

22
     U.S. Official Reporter:          JOHN T. SCHINDHELM, RMR, CRR,
23                                    johns54@sbcglobal.net

24   Proceedings recorded by computerized stenography, transcript
     produced by computer aided transcription.
25

1           P R O C E E D I N G S (8:35 a.m.)

2           THE COURT:  Case No. 2010-CR-288, United States of

3      America vs. James R. Stuart, Jr.  This is day two of our jury

4      trial.

08:35   5           Counsel, do you wish to be heard?

6           MR. BERNHOFT:  Yes, Your Honor.  Move for Jencks

7      production with respect to government's witness Kristy Morgan

8      from the Ogden Service Center.

9           THE COURT:  Repeat that, please?

08:35   10           MR. BERNHOFT:  Yes, Your Honor.  Move for production

11      of Jencks material respecting the government's witness Kristy

12      Morgan, the Service Center witness from Ogden, Utah.

13           Ms. Morgan testified that she's testified previously

14      in about 60 cases.  My understanding of her testimony, she's the

08:36   15      witness coordinator at Ogden, been there a long time, has

16      drafted some of these notice letters and form letters that have

17      been entered into evidence, and we believe that her testimony in

18      the prior cases is mandatorily produced under the Jencks Act.

19           MR. JACOBS:  Your Honor, the government disagrees.

08:36   20      The fact that she's testified previously doesn't mean that it

21      falls within 18 U.S.C. 3500(b).  That relates to the subject

22      matter as to which this witness has testified.  Her testimony

23      here related specifically as to the records concerning

24      Mr. Stuart.  And she's given no prior testimony or there are no

08:36   25      prior recorded statements pertaining to Mr. Stuart's matter in

1    this case.  The fact that some witness has testified ever

2    anyplace else doesn't turn those transcripts into Jencks

3    material.

4            THE COURT:  I would generally agree, Counsel.  Is

08:37   5    there something specific that you can refer to suggesting that

6    prior testimony of Ms. Morgan would be in the nature of

7    discoverable information in this proceeding?

8            MR. BERNHOFT:  Yes, Your Honor.  Ms. Morgan testified

9    regarding the management of documents at the Frivolous

08:37  10    Correspondence Unit there that she's involved with.  She's

11    involved with drafting these letters, she testified to that.

12    And these letters are -- form part of the government's core case

13    in chief.

14            And in previous trials or other evidentiary

08:37  15    proceedings where she testified on oath, she may have made

16    statements regarding the Frivolous Correspondence Unit, her

17    drafting of these letters, et cetera, that could be relevant to

18    cross-examination in terms of impeachment, prior inconsistent

19    statements and other matters.

08:38  20            THE COURT:  Specifically, the question relates to

21    statements in the possession of the government.  Mr. Jacobs has

22    indicated that the witness -- in fact, the witness indicated

23    that she testified previously in multiple cases.  Her testimony

24    in those various cases would not necessarily be in the nature of

08:39  25    statements that would be discoverable or mandatorily subject to

1    production in this particular case.

2         There may or may not have been a transcript made of

3    various testimony given by this person.  And even if there was a

4    transcript, it wouldn't necessarily be in the exclusive

5    possession of the government.  That would be a record of court

6    proceedings.

7         And so, if you are merely asking for transcripts of

8    court testimony, the government is not obligated, under

9    18 U.S.C. Section 3500, to produce such transcripts in this

10   case.  Your motion is denied.

11        MR. BERNHOFT:  Thank you, Judge.

12        THE COURT:  Ms. Morgan should come forward.

13        You remain under oath.  You may proceed.  It's

14   cross-examination.

15        MR. JACOBS:  The jury's not in, Judge.

16        THE COURT:  Oh.

17        MR. BERNHOFT:  You panicked me, Your Honor.

18        THE COURT:  Mr. Hill, would you please get our jury.

19        I didn't even look to the right.

20        (Jury in at 8:42 a.m.)

21        THE COURT:  Good morning, members of the jury.

22        JURY IN UNISON:  Good morning.

23        THE COURT:  We're ready to continue.  You may proceed.

24        MR. BERNHOFT:  Do we have the Elmo up and running?

25        THE COURT:  One second here.  I blanked the monitors

1   at this stage because I don't know what's on the screen.

2   MR. BERNHOFT:  Yes, Your Honor.  We're going to be

3   querying Ms. Morgan on letter correspondence that has been

4   stipulated to by the parties as to being admissible, and we'll

5   be going through them sequentially in chronological order.  And

6   I can represent to the court that each document is stipulated as

7   admitted.

8   THE COURT:  You have to identify everything for the

9   record.

10  MR. BERNHOFT:  Yes, sir.

11  KRISTY MORGAN, GOVERNMENT WITNESS, PREVIOUSLY SWORN

12  CROSS-EXAMINATION

13  BY MR. BERNHOFT:

14  Q.  Good morning, Ms. Morgan.

15  A.  Good morning.

16  Q.  I'm Attorney Bob Bernhoft, and I represent Jim Stuart in

17  this federal criminal tax case.

18  Now, yesterday, Ms. Morgan, you had testified

19  regarding various letters and correspondence that had been sent

20  by and between Mr. Stuart and the Internal Revenue Service; is

21  that correct?

22  A.  Yes, it is.

23  Q.  Thank you.

24  And if I can show the witness a copy of a document

25  that's been marked as G-20.  That's Government's 20.

1          Can you tell us what that is, please?

2    A.   This is a 916(c) letter to James and Marjorie Stuart.

3    Q.   Can you tell me what the date of that letter is, please?

4    A.   The date on this letter is November 16th, 2005.

5    Q.   Excellent.  Thanks very much.

6          Your Honor, I would move admission of G-20 and

7    permission to publish.

8          THE COURT:  Is there any objection?

9          MR. JACOBS:  No, Your Honor.

10         THE COURT:  It's received.

11         (Exhibit 20 offered and received.)

12   BY MR. BERNHOFT:

13   Q.   And, Ms. Morgan, can you see that in the screen there?

14   A.   Yes, I can.

15   Q.   And can you tell me what tax period this letter is

16   regarding, please.

17   A.   The tax period is ending December 31st --

18         THE COURT:  One second.  Can the jury read the

19   document?

20         JURORS IN UNISON:  No.

21         THE COURT:  One second.

22         MR. BERNHOFT:  Is that better?  All right.

23   BY MR. BERNHOFT:

24   Q.   And, Ms. Morgan, can you tell me what tax period this letter

25   is regarding?

1    A.   For the tax period ending December 31st, 2002.

2    Q.   All right.  And if you see the language under "dear

3    taxpayer," that's been highlighted with the yellow marker, could

4    you read that for me, please?

08:46    5    A.   The two paragraphs.

6    Q.   Please.

7    A.   "We are unable to process your claim for the tax periods

8    above because your supporting information is not complete.  If

9    you have more information you did not send with the claim, you

08:46    10   may file another claim and attach your information.

11           "Your amended tax return was received and complete.

12   We ask that you submit a signed copy that includes all

13   correspondence forms and schedules.  Please include your revised

14   copy of the W-2 Form to support the changes you made to your

08:47    15   return."

16   Q.   Thank you.  And based on your knowledge of the documents and

17   your testimony yesterday, is it fair to say that this is an IRS

18   response letter to Mr. Stuart filing that 1040X amended return

19   for 2002?

08:47    20   A.   Yes, asking for additional information.

21   Q.   Thank you.

22           Handing the witness a copy of what's been marked G-21.

23           Can you tell me what that document is, please?

24           THE COURT:  It's not necessary to say "G" inasmuch as

08:47    25   the exhibit is just numbered.

71

1        MR. BERNHOFT:  Thank you, Judge.

2        THE WITNESS:  This is a letter to Dorothy M. Baylis

3    from James A. Stuart.

4    BY MR. BERNHOFT:

08:47    5    Q.  All right.  Thank you very much.

6        Move admission of 21 and permission to publish, Your

7    Honor.

8        THE COURT:  Objection?

9        MR. JACOBS:  None.

08:47    10        THE COURT:  It's received.

11        (Exhibit 21 offered and received.)

12        MR. BERNHOFT:  Thank you.

13    BY MR. BERNHOFT:

14    Q.  Ms. Morgan, do you see the second paragraph there?

08:48    15    A.  Yes.

16    Q.  And I've got some highlighted text there.  It's a brief

17    text.  Could you read that, please, from "my only"?

18    A.  "My only option, therefore, was to fill out and file my 2002

19    Form 1040X."

08:48    20    Q.  And then the second paragraph, please, also in highlighted

21    part?

22    A.  "In part 2 of the 1040X, I have listed the line numbers that

23    were changes were made.  Both of those changes are reflected on

24    the Form 4852 attached to it.  I do not see that there are any

08:48    25    other forms and schedules needed to explain the changes being

72

1   made."

2   Q.   Thank you.  And, Ms. Morgan, do you know what an IRS

3   Form 4852 is?

4   A.   I do.

08:49   5   Q.   And what is that form, please?

6   A.   That's when there could be a correction that needs to be

7   made on a W-2, that form can be used.

8   Q.   And Mr. Stuart had attached that Form 4852 to his 2002 1040X

9   amended return?

08:49   10   A.   Yes, he did.

11   Q.   Thank you.

12          Handing the witness a copy of what's been marked 22.

13          Could you tell me what that document is, Mrs. Morgan?

14   A.   This is a letter 105(c) to James A. and Marjorie Stuart.

08:49   15          MR. BERNHOFT:  Move to admit.  Permission to publish.

16          MR. JACOBS:  No objection, Judge.

17          THE COURT:  Received.

18          (Exhibit 22 offered and received.)

19          MR. BERNHOFT:  Thank you.

08:49   20          THE COURT:  Proceed.

21   BY MR. BERNHOFT:

22   Q.   Can you tell me what the date of that letter is,

23   Mrs. Morgan?

24   A.   I really can't see that clearly.

08:50   25   Q.   Okay.  Autofocus.  Can you see the date there?

1    A.   Yes.   January 9th, 2006.

2    Q.   And what tax period does this IRS letter to Mr. Stuart refer

3    to?

4    A.   Tax period ending December 31st, 2002.

08:50  5    Q.   Thank you.   And I'm going to refer your attention to the

6    body of the letter here.   And I'm going to zoom in just a bit.

7    Could you read that first paragraph, please?

8    A.   "This letter is your notice that we've disallowed your claim

9    for credit for the period shown above."

08:50  10   Q.   And that second paragraph, please?

11   A.   "Why we cannot allow your claim.   We still do not show any

12   corrected information on your W-2.   We may not accept your claim

13   information on your W-2 without supporting correlation documents

14   --"

15             THE REPORTER:   Repeat that, please.

16             THE WITNESS:   Yes.

17             "We still do not have any corrected information on

18   your W-2.   We may not accept your change information on your W-2

19   without supporting correlation documentation from your

08:51  20   employer."

21   BY MR. BERNHOFT:

22   Q.   Could I refer you to that last sentence that's highlighted

23   there next to my pen?

24   A.   "You have the right to appeal our decision to disallow your

08:51  25   claim."

74

1    Q.  And, Ms. Morgan, this IRS letter to Mr. Stuart also refers

2    to the 1040X submitted return and Form 4852 that he filed for

3    2002?

4    A.  It's regarding the claim.

5    Q.  Thank you.

6          THE COURT:  Please note, Counsel, that these exhibits

7    are all subject to redaction as you will note from looking at

8    the placards under the glass on your tables.

9    BY MR. BERNHOFT:

10   Q.  Handing the witness a copy of what's been marked as 23.

11         And, Mrs. Morgan, could you review that document and

12   tell me what that document is, please.

13         (Witness peruses document.)

14   A.  This is correspondence dated January 24th, 2006, to the

15   Internal Revenue Service, Office of Appeals, from James Stuart.

16   BY MR. BERNHOFT:

17   Q.  Thank you.

18         Move to admit, permission to publish.

19         MR. JACOBS:  No objection.

20         THE COURT:  Received.

21         (Exhibit 23 offered and received.)

22         MR. BERNHOFT:  Thank you.

23   BY MR. BERNHOFT:

24   Q.  Do you see that, Mrs. Morgan?

25   A.  Not very well.

75

1  Q.  Okay.  How is that?

2  A.  Better.

3  Q.  And what's the title of this document there, underlined and

4  highlighted in yellow?

5  A.  "Affidavit of an Administrative Appeal and Request For

6  Cure."

7  Q.  All right.  And if I could refer your attention to what

8  appears to be paragraph 4, highlighted in relevant part?  Could

9  you read that for me, please?

10  A.  "Affiant hereby requests either, A, an open office

11  administrative appeal hearing at the Kansas City, Missouri IRS

12  Service Center to resolve the 2002 on such date that it is

13  convenient for all parties."

14  Q.  And is it fair to say that Mr. Stuart is requesting an

15  appeals hearing respecting his denial, the IRS's denial of his

16  2002 amended claim?

17  A.  That's what the statement says.

18  Q.  Thank you.

19          And referring to page 2 of this letter.

20          Autofocus again.

21          Referring, Ms. Morgan, your attention to 6-B there,

22  the second highlighted section next to my pen, could you read

23  that for me, please?

24  A.  "Affiant has communicated in a timely manner and in good

25  faith all notices sent by the Commissioner regarding this tax

1    matter."

2    Q.   And then, just moving down to sub C there, the highlighted

3    section, could you read that for me?

4    A.   "Affiant's earnings are paid to him in exchange for his time

5    and labor and are not identified within the limited definitions

6    of IRC" -- I believe that is 34 -- I can't read the tax code on

7    that.

8    Q.   Let me autofocus and zoom.  How is that?

9    A.   That's better.  "3401(a) and 3121(a).  Affiant received no

10   such IRC 3401 or 3121 wages from New Age Chemical in his

11   earnings in exchange for his time and labor."

12              THE COURT:  Read that again, please.  The last line.

13              THE WITNESS:  The last line?

14              "Affiant received no such IRC 3401 or 3121 wages from

15   New Age Chemical as his earnings in exchange for his time and

16   labor."

17   BY MR. BERNHOFT:

18   Q.   Thank you.  Mrs. Morgan, are you familiar with the acronym

19   IRC?

20   A.   I am.

21   Q.   And what does that stand for, please?

22   A.   Internal Revenue Code.

23   Q.   Are you familiar with those code sections, 3401(a) and

24   3121(a)?

25   A.   No.

77

1    Q.   Thank you.

2            Handing the witness a copy of what's been marked 24.

3            Mrs. Morgan, could you take a look at that and tell me

4    what that is, please.

5            (Witness peruses document.)

6    A.   This is a letter to the Internal Revenue Service, Office of

7    Appeals, from James A. Stuart, dated March 9, 2006.

8    Q.   Thank you.

9            Move to admit.  Permission to publish.

10           MR. JACOBS:  No objection.

11           THE COURT:  Received.

12           (Exhibit 24 offered and received.)

13           MR. BERNHOFT:  Thank you.

14   BY MR. BERNHOFT:

15   Q.   Could you tell me what is the date on that letter,

16   Mrs. Morgan?

17   A.   March 9, 2006.

18   Q.   Thank you.

19           Move this down to the text area.

20           And, Mrs. Morgan, referring to the highlighted

21   portions there, could you read those for the jury, please.

22   A.   The first paragraph starting "on September"?

23   Q.   Please.

24   A.   "On September 19th, 2005, I submitted a 1040X Amended Income

25   Tax Return accompanied by a Form 4852.  The material submitted

1    as to self -- was self-explanatory.

2           "On November 16th, 2005, I received a form letter

3    stating that you were unable to process the claim as it was not

4    complete, with no explanations.  I answered this letter asking

08:57   5    what was not complete."

6    Q.  Could you continue to that third paragraph, please?

7    A.  "On January 9th, 2006, I received another letter stating

8    that you had disallowed my claim entirely because I didn't show

9    any corrected information on my W-2, which the Form 4852 was

08:58  10    supposed to do.  I do not think that this is a statutory

11    explanation taken from the Internal Revenue Code."

12    Q.  And that fourth paragraph there?

13    A.  "I responded with an Affidavit of Administrative Appeal and

14    Request For Cure and am still waiting for a reply."

08:58  15    Q.  And then if you could just take a look at that citation to

16    the code.  Could you just read that for me, please?

17    A.  "26 U.S.C. 6402(k), paren, P.L. 105-206, 3505."

18    Q.  And the text of that citation, please?

19    A.  "Explanation of Reason For Refund Disallowance:  In the case

08:59  20    of a disallowance of a claim for refund, the secretary shall

21    provide the taxpayer with an explanation for such disallowance."

22    Q.  Thank you.

23           Handing the witness a copy of what's been marked as

24    Defendant's 1 (sic).

08:59  25           Mrs. Morgan, could you review that document and tell

1   me what that is, please.

2   A.   This is a letter, 86C, to James and Marjorie Stuart from the

3   Internal Revenue Service.

4   Q.   Thank you.

5              Move to admit, permission to publish.

6              MR. JACOBS:  No objection, Judge.

7              THE COURT:  Received.

8              (Exhibit 1001 offered and received.)

9   BY MR. BERNHOFT:

10  Q.   What is the date of this letter from IRS to Mr. Stuart?

11  A.   April 5th, 2006.

12  Q.   And to the left of my pen there, what tax period is this

13  letter related to?

14  A.   The 2002 tax period.

15  Q.   And referring you to that first highlighted paragraph, could

16  you read that for the jury, please?

17  A.   Could you slide that up?

18  Q.   Sure I can.

19  A.   Thank you.  "We have forwarded your request to appeal to the

20  Milwaukee Appeals Office.  They will respond to you within 60

21  days.  You do not need to do anything further."

22  Q.   Thank you.

23             Handing the witness a copy of what's been marked

24  Defendant's 1002.

25             Mrs. Morgan, could you take a look at that and tell me

1    what that is, please?

2    A.   This is a letter from the Office of Appeals dated April

3    11th, 2006, to Mr. and Mrs. Stuart.

4    Q.   Thank you.

5               THE COURT:  One second, please.

6               MR. BERNHOFT:  Permission to publish.

7               THE COURT:  Hold, please.

8               (Brief pause.)

9               THE COURT:  Do you have a premarked list of your

10   exhibits?

11              MR. BERNHOFT:  Yes.  Given to the clerk yesterday,

12   Your Honor.

13              THE COURT:  I have to get that.  We'll proceed for

14   now.

15              MR. BERNHOFT:  Mr. Tollefson can hand up copies for

16   the court if you wish.

17              THE COURT:  Yes, please.  I don't see an exhibit list

18   with the numbers that you just used.

19              MR. BERNHOFT:  Yeah, it was provided to the clerk

20   yesterday, Your Honor.  I believe Mr. Tollefson can obtain a

21   copy.

22              THE COURT:  The defense exhibits should be starting at

23   1001, and you previously referred to as defense 1.  So defense 1

24   is the same as 1001?

25              MR. BERNHOFT:  Yes, sir.  Yes.  I'll make the proper

1    reference.

2           THE COURT:  All right.  So the previous exhibit number

3    should have been Exhibit 1001 and not 1.  All right.  Again,

4    these documents are received subject to redaction as required.

5           MR. BERNHOFT:  Thank you, Your Honor.

6           Handing a copy of what's been marked Defendant's 1002

7    to the witness.

8    BY MR. BERNHOFT:

9    Q.  Mrs. Morgan, could you tell me what that document is,

10   please?

11   A.  This is a letter from the Internal Revenue Service Appeals

12   Office to Mr. and Mrs. Stuart, dated April 11th, 2006.

13   Q.  Thank you.

14          MR. BERNHOFT:  Move to admit, permission to publish.

15          MR. JACOBS:  I have no objection, Judge.

16          THE COURT:  It's received.

17          (Exhibit 1002 offered and received.)

18          MR. BERNHOFT:  Thank you, Judge.

19   BY MR. BERNHOFT:

20   Q.  And, Mrs. Morgan, referring your attention to that

21   highlighted portion by the pen, what date is that letter from

22   IRS Appeals to Mr. Stuart?

23   A.  April 11th, 2006.

24   Q.  I'm referring you down to that first paragraph highlighted,

25   could you read that for the jury, please.

1  A.  "This letter is our acknowledgment that we received your

2  case for consideration in our Milwaukee Appeals Office on

3  April 3rd, 2006."

4  Q.  Thank you.

5            Handing the witness a copy of what's been marked

6  Defendant's 1003.

7            Mrs. Morgan, could you look at that and tell us what

8  that is, please?

9  A.  This is a letter to the Internal Revenue Service, Kansas

10  City, Missouri office, from James A. Stuart with an attachment.

11  Q.  With attachments.  Thank you.

12            Move to admit permission to publish 1003.

13            THE COURT:  Any objection?

14            (No response.)

15            THE COURT:  It's received.

16            (Exhibit 1003 offered and received.)

17            MR. BERNHOFT:  Thank you.

18  BY MR. BERNHOFT:

19  Q.  Ms. Morgan, referring your attention to that second

20  paragraph with the yellow highlight.  Could you read that to the

21  jury, please?

22  A.  "The company has listed payments as wages as defined in IRC

23  Section 3401(a) and 3121(a) for fear of retaliation from the

24  IRS.  I am rebutting their claim stating that I am a

25  private-sector citizen, nonfederal employee, employed by a

09:04
09:04
09:05
09:05
09:05

1  private-sector company, nonfederal entity, as defined in Section

2  3401(c)(d).  I am not employed in the trade or business nor am I

3  an officer of a corporation.  The amounts listed as withheld in

4  the W-2 is correct, however."

09:06  5  Q.  Thank you.  Mrs. Morgan, I'm going to refer you to page 5 of

6  D-1003.  This page 5 of 1003.  Do you recognize this information

7  that's contained on this page?

8  A.  Yes, I do.

9  Q.  And what sort of information page is this, in your

09:06  10  experience?

11  A.  This is the tracking of the document through the IRS.

12  Q.  And when you say "tracking of the document," how does that

13  work?

14  A.  Which area receives that document they receive that

09:07  15  information in their area.

16  Q.  Now, I note that on page 1 of D-1003, that Mr. Stuart sent

17  this to the Internal Revenue Service/Kansas City.  And yet, when

18  I refer to the highlighted section there, where has this been

19  routed to?

09:07  20  A.  To the Frivolous Filer Operation, Ogden, Utah.

21  Q.  Okay.  And why would Mr. Stuart's letter to Kansas City IRS

22  be routed to the Frivolous Correspondence Unit in Ogden, Utah?

23  A.  That's where the letter came from, concerning that claim was

24  from that area.  That's where the claims are being worked,

09:07  25  that's where the correspondence goes.

1    Q.  But why would it be routed to this Frivolous Correspondence

2    Unit from Kansas City?

3    A.  From Kansas City?

4    Q.  Yes.

09:07    5    A.  Because the case is opened in Ogden.

6    Q.  I see.  Who determines whether correspondence from taxpayers

7    is frivolous?

8    A.  Basically, the determination is made through our area

9    counsel, then referred to the Ogden area.  That's a consolidated

09:08    10    area.  There's only one group that works frivolous documents and

11    that's in Ogden.

12    Q.  I see.  I'm going to refer you to page 1 here briefly.  So

13    based on that testimony, Mr. Stuart sends a letter to IRS in

14    Kansas City regarding his 2002 amended 1040X, and your testimony

09:08    15    is IRS counsel reviewed this letter, determined it was

16    frivolous, and caused it to be routed to Ogden, Utah?

17    A.  No, that's incorrect.

18    Q.  Could you tell me then how this works?

19    A.  The case is opened in Ogden, the correspondence reviewed

09:08    20    there.  Frivolous positions are determined by counsel first

21    initially when they come into the office.

22    Q.  Are these letters individually reviewed by IRS counsel for

23    frivolity?

24    A.  No.

09:09    25    Q.  So then somebody from IRS Kansas City looks at this letter

1   and just reroutes it to Ogden because it's frivolous?

2   A.  Because they see the open control in Ogden that someone is

3   working the case.

4   Q.  Could you describe this open control designation, please?

5   A.  Yes.  That's the person that's working the case that has the

6   claim to make the determination and correspond back and forth

7   with the taxpayer.

8   Q.  And how would the person who received this at IRS Kansas

9   City receive that open control designation such that it would be

10   routed to Frivolous Correspondence in Ogden?

11   A.  In Ogden there is a control area where workload is managed

12   so that the number of the tax examiner would appear on a control

13   base that everyone that works for the IRS can see that and

14   properly route the documents.

15   Q.  Is that control database, is that the Integrated Data

16   Retrieval System?

17   A.  Yes, it can be.

18   Q.  And is the acronym IDRS for that?

19   A.  Yes.

20   Q.  Okay.  So then some IRS person in Kansas City opens up or

21   punches in the EARPL code to get into the IDRS respecting

22   Mr. Stuart, and they see a control code and that's how they know

23   to route that letter to Frivolous Correspondence?

24   A.  I didn't understand your question as far as research.

25   Q.  All right.  You're indicating that this control module that

1    indicates a case is opened, or frivolous filer case is opened in

2    Ogden, is accessible to IRS employees through the IDRS System?

3    A.  That's correct.

4    Q.  And so somebody in Kansas City looked into the IDRS system,

5    reference Mr. Stuart's files, his individual master file I

6    assume, correct?

7    A.  They're searching by Social Security number.

8    Q.  Right.  And that would pull up his IMF, his individual

9    master file?

10   A.  Correct.

11   Q.  And then they would see this control module which would tip

12   them off that they should send this to Ogden to the Frivolous

13   Correspondence Unit?

14   A.  Right, because they have the complete case.

15   Q.  Thank you.  I'm going to refer you briefly to page 6 of this

16   document that's already been admitted.

17          THE COURT:  Again, reference the document number,

18   please.

19          MR. BERNHOFT:  Yes.  D-1003.

20   BY MR. BERNHOFT:

21   Q.  And, Mrs. Morgan, do you recognize this document here in

22   your experience?

23   A.  Yes, I do.

24   Q.  And what is that document?

25   A.  It's an internal document used to route information.

1    Q.  All right.  And so, under "Remarks" what does it say there?

2    A.  "Frivolous correspondence."

3    Q.  And so that's the reason this is being routed up to Ogden.

4    A.  Correct.

5    Q.  Thank you.

6         Now, Mrs. Morgan, I believe you testified yesterday

7    that you had drafted the notice letter to Mr. Stuart that

8    indicated that his positions were frivolous, without merit,

9    without legal basis, and had been repeatedly rejected by the

10   federal courts; is that correct?

11   A.  Not to Mr. Stuart, no.

12   Q.  You drafted the template, the form letter.

13   A.  Initial letter, yes.

14   Q.  Yeah.  And so, in that letter it indicates that Mr. Stuart's

15   correspondence is frivolous.  But when you drafted the template

16   for that letter that would be sent to various taxpayers like

17   Mr. Stuart, what's the criteria for determining that a taxpayer

18   letter is frivolous?

19   A.  The tax examiners have guidelines that they would go

20   through, through their procedures, and identify different

21   language or different types of arguments on the tax return.

22   Q.  Well, what type of language would be a criteria for

23   determining a taxpayer letter was frivolous?

24   A.  If in that correspondence it said wages are not income, if

25   they go through and quote different parts of the code that are

88

1  incorrect as far as their filings.  Different things like that

2  would be key words that they would look for.

3  Q.  A taxpayer citing to portions of the Internal Revenue Code

4  might end you up in Frivolous Correspondence in Ogden?

09:13  5  A.  It may end there, yes.

6  Q.  Handing the witness a copy of what's been marked as D-1004.

7  Mrs. Morgan, could you take a look at that, please,

8  and tell me what that is.

9  A.  This is a letter --

09:13  10  THE COURT:  One second.  Counsel, please approach.

11  (At side bar on the record.)

12  THE COURT:  Just for the record, you're going to use

13  designations that will not appear on the exhibits as they go

14  into the record.  If this transcript is reviewed, someone

09:14  15  reviewing the transcript without knowledge of the proceeding

16  will go through these materials and not see a D, not see an A,

17  not see a G or whatever.

18  MR. BERNHOFT:  I'm well advised, Judge.

19  THE COURT:  Okay.  And just so that it's clear, all of

09:14  20  these documents have your client's Social Security number.

21  MR. BERNHOFT:  Yes.

22  THE COURT:  These will be put into a public file.

23  MR. BERNHOFT:  Yes.

24  THE COURT:  They will be accessible by the world.

09:14  25  MR. BERNHOFT:  Yes.

89

1        THE COURT:  The world will see your client's Social

2   Security number.

3        MR. BERNHOFT:  Yes.

4        THE COURT:  The world will be able to steal your

5   client's Social Security number and use it any way they want to.

6        MR. BERNHOFT:  We will redact prior to admission into

7   evidence.

8        THE COURT:  That's why I've made the statements that

9   I've made.  And on the table it tells you don't offer them with

10  the Social Security numbers and personal information displayed.

11  Anyone in the courtroom can see this information.  Just so that

12  you know.

13       MR. BERNHOFT:  Yes, I do.  And I appreciate the

14  court's admonition.

15       MR. JACOBS:  Judge, could I just get a five-minute

16  break to run to the restroom for a second?

17       THE COURT:  Sure.

18       (End of discussion at side bar.)

19       THE COURT:  We're going to take a very short break.

20  You may return to the jury room with the usual admonition not to

21  discuss the case or do any research whatsoever.  You may leave

22  your notebooks in your chairs.  We will be back into the

23  courtroom very quickly.

24       THE BAILIFF:  All rise.

25       (Jury out at 9:15 a.m.)

1    (Recess taken at 9:16 a.m., until 9:25 a.m.)

2    THE COURT:  Are you ready to proceed?

3    MR. BERNHOFT:  Yes, sir.

4    (Jury in at 9:26 a.m.)

5    THE COURT:  Proceed.

6    MR. BERNHOFT:  May I, Your Honor?

7    THE COURT:  You may.

8    MR. BERNHOFT:  Thank you.

9  BY MR. BERNHOFT:

10  Q.  Mrs. Morgan, handing you a copy of what's been marked 1004.

11  Could you tell me what that document is, please?

12  A.  This is the letter 2645(c) to James Stuart from the Internal

13  Revenue Service.

14  Q.  Thank you.

15    Move admission of 1004.  Permission to publish.

16    MR. JACOBS:  I have no --

17    THE COURT:  Received.

18    (Exhibit 1004 offered and received.)

19  BY MR. BERNHOFT:

20  Q.  Mrs. Morgan, referring your attention to the upper

21  right-hand corner, what is the date of that letter from IRS to

22  Mr. Stuart?

23  A.  May 16th, 2006.

24  Q.  All right.  And referring to the tax period, what tax period

25  is this letter referencing from Kansas City IRS?

1   A.   December 31st, 2005.

2   Q.   And the form number, please?

3   A.   The Form 1040.

4   Q.   Thank you.  And, Mrs. Morgan, referring your attention to

5   the highlighted portion, could you read that for the jury,

6   please.

7   A.   "Thank you for your correspondence received April 14th,

8   2006."

9   Q.   And that second paragraph, please?

10  A.   "We haven't resolved this matter because we haven't

11  completed all research necessary to complete a response.  We

12  will contact you again within 45 days to let you know what

13  action we are taking.  You don't need to do anything further on

14  this matter."

15  Q.   Thank you.  Ms. Morgan, handing you a copy of what's been

16  marked as 1005, could you tell me what that is, please.

17  A.   This is a letter to Dorothy M. Baylis from James A. Stuart,

18  dated May 19, 2006.

19  Q.   And does it tell on there where Ms. Baylis is working?

20  A.   Not that I see from the letter.

21  Q.   All right.  Thank you.

22           Move admission of 1005.  Permission to publish.

23           MR. JACOBS:  Judge, I'd like to be heard on this.

24           THE COURT:  All right.

25           (At side bar on the record.)

92

1    MR. JACOBS:  Judge, again, I just got this so I

2 haven't had time to compare it, but my belief is this is part of

3 a series of letters that we do not have an agreement as to their

4 admissibility.  And this is simply a letter from the defendant.

5    MR. BERNHOFT:  No.  All of these are comprised and

6 compares within the stipulated ranges of the stipulation.

7    MR. JACOBS:  I just wasn't sure if you knew which

8 exhibit this was.

9    MR. BERNHOFT:  We were scrupulously careful.

10    MR. JACOBS:  We had a series of this.  Do you know

11 what the corresponding government exhibit for this is?

12    MR. BERNHOFT:  No.  The reason that these are numbered

13 1005 as defendant's exhibits is you didn't exhibit them.  So

14 just for the court's -- what we have is an aggregate of

15 stipulated documents, some of which the government exhibited,

16 some of which they didn't.  And so the ones that we're going to

17 use that the government didn't exhibit we've marked them.

18    MR. JACOBS:  Okay.  I just wanted to clarify.  I just

19 got this so I'm not certain which exhibit this is.  There are a

20 series of letters that we object to and I just want to know --

21    MR. BERNHOFT:  It's comprised in the stipulation.

22    MR. JACOBS:  Very well.

23    THE COURT:  This contains two sheets.

24    MR. JACOBS:  Right.

25    THE COURT:  Second sheet part of Exhibit 1005?

1      MR. BERNHOFT:  Yes.  And I'm going to redact that

2  right now.

3      THE COURT:  Very well.  Thank you.

4      (End of discussion at side bar.)

09:31  5      THE COURT:  Proceed.

6      MR. BERNHOFT:  Thank you, Judge.  I believe where we

7  left off I moved admission and requested to publish?

8      MR. JACOBS:  And I have no objection, Judge.

9      THE COURT:  It's received.

09:31  10      MR. BERNHOFT:  Thank you.

11      (Exhibit 1005 offered and received.)

12  BY MR. BERNHOFT:

13  Q.  Mrs. Morgan, directing your attention to what's been marked

14  and admitted as 1005.  Could you read the language in that

09:32  15  address block below Ms. Dorothy M. Baylis?

16  A.  It states, "Operation manager, Internal Revenue Service,

17  Kansas City, Missouri."

18  Q.  All right.  So this is Mr. Stuart corresponding with

19  Ms. Baylis in Kansas City IRS.

09:32  20  A.  Correct.

21  Q.  Thank you.  And could you read that first paragraph for me,

22  please?

23  A.  "Today I received a letter with your signature stating we

24  haven't resolved this matter because we haven't completed all

09:32  25  the research necessary for a complete response."

94

1  Q.  And that second paragraph, please?

2  A.  "On May 8, 2006, I also received a letter headed, We Changed

3  Your Estimated Tax Total, and the change reflected was not what

4  was entered on my 1040."

5  Q.  Zoom that just a touch.  And that final third paragraph

6  there that's circled and highlighted, please?

7  A.  "Also today I contacted the IRS at the telephone number

8  shown on the letter and spoke with Mr. Blackwell, number

9  6206212, who was very helpful.  Apparently, according to

10  Mr. Blackwell, there was a mistake in transcribing the

11  information from my 1040 to one of your Internal Revenue (sic)

12  forms--"

13       THE COURT:  Read that again, please.

14       THE WITNESS:  "Apparently, according to Mr. Blackwell,

15  there was a mistake in transcribing the information from my 1040

16  to one of your Internal Revenue (sic) forms."

17       THE COURT:  Is the word "revenue" there?

18       THE WITNESS:  I'm not seeing "revenue."

19  BY MR. BERNHOFT:

20  Q.  I think it's "one of your internal forms"?

21  A.  "One of your internal forms."  Sorry.  "And the amount,

22  $25,919.52, was entered on line 65, whereas on the 1040 it was

23  entered on line 64."

24  Q.  Thank you.  Mrs. Morgan, handing you a copy of what's been

25  marked as 1006, could you tell me what that document is, please?

1   A.   This is a letter to Isela H. Strong, Internal Revenue

2   Service, from James A. Stuart.

3   Q.   Thank you.

4        Move admission of 1006.  Permission to publish.

5        MR. JACOBS:  I have no objection.

6        THE COURT:  Received.

7        (Exhibit 1006 offered and received.)

8        MR. BERNHOFT:  Thank you.

9   BY MR. BERNHOFT:

10  Q.   And could you tell me what the date on that letter is,

11  please?

12  A.   June 13, 2006.

13  Q.   Thank you.  And, Mrs. Morgan, could you read that

14  highlighted text in that first paragraph, please, starting with

15  60?

16  A.   "The 60 days lapsed on the 5th of this month without any

17  word.  When I called, I was informed that you were out for the

18  month of June."

19  Q.   And for that second highlighted sentence, please?

20  A.   "This matter has dragged on for much too long and I would

21  like to get it resolved."

22  Q.   And then that last sentence highlighted starting "I think"?

23  A.   "I think that after reviewing my situation, you will find

24  that I have followed the law to the letter."

25  Q.   Thank you.  Oh, I'm sorry, could you refer to the first

1    paragraph and just review that quickly?  You don't have to read

2    that.  Is it fair to say that this is regarding Mr. Stuart's

3    2002 Amended Form 1040X?

4    A.  It's referred to in the letter as 2002.

5            MR. BERNHOFT:  One moment, please, Judge.

6            (Brief pause.)

7    BY MR. BERNHOFT:

8    Q.  Ms. Morgan, handing you a copy of what's been marked as

9    Exhibit 1007.  Could you tell me what that is, please.

10   A.  This is the letter 2645(c) to James A. Stuart from the

11   Internal Revenue Service.

12   Q.  Thank you.

13           Move admission of Exhibit 1007.  Permission to

14   publish.

15           MR. JACOBS:  I have no objection.

16           THE COURT:  Is there any objection?

17           MR. JACOBS:  No, Judge.  I'm sorry, I have no

18   objection.

19           THE COURT:  Received.

20           (Exhibit 1007 offered and received.)

21           MR. BERNHOFT:  Thank you.

22   BY MR. BERNHOFT:

23   Q.  And, Mrs. Morgan, can you tell me what the date on that

24   letter is, please.

25   A.  The date is June 26th, 2006.

1   Q.  And from Kansas City IRS to Mr. Stuart?

2   A.  Correct.

3   Q.  What tax period is that relating to?

4   A.  December 31st, 2005.

5   Q.  And could you read that highlighted text in that next

6   paragraph, please.

7   A.  "We haven't resolved this matter because we haven't

8   completed all the research necessary for a complete response.

9   We will contact you again within 45 days to let you know what

10  actions we are taking.  You don't need to respond (sic) any

11  further now on this matter."

12  Q.  Thank you.

13          THE COURT:  Please read that again.  The last line.

14          THE WITNESS:  "You don't need to do anything further

15  now on this matter."

16  BY MR. BERNHOFT:

17  Q.  Thank you.  Now, Ms. Morgan, handing you a copy of what's

18  been marked as 1008, could you tell me what that is, please?

19  A.  This is a letter from James -- to James A. Stuart from the

20  Internal Revenue Service dated June 3rd -- July 3rd, 2006.

21  Q.  Thank you.

22          Move admission 1008.  Permission to publish.

23          MR. JACOBS:  I have no objection, Judge.

24          THE COURT:  It's received.

25          (Exhibit 1008 offered and received.)

98

1          MR. BERNHOFT:  Thank you.

2   BY MR. BERNHOFT:

3   Q.  And, Mrs. Morgan, could you tell me what tax period this

4   letter from IRS Kansas City to Mr. Stuart relates to?

5   A.  December 31st, 2005.

6   Q.  And just referring you -- and if you could read that

7   highlighted text starting the first paragraph "although,"

8   please.

9   A.  "Although we try to respond quickly, extensive research is

10  often required.  At this time we are unable to provide a

11  complete response because:  Due to heavy workload, we have not

12  yet completed our research to resolve your" -- "due to heavy

13  workload, we have not yet completed our research to resolve your

14  inquiry."

15  Q.  Now, Mrs. Morgan, I think you testified yesterday that the

16  IRS doesn't discuss tax law.  Do you recall that testimony?

17  A.  They don't argue the tax law, no.  That's not their

18  responsibility.

19  Q.  But they do legal research on tax issues, don't they?

20  A.  I don't know what this area does when this letter was sent

21  out.

22  Q.  Well, on the face of the letter it says that they need to

23  complete their research.

24  A.  That doesn't necessarily require legal research to the law.

25  That's just their research.

1    Q.  I see.  Okay.

2          Now, Ms. Morgan, handing you a copy of what's been

3    marked as 1009, could you tell me what that is, please?

4          THE COURT:  One second.  If there are additional

5    exhibits you will be reviewing with this witness, and it's

6    fairly clear which exhibits you're going to be utilizing, please

7    hand them all up at this time.

8          MR. BERNHOFT:  Yes.  One moment, Judge.

9          (Brief pause.)

10          THE COURT:  Mr. Hill does need his exercise but I

11    don't want him running back and forth.  Thank you.

12          MR. BERNHOFT:  Move admission 1009.  Permission to

13    publish.

14          MR. JACOBS:  I have no objection.

15          THE COURT:  It's received.

16          (Exhibit 1009 offered and received.)

17          THE COURT:  Proceed.

18    BY MR. BERNHOFT:

19    Q.  And could you tell me what the date of that letter from

20    Mr. Stuart to Milwaukee IRS is, please?  I can zoom that in a

21    bit.  Be glad to.

22    A.  Dated July 21st, 2006.

23    Q.  And that's to Milwaukee IRS on Wisconsin Avenue there; is

24    that right?

25    A.  That's correct.

1    Q.  And could you read that highlighted text there in the first

2    paragraph for the jury, please.

3    A.  "As we agreed, I will forward you via mail all the

4    information regarding this situation for your review.  This

09:42    5    includes a 1040X and a Form 4852, as well as all relevant

6    additional communications."

7    Q.  And that first sentence in that second paragraph, please?

8    A.  "It is my belief that in filing the above stated

9    informational returns with the IRS, I have followed the law, and

09:42    10    the IRC, to the letter."

11    Q.  Thank you.  Ms. Morgan, handing you a copy of what's been

12    marked 27, could you review that and tell me what that document

13    is, please.

14    A.  This is a letter from the Internal Revenue Service,

09:43    15    Milwaukee Appeals Office to James and Marjorie Stuart.

16    Q.  Thank you.

17         Move admission of 27 and permission to publish.

18         MR. JACOBS:  I think that was admitted.

19         MR. BERNHOFT:  I'm sorry, it is admitted into evidence

09:43    20    already.  Thank you.

21    BY MR. BERNHOFT:

22    Q.  And publishing to the witness and the jury.  The upper

23    left-hand corner, could you, you know, confirm again who this

24    letter is from to Mr. Stuart?

09:43    25    A.  It's from the Internal Revenue Service, Milwaukee Appeals

101

1    Office.

2    Q.   Okay.  And can you tell me the date of this letter from IRS

3    Milwaukee Appeals to Mr. Stuart?

4    A.   July 27th, 2006.

5    Q.   And if I can have you read these first two short paragraphs

6    to the jury, please, starting with the side of my pen at the

7    paragraph?

8    A.   Beginning with "our office"?

9    Q.   Please.

10   A.   "Our office has completed its review of your claim for

11   refund of taxes that we have charged you.  Based on the

12   information you submitted, there is no basis to allow any part

13   of your claim."

14   Q.   And that second paragraph, please?

15   A.   "The income that you received in 2002 is clearly wages and

16   is taxable.  The Appeals Office does not entertain any arguments

17   listed in your letters."

18   Q.   Now, in reviewing this letter as a whole, Ms. Morgan, are

19   there any citations to any law or any Internal Revenue Code or

20   regulations in this IRS letter to Mr. Stuart?

21   A.   No.

22   Q.   Thank you.

23             One moment, please, Your Honor.

24             THE COURT:  Certainly.

25             (Brief pause.)

1   BY MR. BERNHOFT:

2   Q.  Mrs. Morgan, showing you a copy of what's been marked as 28.

3   Could you tell me what that is?

4   A.  This is a letter to the Taxpayer Advocate Service from James

5   A. Stuart.

6   Q.  Thank you.

7           Move admission of 28.  Permission to publish.

8           MR. JACOBS:  I have no objection.

9           THE COURT:  It's received.

10          (Exhibit 28 offered and received.)

11          MR. BERNHOFT:  Thank you.

12  BY MR. BERNHOFT:

13  Q.  And, Mrs. Morgan, directing you to the upper left-hand

14  corner of that letter, what date is this letter from Taxpayer

15  Advocate in Milwaukee IRS to Mr. Stuart?

16  A.  August 2nd, 2006.

17          MR. JACOBS:  Pardon me.  It's the other way around.

18          MR. BERNHOFT:  Yes.  Thank you very much.

19  BY MR. BERNHOFT:

20  Q.  This is, in fact, a letter from Mr. Stuart to Mr. Kram.  I'm

21  sorry.  Can you confirm that from your review of the letter?

22  A.  That's correct.

23  Q.  Thank you.  And if you would, please, Mrs. Morgan, directing

24  you to the first paragraph, can you read that first paragraph

25  for the jury, please.

1    A.   "In your rely, you stated that the Taxpayer Advocate Service

2    does not have the authority to address any arguments or concerns

3    about the legality of the tax laws.  I wish to state that I

4    understand this, and my concern is not with the legality of the

09:47  5    tax laws, but with (sic) the misrepresentation of these laws by

6    the IRS."

7    Q.   Could you back up and just repeat that sentence and look

8    carefully starting with "but the"?

9    A.   "But the misinterpretation of these laws by the IRS."

09:47  10   Q.   And could you continue, please?

11   A.   "In the response I received from the Appeals Office, the

12   statement was made that it was clear that I owe this tax.  This

13   is where my disagreement arises, in that it is not clear that I

14   owe the tax, not that the tax system itself is illegal."

09:47  15   Q.   Thank you.  Mrs. Morgan, showing you a copy of what's been

16   marked 1012, could you tell me what that document is, please?

17   A.   This is a letter 2644(c) to James Stuart from the Kansas

18   City Internal Revenue Service.

19   Q.   Thank you.

09:48  20           Move the admission of 1012.  Permission to publish.

21           MR. JACOBS:  No objection.

22           THE COURT:  Received.

23           (Exhibit 1012 offered and received.)

24           MR. BERNHOFT:  Thank you.

09:48  25   BY MR. BERNHOFT:

104

1   Q.  And, Mrs. Morgan, again, this is a letter from Kansas City

2   to Mr. Stuart?

3   A.  Yes.

4   Q.  And what is the date of that letter, please?

5   A.  August 9, 2006.

6   Q.  And referring your attention to that first highlighted

7   paragraph, could you read that for the jury, please.

8   A.  "We previously sent you a letter concerning your inquiry

9   received May 23rd, 2006.  Although we try to respond quickly,

10  extensive research is often required.  At this time we are

11  unable to provide a complete response because: --"

12  Q.  And could you just read that second indented paragraph,

13  please?

14  A.  "Due to heavy workload, we have not yet completed our

15  research to resolve your inquiry."

16  Q.  Thank you.  Mrs. Morgan, handing you a copy of what's been

17  identified and marked as 29, could you review that, please, and

18  tell me what that document is.

19  A.  This is a letter to Mr. Mark Everson from James A. Stuart.

20  Q.  Could you tell me what -- that's all right.  Thank you.

21          Move Exhibit 29.  Permission to publish.

22          MR. JACOBS:  No objection.

23          THE COURT:  It's received.

24          (Exhibit 29 offered and received.)

25          MR. BERNHOFT:  Thank you.

105

1    BY MR. BERNHOFT:

2    Q.   And, Mrs. Morgan, referring your attention to the upper

3    left-hand corner, what is the date of this letter?

4    A.   August 28, 2006.

09:50  5    Q.   I'm going to try to zoom that in just a bit.  And again, who

6    is this letter addressed to from Mr. Stuart?

7    A.   Mr. Mark Everson.

8    Q.   And who is Mr. Everson according to this letter?

9    A.   Commissioner of the Internal Revenue Service.

09:51  10   Q.   And, Mrs. Morgan, directing your attention, there appears to

11   be a handwritten note in the upper right-hand corner.  I'm going

12   to just zoom in on that a little bit.  Can you read that

13   handwritten note there starting with that first word which

14   appears to be a name?

09:51  15   A.   I don't know for sure what the name is.  It appears to be

16   "Sandy," or something to that.  "Can you send this to Ogden

17   Frivolous Correspondence Unit?"

18   Q.   All right, thank you.  And, Mrs. Morgan, directing your

19   attention to the last paragraph with the circled yellow

09:52  20   highlight, could you read that for the jury, please.

21   A.   "Now knowing what the IRC actually does say about who owes

22   the income tax, it is clear that such tax does not apply to me,

23   as my employer is not a trade or business within the meaning of

24   26 U.S.C. 7701(a)(26), but rather is a for profit company that

09:52  25   does no business at all with a governmental entity.  As a worker

106

1    engaged in an agreement with a for profit company, said company

2    erroneously sent the IRS a W-2 implying that wages I received

3    were wages as defined in 3401(a) and 3121(a), when, in fact, I

4    did not receive such wages, and I did not, and have never in the

5    past 45 years, received wages that fall under these sections of

6    the IRC.  With the above having been said, I have used all the

7    improper and legal means provided for in the IRC to recover the

8    monies I have sent to the IRS, said monies which were improperly

9    withheld from revenue I earned, and I demand that such monies be

10   returned to me immediately."

11   Q.   And again, Mrs. Morgan, the acronym for IRC is Internal

12   Revenue Code?

13   A.   That's correct.

14   Q.   Thank you.

15        Mrs. Morgan, handing you a copy of what's been marked

16   1014, could you tell me what that document is, please.

17   A.   This is a letter from the Internal Revenue Service to James

18   A. Stuart.  The letter is a 2645(c).

19   Q.   Thank you.

20        Move admission of 1014 and permission to publish.

21        MR. JACOBS:  No objection.

22        THE COURT:  Received.

23        (Exhibit 1014 offered and received.)

24        MR. BERNHOFT:  Thank you.

25   BY MR. BERNHOFT:

107

1   Q.  Mrs. Morgan, referring your attention to the upper

2   right-hand corner.  Can you tell me what the date of that letter

3   is?

4   A.  September 12th, 2006.

09:54   5   Q.  And the highlighted section, what tax period does this

6   IRS/KC letter to Mr. Stuart refer to?

7   A.  The period ending December 31st, 2005.

8   Q.  And based on your knowledge of the documents and your

9   previous testimony, that would be the 2005 1040 return that

09:55   10  Mr. Stuart filed?

11  A.  That's correct.

12  Q.  And that was the 2005 1040 return that took the same

13  position as his amended X returns for '02, '03, '04?

14  A.  Correct.

09:55   15  Q.  And could you read just the highlighted section of that

16  first paragraph for the jury, please.

17  A.  "We haven't resolved this matter because we haven't

18  completed all the research necessary for a complete response.

19  We will contact you again within 45 days to let you know what

09:55   20  action we are taking.  You don't need to do anything further on

21  this matter."

22  Q.  Thank you.  Mrs. Morgan, handing you a copy of what's been

23  marked as 33, could you review that document and tell me what

24  that is, please?

09:56   25  A.  This is entitled, A Notice of Demand From, according to the

1    letter, James A. Stuart.  Don't see a date.

2    Q.   Thank you.

3            Move admission of 33 and permission to publish.

4            MR. JACOBS:  No objection.

5            THE COURT:  It's received.

6            (Exhibit 33 offered and received.)

7            MR. BERNHOFT:  Thank you.

8    BY MR. BERNHOFT:

9    Q.  Mrs. Morgan, I'm first going to direct your attention to

10   page 2 of this notice of demand.  Can you tell me what that date

11   is there?

12   A.   October 6, 2006.

13   Q.   So this correspondence to the IRS is dated October 6, 2006?

14   A.   It's signed that date, yes.

15   Q.   Thank you.  Referring your attention back to page 1 of

16   Exhibit 33.  And I'm going to zoom in for you.  Would you read

17   that highlighted paragraph for the jury, please.

18   A.   "As of the date of this correspondence, there has been no

19   meaningful resolution of this issue offered by the IRS.  I have

20   received no valid reason why the IRS will not send me the

21   requested refund, and instead, all that has been sent is a form

22   letter saying the IRS needs another 45 days to research the

23   matter.  I have received this form letter postponing any action

24   four times since filing my 1040.  What I have not received from

25   the IRS is any form of evidence which is able to refute my sworn

09:56
09:56
09:57
09:57
09:58

109

1    testimony asserting the facts that I have stated above."

2    Q.  Thank you.  Ms. Morgan, directing your attention to what's

3    been marked Exhibit 36.  Would you please take a look at that

4    document and tell me what that is.

09:58  5    A.  This is a letter to Dennis Parizek dated April 10, 2007,

6    from James A. Stuart.

7    Q.  I believe you testified yesterday that you knew who

8    Mr. Parizek was?

9    A.  Yes, I worked for Mr. Parizek.

09:59  10    Q.  And what is his position at Ogden?

11    A.  He was the operation manager at the time.

12    Q.  Is that the head official at IRS at Ogden?

13    A.  No, he's in the examination function.

14    Q.  Thank you.

09:59  15        Move admission of 36.  Permission to publish.

16        MR. JACOBS:  No objection.

17        THE COURT:  Received.

18        (Exhibit 36 offered and received.)

19        MR. BERNHOFT:  Thank you.

09:59  20    BY MR. BERNHOFT

21    Q.  And, Ms. Morgan, just briefly I address your attention to

22    the upper left-hand corner.  What is the date of that letter

23    from Mr. Stuart to Mr. Parizek at Ogden IRS?

24    A.  April 10th, 2007.

09:59  25    Q.  Thank you.  And, Ms. Morgan, directing your attention to

110

1  that first highlighted couple of sentences there, could you

2  please read that to the jury?

3  A.  "The IRS makes, as its basis in law, allegations that the

4  2002 return filed by the undersigned did not contain the

5  information the law requires, but it does not say what

6  information the law does require, which is allegedly missing.

7  The undersigned states that (sic) the IRS -- states to the IRS

8  that the Internal Revenue Code is much too complex for the

9  average individual to understand."

10  Q.  And moving down to the last sentence of that paragraph

11  that's highlighted, would you please read that for the jury?

12  A.  "The undersigned also states to the IRS that he is not to be

13  identified as a tax protester as he is not, and is more than

14  willing to pay any lawful income tax that he might owe."

15  Q.  Thank you.  And I'm going to direct your attention,

16  Ms. Morgan, to page 2 of this letter.  And would you please read

17  starting from the first full sentence in the highlighted area at

18  the top there, line 1?

19  A.  "In checking with the IRS Forms Office, the undersigned

20  can't find where an applicable tax form exists that applies to

21  him and has the proper OMB number, as the Form 1040 appears to

22  apply to a federal person, receiving a federal wage."

23  Q.  Ms. Morgan, are you familiar with the acronym OMB?

24  A.  I'm not totally, no.

25  Q.  Could it be Office of Management and Budget?

111

1  A.  It could be.  I don't know.

2  Q.  Well, does the IRS publish regulations regarding form

3  numbers pursuant to OMB rules and regulations?

4  A.  I don't know.

5  Q.  All right.  Are you familiar with the Code of Federal

6  Regulations at 26 CFR in that regard?

7  A.  No.

8  Q.  Thank you.  Ms. Morgan, lastly I want to direct your

9  attention briefly to page 3, what's been admitted as 36.  And

10  could you read that first paragraph enumerated 10, please.

11  A.  Beginning with "James A. Stuart"?

12  Q.  Please, yes.  Thank you.

13  A.  "James A. Stuart, Jr. attests that he, in his capacity as

14  the living human being, does not, and is incapable of,

15  understanding the Internal Revenue Code, and after reading the

16  code, and not fully understanding its meaning, asks the IRS to

17  show him where in the code he may find his obligation to pay an

18  income tax."

19  Q.  And, please, also paragraph 11?

20  A.  "James A. Stuart, Jr. attests that he does not want to be in

21  violation of the law and requests that the IRS assist him in

22  pointing out and explaining that section of the code which

23  stipulates that he owes an income tax.  He further states that

24  he will comply if the IRS will show him how he may lawfully do

25  so."

112

1    Q.   Thank you.

2              Mrs. Morgan, showing you what's been -- a copy of

3    what's been marked as 0017.

4              MR. JACOBS:   10?

10:03    5              MR. BERNHOFT:   I'm sorry, 1017.

6    BY MR. BERNHOFT:

7    Q.   Could you tell me what that is, please.

8    A.   This is the letter 3176 to James A. Stuart from the Internal

9    Revenue Service.

10:04    10    Q.   Could you tell me what the date on that letter is?

11    A.   June 8, 2007.

12    Q.   Thank you.  Now, Ms. Morgan, I can represent to you, and for

13    counsel's benefit, that this was moved in by the government.

14    It's the June 8, 2007 frivolity letter, government's 40.  But

10:04    15    there was another page that was in this exhibit that the

16    government independently marked it.  So I'll go briefly through

17    this, but you testified about this before I can represent to

18    you.

19              THE COURT:   Is that a question or a statement?

10:05    20              MR. BERNHOFT:   Sorry.  I move admission of 1017.

21    Permission to publish.

22              MR. JACOBS:   I have no objection.

23              THE COURT:   It's received.

24              (Exhibit 1017 offered and received.)

10:05    25              MR. BERNHOFT:   Thank you.

113

1    BY MR. BERNHOFT:

2    Q.  And upon examining this first page, I believe you recall

3    that you did indeed testify about this yesterday, Ms. Morgan?

4    A.  That's correct.

10:05   5    Q.  And I wanted you to take a look at the first two or three

6    paragraphs there.  And if you could read that highlighted text

7    to the jury, please, from this IRS letter to Mr. Stuart?

8    A.  "We have determined that the information you sent is

9    frivolous and your position has no basis in law.  Therefore, we

10:06   10   will not respond to future correspondence concerning these

11   issues.  Our lack of response to further correspondence does not

12   in any way convey agreement or acceptance of the arguments

13   advanced.  If you intend to persist in making such arguments we

14   encourage you to seek advice from a reputable tax practitioner

10:06   15   or attorney."

16   Q.  All right.  And then I'm going to refer you to page 4 of

17   what has been admitted as 1017.  And if you could take a look at

18   that.  Do you see that, Ms. Morgan?

19   A.  Yes.

10:06   20   Q.  And this was an attachment to page 4 to this IRS letter to

21   Mr. Stuart dated June 8, 2007.  Are you familiar with the

22   Privacy Act?

23   A.  Yes, somewhat.

24   Q.  And are you familiar with the Privacy Act statement that IRS

10:06   25   will attach to some letters like this?

1    A.   No.   No.   I've heard the term Privacy Act.

2    Q.   All right.   Could you please read that highlighted text for

3    me to the jury?

4    A.   "They say that you must furnish us with records or" --

5    Q.   Excuse me, I apologize.   Could you start at the top there

6    which will give context, starting with "under"?

7    A.   Okay.

8    Q.   Thank you.

9    A.   "Under the Privacy Act of 1974, we must tell you that our

10   legal right to ask for this information is Internal Revenue Code

11   Section 6001, 6011, 6012(a) and their regulations.   They say

12   that you must furnish us with records or statements for any tax

13   for which you are liable, including the withholding of taxes by

14   your employer."

15   Q.   Thank you.

16          Ms. Morgan, referring you to a copy of what's been

17   admitted as Exhibit Number 41, could you briefly tell us what

18   that is?

19   A.   This is a letter dated June 22nd, 2007, to the Internal

20   Revenue Service in Ogden, Utah, and it is signed by James A.

21   Stuart, Jr.

22   Q.   Thank you.   I'm going to just briefly refer your attention

23   to the last page of this letter, page 5.   And could you read

24   that brief highlighted text there for the jury, Ms. Morgan?

25   A.   "If the IRS is able to satisfactorily provide answers to the

115

1  questions posed above, and can demonstrate where the Trust does

2  lawfully owe an income tax, and (sic) said tax" -- excuse me,

3  "said tax will be paid."

4  Q.  Thank you.  Ms. Morgan, and please refresh my recollection,

5  your history with IRS in Ogden, Utah, how long have you worked

6  in Ogden?

7  A.  For 27 years.

8  Q.  And what is your current position at Ogden?

9  A.  I'm the court witness coordinator.

10  Q.  Do you have knowledge of the Frivolous Correspondence Unit

11  at Ogden?

12  A.  Yes.

13  Q.  And do you know who is in charge of the Frivolous

14  Correspondence Unit?

15  A.  As far as today, no.

16  Q.  In your work experience at the Ogden campus, are you

17  familiar with a term called the "funny box"?

18  A.  Yes.

19  Q.  And could you tell the jury what the funny box is?

20  A.  That's different returns or information that are pulled from

21  the system that may contain things that needed additional

22  review.

23  Q.  Do you know why the Ogden campus called that the funny box?

24  A.  I think someone just come up with a title just so that we'd

25  all know what they were talking about.

1    Q.   Are you familiar with the term "classified trash"?

2    A.   Yes.

3    Q.   And what does the term "classified trash" mean?

4    A.   That's information that's at the IRS that has information

5    that should not be disclosed — for instance, Social Security

6    numbers, names and addresses.  It's put in a trash that is

7    shredded and then burned.

8    Q.   Thank you.  Turning back to the funny box issue, is it

9    correct to say that certain revenue officers and IRS criminal

10   investigation division special agents will review documents that

11   are placed in the funny box up there in Ogden?

12   A.   Yeah.  It can be reviewed by any organization of the IRS,

13   yes.

14   Q.   Isn't it true that there's a CI, at least one CI individual

15   special agent or team that does routinely review the funny box

16   correspondence?

17   A.   CI?

18   Q.   Criminal investigation.

19   A.   Not a special agent, no.

20   Q.   Are you familiar with Special Agent Mike Anderson from

21   Ogden?

22   A.   No.  I don't know him.

23   Q.   Ms. Morgan, handing you a copy of what's been marked as 45.

24   Could you take a look at that document and tell me what that is,

25   please?

1    A.   This is a letter dated July 25th, 2007, to the Internal

2    Revenue Service from James A. Stuart, Jr. taxpayer.

3    Q.   Thank you.

4         Move admission of 45.  Permission to publish.

5         MR. JACOBS:  No objection.

6         THE COURT:  It's received.

7         (Exhibit 45 offered and received.)

8         MR. BERNHOFT:  Thank you.

9    BY MR. BERNHOFT:

10   Q.   And, Ms. Morgan, what's the date of that letter?

11   A.   July 25th, 2007.

12   Q.   And directing your attention briefly to paragraphs 3, 4 and

13   5, and I'm going to -- is that clear for you?

14   A.   Yes.

15   Q.   Would you please read those highlighted sections for the

16   jury, please.

17   A.   "After continued studying of the IRC, the Trustee believed

18   he had discovered the proper means to correct his previous

19   filings and proceeded correct the mistake -- and proceeded

20   correct the mistake by filing a Form 1040 accompanied by a

21   Form 4852, restarting (sic) the amount -- restating the amount

22   of wages believed to have been earned for that year.

23        "In making the above referenced filing, the Trustee

24   believed that he was acting responsibly on behalf of the Trust,

25   and was adhering to these provisions provided for in the IRC to

1    correct an error.  The Trustee was so convinced he was acting

2    responsibly that he signed the corrected forms under penalties

3    of perjury.

4         "The James A. Stuart, Jr. Trust is not a tax

5    protester, and has, on numerous occasions, stated that he is

6    willing to pay any lawful income tax that is due, providing said

7    tax is understandable."

8    Q.  Thank you.

9         Your Honor, moment to confer?

10        THE COURT:  Certainly.

11        (Brief pause.)

12        MR. BERNHOFT:  Thank you.

13   BY MR. BERNHOFT:

14   Q.  We have one last document, Ms. Morgan.  Ms. Morgan, handing

15   you what's been marked as Exhibit 47, could you take a look at

16   that and tell me what that document is, please.

17   A.  This is a letter to the Internal Revenue Service from James

18   Stuart dated August 6, 2007, with some attachments.

19   Q.  Thank you.

20        Move admission of 47.  Permission to publish.

21        MR. JACOBS:  No objection.

22        THE COURT:  Received.

23        (Exhibit 47 offered and received.)

24        MR. BERNHOFT:  Thank you.

25   BY MR. BERNHOFT:

1   Q.  I'm going to ask you to just read a couple of the sections,

2   not all these highlighted sections, then I'm going to point my

3   pen to a couple of items if that's all right.

4       This paragraph 15 here, could you read that

5   highlighted sentence there, please?

6   A.  "The Trustee, after studying the code, had proceeded to act

7   upon information that he had learned and believed to be correct,

8   and as a result, is now being punished by the IRS for doing so."

9   Q.  And then below there, paragraph 17, Ms. Morgan -- I'm

10  sorry -- if you could read that for the jury, please.

11  A.  "When the Trustee asked said tax professionals whether or

12  not a CPA is an agent of the IRS, said professional replied, in

13  front of a witness, that we take our marching orders from the

14  IRS, yes."

15      MR. BERNHOFT:  Thank you.  I have no further questions

16  on cross-examination for this witness, Your Honor.

17      MR. JACOBS:  Judge, I do have some questions.

18                  REDIRECT EXAMINATION

19  BY MR. JACOBS:

20  Q.  Ms. Morgan, I wanted to review some of the correspondence

21  that Mr. Bernhoft showed you.  And I know -- am I correct you

22  weren't reading the entire documents?

23  A.  No, only parts of the documents.

24  Q.  And if I could first draw your attention to -- I believe

25  Mr. Bernhoft showed you Exhibit 24.

120

1          And, Judge, I wonder if I could, as opposed to handing

2    her paper documents, rely on just the scanned images of those.

3          THE COURT:  That's fine.

4          MR. JACOBS:  I don't know if the court would be

5    willing to switch over to the -- I think it's currently on the

6    Elmo.

7          THE COURT:  That's fine.

8    BY MR. JACOBS:

9    Q.  This is Exhibit 24.  Do you recognize what that is?  Can you

10   see it from where you are there?  I can probably make it a

11   little larger.

12   A.  Yes.

13   Q.  And what was that?

14   A.  It's the March 9th, 2006 letter from Kansas City Appeals

15   Office to Mr. Stuart.

16   Q.  Is that the other way around?

17   A.  It is.  It's to the IRS from Mr. Stuart.

18   Q.  And can you read that last paragraph of Mr. Stuart's letter?

19   A.  "With the above statute in mind, I hereby demand that I

20   either: receive my refund, receive a satisfactory explanation as

21   to why the refund is denied, or an answer to my letter

22   requesting an administrative appeal and request for cure.  In my

23   (sic) opinion that the IRS is" --

24          THE COURT:  Read that again, please.

25          THE WITNESS:  "It is my opinion that the IRS is

121

1  skating on thin ice regarding this matter and appears to be

2  willfully denying my claim, which is an act with dire

3  repercussions."

4  BY MR. JACOBS:

10:19  5  Q.  And then he showed you what was admitted as Exhibit 26.

6  Bear with me just one second.

7  MR. BERNHOFT:  I'm sorry, Your Honor, I don't think 26

8  has been admitted.

9  THE COURT:  It has not.

10:20  10  MR. JACOBS:  Your Honor, based on the stipulation

11  entered into by the parties I would move into evidence

12  Exhibit 26.

13  MR. BERNHOFT:  No objection, Judge.

14  THE COURT:  It's received.

10:20  15  (Exhibit 26 offered and received.)

16  BY MR. JACOBS:

17  Q.  You recognize what this document is, Ms. Morgan?

18  A.  Yes.

19  Q.  And what is it?

10:20  20  A.  This is the letter dated June 28, 2006 to Ms. Dorothy Baylis

21  from James A. Stuart.

22  Q.  And again, can you read that lower portion of the letter,

23  paragraph beginning with "therefore"?

24  A.  "Therefore, there is nothing" --

10:21  25  Q.  Oh, I'm sorry.  I can tell I highlighted too -- beginning

122

1    with "along."

2    A.  I'm sorry, I can't find that.

3    Q.  The top line.

4    A.  Oh, along.  "Along with my 1040, I submitted both a 4852

5    refuting the W-2 sent to the IRS by my employer, and a revised

6    1099, both signed under penalty of perjury, in the form of an

7    affidavit, stating that my employer was wrong, and lied, was

8    fearful of the IRS retaliation, or misinformed about wages paid

9    me, as there were none.  Therefore, there is nothing for you to

10   research, as justification for my actions are clearly spelled

11   out in the code.  I therefore demand that the claimed refund

12   stated on my 1040 be returned to me immediately.  This stalling

13   game is a ruse to discourage honest, law-abiding citizens who

14   are following the law to the letter and I will have no part of

15   it as I will not be discouraged.  I consider this money in

16   effect stolen from me by my employer and I want it back."

17   Q.  And then turning your attention to I believe Exhibit 29

18   which was shown to you by Mr. Bernhoft.  This is a letter dated

19   August 28, 2006, addressed to Mr. Everson.  I think you

20   identified him as the Commissioner of the Internal Revenue

21   Service?

22   A.  That is correct.

23   Q.  Can you read the first paragraph of Mr. Stuart's letter?

24   A.  "I have recently discovered that the income tax, which I

25   have been dutifully paying for years, does not apply to me.  In

123

1  reality, I have been deceived for all these years as I have been

2  duped into thinking that this tax was in fact owed.  The

3  deception has been perpetrated upon me, and millions like me,

4  through the deceptive acts and actions of the IRS and it is time

5  that it stops, as more and more Americans are being educated as

6  to what constitutes the truth."

7  Q.  I believe then you were also shown a notice and demand

8  submitted by Mr. Stuart, Exhibit 33.  And I'd like to turn your

9  attention first to the -- just one second.  This is the third

10 page of that document.  Can you read what it says?

11 A.  "Statement:  I, James A. Stuart, Jr., swear that I am a

12 natural person residing in the city of Delafield, in Waukesha

13 County in our country of Wisconsin, expressly not within the

14 United States."

15 Q.  And then the next page of that affidavit Mr. Stuart

16 submitted, can you read the second paragraph?

17 A.  "Statement:  I, James A. Stuart, Jr., swear that I am not in

18 receipt of, or have no knowledge of, evidence possessed by the

19 government demonstrating that I am a U.S. citizen, nor do I

20 reside in Washington, D.C., or any territories or possessions of

21 the United States."

22 Q.  And I believe Mr. Bernhoft showed you Exhibit 36, a letter

23 from Mr. Stuart to Dennis Parizek dated April 10, 2007.

24 A.  That's correct.

25 Q.  And I'd like you to read a couple paragraphs.  First let's

124

1  start with paragraph 3 of Mr. Stuart's letter.  Can you read

2  that?

3  A.  "The IRS persists in the act of addressing the entity, James

4  A. Stuart, Jr., as being a taxpayer and alleging that this

5  entity is also the same person as James A. Stuart, Jr.  James A.

6  Stuart, Jr. is a taxpayer, but by his own personal knowledge,

7  James A. Stuart, Jr. asserts he is not, and he also asserts that

8  the two entities are not one and the same."

9  Q.  And if we continue to -- I don't want to make you read the

10  entire document, but let's look at paragraph 5.  Can you read

11  that?

12  A.  "The undersigned, through his own independent study, attests

13  that the Trust's name is not the name of the natural man,

14  spelled with all capital letters.  The Social Security

15  Administration does not own, or hold, the name of a natural man

16  and cannot give it to anyone or anything and the SSA cannot

17  change the spelling of a natural man's name.  The English

18  language grammar rule requires that only the first letter of

19  proper nouns be capitalized.  Said rule is recognized by

20  agencies within the United States Government corporation:  The

21  United States Government printing office, style manual,

22  chapter 3.  Capitalization, paragraph 3.2, proper names; and,

23  the United States Government correspondence manual, chapter 4,

24  forms and addresses, U.S. citizens, and chapter 5, the elements

25  of style, capitalization, proper nouns; and, the United States

125

 1   Postal Service, domestic mail manual, issue 57, Section AO40,

 2   alternate addressing formats, and the United States Postal

 3   Service Publication 28, Postal Addressing Standards, Section 2,

 4   Postal Addressing Standards, 212 format.  The natural exception

 5   to this rule is for entities whose name are defined in their

 6   creation by their all capital letter spelling and the estates,

 7   paragraph (sic), trusts, of dead people.  Natural people's names

 8   do not fit that exception and can only be spelled properly

 9   according to rules of English language grammar which are

10   recognized."

11   Q.  Okay.  And then the paragraph below that, paragraph 6?

12   Well, let me try that again.

13   A.  "James A. Stuart, Jr. attests that he is a living human

14   being who has loaned his consciousness to, and is acting in the

15   capacity of, the Office of Trustee of the James A. Stuart, Jr.

16   Social Security Trust."

17   Q.  And then try paragraphs 7 and 8.

18   A.  "James A. Stuart, Jr., through his own independent study,

19   attests that it is the James A. Stuart, Jr. Trust that has

20   received income, and not the natural man, James A. Stuart, Jr.

21        "James A. Stuart, Jr., through his own independent

22   study, attests that he is not, nor has he ever been, in the

23   possession of a Social Security number or a Social Security

24   card, therefore has no TIN, and that said instrument and TIN

25   belong to the James A. Stuart, Jr. Social Security Trust

126

1  account."

2  Q.  And now that we see that, let me -- let's -- go to the first

3  page.  What's the date of this letter?

4  A.  April 10th, 2007.

5  Q.  Let me move on.  Next I believe you were shown Exhibit 41.

6  Do you recognize what Exhibit 41 is?

7  A.  Yes.

8  Q.  It's a letter from Mr. Stuart to the IRS dated June 22 of

9  2007?

10  A.  That's correct.

11  Q.  And if we could just -- let me, first of all, highlighting

12  this section, the first sentence, the "James A. Stuart, Jr.

13  Trust declines to complete the questionnaire;" do you know what

14  questionnaire is being referred to there?

15  A.  No, I don't.

16  Q.  Are there questionnaires that were sometimes sent out to the

17  taxpayers when they filed frivolous claims?

18  A.  Yes.  Yes.

19  Q.  What type of questionnaires might be sent out?

20  A.  They would be sending out questionnaires that might ask, you

21  know, where they received the information, it's an independent

22  study, is it from something off the Internet, if they have names

23  or asked to turn those over.

24  Q.  All right.  If you could read the paragraph that follows in

25  which -- in Mr. Stuart's letter.

127

1  A.  "James A. Stuart, Jr., the living human being, who is not in

2  possession of a taxpayer identification number, TIN, or a Social

3  Security number, SSN, and who has loaned his consciousness and

4  physical capacity to, and acts in the capacity as, the Office of

5  Trustee for the James A. Stuart, Jr. Trust, and for the purpose

6  of this correspondence is now acting in said capacity, hereby

7  states the following."

8  Q.  And if we move to that next paragraph, can you read that?

9  A.  "James A. Stuart, Jr., after completing a great deal of

10  diligent research, has concluded that he, in his capacity as a

11  living human being and not in the possession of a Social

12  Security number, SSN, and as a citizen of one of the several

13  states in these United States of America, who has inalienable

14  rights guaranteed him under the Constitution of the United

15  States of America, now believes that he, as the man, does not

16  owe an income tax.  Therefore, from this point forward, all

17  comments in this correspondence are being made by the Office of

18  Trustee, thereafter also referred to as Trustee, of the James

19  Arthur Stuart Jr., aka James A. Stuart Jr. Trust, said trust

20  being a Social Security numbered taxpayer."

21  Q.  I don't want to make you read the entire letter, but let's

22  try the first sentence beginning at the top of the second page.

23  "The sovereign"?

24  A.  "The sovereign human being, being a natural person, who has

25  loaned his consciousness and physical capacity to the Office of

128

1    Trustee of the Trust, wanting to duly execute his responsibility

2    and comply with the law, has made a concerted effort to find in

3    the IRC where a living human being owes an income tax, and

4    cannot find where such an obligation exists.  This same

5    individual, acting in the same capacity, and after further

6    research, has discovered information that appears to indicate

7    that the taxpayer is in fact an entity with a name spelled much

8    like the name of the living human being who loaned his

9    consciousness and physical capacity to the Office of Trustee,

10    but instead, the name is spelled in all upper case letters.  The

11    following is what the natural person believes to be the case

12    regarding the creation of this taxpayer."

13         MR. BERNHOFT:  Your Honor, may we approach briefly?

14         THE COURT:  Certainly.

15         (At side bar on the record.)

16         MR. BERNHOFT:  Judge, I don't mind Mr. Jacobs getting

17    into this stuff, that's fine, that's part and parcel of the

18    correspondence chain, but, you know, he elected not to do this

19    on direct.  I crossed pretty selectively, got my subject matters

20    and highlights in there.  I mean, I think there is some natural

21    limit to redirect and I think we're kind of approaching that.

22         MR. JACOBS:  Truthfully, Judge, like he says, he kind

23    of selectively pulled from the letters and I don't think that

24    gave an accurate representation of what the correspondence was.

25    So it forced us to go back and say --

129

1          THE COURT:  To the extent he's expressing objection

2    it's overruled.  Proceed.

3          MR. BERNHOFT:  Thank you.

4          (End of discussion at side bar.)

10:36    5          MR. JACOBS:  Give me just one second, Your Honor.

6          (Brief pause.)

7    BY MR. JACOBS:

8    Q.  I'd like to show you what's been marked for identification

9    as Exhibit 52.

10:37   10          (Witness peruses document.)

11   BY MR. JACOBS:

12   Q.  Do you recognize what that exhibit is?

13   A.  Yes.

14   Q.  And is it correct that that's a letter from Mr. Stuart to

10:37   15   the IRS?

16   A.  Yes, it is.

17          MR. JACOBS:  Your Honor, I'd move into evidence

18   Exhibit 52.

19          MR. BERNHOFT:  Moment to confer with counsel?

10:37   20          (Brief pause.)

21          MR. BERNHOFT:  No objection.

22          THE COURT:  52 is received.

23          (Exhibit 52 offered and received.)

24   BY MR. JACOBS:

10:38   25   Q.  And what's the date of the letter, Ms. Morgan?

1    A.   December 3rd, 2007.

2    Q.   And to whom is it addressed?

3    A.   It's addressed to Jon Schwartz.

4    Q.   And do you know who Mr. Schwartz is?

10:38  5    A.   I do not, no.

6    Q.   Someone with the IRS, I gather.

7    A.   Someone with the IRS, yes.

8    Q.   Let me start with the first paragraph, number 1.  Can you

9    read that to the jury?

10:38  10   A.   "The Trust is fully aware of the nature of the statutes

11   created by the United States Government, a corporation,

12   hereafter referred to as USG, and now these statutes have been

13   used since the bankruptcy of the United States was declared in

14   1938."

10:39  15   Q.   And if I could turn to the fourth page of that exhibit,

16   paragraph 21.  Could you read that?

17   A.   "The Trust believes that at that time it was decided by the

18   bankers, and USG, not to inform the people of the United States

19   of America of the bankruptcy.  It was not made known to them the

10:39  20   fact that under bankruptcy, they had purportedly lost all of

21   their constitutional rights and were now under the jurisdiction

22   of compelled performance to repay the debt to the bankers.  If

23   the people knew this, they would become alarmed and demand an

24   accounting.  It was also decided to tell the people that, for

10:39  25   the sake of convenience and simplicity, the USG and the American

131

1   B.A.R., were going to blend the procedures of law with the

2   procedures of equity, and because this sounded legal and lawful,

3   the people bought it hook, line, and sinker, and the UCC was

4   subsequently created.  The USG then created its foreign

5   international courts in admiralty jurisdiction, and unbeknown to

6   the people, and all laws Congress has passed since this time

7   have been public policy statutes, and not public laws, as the

8   corporate Congress is not capable of passing public laws that is

9   not in the interest of its creditor.  Said public policy is in

10  the interest of our creditors, and not in the interest of the

11  people, who purportedly no longer have any constitutional rights

12  under bankruptcy."

13  Q.  Let me just show you one more -- what's been marked for

14  identification as Exhibit 51, and stipulated to as being

15  admissible.  Exhibit 51.

16          And I would move into evidence Exhibit 51, Your Honor.

17          MR. BERNHOFT:  No objection.

18          THE COURT:  Received.

19          (Exhibit 51 offered and received.)

20  BY MR. JACOBS:

21  Q.  Can you tell the jury what is Exhibit 51?

22  A.  This is a letter to the Internal Revenue Service regarding

23  James A. Stuart dated September 26, 2007.  It is actually signed

24  by James A. Stuart, Jr., Trustee.

25  Q.  I gather -- how many pages is the letter?

132

1    A.   The letter is five pages, and then there is some

2    attachments.

3    Q.   And I think you looked at this signature block at the end;

4    is that right?

5    A.   Correct.

6         MR. JACOBS:  If I could just have a moment, Judge.

7         (Brief pause.)

8    BY MR. JACOBS:

9    Q.   I need to back up just one second to Exhibit 36.  I believe

10   you were shown this on cross-examination.  The signature block

11   on page 36, just showing you, do you see the signature block?

12   A.   Yes.

13   Q.   And can you read that?

14   A.   "James A. Stuart, Jr. in care of non-domestic, 2410

15   Hirschman Lane, near:  Hartland, Wisconsin, 53029, United States

16   of America, expressly not the United States, without prejudice

17   to, and reserving all of my inalienable rights."

18   Q.   And then if I could return to Exhibit 51.  Do you have that

19   in front of you?

20   A.   Yes, I do.

21   Q.   Could you read the first two sentences of the second

22   paragraph of that letter?

23   A.   "The living human being, James A. Stuart, Jr., Steward, who

24   has loaned his consciousness and physical capacity to, and acts

25   within the capacity as Office of Trustee, hereafter referred to

133

1  as Trustee, of the James A. Stuart, Jr. and the Code of Federal

2  Regulations, CFR, and the Social Security Act in more detail and

3  has made some interesting discoveries.  The Trustee has also

4  been reading in various independent publications, as well as a

5  publication circulated by the Social Security Administration,

6  SSA, itself, that the Social Security fund is in serious

7  jeopardy, and unless taxes are increased, or another remedy is

8  found, the fund will become insolvent within the next 20 years

9  or so."

10  Q.  And then if you would turn to the second page of the letter.

11  Let's try the first -- excuse me.  Third page.

12  A.  Third paragraph?

13  Q.  The third page.

14  A.  Oh, the third page.  Whoop.  That was the second page, we're

15  good.  Thank you.

16  Q.  Could you read just the first two paragraphs?

17  A.  "No living human being has ever been issued an SSN and most

18  certainly is not numbered.

19      "5:  The human being who has loaned his consciousness

20  and physical capacity to, and acts within the Office of Trustee

21  for James A. Stuart, Jr. Trust has no SSN."

22  Q.  And then just one slightly longer piece of reading.

23  Paragraph 8 of Mr. Stuart's letter?

24  A.  "A further maxim of law is; as the IRS is an agent of the

25  U.S. Treasury which is the maker/issuer of the notes that the

134

1   Trust has received from said banks, and that these notes were

2   used to discharge, not pay, the debt of the banks to the Trust,

3   the IRS then is equally, jointly, collectively, and severely

4   liable for payment, not discharge of, the face value of the

5   note.  Because the IRS owned the debt prior to the Trust

6   receiving the debt instrument, the IRS must first pay real money

7   to the Trust, as a ratio of 21.95 Federal Reserve notes to every

8   1 silver dollar, before the Trust can pay any tax on income

9   purportedly earned, because until this event occurs, no income

10   has been received."

11           MR. JACOBS:  Judge, that's the extent of my redirect.

12           THE COURT:  Rebuttal?

13           MR. BERNHOFT:  No recross.

14           THE COURT:  You may step down.  Please do not discuss

15   your testimony with anyone unless you're advised this case has

16   been concluded.  Have a good day.

17           (Witness excused at 10:47 a.m.)

18           MR. JACOBS:  Should I call my next witness, Judge?  We

19   would next call David Schwarz.

20           Mr. Schwarz, if you would come forward.  Remain

21   standing.

22           THE REPORTER:  Raise your right hand, please.

23             DAVID SCHWARZ, GOVERNMENT WITNESS, SWORN

24           THE REPORTER:  Please state your name and spell your

25   name for the record.

1    THE WITNESS:  David L. Schwarz, S C H W A R Z.

2    DIRECT EXAMINATION

3    BY MR. JACOBS:

4    Q.  Good morning, Mr. Schwarz, how are you?

10:49    5    A.  Good.

6    Q.  Sir, can you tell me, where do you currently reside?

7    A.  Slinger, Wisconsin.

8    Q.  How long have you lived in Slinger?

9    A.  23 years.

10:49    10    Q.  And how are you currently employed?

11    A.  I'm currently employed as controller of Services Plus in

12    Green Bay.

13    Q.  What type of company is that?

14    A.  It's a co-packaging/co-manufacturing company, primarily in

10:49    15    the tissue industry.

16    Q.  Tell me what your educational background is.

17    A.  Four-year double major in accounting and mathematics from

18    St. Norbert College in De Pere, Wisconsin.  And I have a CPA as

19    well.

10:49    20    Q.  Are you familiar with a company called Payroll Data

21    Services?

22    A.  Yes.  I was employed there.

23    Q.  During what period of time were you employed there?

24    A.  January of 2007 to about September 2007.

10:50    25    Q.  What type of business is Payroll Data Services?

136

1  A.  It's a payroll processing company, very similar to the

2  bigger well-known companies like ADN and Ceridian and so forth.

3  Q.  Can you describe, how big is it, how many clients it had

4  while you were there?

5  A.  It had about 800 clients, primarily in the state of

6  Wisconsin.

7  Q.  And what was your position there?

8  A.  My position was chief operating officer and chief financial

9  officer.

10  Q.  And are you familiar with a business called New Age

11  Chemical?

12  A.  Yes, I am.

13  Q.  How are you familiar with that business?

14  A.  They were a client of Payroll Data Services.

15  Q.  And do you recall what type of services Payroll Data

16  Services provided to New Age Chemical?

17  A.  The typical payroll processing, standard, you know, type

18  thing.

19  Q.  And what does that involve?  I mean, what does Payroll Data

20  Services do?

21  A.  Okay.  Well, they process the payrolls on a weekly or

22  semi-weekly and monthly type system.  And then also provide tax

23  filings and so forth as well.

24  Q.  What type of tax filings?

25  A.  It can be, you know, weekly type filings as well as

1    quarterly filings.  And then, also, W-2s at the end of the year,

2    1099s, that type stuff.

3    Q.  And what is it that Payroll Data Services files?  Is there

4    particular forms or --

5    A.  There's various different forms.  Well, the W-2s at the end

6    of the year, along with the summary filings and so forth that go

7    with that.  1099s were issued as well.  And then, also,

8    quarterly unemployment tax filings as well as filings of income

9    tax withholdings and so forth from the various companies that we

10   process payrolls for.

11   Q.  And do you recall having any specific dealings with that

12   company New Age Chemical?

13   A.  Yes, I do.

14   Q.  And was there anyone in particular that you had dealings

15   with at New Age Chemical?

16   A.  James Stuart.

17   Q.  Do you know what his relationship to New Age Chemical was?

18   A.  I believe he was the owner.

19   Q.  And is that typical for you to have contact with clients as

20   part of your job at Payroll Data Services?

21   A.  At the level that I was at, not on a day-to-day basis.  It

22   was more if there was a problem or a concern.

23   Q.  And do you recall generally what dealings you had with

24   Mr. Stuart?

25   A.  We had discussions.  He was talking to Jane McCartan, one of

1    our processing people, customer service types, about not wanting

2    certain information relayed to the governments, W-2s, that type

3    of thing, and it ultimately got up to me.

4    Q.  Did you have occasion to ever meet Mr. Stuart?

10:53   5    A.  Yes, I did.  We met in our offices sometime in I wanna say

6    March to May timeframe of 2007.

7    Q.  Do you think you'd recognize him today if you saw him?

8    A.  Yes.

9    Q.  Do you see him here today?

10:53  10   A.  Yes.  He's in that seat in the middle there.

11   Q.  I'm sorry, just so it's clear, could you identify where he's

12   seated, what he's wearing?

13   A.  I believe he's right in the middle with the blue tie.  It's

14   been a few years, though, I'm not sure.

10:53  15   Q.  He might appreciate that, but on how many occasions have you

16   met him?

17   A.  Just once.

18   Q.  And that would have been more than four years ago?

19   A.  Yes.

10:53  20   Q.  Did you have any other communications with him other than in

21   person?

22   A.  Yeah, there were a few phone conversations as well.

23   Q.  Did you have any written communications with him?

24   A.  Yes.  I did have one piece of correspondence that I wrote to

10:54  25   him after he had written correspondence to Jane in our company,

1    as well as one that I received from him.

2    Q.  I'd like to show you what's been marked for identification

3    as Exhibit 152.  If you would look through that.

4            (Witness peruses document.)

5    A.  All right.

6    BY MR. JACOBS:

7    Q.  Mr. Schwarz, do you recognize what that is?

8    A.  Yes.  This is the correspondence back and forth between

9    Payroll Data Services and James Stuart.

10           MR. JACOBS:  Your Honor, I'd move into evidence

11   Exhibit 152.

12           THE COURT:  Is there any objection?

13           MR. BERNHOFT:  None.

14           THE COURT:  It's received.

15           (Exhibit 152 offered and received.)

16   BY MR. JACOBS:

17   Q.  And can you tell me how many -- approximately how many

18   letters are there, can you tell?

19   A.  Let's see.  There's one, two, three, four -- six -- seven

20   letters.

21   Q.  Okay.  And can you tell, are they in chronological order?

22   A.  Yes.

23   Q.  And what's the first letter?  What's the date of the first

24   letter?

25   A.  March 26th.

140

1    Q.   Okay.  And who is that -- who wrote the letter and to whom

2    is the letter addressed?

3    A.   James Stuart wrote the letter and it is to Jane McCartan.

4    Q.   And is this the woman whose name you couldn't spell before?

5    A.   Yes.

6    Q.   Can you spell it?

7    A.   It's M C, capital C A R T A N.

8    Q.   And who was Ms. McCartan at that time?

9    A.   I'm not sure of her title but it was primarily customer

10   service, day-to-day contact.

11   Q.   And do you know, was she the customer service contact for

12   New Age Chemical?

13   A.   She might have been the supervisor of the person doing the

14   day-to-day.

15   Q.   And do you recall this letter?

16   A.   Yes.

17   Q.   And summarize for the jury, what's the substance of the

18   letter?

19   A.   Well, the substance was in relation to a 1099 filing for the

20   year 2006.  It's been awhile since I've read through this but --

21   primarily it was that and I'm not sure if he references the W-2s

22   in there.  Yes, he does.  He didn't want the filing of W-2s and

23   the W-3 summary form filed either.

24   Q.   Who is "he"?

25   A.   James Stuart.

1    Q.  Now, was that a service that you were providing for New Age

2    Chemical?

3    A.  Yes, it was.

4    Q.  Was it significant to Payroll Data Services that Mr. Stuart

5    didn't want you to file them?

6    A.  Yes, because the way we process the payrolls and so forth

7    it's all electronic.  It's done in summary form along with other

8    employers when you do the tax filings.

9    Q.  Now, that letter is -- is that two pages long for

10   Mr. Stuart?

11   A.  Yes.

12   Q.  And again, I gather there was additional correspondence.  Do

13   you have the next letter in front of you dated April 13, 2007?

14   A.  Yes.

15   Q.  And who wrote that letter?

16   A.  James Stuart again.

17   Q.  And to whom is it addressed?

18   A.  To Dave Jensen.

19   Q.  And who is Mr. Jensen?

20   A.  He was the owner of Payroll Data Services.

21   Q.  And do you know what the substance of this letter is?

22   A.  Generally the same thing for the year 2006, as far as

23   payment made to him, I believe.  And then also the filing of the

24   W-2s.

25   Q.  And when you say the filing of the W-2s, what's the issue

1    with the W-2s?

2    A.  Generally he did not want them reported to the government

3    agencies because he wanted to file them himself in a different

4    summary format.

5    Q.  And is that typical?

6    A.  No.  No, it's not.

7    Q.  And again, when you say "he" you mean Mr. Stuart.

8    A.  Yes.

9    Q.  The next letter, April 16, 2007, who wrote that letter?

10   A.  That was James Stuart again, and to myself.

11   Q.  And can you tell the jury what's the substance of this

12   letter?

13   A.  Pretty much along the same lines, the filing of the W-2s and

14   the W-3.  And the fact that he didn't want -- he wanted those

15   reversed.

16   Q.  And what do you mean by "reversed"?

17   A.  He wanted us to correct them and basically have it not be

18   filed at all, the 1099.

19   Q.  1099?

20   A.  There was a 1099 I believe for a payment made to him that he

21   thought was not compensation.

22   Q.  And is that something that Payroll Data Services would

23   typically do for a client?

24   A.  Yes.

25   Q.  Okay.  And did you agree to reverse the 1099?

1    A.   Ultimately, yes, we did, in May.

2    Q.   Now, you've used a couple terms that maybe most people are

3    familiar with but, for the record, what's a W-2?

4    A.   W-2 is a statement of earnings given to an employee.

10:59   5    Q.   And how is that different from a 1099?  What's a 1099?

6    A.   A 1099 is more of a tax filing for dividends, miscellaneous

7    income, other forms of compensation.

8    Q.   And could you explain the difference between a W-2 and a

9    1099?

11:00   10   A.   A W-2 is primarily given to direct employees of a company,

11   where a 1099 is given to other parties that are not necessarily

12   employees.

13   Q.   And during the time you were at Payroll Data Services did

14   you issue W-2s and 1099s for New Age Chemical?

11:00   15   A.   Yes, we did.

16   Q.   Do you know, did you issue both W-2s and 1099s for

17   Mr. Stuart?

18   A.   Yes.

19   Q.   Did there come a time when that changed?

11:00   20   A.   I think -- I mean, we obviously reversed the one, but I

21   don't know about other happenings after I left employment there.

22   Q.   Were there any other individuals you were issuing W-2s for

23   with respect to New Age Chemical?

24   A.   Yes, the remainder of the employees of New Age Chemical.

11:01   25   The people that we processed on our payroll.

144

1   Q.  And do you recall right now approximately how many people

2   that was?

3   A.  I do not recall, no.

4   Q.  Turning your attention to the next letter that's dated April

5   25 of 2007.

6   A.  Uh-huh.

7   Q.  Do you recognize this letter?

8   A.  Yes, I do.

9   Q.  Who wrote it?

10  A.  James Stuart.

11  Q.  And to whom is it addressed?

12  A.  To me.

13  Q.  And could you describe for the jury, what's the substance of

14  this letter?

15  A.  Pretty much the same thing, saying that we should reverse

16  the 1099 that was issued for 2006, as well as the W-2s, the fact

17  that he didn't want those filed.

18  Q.  Now, in the middle of the letter there is -- there's a

19  sentence here that says:

20      "Should it become necessary to bring any legal action

21  forward regarding this matter, the under signed reserves the

22  right to bring said action in an Article III common-law court,

23  i.e., District Court of the United States, where he is entitled

24  to a trial by jury, as an equity court, which is only able to

25  recognize corporate entities, is not capable of, nor does it

1    have jurisdiction over a matter such as this."

2         Do you know what that's about?

3    A.  We never talked about that specifically.  I mean, I took it

4    more as a threat towards Payroll Data Services, to be honest

5    with you.

6    Q.  And then in the bottom here, the last paragraph, it tells

7    you -- well, let me try that again.

8         "It is certainly most desirable that this matter" --

9         MR. BERNHOFT:  Your Honor, objection.  Counsel can ask

10   the witness to refer to relevant sections of the letter,

11   et cetera.

12        THE COURT:  Objection sustained.

13   BY MR. JACOBS:

14   Q.  Can you read this section of the letter?

15   A.  Sure.  "It is certainly most desirable that this matter can

16   be settled by the simple correction of the Form 1099 addressed

17   to the natural person James A. Stuart, Jr., who most certainly

18   did not receive the compensation stated, and most certainly is

19   not to be confused with, nor is, the federal person known as

20   James A. Stuart, Jr. which instead is a corporate entity, as

21   well as a Social Security Trust."

22   Q.  Do you know what Mr. Stuart is referring to there?

23   A.  We talked about that in person at our offices.  He

24   basically -- in layman's terms, because I'm not a, you know,

25   expert on this matter certainly -- but he was basically saying

1    the Constitution does not allow the IRS to tax him as a person

2    versus an entity or vice-versa.  I can't really recall which.

3    Q.  So did Payroll Data Services, or you on behalf of Payroll

4    Data Services, agree to take any action based on Mr. Stuart's

5    request?

6    A.  Ultimately we did.  In May, as you can see from my letter,

7    based upon his statements saying that the payment on the 1099

8    for 2006 was not compensation, we took him at his word then at

9    that point and reversed the 1099.

10   Q.  Did Mr. Stuart tell you -- did he tell you what the payments

11   to him were from New Age Chemical?

12   A.  Yes.  He said it was return --

13               MR. BERNHOFT:  Objection, hearsay.

14               THE COURT:  One second.  What's the objection?

15               MR. BERNHOFT:  Hearsay.

16               THE COURT:  Overruled.

17   BY MR. JACOBS:

18   Q.  Did Mr. Stuart tell you what the payments were?

19   A.  He said it was non-employee compensation or a return of

20   capital.

21   Q.  And why would that be significant to Payroll Data Services?

22   A.  Well, if it's a bonus it would certainly go onto a 1099 or

23   some form of, you know, W-2 or something like that and be

24   reported to the federal government and to the state agencies as

25   well.  Whereas if it's return of capital, you know, that's a

1    corporate matter.

2    Q.   Do you report those payments to the federal government?

3    A.   Typically we don't even process those.

4    Q.   Had Payroll Data Services processed the payments that it was

5    reporting on the 1099?

6    A.   I do not recall.  That was before I was there.

7    Q.   I see.  Is there a way they would have gotten onto a

8    Form 1099 if you hadn't processed them?

9    A.   No.

10   Q.   And then, the next letter I think I have here is May 9th of

11   2007.  Do you recognize this letter?

12   A.   Yes, I do.

13   Q.   I didn't go backwards, did I?  And who wrote it and to whom

14   is it written?

15   A.   It's from James Stuart again to myself.

16   Q.   Again, I'm gonna just highlight the first --

17   A.   I'm sorry?

18   Q.   Can you read that first paragraph?

19   A.   Sure.  "Dear Dave, as a result of our conversation of

20   yesterday, I am writing you concerning a certain monetary amount

21   Payroll Data Services, LLC has, without authorization, reported

22   to the IRS as non-employee compensation, said amount allegedly

23   having been paid by an entity, in possession of an EIN, to James

24   Stuart, Jr. whom Payroll Data Services, LLC has alleged is in

25   possession a Social Security number.  James Stuart, Jr. hereby

148

1    states that he has recently learned that he, the man, does not

2    possess a Social Security number, and that instead it is the

3    legal fiction, James Arthur Stuart, Jr. that, in fact, is in

4    possession of said number, and that it is this entity that has

5    been employed up until January 1st, 2006, by the aforementioned

6    entity with the EIN.

7           "After recognition of this fact, James Stuart, Jr. has

8    directed the company for whom he works that if he wished to

9    continue to retain his services, it must hereafter recognize

10   works that if it wished to (sic)" -- I'm sorry -- "recognize

11   that it has hired him the living human being, and not James

12   Arthur Stuart Jr., the legal fiction, and that James Stuart,

13   Jr., the man, is not the entity possessing a Social Security

14   number and as such is not to be designated as a taxpayer.  As

15   evidenced by the Form 1099 issued to James Stuart, Jr. by

16   Payroll Data Services, LLC, it is making a statement that the

17   man is in possession of a Social Security number."

18          I apologize.  There's glare on here.

19   Q.  I think maybe I gave you a paper copy.  I'm sorry.  Never

20   mind.

21          Do you know, did you discuss this with Mr. Stuart?

22   A.  I'm not sure if it was before or after that.  I think our

23   conversation was actually before that timeframe.

24   Q.  The next letter is dated May 14, 2007, do you recognize

25   this?

149

1    A.   Yes, I do.

2    Q.   And who wrote the letter and to whom is it written?

3    A.   It was written by myself to James Stuart the president of

4    New Age Chemical.

5    Q.   Can you describe the substance of your letter?

6    A.   Yes.  It was saying that we voided the 1099 filing and that

7    was paid through our payroll service for 2006, based upon the

8    fact that he indicated it was not compensation but a return of

9    capital or some other non-compensable payment.  Relying on

10   verbal conversations that we have had at our offices and also on

11   the phone.

12            It also indicates that the W-2s that we did plan and

13   continue to process those, and basically if he wanted those to

14   not be processed he should find another payroll service to do so

15   and terminate our services.

16   Q.   What does that mean?  What are you telling Mr. Stuart in

17   that second paragraph?

18   A.   In the second paragraph I'm basically saying that we're not

19   gonna change our process.  We feel W-2s should be reported to

20   the government agencies as required by law, and that we're not

21   going to try to segregate his out and just print them on paper

22   and send them to him like he wanted us to.

23   Q.   Do you know, did you ever hear back from Mr. Stuart in

24   response to your letter?

25   A.   Yes.  It's on the next letter, May 16th.

1   Q.   And what is the substance of Mr. Stuart's letter back to

2   you?

3   A.   Basically thanking us for reversing the 1099 filing, denying

4   that it was a return of capital, and that he agreed that he has

5   no problem with the transactions -- the W-2s still being

6   processed.

7   Q.   Did you have any further contact with Mr. Stuart after that?

8   A.   No, I did not.

9   Q.   And I gather that would have been the last time you would

10   have talked to him or seen him?

11   A.   Yes.

12          MR. JACOBS:  That's all I have, Judge.

13          THE COURT:  Cross?

14          MR. BERNHOFT:  Your Honor, I have a request for a

15   short bathroom break, is that possible?

16          THE COURT:  We'll take a break.

17          THE BAILIFF:  All rise.

18          (Jury out at 11:10 a.m.)

19          THE COURT:  Short break.

20          (Recess taken at 11:11 a.m., until 11:27 a.m.)

21          (Jury in at 11:27 a.m.)

22          THE COURT:  You may proceed.

23          MR. BERNHOFT:  Your Honor, I have no questions for

24   this witness.

25          THE COURT:  You may step down.  Please do not discuss

151

1    your testimony with anyone unless you're advised this case has

2    been completed.  Have a good afternoon.  Stay warm.

3                (Witness excused at 11:28 a.m.)

4                MR. JACOBS:  Your Honor, for our next witness the

5    United States would call Beverly Schlipp.

6                Ms. Schlipp, if you would come forward.  I'll just

7    take several objects off the witness stand.

8                THE REPORTER:  Raise your right hand, please.

9                BEVERLY SCHLIPP, GOVERNMENT WITNESS, SWORN

10               THE REPORTER:  Please state your name and spell your

11   name for the record.

12               THE WITNESS:  Beverly Schlipp, S C H L I P P.

13                         DIRECT EXAMINATION

14   BY MR. JACOBS:

15   Q.  Good afternoon, Ms. Schlipp.  Or maybe it's still morning.

16   Good morning, Ms. Schlipp.  Can you tell me, where do you

17   currently live?

18   A.  I live on Wilton Road in Eagle, Wisconsin.

19   Q.  And how long have you lived there?

20   A.  About 16 years.

21   Q.  Can you tell me, how far did you go in school?

22   A.  Four years of college but never graduated.

23   Q.  What were you studying?

24   A.  Physical education.

25   Q.  And are you married?

152

1    A.  I certainly am.

2    Q.  How long have you been married?

3    A.  16 years.

4    Q.  And do you have any children?

5    A.  I've got two of my own and two stepchildren.

6    Q.  And how old are your own children?

7    A.  33 and 35.

8    Q.  And what are their names?

9    A.  My son's name is Brian Reese, and my daughter's name is

10   Allison Reese.  She just got married but she's Allison Reese.

11   Q.  And do you know what your daughter does for a living?

12   A.  She is an accountant.

13   Q.  And where does she currently live?

14   A.  She lives in Falls Church, Virginia.

15   Q.  Ms. Schlipp, are you currently employed?

16   A.  I'm retired.

17   Q.  And when did you retire?

18   A.  March of 2010.

19   Q.  At the time you retired where were you working?

20   A.  I was working at New Age Chemical.

21   Q.  Do you know an individual named James Stuart?

22   A.  Yes, I do.

23   Q.  How do you know Mr. Stuart?

24   A.  He's my brother.

25   Q.  Do you see him here today?

153

1    A.  Yes, I do.

2    Q.  Could you just identify him by where he's seated, what he's

3    wearing?

4    A.  Sure.  He's sitting back there with a blue suit and a tie

5    on.  The second table.

6    Q.  Far left-hand side?

7    A.  Yes.

8    Q.  Not the guy in the middle.

9    A.  No.  Sorry.

10   Q.  That's all right.  And he's your older brother?

11   A.  Yes, he is.

12   Q.  Not much older.

13          THE COURT:  One second, please.  Please approach.

14          (At side bar on the record.)

15          (Discussion off the record.)

16          THE COURT:  I note that Mr. Schwarz is in the

17   courtroom, the parties have been advised, and neither party has

18   any objection to him remaining.

19          (End of discussion at side bar.)

20          MR. JACOBS:  Your Honor, I would ask the record

21   reflect that the witness has identified the defendant James

22   Stuart.

23          THE COURT:  Noted.

24   BY MR. JACOBS:

25   Q.  Now, I believe you indicated you retired in March of 2010,

154

1    and at that time you were working at New Age Chemical.  Tell the

2    jury, what type of business is New Age Chemical?

3    A.  It's a manufacturer of metal working fluids which would be

4    like for machine shops and things like that.

11:32    5    Q.  And where is it located?

6    A.  It's located in Kettle Court in Delafield, Wisconsin.

7    Q.  K E T T L E?

8    A.  Yes.

9    Q.  And then Court?

11:33    10    A.  Court.

11    Q.  How long has it been at that location?

12    A.  Approximately 12 years.

13    Q.  How long has the business itself been in existence?

14    A.  It was formed in 1985.

11:33    15    Q.  Where was it prior to moving to Delafield?

16    A.  Prior to that it was in -- on Pearl Street in Waukesha,

17    Wisconsin.

18    Q.  And when you were last working there how many employees

19    worked at New Age Chemical?

11:33    20    A.  Approximately eight.

21    Q.  And how long had you worked there when you retired in March

22    of 2010?

23    A.  I started around 1987.  20-some years.

24    Q.  And what was your position when you retired?

11:33    25    A.  When I retired I was a vice-president.

1   Q.  What were your responsibilities at that time?

2   A.  I did everything from postings for accounts payables, I

3   wrote checks for the accounts payables, I processed orders.  Not

4   all the time did I process the orders but I did process orders.

5   I answered phones, had customer relations, negotiated terms with

6   vendors and did payroll.  Overall just looked out for the

7   goodwill of the company.

8   Q.  And again, your voice is pretty soft, you may just want to

9   pull that microphone a little closer.  It's pretty flexible.

10  A.  Sure.

11  Q.  Do you know who owns New Age Chemical?

12  A.  Jim Stuart and myself.  Jim Stuart is 70 percent and I'm 30.

13  Q.  And has that always been the case?

14  A.  Yes, sir.  Well, no, it hasn't.  It started out with my dad,

15  Jim Stuart, Sr., my father, and my brother had it, and they had

16  their equal distribution of their stock, and I purchased about

17  3 percent from my father around 1986 or 7.  '87 or '88.  And up

18  until about 2003, when we bought out my father's -- my father

19  had passed away and we bought out my mother's share of hers, we

20  bought that out, which made it 70/30.

21  Q.  And what year was that?

22  A.  2003, approximately.

23  Q.  And is that still the case right now?

24  A.  Yes, sir.

25  Q.  So at least from 2003 to the present you've been a 30

156

1   percent owner and your brother Mr. Stuart is the 70 percent

2   owner.

3   A.  Yes.

4   Q.  Does he also have a position at New Age Chemical?

5   A.  President.

6   Q.  Do you know what his responsibilities were during -- again,

7   I want to focus just on the time from 2003 when you became a 30

8   percent owner to when you retired in March of 2010.  Do you know

9   what Mr. Stuart's, did he have any responsibilities at the

10   business?

11   A.  He did quite a bit of the formulating for the formulas that

12   we have.  And he also did customer contacts with discussing

13   things and solved quite a few problems with the customers if

14   there would be problems or something.  He was there every day to

15   oversee basically the company.

16   Q.  Now, you mentioned the company was originally started in

17   1985; who started the company?

18   A.  My father Jim Stuart and my brother Jim Stuart, Jr.

19   Q.  You also mentioned your father has since passed away; what

20   year did your father pass away?

21   A.  Around 1997.

22   Q.  And since the time of your father's death have there been

23   any other officers of New Age Chemical?  You mentioned you're a

24   vice-president and your brother's the president, were there any

25   other officers?

1    A.  No, sir.

2    Q.  Any other owners?

3    A.  No, sir.

4    Q.  Now, prior to retiring in March of 2010, did you receive a

5    salary or any compensation from New Age Chemical?

6    A.  Prior to 2010?

7    Q.  Prior to retiring.

8    A.  I received a salary up until around about 2008.

9    Q.  And do you recall what your salary was when you last

10   received it in 2008?

11   A.  It was around 7,000 a month.

12   Q.  And how frequently were you paid that salary?

13   A.  Twice a month.

14   Q.  Were any other employees at New Age Chemical paid a salary?

15   A.  Yes, sir.

16   Q.  Was your brother, as president at New Age Chemical, paid a

17   salary?

18   A.  Yes, sir.

19   Q.  And how frequently was your brother paid a salary?

20   A.  The same, twice a month.

21   Q.  And do you recall in 2008 what your brother's salary was?

22   A.  It was around 16,000 a month, I believe.

23   Q.  $16,000?

24   A.  Yes.

25   Q.  Now, again, I want to focus again on the period from 2003,

158

1    when you became a 30 percent owner, until the time you retired

2    in 2010.  Do you recall -- I'm sorry, who handled payroll during

3    that period of time?

4    A.  I did.

11:38  5    Q.  And did you handle that all by yourself?

6    A.  No, I called it into a firm called Payroll Data.

7    Q.  And what did you call in?

8    A.  For the hourly employees I would call in obviously the hours

9    they worked for that week and then I would, twice a month I

11:39  10   would call in Jim Stuart's and my salary.

11   Q.  And how is the salary paid to you during that period of

12   time?

13   A.  We started out getting checks.  Payroll Data would send me

14   packets and I would just sign the checks and distribute them.

11:39  15   But after a certain period of time, I believe around 2006, we

16   started getting direct deposit.

17   Q.  And was that the case for all of the employees including

18   your brother?

19   A.  Yes, sir.

11:39  20   Q.  And during the time the salary was being paid to you — that

21   is, during the time 2003 to your retirement — was there

22   withholding for questioned income taxes from your salary?

23   A.  From mine, yes, sir.

24   Q.  And would you receive a wage statement at the end of the

11:40  25   year, a W-2?

159

1    A.   I received a W-2 up until I -- when I was receiving a

2    salary, yes, sir.

3    Q.   And during that period of time 2003 through 2010, where did

4    New Age Chemical maintain its bank accounts?

5    A.   We had bank accounts.  It depended upon where the mortgage

6    was for the business.  And we -- at one point it was Chase, at

7    one point it was M&I.  I believe Waukesha State was in there at

8    one point, too.

9    Q.   And did New Age Chemical maintain more than one account?

10   A.   Yes.

11   Q.   And, that is, more than one bank account?

12   A.   Yes.

13   Q.   And how many bank accounts would it typically maintain at

14   any one time?

15   A.   Two.  We had a payroll and a general operating account.

16        MR. JACOBS:  Your Honor, I'd like to read a portion of

17   the stipulation and then move some exhibits into evidence, if I

18   could.

19        THE COURT:  Proceed.

20            TRIAL STIPULATION NO. 6 ADMITTED

21        MR. JACOBS:  Paragraph 6 of the stipulation of the

22   parties reads:

23        "If a representative of JPMorgan Chase Bank N.A. were

24   called to testify, he or she would testify that the following

25   exhibits are business records of the bank.  The representative

160

1   of the bank would further testify that these records were

2   contemporaneously generated by persons with knowledge of the

3   information reflected in the records and/or received by the bank

4   in the regular course of its business activity and created

5   and/or received which the bank as a regular practice as part of

6   the bank's regularly conducted business activity.  The parties

7   further stipulate and agree that these exhibits can be admitted

8   at the trial in this case."

9          And that pertains to Exhibits 60 through 70.

10         And with that, Your Honor, I would move into evidence

11  Exhibits 60 through 70.

12         THE COURT:  They're received.

13         (Exhibits 60-70 offered and received.)

14  BY MR. JACOBS:

15  Q.  Now, Ms. Schlipp, you mentioned that you used a payroll

16  service, Payroll Data to handle payroll; did there ever come a

17  time when the issue of how your brother James Stuart was

18  receiving his salary should be paid to him?

19  A.  Yes.

20  Q.  Do you recall when that issue first arose?

21  A.  I would say around 2004-2005, around in there somewhere.

22  Q.  And at that time would you have been handling the payroll

23  for New Age Chemical?

24  A.  Was I?

25  Q.  Yes.

161

1    A.  Yes, sir.

2    Q.  And what was the issue that arose?

3    A.  He didn't want to have payroll taxes taken out.

4    Q.  Did he tell you why he didn't want to have payroll taxes

5    taken out?

6    A.  He didn't think that paying payroll taxes was legal.

7    Q.  Do you have more than one brother?

8    A.  Yes, sir.

9    Q.  But in this context, when I refer to your brother I'm

10   referring to the defendant James Stuart, just so it's clear on

11   the record.  Okay?

12   A.  Uh-huh.

13   Q.  And when your brother indicated he didn't want payroll taxes

14   taken out, did he direct you to do anything?

15   A.  He directed me to call Payroll Data and not have them take

16   out the payroll tax.

17   Q.  And was that just for his salary?

18   A.  Yes.

19   Q.  Now, you mentioned there was some hourly workers.  Were

20   there any other employees at New Age Chemical that received a

21   salary, that is, were not paid as hourly workers?  Was it just

22   you and your brother that received a salary?

23   A.  No.  There was his wife -- Jim's wife, Margie Stuart.

24   Q.  She received a salary?

25   A.  Yes.

162

1   Q.   Do you know during what period of time she received a

2   salary?

3   A.   I don't recall exactly.

4   Q.   Okay.  Anyone else?

5   A.   We're saying up to what date?

6   Q.   Okay.  During the period 2003 to your retirement in 2010.  I

7   don't know if there were any other salaried employees.

8   A.   My husband Richard Schlipp.

9   Q.   He was also a salaried employee?

10  A.   Yes.

11  Q.   Do you know what period of time he worked there?

12  A.   He worked there around four years.

13  Q.   And would that have been sometime during the period 2003 to

14  2010?

15  A.   Yes.

16  Q.   Okay.  After you contacted Payroll Data Services did they

17  continue to issue payroll checks to your brother or make direct

18  deposits to your brother?

19  A.   They didn't want to do it.

20  Q.   So what happened?

21  A.   I had Jim Stuart call Payroll Data and I do not know what

22  happened after that.

23  Q.   Did he continue to receive a salary?

24  A.   Oh, yes, sir, he did.

25  Q.   And was it continued to be paid through Payroll Data

1  Services?

2  A.  No.  We started doing them at the company and at that

3  particular point I made -- I wouldn't sign any of those checks.

4  Q.  Do you know when approximately that change took place?

5  A.  I'd say around 2007.  6 or 7.

6  Q.  And was that change made for all of the employees at New Age

7  Chemical?

8  A.  No.

9  Q.  Did you continue to receive a salary at New Age Chemical?

10  A.  I received a salary up till around 2007, and then I started

11  getting -- receiving K-1s.

12  Q.  But I think you said at some point your brother's salary was

13  not being paid through Payroll Data Services, was yours?

14  A.  Yes, sir.

15  Q.  And were you getting checks or direct deposits at that time?

16  A.  Direct deposit.

17  Q.  How about all the other employees?

18  A.  Everyone was on direct deposit.

19  Q.  And were there ever any changes made to the withholding on

20  any of the employees at New Age Chemical?

21  A.  No.

22  Q.  Did your brother, the defendant Mr. Stuart, did he continue

23  to get a salary even though it wasn't being handled by Payroll

24  Data Services?

25  A.  Yes.

1    Q.   And how was it paid?

2    A.   Check.

3    Q.   And who issued those checks?

4    A.   I did.

5    Q.   And again, you mentioned that New Age Chemical had more than

6    one bank account; do you know off of which bank account you

7    issued those checks?

8    A.   That came off of the general account.

9    Q.   And how frequently would you issue checks to your brother?

10   A.   Twice a month.

11   Q.   And do you know the amount of those checks?

12   A.   16,000.  Approximately 8,000 twice a month.

13   Q.   And for how long did that continue?

14   A.   Until I left.

15   Q.   Did you withhold taxes from those payments?

16   A.   No, sir.

17   Q.   Why not?

18   A.   Because I was instructed by Jim Stuart not to.  Jim was 70

19   percent, I was 30 percent, I feared for my job because he was

20   supermajority and I could be fired.

21   Q.   How do you know that?

22   A.   He told me several times.

23   Q.   Well, did you at least prepare a W-2 at the end of the year

24   for your brother's payments?

25   A.   We prepared K-1s.

165

1    Q.  Did you prepare one for your brother?

2    A.  Yes, sir.

3    Q.  And that is, you personally prepared that?

4    A.  No.

5    Q.  Who prepared it?

6    A.  The latter part it was Suby, Joel Nettesheim.  Before that

7    it was Clifton Gunderson.

8    Q.  When you were issuing these checks to your brother, who were

9    they made payable to you?

10   A.  Originally they were paid made payable to him, but after the

11   point when after he went -- the discussion with the Payroll

12   Data, it was made out to New Age Chemical Draw.

13   Q.  Do you know what that is?

14   A.  It was an account that Jim had set up that had -- an account

15   that Jim had set up for himself.

16   Q.  Now, I'd like to show you exhibits from the bank records.

17   They're marked as 67A -- 68A -- sorry.  Let me back up just one

18   second.

19           I show you what have been marked for identification as

20   65A, 67A, 68A, and 70A.

21           And for the record, these are just parts of

22   Exhibits 65, 67, 68, and 70.

23           I wonder if you could take a look at those and then

24   I'll ask you some questions.

25           (Witness peruses document.)

166

BY MR. JACOBS:

Q.  Ms. Schlipp, have you reviewed those four pages?

A.  Yes, sir.

Q.  And do you recognize what those are?

A.  They're compensation for Jim Stuart.

Q.  And just looking at the first page of 65 which is from Exhibit 65A, whose handwriting is that?

A.  That's mine.

Q.  Now, I know you probably can't see on the monitor, but is there -- you have an endorsement on the paper copy you have there, do you recognize that handwriting?

A.  Yes, it's Jim Stuart's.

Q.  And each of these checks that are in 65A, are they all issued by you?

A.  Yes, they are.

Q.  And do you recognize each of those checks?

A.  Yes, I do.

Q.  And what are they?

A.  Compensation checks.

Q.  Do you know how those were delivered to your brother?

A.  I wrote them and put them on his desk.

Q.  And did you withhold any taxes, payroll taxes, Medicare taxes, Social Security taxes from these compensation checks?

A.  No, sir.

Q.  And why not?

1    A.  Because I was told not to by Jim Stuart.

2    Q.  And I'd like to have you just look at the checks that are in

3    67A.  Do you see them there?

4    A.  Yes, I do.

5            (Witness peruses document.)

6    A.  Yes, sir.

7    BY MR. JACOBS:

8    Q.  Now, I notice the checks in 65A, they're written on an

9    account, the New Age Chemical payroll account, but the checks in

10   67A, is that a different account?

11   A.  Yes, the original packet was written out on the payroll

12   account; the other ones that were done in print were the

13   operating account.

14   Q.  And do you know why there were different accounts used for

15   the checks in 67A?

16   A.  I believe this is around the same time that he didn't have

17   direct deposit anymore.

18   Q.  But obviously 65A are all checks also.

19   A.  Yes.

20   Q.  But they're on the payroll account.

21   A.  Yes.

22   Q.  These seem to be written off the operating account.  Do you

23   recall why you began writing checks off the operating account?

24           MR. BERNHOFT:  Objection, the witness already answered

25   the question.

168

1        THE COURT:  Overruled.

2    BY MR. JACOBS:

3    Q.  You can answer if you know.

4    A.  I don't know if there really was a reason for that.

5    Q.  Okay.  And do you know what the purpose for issuing these

6    checks was?

7    A.  Compensation for Jim Stuart.

8    Q.  And did you withhold taxes from these payments to your

9    brother?

10   A.  No, sir.

11   Q.  And why not?

12   A.  I was told by Jim Stuart not to.

13   Q.  And again, all of the checks, the signatures authorizing the

14   checks themselves, is that your signature?

15   A.  Yes, sir.

16   Q.  And the endorsements on the back of the checks, do you

17   recognize whose signature that is?

18   A.  Yes, Jim Stuart's.

19   Q.  Turning to the package of checks that's in 68A, do you have

20   those in front of you?

21   A.  I do.

22   Q.  Do you recognize what the purpose -- do you recognize these

23   checks?

24   A.  Yes, I do.

25   Q.  And what are these checks?

1    A.   Compensation for Jim Stuart.

2    Q.   Now, the initial checks in 68A appear similar to what are in

3    65 and 67A.

4         THE COURT:  Is that a question?

5    BY MR. JACOBS:

6    Q.   I note that when you go to the last four or five, are those

7    checks different in any way?

8    A.   Yes, sir.  I was not signing them anymore, Jim Stuart was.

9    Q.   Do you know when that started?

10   A.   Around that time, 2007.

11   Q.   Can you identify the first time one of the checks was not

12   signed by you?

13   A.   Do I identify it?

14   Q.   Can you see in there when that starts?

15   A.   Yes, I do.

16   Q.   When is that?  What's the date of that check?

17   A.   It was 5/16 of 2007.

18   Q.   Do you recall why that happened?

19   A.   I did not want to sign his paychecks anymore because I did

20   not believe in taxes not coming out of the account.

21   Q.   Did you express that to your brother?

22   A.   Yes, I did, sir.

23   Q.   And what did he say, if anything?

24   A.   That if I didn't want to start signing paychecks then I

25   didn't really have a job there.

170

1    Q.  Do you recognize his signature on the checks?

2    A.  Yes, I do.

3    Q.  And those checks, do you know what the purpose of those

4    checks were?

5    A.  Compensation.

6    Q.  Would you have been still maintaining the books and records

7    for this account at that time?

8    A.  Yes, sir.

9    Q.  Was there any withholding of taxes from these compensation

10   checks paid to your brother?

11   A.  No, sir.

12   Q.  Now, you were getting a salary at this time, correct?

13   A.  Yes.

14   Q.  Were there taxes being withheld from your salary for New Age

15   Chemical?

16   A.  Yes, sir.

17   Q.  Now, the endorsement on those checks that your brother

18   signed, do you see the endorsement?

19   A.  Yes.

20   Q.  Do you recognize the handwriting?

21   A.  Some of them do not look like his signature.

22   Q.  There appear to be three or four letters after a signature.

23   Do you recognize what those three or four letters are?

24   A.  That stands for, I was told, trustee.

25   Q.  Who told you that?

171

1    A.   Jim Stuart.

2    Q.   Did he explain what that meant?

3    A.   He might have explained it but I didn't understand exactly

4    what the trustee was for.

5    Q.   And, finally, if I could turn your attention to Exhibit 70A.

6    Not finally, but --

7            Do you recognize what the checks in Exhibit 70A are?

8    A.   Yes, sir.

9    Q.   What are those?

10   A.   These are compensation for Jim Stuart.

11   Q.   And who is the authorizing signature on these checks?

12   A.   I am, sir.

13   Q.   Now, these checks, the first one is dated August 14 of 2007.

14   Did you resume writing out the checks?

15   A.   Another -- Jim formed another entity called New Age

16   Chemical, Ltd., and he said that if I signed those checks that

17   it was a complete different entity and I could not be injured by

18   it.

19   Q.   Do you remember when he did that?

20   A.   Around 2007.

21   Q.   So as a result of that did you begin signing these checks?

22   A.   Yes, I did.

23   Q.   Now, I notice on the first one there appear to be some

24   letters or some symbols after your name on the August 14, 2000

25   check; do you know what that is?

172

1  A.  He told me to put the TTEE on there as protection.

2  Q.  Protection from what?

3  A.  I'm not quite sure, sir.

4  Q.  Do you recognize the endorsement on the check?

5  A.  Yes, I do.

6  Q.  Whose handwriting is that?

7  A.  Jim Stuart's.

8  Q.  There seems to be more written there than a signature; do

9  you know what else is written there?

10 A.  This particular check was made out to the New Age Chemical

11 Drawing Account.  And that's why it says "New Age Chemical" as

12 an endorsement on the back, Drawing Account.

13 Q.  The payee on this check is different than the other checks?

14 A.  Yes.

15 Q.  Why is that?

16 A.  I don't know why he did that.

17 Q.  Did you make that change?

18 A.  I was told to by Jim Stuart.

19 Q.  Were the purpose of these checks the same as all the other

20 checks we've been looking at?

21 A.  Yes, sir.

22 Q.  Are you familiar with this entity New Age Chemical, Ltd.

23 Drawing Account?

24 A.  Yes, sir.

25 Q.  What is that?

173

1   A.   It's a -- I'm not quite sure how to explain it.

2   Q.   Okay.  Are you a part of it?

3   A.   It's papers that were drawn up for Kingdom of Israel type

4   limited company.  Corporation.

12:02   5   Q.   Do you know who set that up?

6   A.   Jim Stuart.

7   Q.   Did he provide you any explanation about what it was?

8   A.   To basically, I suppose, fly under the radar of any tax

9   problems.

12:03   10   Q.   Are those his words?

11   A.   So to speak.

12   Q.   Now, did New Age Chemical -- do you know what kind of

13   business it is, what type of tax business it is?  I mean, what

14   kind of structure it has for tax purposes?

12:03   15   A.   New Age Chemical is an S Corp.

16   Q.   During the time you've been an owner, a 30 percent owner,

17   has that always been the case?

18   A.   When I -- yes, sir.  Since I've been owner.

19   Q.   And does New Age Chemical -- I'm sorry, did New Age

12:03   20   Chemical, during the time you were working there from 2003 to

21   2010, did it file federal income tax returns?

22   A.   Every year, yes.

23   Q.   And you mentioned, do you know who prepared those tax

24   returns?

12:03   25   A.   In the beginning a firm called Clifton Gunderson prepared

174

1    them, and then a firm called Suby and Schloedorn (sic).

2    Q.  Is it like Suby Von Haden?

3    A.  Yes.

4    Q.  Was there someone in particular you dealt with at Clifton

5    Gunderson?

6    A.  I dealt with a gentleman called Pat Walsh.

7    Q.  And do you know when you first started dealing with

8    Mr. Walsh?

9    A.  As long as I was there.  Since I started in 1987.

10   Q.  And did Mr. Walsh have any type of relationship with you or

11   your family other than preparing the tax returns?

12   A.  He's a close friend of the family.

13   Q.  Was he familiar with your father?

14   A.  Very much so.

15   Q.  Do you know if he ever had any position with New Age

16   Chemical?

17   A.  He consulted with us.

18   Q.  And do you know when he stopped preparing the tax returns

19   for New Age Chemical?

20   A.  I wanna say around 2004.

21   Q.  And do you know why that is?

22   A.  He didn't want to have -- he knew that Jim Stuart was not

23   paying taxes and he --

24            MR. BERNHOFT:  Objection, hearsay, Your Honor.

25            THE COURT:  Sustained.

175

BY MR. JACOBS:

Q.  Did Mr. Walsh ever have a meeting with you and your brother?

THE COURT:  One second.  The last response to the question is stricken.  It must be disregarded.

Proceed.

BY MR. JACOBS:

Q.  Did Mr. Walsh ever meet with you and your brother concerning whether he would continue to prepare tax returns for New Age Chemical?

A.  Yes.

Q.  Were you present at that meeting?

A.  Yes.

Q.  And did Mr. Walsh tell your brother why he wouldn't prepare taxes?

A.  Yes.

Q.  Why did he tell your brother?

MR. BERNHOFT:  Objection, hearsay.

THE COURT:  Side bar.

(At side bar on the record.)

MR. JACOBS:  Judge, it's a verbal act.  We have to prove knowledge.  So the fact that someone tells the defendant facts establishes his knowledge.  Whether it's true or not is not relevant.  What's relevant is whether he's been told certain things and he therefore has knowledge of them.

MR. BERNHOFT:  That's a little bit confusing in terms

1    of that statement.  What I object to is hearsay.  Mr. Walsh is

2    going to be a witness in this case.  If Mr. Jacobs wants to ask

3    Mr. Walsh what he told Mr. Stuart at a meeting he can ask that

4    witness.

5    MR. JACOBS:  But we have the firsthand witness of that

6    meeting, he being told facts by a third party.  So it's not

7    hearsay.  I have the person saying I heard this said to the

8    defendant.

9    THE COURT:  Let's clarify to make sure she was a party

10   to the conversation.  So the objection is subject to the

11   response.

12   MR. BERNHOFT:  Okay.  Thank you.

13   (End of discussion at side bar.)

14   BY MR. JACOBS:

15   Q.  Ms. Schlipp, I just want to make sure it's clear, were you

16   present during a meeting between Mr. Walsh and your brother

17   James Stuart?

18   A.  Yes, sir.

19   Q.  And did you hear Mr. Walsh tell your brother James Stuart

20   certain things?

21   A.  Yes, sir.

22   Q.  And so you were a party to this meeting?

23   A.  Yes.

24   Q.  Okay.  So, again, I want to focus on what you specifically

25   heard Mr. Walsh tell your brother James Stuart.

177

1   THE COURT:  One second.  Please clarify the timeframe.

2   MR. JACOBS:  Sure.

3   BY MR. JACOBS:

4   Q.  Do you know approximately when this meeting took place?

12:07   5   A.  Approximately 2005, 4 or 5.

6   Q.  And where did the meeting take place?

7   A.  At New Age Chemical.

8   Q.  And other than you, your brother and Mr. Walsh, was anyone

9   else present?

12:08   10   A.  Not at that particular meeting.

11   Q.  And what did Mr. Walsh tell your brother?

12   A.  Excuse me, one other person was present, Allison Reese.

13   Q.  Okay.  And that's your daughter?

14   A.  Yes.

12:08   15   Q.  And what did Mr. Walsh tell your brother?

16   A.  That he should be paying taxes.  It's going to get New Age

17   Chemical in trouble.  That he's doing wrong by doing this.  And

18   listed quite a few reasons why, you know, Jim should be paying

19   taxes.

12:08   20   Q.  Do you know how long that meeting lasted?

21   A.  I have no idea.  I'm sorry.

22   Q.  After the meeting did Mr. Walsh continue to provide tax

23   preparation services to New Age Chemical?

24   A.  No.

12:08   25   Q.  Let me ask you, did Mr. Walsh provide any other services

178

1    other than tax preparation services to New Age Chemical, to you

2    or other members of your family?

3    A.  He continued to do my mother's tax return.  He did not

4    prepare mine anymore either.

5    Q.  Had he in the past?

6    A.  Yes, sir.

7    Q.  Do you know if he prepared any other -- had prepared tax

8    returns for any other members of your family prior to this

9    meeting?

10   A.  Prior to the meeting?

11   Q.  Yes.

12   A.  He just prepared -- prior to the meeting mine and my

13   mother's, prior to the meeting.

14   Q.  Do you know if he prepared your brother's tax returns for

15   prior years?

16   A.  I don't know whether he did or not.

17   Q.  Okay.  So after the meeting with Mr. Walsh, did you continue

18   to work at New Age Chemical?

19   A.  Yes, sir.

20   Q.  Did you continue to handle the payroll?

21   A.  Yes, sir.

22   Q.  Did you continue to issue payroll compensation checks to

23   your brother?

24   A.  Yes.

25   Q.  And did you withhold taxes from those?

179

1    A.   No.

2    Q.   Now, as a shareholder, a 30 percent owner of New Age

3    Chemical, did you receive income from the business as an owner

4    of the business?

5    A.   You mean as far as -- paycheck type thing?

6    Q.   No.  Distributions or have to report income from New Age

7    Chemical on your tax returns.

8    A.   I received a K-1 at the end of each year.

9    Q.   And do you know what information is on a K-1?

10   A.   A K-1 generally is where the tax burden instead of being on

11   the company it filters down into the tax return of the

12   individual owner/partner.

13   Q.   And did you receive one of those for each of the years when

14   you were an owner of New Age Chemical?

15   A.   Yes, sir.

16   Q.   And did you report that on your tax returns?

17   A.   Yes, sir.

18   Q.   And I think you said that prior to 2004 the tax returns for

19   New Age Chemical were prepared by Clifton Gunderson, and they

20   stopped preparing them at some point?

21   A.   Yes, they did.

22   Q.   Do you know who prepared the tax return for New Age Chemical

23   for the next year?

24   A.   My daughter, Allison Reese.

25   Q.   And did you sign and file that return?

180

1   A.   Yes, sir.

2   Q.   And did you get a K-1 reflecting the income that you were

3   responsible for from that business?

4   A.   I did.

5   Q.   And was there a K-1 for your brother for his share of the

6   income?

7   A.   Yes, sir.

8   Q.   Do you know if he received it?

9   A.   It was placed on his desk.

10  Q.   Who placed it on his desk?

11  A.   I did.

12  Q.   Do you know, were tax returns prepared for New Age Chemical

13  for the following years, after the one your daughter prepared?

14  A.   Yes.

15  Q.   And do you know who prepared those?

16  A.   Joel Nettesheim from Suby.

17  Q.   He works for an accounting firm, something like Suby, Von

18  Haden?

19  A.   Yes, sir.

20  Q.   And did you continue to receive K-1s from him?

21  A.   Yes.

22  Q.   Do you know if your brother continued to receive those K-1s?

23  A.   I put them on his desk.

24  Q.   While you were working at New Age Chemical during the years

25  2003 through 2010, did you ever see correspondence from the

181

1    Internal Revenue Service?

2    A.   I saw envelopes from the Internal Revenue Service.

3    Q.   Did you ever discuss those envelopes with your brother James

4    Stuart?

5    A.   We were told not to open them, to send them back.

6    Q.   When you said "we were told," who told you that?

7    A.   Jim Stuart.

8    Q.   Do you know when he first told you that?

9    A.   I don't remember the date.

10   Q.   Do you know approximately what year it would have been?

11   A.   I would say around the 2004 or 5.  I'm not sure on that.

12   Q.   Were you given -- did Mr. Stuart give you any other

13   instructions besides not to open and to return?

14   A.   There was supposed to be marked on the outside -- I'm not

15   quite sure what the -- it's been awhile since I've been there --

16   the exact thing that was supposed to be written on the outside

17   before they were returned.

18   Q.   Can you paraphrase, give me a sense of what you were

19   supposed to write?

20        MR. BERNHOFT:  Objection, form.

21        THE COURT:  Sustained.

22   BY MR. JACOBS:

23   Q.   Could you describe what Mr. Stuart told you to write on the

24   outside of the letters?

25   A.   Exactly?

1   Q.  As best as you can recall.

2   A.  Something about refused, mail service, legal matters.

3   Something like that.

4   Q.  And did you ever do that?

5   A.  I put them on Jim's desk.  I did not.

6   Q.  Did you observe your brother give anyone else those

7   instructions?

8   A.  Yes.

9   Q.  Who else did he give those instructions to?

10  A.  My husband, Rich Schlipp.  Margie Stuart.

11  Q.  And that's your brother's wife?

12  A.  Yes.

13  Q.  What was her job at New Age Chemical?

14  A.  Receptionist and receivables.  Taking orders.

15  Q.  Can I ask, when is the last time you talked to your brother?

16  A.  I would say a year.

17          MR. JACOBS:  Judge, that's all I have for the witness.

18          THE COURT:  We'll break at this time.  Please do not

19  discuss your testimony with anyone.  And please return at 1:00

20  o'clock.  We will break at this time.  Have a good lunch.  Do

21  not discuss the case or have any communication with anyone

22  respecting the case in order to preserve your integrity and the

23  process.

24          THE BAILIFF:  All rise.

25          (Jury out at 12:15 p.m.)

183

1       (Lunch recess taken at 12:15 p.m., until 1:01 p.m.)

2       THE COURT:  Are you ready to proceed?  If so I'll get

3  the jury out here.  Do you have your witness?  Please come

4  forward.

5       (Jury in at 1:03 p.m.)

6       MR. BERNHOFT:  May I proceed, Your Honor?

7       THE COURT:  Yes, you may.

8       MR. BERNHOFT:  Thank you.

9                    CROSS-EXAMINATION

10 BY MR. BERNHOFT:

11 Q.  Good afternoon, Ms. Schlipp.

12 A.  Good afternoon.

13 Q.  As you are probably aware, I'm Bob Bernhoft, I represent

14 your husband Jim Stuart in this case.

15      THE COURT:  One second.  Did you say husband?

16      MR. BERNHOFT:  I'm sorry?

17      THE COURT:  Did you say husband?

18      MR. BERNHOFT:  I'm sorry.  Sorry about that.

19 BY MR. BERNHOFT:

20 Q.  I represent your brother Jim Stuart in this action.

21 Thank you for your tolerance.

22      THE COURT:  I saw a perplexed look on her face.

23      (General laughter.)

24 BY MR. BERNHOFT:

25 Q.  Now, Ms. Schlipp, you indicated that your brother Jim Stuart

184

1    had -- the reason that you were writing these checks to him

2    personally that weren't going through the payroll processing

3    service, that he had, you know, threatened to fire you if you

4    stopped writing those checks; is that correct?

01:05    5    A.  Yes, sir.

6    Q.  Now, there came a time, though, in early May 2007, where you

7    indeed stopped writing checks and, as the evidence showed,

8    Mr. Stuart started to sign his own checks; is that correct?

9    A.  Yes, sir.

01:05    10    Q.  And did your brother fire you for not writing those checks?

11    A.  No, sir.

12    Q.  Can I ask you again, just to confirm, when did you start

13    working for your father's and brother's company?  Was that late

14    '80s?

01:05    15    A.  About 1987.

16    Q.  Okay.  So about how long did you work for New Age -- for

17    your brother's company before your retirement?

18    A.  The entire time until 2010.  2010, yes.

19    Q.  So like about 23 years?

01:05    20    A.  Approximately, yes.

21    Q.  When did Mr. Stuart hire your husband to work for his

22    company?

23    A.  He worked there approximately four years and he retired

24    probably 2007 maybe.  Around in there.

01:06    25    Q.  Okay.  And do you know how much Jim Stuart paid your husband

185

1  to work at New Age?

2  A.  I believe 40,000.  Between 40 and 45.

3  Q.  And that would be per year?

4  A.  Yes.

5  Q.  Okay.  And how much was your brother Jim Stuart paying you

6  from New Age to work there?

7  A.  At what particular time was that?

8  Q.  Let's say between 2004 and up and through your retirement.

9  A.  Because I wasn't receiving a paycheck because I received a

10 K-1.

11 Q.  Uh-huh.

12 A.  So --

13 Q.  But you were also receiving salary compensation?

14 A.  No, not after probably 2009.  2008 I just started receiving

15 a K-1.

16 Q.  Around in about 2008.

17 A.  2008, yes.

18 Q.  Okay.  And that led up to your retirement in round about

19 2010?

20 A.  Yes, sir.

21 Q.  Okay.  Prior to 2008 then, in the early 2000s, approximately

22 how much a year were you making from New Age?

23 A.  Approximately 7,000 a month.

24 Q.  So around about 84,000 a year?

25 A.  If that's what it calculates to, yes.

01:06
01:06
01:07
01:07
01:07

1  Q.  Okay.  So then total between your husband and you for that

2  series of years in the early 2000s, Jim Stuart was paying your

3  immediate family directly around about $130,000 a year?

4  A.  Yes, sir, if that's what it -- yes.

01:07  5  Q.  And then you also received this K-1 income as a 30 percent

6  owner of the company, correct?

7  A.  I didn't receive both at that time, no.  We took the

8  paycheck, and then after a point we were told by Joel Nettesheim

9  that being owners of the company we should be just receiving

01:08  10  K-1s instead of a compensation.

11  Q.  Okay.

12  A.  So I received the same amount regardless whether it was a

13  paycheck or it was a K-1.

14  Q.  I see.  So it was sort of a cash flow/cash revenue

01:08  15  management device?

16  A.  It was the same thing.  It just went from a W-2 into a K-1.

17  Q.  Okay.  Did your brother Jim Stuart ever instruct you not to

18  record the checks that were being written to him or his entities

19  on the New Age company's books and records?

01:08  20  A.  No, sir.

21  Q.  So it would be true then that every single check that New

22  Age paid over to your brother or his entities was properly

23  recorded by you in the books?

24  A.  Yes, sir.

01:08  25  Q.  Did your brother ever try and instruct you, or did he

187

1    instruct you, when it came to giving information to the CPAs and
2    accountants that were working for him and the company, did he
3    ever instruct you not to provide all of the books and records so
4    that the CPAs had full information to do their work?
5    A.  No, sir.
6    Q.  Did your brother ever attempt to impede employees at New Age
7    from having their withholding taxes withheld from the company
8    and then paid over to IRS?
9    A.  He would talk to the employees about not doing it, but he
10   never forced the employees to do it.
11   Q.  Isn't it true he gave them a choice, they could choose?
12   A.  He gave them a choice, yes.
13            MR. BERNHOFT:  That's all I have, Your Honor.
14            THE COURT:  Redirect?
15            MR. JACOBS:  No.  Nothing, Judge.
16            THE COURT:  You may step down.  Please did not discuss
17   your testimony with anyone unless you're advised this case has
18   been completed.  Have a good afternoon.
19            THE WITNESS:  Thank you.
20            (Witness excused at 1:10 p.m.)
21            MR. JACOBS:  Your Honor, next we would call Allison
22   Reese.
23            THE REPORTER:  Raise your right hand, please.
24             ALLISON REESE, GOVERNMENT WITNESS, SWORN
25            THE REPORTER:  Please state your name and spell your

188

1    name for the record.

2           THE WITNESS:  My name is Allison Reese, that's

3    A L L I S O N, last name Reese, R E E S E.

4                         DIRECT EXAMINATION

5    BY MR. JACOBS:

6    Q.  Good afternoon, Ms. Reese.  Ma'am, where do you currently

7    reside?

8    A.  Falls Church, Virginia.

9    Q.  How long have you lived in Falls Church, Virginia?

10   A.  Four years.

11   Q.  And were you recently married?

12   A.  I was.  In August.

13   Q.  And is your last name then different than Reese or where are

14   you in that --

15   A.  In the legal process I'm still Reese.  My married name is

16   Putland.

17   Q.  Putland?

18   A.  Uh-huh.

19   Q.  Can you tell me, what's your educational background?  How

20   far did you go in school?

21   A.  I graduated from UW Milwaukee with a accounting degree.

22   Q.  And when was that?

23   A.  In December of 2000.

24   Q.  And are you currently working?

25   A.  I am.

189

1    Q.  Where are you employed?

2    A.  I'm employed with a company called Bridge Street, and my

3    profession is director of accounting.

4    Q.  Now, you have kind of a soft voice and so if you could maybe

5    lean into the microphone it will help carry.

6    A.  Sure.  That's the first time I've heard that.  Sorry.

7    Q.  They don't know you as well.

8    A.  I suppose not.

9    Q.  Can you tell me, what are your responsibilities in your

10   current position?

11   A.  In my current position I actually have 13 employees that

12   report to me.  I handle, on the U.S. side -- well, the company I

13   work for is a global company, so from the U.S. side I handle all

14   of the U.S. transactions as well as the -- and, I apologize, the

15   APAC which is our Asia Pacific.

16          From that then for the month-end close procedures I

17   handle all of the London and Paris financial statements come

18   over to me.  I have a counterpart over there that handles all

19   the day-to-day transactions.  She then gives me the month-end

20   financial statements.  I then pull together all of the U.S.

21   financial statements with a staff of general accountants, senior

22   accountants, that then give those to me so I can do the

23   consolidated financial statements.

24          In addition, too, I help out with forecasting,

25   budgeting, and any other ad hoc reports that I need to do.

190

1   Q.   Okay.  How long have you had that job?

2   A.   For four years.

3   Q.   What did you prior to that?

4   A.   Before that I was a auditor for a mid-sized accounting firm.

01:13   5   Q.   Where was that located?

6   A.   In Brookfield, Wisconsin.

7   Q.   And what's the name of that firm?

8   A.   Vrakas Blum.

9   Q.   And is it V R A K A S?

01:14   10   A.   Yes.

11   Q.   And then Blum, B L U M?

12   A.   Correct.

13   Q.   Okay.  And during what period of time did you work at Vrakas

14   Blum?

01:14   15   A.   From the time I graduated from college, so January of 2001,

16   until I moved to Virginia in October of 2007.

17   Q.   And would you explain to the jury what that job entailed at

18   Vrakas Blum?

19   A.   Yes.  As an external auditor my objective was to go in as an

01:14   20   independent person to review their -- not review but perform an

21   audit on their year-end financial statements.  And so what that

22   means, is I had to comply with the governing bodies of the

23   Accounting Standards Board to ensure that we were following how

24   to -- well, through audit testing.

01:14   25        So what is audit testing?  Audit testing would be we

1    would go in, look at the year-end financial statements, and

2    starting off with cash.  We would say, okay, we need to validate

3    this, and from that we would send off the bank confirmation to

4    the respective bank to say this number that they're actually

5    showing on the balance sheet does tie to what the client that we

6    had is stating as such.

7         So, essentially, my job was to go in through these

8    testings and ensure that the company itself -- so the person,

9    now essentially me, and what I do, because we have external

10   accountants come in and do audits on our work to ensure that the

11   users of the financial statements can rely on the validity and

12   the accuracy of it.  And ultimately to ensure that the financial

13   statements are materially free from error, whether due to fraud

14   or material misstatement.

15        And that, from an audit standpoint, as mentioned, we'd

16   send out bank confirmations.  In addition to we'd send out

17   confirmations to a random selection of accounts receivable.  As

18   well as do year-end inventory observations.  Statistical

19   sampling on the inventory.  We'd also review the P&Ls, make sure

20   that the -- perform analytics on their P&Ls to ensure that year

21   over year as well as what we're seeing reported on the financial

22   statements make sense.

23        In addition, you review their internal controls to

24   ensure that as the company is operating that they have --

25   they're securing their safeguards over their assets.  So at the

192

1    end of the day you'd sit down with maybe one of their associates

2    and make sure that the same person who receives the mail in

3    isn't the same person that may get a check and then record that

4    cash into the general ledger, which then ultimately reflects the

5    year-end financial statements.

6            Working at Vrakas as an auditor, what we actually did

7    is all of our clients were privately held companies.  So the

8    bank actually would say within -- they'd borrow or lend the

9    company money and say as part of lending you money one of the

10   things that you have to do is you have to have this external

11   independent audit report.  And so from that we go in, perform

12   our audit procedures within the governing bodies, and ensure

13   that they were -- provide assurance that they're relatively free

14   of error.

15   Q.  And you mentioned a couple of terms, I just want to be

16   clear.  You said P&L, that's a profit and loss statement?

17   A.  Sorry, yes.

18   Q.  That one of your clients would have one and your job was to

19   make sure that it was accurate.

20   A.  Correct.

21   Q.  And you did that for approximately six, six and a half

22   years?

23   A.  Correct.

24   Q.  Now, do you know an individual named James Stuart?

25   A.  I do.

193

1  Q.  And how do you know James Stuart?

2  A.  He's my uncle.

3  Q.  And how is he your uncle?

4  A.  It's my mom's brother.

5  Q.  And do you see him here today?

6  A.  I do.

7  Q.  Could you just identify him by where he's seated and what

8  he's wearing?

9  A.  He's the gentleman sitting at the end in the blue jacket

10  with the tie.

11  Q.  That could be anybody back there, but on the far left-hand

12  side?

13  A.  Far left-hand side, yes.

14          MR. JACOBS:  I'd ask the record reflect the witness

15  has identified the defendant, Your Honor.

16          THE COURT:  Noted.

17  BY MR. JACOBS:

18  Q.  And do you know what your uncle does for a living?

19  A.  Yes.  He is a 70 percent owner in a company called New Age

20  Chemical.

21  Q.  And are you familiar with that business?

22  A.  I am.

23  Q.  Do you know where it's located?

24  A.  It's located in Delafield, Wisconsin.

25  Q.  And do you know what kind of business it is?

194

1    A.   I do.  Their primary product is a coolant in which they

2    manufacture so that the machines do not burn out, essentially.

3    Q.   And you mentioned that he's the 70 percent owner, do you

4    know who the other owner or owners are of the business?

5    A.   I do.

6    Q.   And --

7    A.   My mom.

8    Q.   I'm sorry?

9    A.   My mother, Beverly Schlipp.

10   Q.   Anybody else?

11   A.   No.

12   Q.   Now, do you know if your mother has ever worked for New Age

13   Chemical?

14   A.   She did, yes.

15   Q.   Do you know what her position was?

16   A.   Her position at the time was vice-president.

17   Q.   And do you know what her responsibilities were?

18   A.   My mom's objective when she was there was she handled all of

19   the financial statements.  She handled the day-to-day

20   transactions of payables, receivables.  Ensuring that the

21   inventory counts were in line with what was being reported on

22   the financial statements.  In addition to she would ensure that

23   cash flow was up to spec.  Compliance of their note with the

24   bank.  As well as just interacting with the vendors and

25   instances that they needed to switch around maybe for additional

195

1  cash flow as well as with their clients to ensure the goodwill

2  with their clients.

3         Ultimately, too, at the end of the day she would

4  prepare the monthly financial statements, the annual financial

5  statements, which would -- which she'd send off to the

6  accounting firm so that they could prepare the tax returns.

7  Q.  Have you ever been worked at New Age Chemical?

8  A.  I did, yes.

9  Q.  When was that?

10  A.  It would have been in 1997.

11  Q.  And why were you working there in 1997?

12  A.  My mom actually had a horseback riding accident where she

13  fell off her horse and the ball came out of the socket and the

14  bone connected to it snapped in half.  So needless to say, she

15  had to have several surgeries.  At the time I was in college, so

16  it was actually December of 1997, it was a break, and I went in

17  and tried to help fill in with her day-to-day accounting

18  functions.

19         And then, ultimately, in the summer of 1998, I worked

20  there over the span of that summer to assist again for another

21  operation she had to have.

22  Q.  Is it fair to say you performed your mother's functions so

23  she could have her surgeries?

24  A.  Correct.

25  Q.  And do you know what your uncle James Stuart's

196

1  responsibilities were at New Age Chemical?

2  A.  Yes.  He was the president of New Age Chemical.  And what

3  Jim did was, he maintained all of the -- all of their products.

4  He would also ensure if there was a tweak of a product that

5  needed to be made he dealt directly with the clients and ensured

6  that if something else needed to be tweaked he had the knowledge

7  base to go out and research that, change anything that might

8  need to be done.  Sales.

9  Q.  Now, did you ever have occasion to discuss with your uncle

10  his views on the U.S. tax system?

11  A.  I did.

12  Q.  Do you recall the first time you had any discussions with

13  your uncle about the U.S. tax system?

14  A.  The first time that I had a discussion with him it was in

15  the summer of like 2005, at a bonfire that he had at his home.

16  It was the first time I ever heard of his views on taxes.  At

17  that point in time the discussion really didn't go that far and

18  I didn't really think much of it.

19  Q.  Do you recall what, if anything, your uncle told you about

20  his views of the U.S. tax system at that summer bonfire?

21  A.  The only thing that I do recollect was that he had

22  referenced that taxes were unconstitutional.  To be quite

23  honest, the views were so far outside my --

24         MR. BERNHOFT:  Objection.

25         THE COURT:  Objection sustained.

197

1    BY MR. JACOBS:

2    Q.  Do you recall anything else that he said?

3    A.  I do not.

4    Q.  Now, at that time what were you doing for a living?  In the

5    summer of 2005.

6    A.  I was currently employed at Vrakas Blum as an auditor.

7    Q.  Did you have any further discussions with your uncle

8    concerning his views on the U.S. tax system after the summer of

9    2005?

10   A.  I did.

11   Q.  And when was that?

12   A.  It was not until March of 2007.

13   Q.  And again, at that time what were you doing for a living?

14   A.  I was sill an auditor at Vrakas Blum.

15   Q.  And can you describe the circumstances that you had

16   discussions with your uncle?

17   A.  Yeah.  It was printout to my attention from my mom that she

18   was no longer --

19          MR. BERNHOFT:  Objection, hearsay.

20          MR. JACOBS:  It's not hearsay.

21          THE COURT:  Overruled.

22          MR. JACOBS:  I'm sorry, go ahead.  What was brought to

23   your attention?

24          THE WITNESS:  It was brought to my attention by my mom

25   that they were no longer withholding payroll taxes from their

198

1    paychecks.  Needless to say I freaked out but was definitely

2    concerned and explained to my mom that she couldn't do that.

3    From that, I actually went to my mom's house and sat down with

4    her and found out what was really going on at that point.

5    BY MR. JACOBS:

6    Q.  Now, do you recall when was this?

7    A.  It was March of 2007.

8    Q.  And while at your mother's house did you do any research?

9    A.  Yes.

10   Q.  Can you describe the type of research that you did?

11   A.  Well, at that point in time based on what my mom had told

12   me, that Jim's views were --

13            THE COURT:  One second.  Ask another question.

14            MR. JACOBS:  Could I be heard at side bar, Judge?

15            (At side bar on the record.)

16            THE COURT:  I stopped the witness because she was

17   getting into views of the defendant that weren't necessarily

18   statements that were made to her by the defendant or statements

19   in front of the defendant.

20            MR. JACOBS:  She only needs to explain why she did

21   what she did.  That is, she did certain research and looked up

22   certain specific things and so she needs to explain the reason

23   why she looks up the reason she looks up.  So it's not offered

24   for the truth but it explains why she acted the way she did.

25   Whether it's true or not, the guy said it.  She was told that.

199

1    MR. BERNHOFT:  She's not saying that he said it.

2    THE COURT:  She's not saying that he said it.

3    MR. JACOBS:  That's what I'm saying.  It doesn't

4 matter whether he said it or not, she's saying here's the

01:25    5 information that I was given to cause me to do it.

6    THE COURT:  You need to ask the question in such a way

7 that that is clear.  Because the way it is coming out, it

8 appears that she is expressing -- she's giving a hearsay

9 statement.

01:26   10    MR. JACOBS:  But again, Judge, even if what she says

11 is I was told he believed this, and as a result of being told

12 this, whether he really believed it or believes it or not, it's

13 not offered for the truth.

14    THE COURT:  Ask her what she did and why she did it.

01:26   15    MR. JACOBS:  And she needs to explain because I was

16 told he believed X, I did research on X.

17    MR. BERNHOFT:  That's offered for the truth of the

18 matter asserted.

19    MR. JACOBS:  No, it's not.  It explains why she does

01:26   20 what she does.  Doesn't matter if it's true or not, it only

21 explains her actions.  That's not hearsay.

22    THE COURT:  I understand that.  But she has to be

23 clear that she was acting on the basis of what she was told.

24    MR. JACOBS:  Okay.

01:26   25    (End of discussion at side bar.)

200

1          THE COURT:  Ask another question, please.

2    BY MR. JACOBS:

3    Q.  Ms. Reese, I think you were saying you did some research.

4    Can you tell me what you researched?

01:27   5    A.  Yes.  We went on the IRS website and looked at different

6    case studies.

7          THE COURT:  One second.  Please listen to the

8    question.  You said what we did.  I want to know -- the question

9    is what did you do.  Okay?

01:27  10          THE WITNESS:  Oh, sorry.

11          THE COURT:  Proceed.

12          THE WITNESS:  Okay.  So what I did at that point in

13    time was went on the IRS websites and reviewed different case

14    studies relating to the views that my mom had told me that my

01:27  15    uncle was --

16    BY MR. JACOBS:

17    Q.  Espoused.

18    A.  Yes.

19    Q.  You don't know if he said it or not, it's just what you were

01:27  20    told.

21    A.  Correct.

22    Q.  And based on that you did some research.

23    A.  Correct.

24    Q.  Okay.  Did you print off any written materials?

01:27  25    A.  We did print it off, yes.

201

1    Q.  And again, when you say we --

2    A.  Sorry, I.  Yes.  Myself and my mom.

3    Q.  Your mom was with you?

4    A.  Correct.

01:27    5    Q.  Who is at the computer?

6    A.  I was.

7    Q.  Who is doing the printing?

8    A.  I was.

9    Q.  She was just with you?

01:27    10    A.  Correct.

11    Q.  And can you describe just generally the type of materials

12    you printed off.

13    A.  They were the case studies where you find if somebody had a

14    particular view such as that paying taxes were unconstitutional.

01:28    15    I found case studies where they already went to court and tried

16    and they lost.  So from that I printed it off to try to share

17    with my uncle.

18    Q.  Okay.  Do you recall any other topics that you printed off

19    materials concerning?

01:28    20    A.  To be quite honest, I don't.

21    Q.  And what, if anything, did you do with those materials?

22    A.  What I wanted to do with them, and what I did do with them,

23    was the next morning I went to New Age to talk to my uncle.

24    Q.  Okay.  And maybe you mentioned this, at that time where was

01:28    25    New Age Chemical?

202

1    A.  In Delafield, Wisconsin.

2    Q.  And did your uncle have an office at New Age Chemical?

3    A.  He did.

4    Q.  And did you, in fact, meet with your uncle?

01:29    5    A.  I did.

6    Q.  Now, do you know, does your uncle have any formal education

7    in the areas of accounting or tax law?

8    A.  None that I'm aware of, no.

9    Q.  And did you, in fact, get to meet with him that day?

01:29    10    A.  I did, yes.

11    Q.  Where did you meet with him?

12    A.  I met with him in his office.

13    Q.  Was there anybody else there with you?

14    A.  No, it was just him and myself.

01:29    15    Q.  And approximately how long did you meet with him?

16    A.  I would say roughly about an hour.

17    Q.  And can you describe for the jury that meeting, how it

18    transpired?

19    A.  Yes.  I took the materials to him because I was concerned

01:29    20    just as I had heard from my mom that --

21            MR. BERNHOFT:  Objection, unresponsive.

22    BY MR. JACOBS:

23    Q.  Just describe the meeting.  What happened?

24    A.  So from that meeting I provided the documents that I had

01:29    25    printed the night before based on the case laws in which people

1    tried with different views such as taxes were unconstitutional,

2    and that they had lost.  And I tried to talk to him about it

3    saying that I was concerned for his viewpoints and what it was

4    going to do to the company.

01:30    5    Q.  And did your uncle accept those materials from you?

6    A.  He did not.

7    Q.  Did he respond to the information that you were giving him?

8    A.  He did.

9    Q.  What did he say?

01:30    10    A.  He got extremely excitable.  He would not listen to what I

11    was trying to actually provide to him.  And in addition to,

12    stated that I was brainwashed because I had gone to school for

13    accounting.

14    Q.  Did he discuss the legality of courts in the United States?

01:30    15    A.  He did.

16    Q.  What did he say?

17    A.  And this is where I can't confer any further from there.  It

18    was so outside of what I knew as legal that I don't recollect.

19    Q.  Did he indicate whether he was a U.S. citizen?

01:31    20    A.  He did state that he was not a U.S. citizen.

21    Q.  Did he indicate that he was a sovereign of some other

22    geographic --

23         MR. BERNHOFT:  Objection, leading.

24         THE COURT:  Sustained.

01:31    25    BY MR. JACOBS:

204

1   Q.  Did he make any other statements concerning his citizenship?

2   A.  Yes.  He stated that he was the sovereign citizen of the

3   state of Wisconsin, I believe.

4   Q.  And did you make any other efforts during that meeting to

5   convince him of your views?

6   A.  I did.

7   Q.  What did you do?

8   A.  I tried to explain to him that I was concerned that if he

9   went down that route, not only for himself, the company, and

10  even in the stance of my mom, I didn't want to see --

11          MR. BERNHOFT:  Objection, unresponsive.

12          THE COURT:  Technically that's not your objection but

13  I will interrupt and ask that another question be asked.

14  BY MR. JACOBS:

15  Q.  Can you describe for me your efforts during the ming?

16  A.  I tried very hard to provide to him the information that I

17  had gotten off the Internet.

18  Q.  Did you discuss any possible ramifications of his actions

19  with him?

20  A.  I did.

21  Q.  What did you tell him?

22  A.  That it could be jail time or penalties.

23  Q.  And what did he say?

24  A.  He said that he was willing to take that because he was a

25  martyr and he believed in his views.

205

1    Q.   Did your uncle during that meeting show an interest in your

2    views?

3    A.   No.

4    Q.   Did he express at least respect for what you were saying?

5    A.   No.

6    Q.   How do you know that?

7    A.   He did make a comment about the fact that I went to school,

8    that I was brainwashed, in addition to he said that I was

9    stupid.

10   Q.   Can you tell me, you say that meeting lasted about an hour,

11   how did the meeting end?

12   A.   Where it ended up was that my mom was going to start to

13   continue to have her payroll taxes withheld from her payroll, in

14   addition to I was going to prepare their tax return.

15   Q.   When you say prepare their tax return, whose tax return?

16   A.   New Age Chemical's.

17   Q.   And do you know what kind of tax entity New Age Chemical is?

18   A.   It was an S Corp.

19   Q.   And what does that mean?

20   A.   An S Corp is a corporation that's set up that when the

21   company makes money the income, or loss, would then be divided

22   amongst the owners based on the ownership percentage.

23   Q.   So does it have to file tax returns?

24   A.   They do, yes.

25   Q.   But does it pay taxes?

206

1  A.  The entity itself, no.

2  Q.  And what's the type of return New Age Chemical files?

3  A.  An 1120.

4  Q.  And did you, in fact, prepare a tax return for New Age

5  Chemical?

6  A.  I did.

7  Q.  Do you remember for what period of time that was?

8  A.  It was for their fiscal year-end, which is September 30th,

9  2006.

10  Q.  And when would you have prepared that return?

11  A.  I prepared it in June of 2007.

12  Q.  Let me show you what's been previously admitted into

13  evidence -- at least I believe it has -- as Exhibit 9.  If you

14  could just review that, I'm going to ask you a couple of

15  questions.

16        (Witness peruses document.)

17        MR. JACOBS:  Judge, I'm not certain if the display is

18  on for the monitors.

19  BY MR. JACOBS:

20  Q.  Do you recognize what Exhibit 9 is, Ms. Reese?

21  A.  I do.

22  Q.  What is it?

23  A.  It's the 1120S tax return that I filed.  Well, they filed.

24  I prepared.  Sorry.

25  Q.  I'm sorry?

207

1  A.  I prepared, they filed.

2  Q.  Now, I note that there is a signature there for preparer at

3  the bottom and it's blank.

4  A.  Correct.

01:35   5  Q.  Why is that?

6  A.  I was not a paid preparer.

7  Q.  And that line is only for paid preparers?

8  A.  Correct.

9  Q.  And what period of time does this tax return cover?

01:35  10  A.  It would be from October 1st, 2005 to September 30th, 2006.

11  Q.  You know, I notice the form says 2005 in the upper

12  right-hand corner; do you know why that is?

13  A.  Yeah, because it's a fiscal year-end.  Well, it has a fiscal

14  year-end of 9/30.  And by "fiscal," it's not a calendar year-end

01:36  15  of 12/31.  You have to have your tax return filed within 90 days

16  of your year-end, and so their previous year's financial

17  statements would have been the 2004 form.  And so in this

18  instance I was preparing the next year, and so I utilized the

19  2005 form.

01:36  20  Q.  Okay.  And do you know, what did you use to prepare this

21  return?

22  A.  Actually, I utilized the software at Vrakas Blum called

23  Ghost Systems.

24  Q.  And what did you use for a source of information to complete

01:36  25  the return?

208

1    A.   The source of information I utilized was their previous year

2    tax return, in addition to their fiscal year-end financial

3    statements of 9/30/2006, along with other various work papers

4    that I received from the company.

01:36    5    Q.   Okay.  And do you know, did the company -- did New Age

6    Chemical make money during this fiscal year ending on September

7    30, 2006?

8    A.   They did.

9    Q.   And how much did it make?

01:37    10    A.   108,000.

11    Q.   Dollars?

12    A.   Yes.  107,998.

13    Q.   And were individuals -- were there people who were required

14    to report that income and pay taxes on it?

01:37    15    A.   Yes, the owners.

16    Q.   And who are those owners?

17    A.   Jim Stuart and Beverly Schlipp.

18    Q.   And do they both have to report the $108,000?

19    A.   No, it's divided amongst their ownership percentage.

01:37    20    Q.   And is that reflected somewhere in the return?

21    A.   In their K-1s.

22    Q.   And what is a K-1?

23    A.   A K-1 is attached to the 1120S.  That's where it signifies

24    each ownership's percentage of income that's divided amongst

01:37    25    them.  And that K-1 is then attached to their personal tax

209

1    returns or their 1140 that they filed.

2    Q.  Is that information reflected in this return somewhere?

3    A.  It is.

4    Q.  And did you prepare one for both of the owners, your

5    uncle --

6            THE COURT:  One second, please.  Would you read back

7    her last answer?

8            (Record read.)

9    BY MR. JACOBS:

10   Q.  1040?

11   A.  1040, sorry, yes.

12   Q.  And do you actually have to attach a K-1 to your 1040?

13   A.  You have to report the income that's generated from your

14   K-1.

15   Q.  Like a W-2, when up file your 1040 you put that W-2 on that

16   1040, right?

17   A.  Right.

18   Q.  The K-1, that goes with the 1120S?

19   A.  Correct.

20   Q.  You just take the amounts from it.

21   A.  Correct.

22   Q.  And did you prepare K-1s both for your uncle and your

23   mother?

24   A.  I did.

25   Q.  And if we return to -- I'm not sure what page of Exhibit 9

210

1    this is.

2              (Brief pause.)

3    BY MR. JACOBS:

4    Q.  There we go.  Sorry.  There are some highlights on it.  Do

5    you recognize that K-1 that's on the monitor?

6    A.  Yes.

7    Q.  Whose is that?

8    A.  That's Beverly Schlipp's.

9    Q.  And what was her share of the income for New Age Chemical

10   for that year?

11   A.  Her share was 30 percent.  So out of the 107,998, hers was

12   the 32,068.

13   Q.  Did she have the report that somewhere?

14   A.  She had to report it on her personal income tax return.

15   Q.  And what year would that have been for?

16   A.  She would have done that in 2007.

17   Q.  For which tax year?

18   A.  For 2006.

19   Q.  Okay.  And then if we flip through a couple more, is there

20   also a K-1 for your uncle?

21   A.  Yes.

22   Q.  And how much income was he required to report from New Age

23   Chemical?

24              MR. BERNHOFT:  Excuse me, can we clarify who "he" is?

25   BY MR. JACOBS:

211

1    Q.  Was James Stuart, your uncle, required to report.

2    A.  75,930.

3    Q.  And again, what year was he required to report that?

4    A.  In 2006.

01:41   5    Q.  That's the tax year 2006?

6    A.  Yes.

7    Q.  Now, what did you do -- when you prepared this return, what

8    did you do with it once you prepared it?

9    A.  Once I prepared it I took it to New Age Chemical and

01:41   10   provided it to Beverly Schlipp and James Stuart.

11   Q.  Do you know if James Stuart received a copy of this K-1?

12   A.  He did.

13   Q.  How do you know?

14   A.  I handed it to him.

01:41   15   Q.  Can I ask, is the K-1 income here, is that the same thing as

16   the salary that an officer of New Age Chemical would be paid?

17   A.  Is that the same thing as a salary?  No, it's reporting the

18   income that the corporation made for the year.

19   Q.  So if an officer of a corporation received compensation

01:42   20   payments they'd have to report that in addition to the

21   corporation's income.

22   A.  Correct.

23   Q.  And do you know, again, approximately when you would have

24   prepared this return?

01:42   25   A.  Well, subsequent to the March meeting with my uncle, it was

212

1    in-between March and June of 2007.  I was working on it.

2    Q.  Other than the meeting with your uncle in March of 2007, did

3    you have any additional meetings with him to discuss his views

4    on the tax system?

5    A.  I did, yes.

6    Q.  How many other meetings did you have?

7    A.  Just one.

8    Q.  And do you recall --

9            THE COURT:  Counsel, please approach.

10           (At side bar on the record.)

11           THE COURT:  I apologize for interrupting but there are

12   several people who have come in.  I want to make sure that they

13   are not witnesses who would be excluded otherwise.

14           MR. JACOBS:  I don't know who all of them are.

15           THE COURT:  All right.

16           MR. BERNHOFT:  I know Mr. Schlipp is, but he's not a

17   witness.  That's his daughter so -- thank you, Judge.

18           THE COURT:  All right.

19           (End of discussion at side bar.)

20   BY MR. JACOBS:

21   Q.  Can you tell me, after March of 2007, how many additional

22   meetings did you have with your uncle?

23   A.  One.

24   Q.  Do you recall approximately when that was?

25   A.  It was sometime between June of 2007 and October 2007.

213

1    Q.   Do you recall where the meeting was?

2    A.   In his office.

3    Q.   And do you recall, was there anyone at that meeting besides

4    you and your uncle James Stuart?

5    A.   No.  At this point in time it was myself, Beverly Schlipp,

6    and Pat Walsh.

7    Q.   So that's your mother, Beverly Schlipp?

8    A.   My mom is Beverly Schlipp, yeah, and Pat Walsh.

9    Q.   And who is Pat Walsh?

10   A.   Pat Walsh was a very close friend to my grandfather and now

11   a dear friend to the family.

12   Q.   And when you say your grandfather, do you mean James Stuart,

13   Sr.?

14   A.   Correct.

15   Q.   Because you could have a grandfather on the other side,

16   right?

17   A.   Correct.

18   Q.   And other than a dear friend had Mr. Walsh ever done any

19   work for New Age Chemical?

20   A.   He did.

21   Q.   Do you know what kind of work he did?

22   A.   He was a tax partner at an accounting firm called Clifton

23   Gunderson, so he handled their tax work.

24   Q.   And do you recall how long this meeting was?

25   A.   I would say roughly around an hour.

214

1  Q.  And what was the purpose of the meeting?

2  A.  Once again, I had hoped that we could talk to my uncle

3  regarding his views around taxes.

4  Q.  And could you describe how the meeting transpired?  What

5  happened?

6  A.  Once again, we tried to relay — myself, my mom Beverly

7  Schlipp, and Pat Walsh — tried to convey that the views on his

8  taxes were going to get him in trouble.  And he did not want to

9  listen to what we had to say.

10 Q.  Well, did he at least appear curious, interested in the

11 information you had?

12 A.  No.

13 Q.  Did he appear that he didn't understand the Internal Revenue

14 Code and he just wanted more information from the Internal

15 Revenue Code to help him understand it?

16 A.  No.

17         MR. BERNHOFT:  Objection.

18         THE COURT:  Sustained.  The response is stricken.

19 BY MR. JACOBS:

20 Q.  Can you tell me, did he express any opinion about what you

21 were telling him?

22 A.  Well, his opinions were he believed that he -- that the

23 taxes were unconstitutional.

24 Q.  Could you describe his demeanor during the meeting?

25 A.  It was very similar to the meeting I had with him in March.

215

1    Q.  And how was that?

2    A.  Adamant about his views.

3    Q.  And did he express any opinion about your views?

4    A.  Once again, it went the same way as it did in March.  Just

5    this time there was additional people in the room.

6    Q.  And what was that?  Did he express any opinion about your

7    views?

8    A.  That we were wrong and he was right.

9    Q.  Now, do you know if your uncle is familiar with the

10   Internet?

11   A.  Yes, he is.

12   Q.  How do you know that?

13   A.  He expressed to the me that he found his views off the

14   Internet.

15   Q.  Did you -- do you know, the material you tried to give him

16   at your first meeting, did you tell him where you had gotten

17   those materials?

18   A.  I did.

19   Q.  And where was that?

20   A.  I got it off the Internet.

21   Q.  And did you tell your uncle that?

22   A.  I did.

23   Q.  And did he respond to that?

24   A.  The problem was is I got it off the IRS website.

25   Q.  That's what he said?

216

1   A.  Yes.

2        MR. JACOBS:  Judge, that's all I have for this

3   witness.

4        THE COURT:  Very well.  You may cross.

5                    CROSS-EXAMINATION

6   BY MR. BERNHOFT:

7   Q.  Good afternoon, Ms. Reese.

8   A.  Good afternoon.

9   Q.  I'm Bob Bernhoft, I represent your uncle Jim Stuart in this

10  case.

11       These two meetings -- you testified on direct that the

12  first meeting was just you and your uncle Jim Stuart in-between

13  March and June of 2007; is that correct?

14  A.  Correct.

15  Q.  And then the second meeting that you had with your uncle

16  Mr. Stuart was somewhere between June and October of 2007; is

17  that right?

18  A.  Correct.

19  Q.  I believe you testified on direct, correct me if I'm wrong,

20  that each of these meetings lasted about one hour.

21  A.  Correct.

22  Q.  I'm curious, what did you talk about for one hour given your

23  testimony that Mr. Stuart didn't want to listen to what you had

24  to say?

25  A.  He did the majority of the talking.

217

1   Q.   Okay.   Now, you've said that -- let me ask you a question.

2   You testified on direct that your goal was to convince your

3   uncle Jim Stuart that his understanding of the Internal Revenue

4   Code was incorrect; is that correct?

01:49   5   A.   Correct.

6   Q.   And did you understand that your uncle Jim Stuart was taking

7   the position that he didn't have to pay income tax or file tax

8   returns?   Is that a fair paraphrase?

9   A.   Correct.

01:50   10   Q.   And you testified, Ms. Reese, that you received a accounting

11   degree from University of Wisconsin-Milwaukee, was that December

12   of 2000?

13   A.   Correct.

14   Q.   Did you take some tax courses when you were obtaining your

01:50   15   accounting degree there?

16   A.   Yes.

17   Q.   All right.   Now, let's talk about the first meeting if we

18   can which occurred, according to your testimony, somewhere

19   between March and June of 2007.   Did you advise your uncle what

01:50   20   section of the Internal Revenue Code made him liable for the

21   federal income tax?

22   A.   From the documents that I had, yes.

23   Q.   That's unresponsive to my question.   Please listen to my

24   question.

01:50   25            MR. JACOBS:   I'm going to object to that, Your Honor.

218

1      THE COURT:  No objection is necessary.  Counsel,

2  please ask another question, please.

3      MR. BERNHOFT:  Yes.

4  BY MR. BERNHOFT:

01:50   5  Q.  At that first meeting that took place between March and June

6  of 2007, did you or did you not advise your uncle what section

7  of the Internal Revenue Code makes him liable for the federal

8  income tax?

9  A.  I tried to tell him that he should pay taxes.

01:51  10  Q.  Right.  Let me rephrase that.  At that meeting in March and

11  June of 2007, did you advise your uncle what section of the

12  Internal Revenue Code made him liable for the federal income

13  tax?

14  A.  In specifics, I guess not.

01:51  15  Q.  Okay.  At that meeting between March and June 2000, did you

16  advise your uncle what section of the code or regulation

17  required him to file the Form 1040 personal income return to

18  make a return on income tax?

19  A.  No.

01:51  20  Q.  At the that meeting between March and June of 2007, did you

21  advise your uncle of what section of the code made -- subjected

22  the money he made from New Age Chemical to withholding taxes?

23  A.  No.

24  Q.  All right.  And if I asked you those same three questions

01:52  25  for this second meeting between June and October of 2007, would

219

1    your answers be the same?

2    A.   And that's why Pat Walsh was there.

3    Q.   Let me ask that again.  If I asked you those same three

4    questions respecting the second meeting between June and October

5    of 2007, would your answers be the same?

6    A.   Yes, they would be.

7              MR. BERNHOFT:  All right, thank you.  No further

8    questions.

9                        REDIRECT EXAMINATION

10   BY MR. JACOBS:

11   Q.   Ms. Reese, Mr. Bernhoft asked you about what you advised

12   Mr. Stuart, your uncle, at those two meetings.  Did the material

13   you had with you provide that information?

14   A.   It did.

15   Q.   It provided the statutory authority --

16             MR. BERNHOFT:  Objection, Your Honor.  There's lack of

17   foundation here.

18             THE COURT:  Objection sustained.

19             MR. JACOBS:  Could I be heard at side bar?

20             THE COURT:  Yes.

21             (At side bar on the record.)

22             THE COURT:  The objection is lack of foundation.

23             MR. JACOBS:  She's testifying she printed off the

24   material that had this statutory authority in it and gave it to

25   him.

220

1         MR. BERNHOFT:  No, she didn't.

2         MR. JACOBS:  I asked her that question.

3         MR. BERNHOFT:  Her first testimony was that she pulled

4    case studies off the Internal Revenue Service's website where

5    people had lost.  There's no foundation for her suddenly

6    remembering --

7         MR. JACOBS:  If you want to cross that's fine.  She

8    just said it had it.

9         THE COURT:  And she's interpreting --

10         MR. JACOBS:  That's for cross, Judge.  She said it's

11   in there.

12         THE COURT:  She can testify to what she gave him.  But

13   if she's interpreting she's being asked to give more than just

14   provide raw information that she provided -- that she gave to

15   her uncle.  So you can ask her what she gave him.

16         MR. JACOBS:  Okay.

17         (End of discussion at side bar.)

18         THE COURT:  Ask another question, please.

19   BY MR. JACOBS:

20   Q.  Ms. Reese, do you recall specifically what was in the

21   written material you tried to give your uncle in the March 2007

22   meeting?

23   A.  Specifically the details that I obtained from the IRS

24   website included not only -- it included the case laws that I

25   found based upon his views, and how the results of those cases

221

1    ended up.

2    Q.  So it was primarily case studies.

3    A.  Correct.

4    Q.  Okay.  And did your uncle accept that material from you?

5    A.  He did not.

6            MR. JACOBS:  Okay.  That's all I have, Judge.

7            MR. BERNHOFT:  Nothing on recross, Your Honor.

8            THE COURT:  You may step down.  Please to not discuss

9    your testimony with anyone unless you're advised this case has

10   been completed.  Have a good afternoon.

11           THE WITNESS:  You too.

12           THE COURT:  I'll do the best I can.

13           (Witness excused at 1:55 p.m.)

14           MR. JACOBS:  Judge, we next would call Patrick Walsh.

15           THE COURT:  If you would like to stretch this may be a

16   good opportunity.

17           MR. JACOBS:  Sir, if you could step up to the witness

18   stand and remain standing and be placed under oath.

19           THE REPORTER:  Raise your right hand, please.

20            PATRICK WALSH, GOVERNMENT WITNESS, SWORN

21           THE REPORTER:  Please state your name and spell your

22   name for the record.

23           THE WITNESS:  Patrick W. Walsh, W A L S H.

24           MR. JACOBS:  If I could have just a moment, Your

25   Honor.

222

1          (Brief pause.)

2          MR. JACOBS:  Judge, I wonder if I could have like a

3    five-minute break to run up to my office.  I'm missing part of

4    my file.

5          THE COURT:  All right.  We'll take the opportunity to

6    relax.  Please return to the jury room.

7          THE BAILIFF:  All rise.

8          (Jury out at 1:57 p.m.)

9          (Recess taken at 1:58 p.m., until 2:07 p.m.)

10         (Jury in at 2:08 p.m.)

11                        DIRECT EXAMINATION

12   BY MR. JACOBS:

13   Q.  I believe you already said your name, Mr. Walsh?

14   A.  Yes.

15   Q.  Mr. Walsh, how old are you?

16   A.  I'm 74.

17   Q.  And where do you currently live, what city?

18   A.  In Marco Island, Florida.

19   Q.  Do you maintain a home here in Wisconsin as well?

20   A.  Yes, I do.

21   Q.  And where is that?

22   A.  That's Kohler, Wisconsin.

23   Q.  Can you tell me what your educational background is?

24   A.  I have a BA degree from Concordia University and an MS

25   degree from Cardinal Stritch University.

223

1   Q.  And in what area is your undergraduate degree in?

2   A.  Accounting.

3   Q.  And how about your master's degree?

4   A.  That's business management.

02:09   5   Q.  And are you a certified public accountant as well?

6   A.  Yes, I am.

7   Q.  Are you currently employed?

8   A.  I'm self-employed on a part-time basis doing tax and

9   business consulting.

02:09   10   Q.  When did you move to that status?

11   A.  In at the end of 1999.

12   Q.  What did you do prior to that?

13   A.  I was in public accounting practice all of my career which

14   entails, to date, about 40 years.  My last position was as a

02:09   15   managing partner of the Milwaukee office of Clifton Gunderson.

16   Q.  And how big is that firm, Clifton Gunderson?

17   A.  Clifton Gunderson is a major.  It's not the top-tier four

18   firms, but it's beneath that.  I think they're ranked as the

19   10th largest U.S. accounting firm.

02:10   20   Q.  And approximately how many professionals or accountants

21   would they employ?

22   A.  Thousands.

23   Q.  Now, in your current part-time employment, is there a

24   business name associated with that?

02:10   25   A.  Yes.  My wife's -- it's my wife's practice.  It's a tax

224

1  practice, and it's called Brenda K. Walsh and Associate.

2  Q.  And has that been the name of the firm since you went to

3  that in 1999?

4  A.  No.  We were married in 2001, and prior to that it was

02:10  5  called -- with her maiden name it was called Brenda Kippenhen

6  and Associates.

7  Q.  Is that K I P P E N H E N?

8  A.  Yes.

9  Q.  Would you describe the type of work you did when you were

02:11  10  working at Clifton Gunderson?

11  A.  Well, I was a manager of the office primarily.  Besides that

12  I worked on -- I had a number of clients that I served, as the

13  other CPAs in the firms did, which would include -- my area of

14  expertise was primarily in tax work, but I was the partner in

02:11  15  charge of audits as well as other accounting services and tax

16  work, preparation of business tax returns.

17  Q.  In connection with that employment do you know an individual

18  named James A. Stuart, Jr.?

19  A.  Yes, I do.

02:11  20  Q.  And how long have you known Mr. Stuart?  That Mr. Stuart.

21  A.  Oh, I would say going back to 1980.

22  Q.  And do you see him here today?

23  A.  Yes, he's here.

24  Q.  Could you just identify him by where he's seated and what

02:12  25  he's wearing?

225

1    A.  He's got a blue jacket on with a tie and a white shirt and

2    he's on the end of the second table there.

3    Q.  That is the left-hand side?

4    A.  Yes.

5            MR. JACOBS:  Judge, I'd ask the record reflect he has

6    identified the defendant James Stuart.

7            THE COURT:  Noted.

8    BY MR. JACOBS:

9    Q.  Do you recall how you first came to know Mr. Stuart?

10   A.  Well, I first came to know his father James Stuart, Sr.

11   Q.  And how did you come to know his father?

12   A.  I met him through a bank.  I lived in Fredonia, Wisconsin at

13   the time, and he also lived in Fredonia, and he was referred --

14   or I was referred to senior Stuart by the banker.  And I think

15   that was in the late '70s or perhaps '80.  And he wanted to --

16   he asked my advice on tax and business operations that he was

17   involved in.  And through him I met his son Jim Stuart, who is

18   present here.

19   Q.  And did there ever come a time that you had a professional

20   relationship with James Stuart, Jr.?

21   A.  Well, I did his personal income tax return, and he was

22   involved with business activities with his father, but I'm not

23   real certain when I started.  But I did -- for many years I did

24   Jim Stuart, Jr.'s Individual Income Tax Return.  And later on

25   they incorporated a business and both of the Stuarts were owners

226

1   of the business and I did the tax work and business advising for

2   them and their corporation.  That began in 1985.

3   Q.  What was the name of the corporation that you started doing

4   work for in 1985?

02:14   5   A.  S & S Industrial Services, Incorporated.

6   Q.  Do you recall where that was located?

7   A.  Pardon?

8   Q.  Where was that located?

9   A.  It was in Milwaukee -- I think in Waukesha.

02:14   10   Q.  And who were the owners of that business?

11   A.  Jim Stuart, Sr. and Jim Stuart, Jr., and Jim Stuart, Jr.'s

12   sister Beverly.

13   Q.  And is that Beverly Schlipp?

14   A.  Yes.

02:14   15   Q.  Okay.  Did that business change names at some point?

16   A.  Yes, it did.

17   Q.  And when was that, do you recall?

18   A.  I believe it was around 1998, they changed the name to New

19   Age Chemical.  The same corporate entity, just a name change.

02:15   20   Q.  And do you recall, was it still located in Milwaukee in

21   1998?

22   A.  In 1998, they moved from their -- where they had been -- I

23   think they had been in a couple of places in Waukesha or

24   Milwaukee, and in '98 they moved to a new building in Delafield

02:15   25   that they had built.  And I believe they moved in there towards

227

1    the end of 1998.

2    Q.  And when they moved into the Delafield location do you know

3    who the owners of the business were?

4    A.  The owners of the business were still the same.  Jim Stuart,

5    Sr. owned a majority control and Jim Stuart, Jr. had a

6    significant amount, like 20 percent or so, and Beverly Schlipp

7    had maybe 3 percent, something like that.

8    Q.  And do you know what kind of business it was?  Can you

9    describe what they made?

10   A.  Yeah, they did manufacture metal working fluids for

11   industry.  For example, Mercury Marine in Fond du Lac where they

12   manufactured watercraft engines, when they machined the parts

13   that go in there they need some coolant or a lubricant that they

14   kind of squirt on the metal as it's being machined and it keeps

15   it from burning up and keeps it in tolerances.

16   Q.  And do you know approximately how many employees the

17   business had when you were involved with it?

18   A.  I don't remember.  I'm sure it varied from time to time.  I

19   would say half a dozen.

20   Q.  Now, after the business moved to Delafield did there ever

21   come a time when the ownership interests changed from what you

22   described?

23   A.  Yes.

24   Q.  When was that?

25   A.  In 1997 the senior Jim Stuart passed away.  I think it was

228

1    in December of 1997.  And also, just coincidentally, in I

2    believe it was April of 1997, they changed the -- it was a

3    regular C Corporation, which means the corporation does its own

4    reporting and pays its own taxes.  In April of 1997, they

5    elected to become an S Corp which means that then the taxes are

6    paid by the owners.  It's more like a partnership.  And so

7    beginning then in 1997, they were acting as a partnership and,

8    again, the individuals pay the tax.

9         So, I say that because you asked when the change in

10   ownership.  The change of ownership, senior died then, after

11   that, Jim -- James Stuart, Jr. and Beverly Schlipp were the main

12   officers of the company.  The father was gone.  And the widow,

13   Wanda, was a majority owner of the business.

14        And after, from '97 to 2003, during that period of

15   time there was a lot of negotiations, and discussion I should

16   say, and in negotiation as to whether that should continue that

17   way because the two children, if I may call them that, were

18   operating the business and the mother Wanda really had nothing

19   to do with the business, whereas when the father James Stuart,

20   Jr. -- or Sr. was there, he actually participated in the

21   business.

22        And so in 2003, Wanda sold and transferred her

23   ownership to Jim, Jr. and Beverly, and she transferred in not

24   equal amounts to them but in amounts so that Beverly had 30

25   percent and Jim had 70 percent.  That was in the year 2003.

229

1    Q.  All right.  Now, throughout this time were you providing

2    financial services to New Age Chemical?

3    A.  Yes.

4    Q.  Can you describe the services that you were providing.

5    A.  It was business and tax advice to them, as well as doing or

6    supervising the preparation of their income tax returns, their

7    individual returns as well as the corporate tax return.

8    Q.  And when you say individual tax returns, for whom did you or

9    your firm prepare individual tax returns?

10   A.  For the widow Wanda, and for Beverly, and for Jim, Jr., and

11   the corporation.

12   Q.  And did you have any other position with respect to New Age

13   Chemical during this time?

14   A.  Late in the '90s Jim Stuart, Sr., I would say in the middle

15   '90s, he was ill.  He was ill probably the last 8 or 10 years of

16   his life, and much of it he spent at home.  Earlier he would

17   continue to get out, but mostly towards the end a number of

18   years before he died he was immobile.  And he would frequently

19   call me and ask me to come over to his house, and he wanted to

20   discuss business, how things were going.  He would review what

21   was happening and he wanted me to know certain things.

22          And he was kind of preparing.  I'm sure he felt and

23   knew that he was going to die.  And so he asked if I would be

24   willing to be on the board of directors of New Age, the purpose

25   being, of course, that he -- then I would be kind of engaged to

230

1    continue to give business advice to them.  And, in addition to

2    that, he asked if I would be willing to be -- to assist and

3    advise his wife in the event of his death or incapacity, and I

4    also agreed to do that.  That was done towards the middle of the

02:22    5    '90s.

6    Q.  And for how long were you on the board of directors of New

7    Age Chemical?

8    A.  I would estimate or guess that it was probably about three

9    years.  Two or three years.  And it ended pretty much within a

02:22    10    few months -- probably within six months after senior Stuart

11    died.

12    Q.  I believe you indicated you prepared personal tax returns

13    for James Stuart, Jr.?

14    A.  Yes.

02:22    15    Q.  And do you know when you started doing that?

16    A.  I don't remember exactly, but I believe it started shortly I

17    would say around 1990.

18    Q.  And are you still doing that?

19    A.  No.  I'm not.

02:23    20    Q.  Do you know the last tax year for which you prepared

21    personal tax returns for Mr. Stuart?

22    A.  Yes, 2004.

23    Q.  And I believe you indicated you or your firm prepared the

24    corporate tax returns for New Age Chemical, and when did that

02:23    25    start?

231

1    A.   In 1985.

2    Q.   And are you still preparing those tax returns?

3    A.   The corporate return, no.

4    Q.   Do you know when that stopped?

5    A.   In 2004, I believe.  No, no.  The corporate return -- when I

6    was at Clifton Gunderson, and I left at the end of 1999, they

7    continued to do the tax return, the firm, and I was not directly

8    involved in the preparation of the tax return after 1999.

9         However, I went in to -- as I had done when I was with

10   Clifton, I went in and helped Beverly — she was controller, or

11   the accountant there — and I would go in and help her get it

12   organized and put it into the order that was necessary for

13   Clifton Gunderson to prepare the return.  And I believe they

14   prepared the return for 2000, 2001 and 2002 and 2003.

15   Q.   All right.  You mentioned you left Clifton Gunderson in

16   1999, did you continue to visit New Age Chemical after leaving

17   Clifton Gunderson?

18   A.   Yes, I did.

19   Q.   And can you tell me, how frequently would you visit New Age

20   Chemical?

21   A.   Well, I would say probably 8 or 10 times in a year.  I had

22   made a commitment to Jim Stuart, Sr. that I would kind of

23   continue to advise them and to help them, and I tried to do

24   that.  Whether they had a problem or not, I would go visit them.

25   Q.   And for how long did you continue to visit New Age Chemical

232

1    in that capacity?

2    A.   I continued that -- it was more earlier on, around 2001, 2,

3    and 3 and 4 and so on.  But then after 2004, it diminished a

4    little bit.  But I think -- I believe I still was in there a

5    number of times.  And it continued to diminish so that I don't

6    believe -- I don't remember being there at all in the last three

7    years.  But up through 2008, I was in there quite often.

8    Q.   When you say "quite often," approximately?

9    A.   Probably six or eight times in a year.

10   Q.   And focusing on the period from 2003 to 2008, what were the

11   reasons for you visiting New Age Chemical?

12   A.   Well, in 2004 was the last return prepared.  His personal

13   returns were prepared by myself and my wife as Brenda K. Walsh

14   and Associates.

15   Q.   That is James Stuart's personal return?

16   A.   Yes.

17   Q.   I see.

18   A.   That would have been the 2001, 2, 3 and 4.  After 4 I told

19   Jim Stuart, Jr. that we no longer could prepare his returns

20   because he was insisting on doing things that I believed were

21   unlawful, and we could not have any part of that.

22         And I had many conversations with him with regard to

23   that, and trying to convince him that what he was proposing

24   would be wrong, unlawful, and actually fraudulent.  And I told

25   him that fraud was not only -- you eventually would have to pay

233

the tax, but the penalties were severe, very severe, and it also

means prison. And I didn't want any part of it.

And so I -- he insisted, he was adamant that he was

going to do what he was going to do, and I told him that I

couldn't do that. But I had made a commitment to his father

that I would continue to try to see that they did well and that

they would abide by the law. Not that his father was suggesting

that they wouldn't. There was never any conversation of that

manner.

But I felt I had a commitment to try to help them.

And also, Beverly, his sister, wasn't of the same mind, and I

would go there to try to help her to do as best she could, you

know, under the circumstances.

And Jim was very friendly with me and he did challenge

me. He asked me to prove, you know, that he had to pay taxes.

And at one time I did offer to him my Master Tax Guide, which I

said was my authority. And, of course, the Master Tax Guide is

an abbreviation and kind of a understanding of the IRS code.

And I also said that if he needed more than that he could go on

the Internet and read the code.

He insisted that that isn't what he was going by. He

was going by the Constitution, and the Constitution provided --

or did not provide that there was any right of the government to

be taxing people.

And my discussions with him in 2005 and 6 and 7, if he

1  was there when I came there — and most of the time he was — we'd

2  discuss that and he was adamant in his position.

3  Q.  Can you tell me, during this period of time did Beverly

4  Schlipp work at New Age Chemical?

5  A.  Yes, she did.

6  Q.  What was her position?

7  A.  She was the controller throughout the whole period of time.

8  Q.  And Jim's position, Mr. Stuart's position, what was that?

9  A.  He was president.

10  Q.  Were there any other officers of the New Age Chemical during

11  this time?

12  A.  Not to my knowledge.

13  Q.  And do you know during the time you were preparing

14  Mr. Stuart's personal tax returns during that 2002, 2003, 2004,

15  do you know what his sources of income were?

16  A.  I think it was primarily New Age Chemical.  In addition to

17  that, he and Beverly owned the building that they were housed.

18  And that was a 50/50.  And that's a partnership.  And so he had

19  rent coming from New Age.  The building was called Chem-Lease.

20  So he had rental income in addition to his salary.

21          There were a couple of ventures that he embarked on

22  with some other outside people during that period of time, and I

23  don't -- I was not involved in that so I really don't know

24  precisely what they were but I understand there was some income

25  from that.  I would say the majority of it was all New Age

235

1    Chemical.

2    Q.  Let me show you what have been marked for identification as

3    Exhibits 125, 126, and 128.

4            (Exhibits handed to the witness.)

02:32  5    BY MR. JACOBS:

6    Q.  Mr. Walsh, do you recognize what those three exhibits are?

7    A.  Yes, I do.

8    Q.  Could you describe generically what are they?

9    A.  They're -- these are our work papers.  They're copies of Jim

02:33  10   Stuart, Jr.'s Individual Income Tax Return for the year 2002,

11   2003, and 2004.  And in addition to the tax return itself, it's

12   an organizer that we would have sent to him to kind of organize

13   his data before we would do the return.  And also some work

14   papers that we would have put together in order to summarize

02:33  15   and/or organize the data to prepare the tax returns.  The tax

16   returns and our work papers.

17   Q.  Where does the information come from that you used to

18   prepare those tax returns?

19   A.  It came from Jim Stuart.

02:33  20           MR. JACOBS:  Your Honor, I move into evidence Exhibits

21   125, 126, and 128.

22           MR. BERNHOFT:  No objection, Your Honor.

23           THE COURT:  Received.

24           (Exhibits 25, 26 and 28 offered and received.)

02:33  25   BY MR. JACOBS:

236

1  Q.  And in preparing -- were you actually the person dealing

2  with Mr. Stuart in preparing those tax returns?

3  A.  Yes.

4  Q.  And if you could just tell me, what types of income are

5  reported for Mr. Stuart on those three tax returns?

6  A.  Sure.  Salary.

7  Q.  And do you know where he got that salary?

8  A.  Yes, I can tell you.

9         (Witness peruses documents.)

10 A.  On 2002, and I'm sure it's pretty much the same on all of

11 them, it's salary, salary, wages from New Age Chemical.

12 BY MR. JACOBS:

13 Q.  Okay.  Are there any other sources of income that Mr. Stuart

14 reported for those three tax years?

15 A.  Yeah, there's some small amount of dividends and interest.

16 And there is -- have to bear with me here, okay?

17        He had rental income from Chem-Lease.  And he had his

18 share of the earnings other than salary from New Age Chemical.

19 Being that the corporation now is a partnership, taxes as a

20 partnership, he had salaries and then the profit after the

21 salaries from the corporation, he would have his 70 percent

22 share of that.

23 Q.  Okay.

24 A.  And he had that amount in there too.  That was 126,000.  And

25 then React Corp., which was one of these outside activities that

237

1    I don't really know a whole lot about, it was $6600.

2    Q.  And can you tell me, are those the sorts of income that

3    Mr. Stuart had in the years 2003 and 2004?

4    A.  I can look.  I believe they would be the same.  Salary.

5    Well, and in 2003 he had another source.  2003 he showed a loss

6    of 80,000 from the partnership of this React Corporation, but he

7    also had -- I think he sold React.  Here it is.  His interest in

8    this outside venture called React was sold, and he had a gain,

9    about 200,000, $205,000.  So that was a little different in '03.

10           In '04, '04 it was pretty much just New Age Chemical

11   and the rental.  New Age Chemical salary and the rental and the

12   New Age -- in 2004 it looks like there was a loss on the New Age

13   Chemical partnership part.

14   BY MR. JACOBS:

15   Q.  And is the 2004 return the last personal tax return you

16   prepared for Mr. Stuart?

17   A.  Yes, it is.

18   Q.  And for those returns, were those filed, and did Mr. Stuart

19   pay the tax he owed for each of those years?

20   A.  Excuse me?

21   Q.  Were those tax returns filed and did Mr. Stuart pay the

22   taxes he owed for those years?

23   A.  Yes, I believe so.

24   Q.  I want to show you a couple of documents from those work

25   papers.  First I want to show you what's been marked as

238

1   Exhibit 127.  It's a page from Exhibit Number 126.  Do you

2   recognize that document, Mr. Walsh?

3   A.  Yes.  It's -- that's a K-1 which is a form that comes along

4   with a partnership.  And it shows his -- this was that entity

02:39   5   that I didn't have anything to do with.  It was a side venture

6   that he was involved in, he was a 50 percent owner in it.  It

7   was a corporation called React Corporation, and it showed that

8   he had a loss from operations of 80,000.

9        And if you remember I just said, on the return — I'm

02:40   10   digressing a little — he also had a $205,000 gain from the sale

11   of the business.  So he sold out his interest in it.  But the

12   operating loss was 80, so that offset the 205,000 gain that he

13   had.

14        You asked me about this note that's on here?

02:40   15   Q.  Yeah, there's a sticky note there.  Do you know whose

16   handwriting that is?

17   A.  Yeah, that's Jim Stuart, Jr.'s.

18   Q.  And do you know when you would have received this note from

19   Mr. Stuart?

02:40   20   A.  This is for the 2003 return.  His personal return for 2003.

21   So I would have received that sometime in the spring of 2004.

22   Q.  Okay.  See if I can -- can you read that note to the jury,

23   Mr. Walsh?

24   A.  Sure.  It's addressed to me, Pat.  It says:

02:41   25        "Info for taxes.  The React K-1 form will change.  Be

1   as creative as you want here and get my tax bill as low as

2   possible.  Thanks, Jim."

3   Q.  And did you do that, were you creative in getting his tax

4   bill as low as possible?

5   A.  Well, I used -- the only thing I can do is -- this is

6   upside-down here -- I used the K-1, and that's my authority.  A

7   K-1 is like a W-2 for a business.  And what I did is the amounts

8   that are on here is what I used on his tax return.  I can't use

9   anything else because if I use something else it will bounce

10  back from the Internal Revenue Service.

11  Q.  And so this would have been for the return filed for the tax

12  year 2003?

13  A.  Yes.

14  Q.  And when would that have been filed?

15  A.  By April 15th of 2004.

16  Q.  Okay.  And then let me show you what's been marked for

17  identification as Exhibit 129.  This is a page from Exhibit 128.

18  Do you recognize that document, Mr. Walsh?

19  A.  Yes, I do.

20  Q.  This is a typed note.  Do you know the source or who wrote

21  this note?

22       MR. BERNHOFT:  I'm sorry, Your Honor, is this

23  admitted?

24       MR. JACOBS:  Well, it is.  It's in 128.  So it is.  I

25  can move to have it separately admitted, but it's already

1    admitted in Exhibit 128.

2           MR. BERNHOFT:  Could I approach?

3           THE COURT:  Approach.

4           (At side bar on the record.)

5           (Discussion off the record.)

6           THE COURT:  We're on the record.  Go ahead.

7           MR. BERNHOFT:  I did not note that this wasn't there

8    and, if it wasn't there, I don't know why it's here.

9           THE COURT:  That's 129.

10           MR. BERNHOFT:  Right.

11           MR. JACOBS:  It's a page out of 128.  It's a page out

12    of here because it's easier than have him flip through the

13    entire return.  If you see the work papers, it's in here.

14           MR. BERNHOFT:  000305.

15           THE COURT:  Bates number?  All right.

16           MR. BERNHOFT:  I didn't intend to not object to this.

17    Authenticity.

18           THE COURT:  Just want to check our logistics in terms

19    of our day.  What other witnesses do you have?

20           MR. JACOBS:  Well, I may have to take a break on this

21    next one to find out, Judge.  Our pacing has been hard to

22    predict, to be honest with you.  I've asked two other witnesses

23    to get down here and have them available.  I didn't expect --

24    the pace has been unpredictable.  We could have two other

25    witnesses here.

1      THE COURT:  And will that end your case in chief?

2      MR. JACOBS:  No.  There's still two more agents after

3   that.

4      THE COURT:  So how much time do you anticipate?

5      MR. JACOBS:  I would say the next -- the next two

6   witnesses could be an hour.

7      THE COURT:  So you think you can finish today?

8      MR. JACOBS:  No, I wouldn't think so, only because

9   there's four witnesses.  Assuming I can get them here.  I mean,

10  I don't know about cross, but I would hope two IRS agents in the

11  morning and we'll be done.

12     THE COURT:  So you'll go until 6:00, correct?

13     MR. JACOBS:  I wasn't really planning on going till

14  6:00.  If I need to I will.

15     THE COURT:  If your witnesses are available -- if you

16  think you can get things done quickly tomorrow morning then we

17  will end about 5:30?

18     MR. JACOBS:  Okay.

19     MR. BERNHOFT:  I have no problem.  I mean, I expect

20  light or no cross on the revenue witness.  I expect 5, 10, 15

21  minutes on Rech.  On Nettesheim, 5, 10 minutes.  On Mr. Walsh,

22  maybe 10 minutes, 15 minutes.  That's my best estimate from what

23  I see in the docs.

24     THE COURT:  Part of the reason I'm asking is I do have

25  some other cases on tomorrow and I haven't -- I have a hearing

242

1   at 12:00 o'clock tomorrow.  So that's why I'd like to get as

2   much done today as possible.

3              MR. JACOBS:  All right.  Can we take an afternoon

4   break after he's done?  And then I'll see whose here.  We'll

5   call the people and say get down here, we're moving quickly.

6              THE COURT:  Okay.  Because I have to notify security

7   about going outdoors and so forth.  All right, very well.

8              (End of discussion at side bar.)

9   BY MR. JACOBS:

10  Q.  Mr. Walsh, do you recognize Exhibit 129?

11  A.  Yes, I do.

12             THE COURT:  We're gonna go back to 128.

13             MR. JACOBS:  Oh, I misunderstood.

14             THE COURT:  128.

15  BY MR. JACOBS:

16  Q.  Can you -- bear with me one second.

17             THE COURT:  Can you pull that up, 128?

18             (Brief pause.)

19  BY MR. JACOBS:

20  Q.  Mr. Walsh, turning your attention to the tabbed page in

21  Exhibit 128, do you recognize that typed note?

22  A.  Yes, I do.

23  Q.  Who is that from?

24  A.  Jim Stuart, Jr.

25  Q.  And do you know when you would have received this note?

243

1  A.  It was for his 2004 income tax return, so probably was in

2  the spring of 2005.

3  Q.  And can you read the first paragraph to me?

4  A.  Sure.  It's addressed to me.

02:50   5      "Here is all my stuff for the 2004 taxes.  I remember

6  last year how I got caught up in the AMT tax and the whole thing

7  makes me furious.  See what you can do about my not getting

8  caught up in it this year.  I want to take every deduction you

9  can think of and will take my chances on an audit."

02:50  10  Q.  Now, in that note Mr. Stuart references the AMT, what is

11  that?

12  A.  That's alternative minimum tax.

13  Q.  And can you easily explain what that means?

14  A.  Sure.  You compute the tax or prepare the return as normal

02:50  15  according to the tax law, and then you have to do it a second

16  time by eliminating certain things and see whether it comes out

17  to more than it did on the first go-through.  And if it comes

18  out the more, then you use the higher.

19      And what happens typically, sometimes deductions are

02:51  20  eliminated on the second go-through and it frequently, if your

21  income gets high enough as Jim Stuart junior's did get high

22  enough, it results in a higher tax.

23  Q.  And did that happen to Mr. Stuart for the 2003 tax year?  I

24  guess that was the --

02:51  25  A.  Yes, it did.

244

1   Q.  Now, this was for the 2004 tax year, did you prepare any

2   personal tax returns for him after this?

3   A.  No, I did not.

4   Q.  Did you end up in any disputes with Mr. Stuart about taxes?

5   A.  Yes, I did.  He was insisting on not reporting.  He did not

6   want his income to go on the W-2 anymore.  And he did not want

7   any withholding -- income tax withheld anymore.  And I told him

8   that was wrong, you can't do that.  And he also wanted -- when

9   the corporate return was prepared, he did not want K-1s to be

10  part of the return or he didn't want his K-1 in there, which is

11  the second source of income from New Age Chemical.

12         I told him if he wanted to do that -- that goes back

13  to what we talked about earlier.  I told him I cannot do that;

14  that that's what the law says you have to do: you have to have

15  W-2 wages and you have to have withholding on it.  And he

16  disputed that.  And we had discussions of that.  And also, you

17  have to have a K-1 because that's the type of entity you are,

18  and you have to report the profit after all expenses on that and

19  he gets his share of it and we have to prepare that.

20         He disagreed and he didn't want to do that.

21  Q.  Can you tell me when that started, when that dispute that

22  you've described?

23  A.  Well, that happened right after the 2004 tax return was

24  prepared.  And I told him that I would not be able to do returns

25  for him, and I was sure that Clifton Gunderson was not going to

245

1    want to do the corporate return anymore either.

2    Q.  Did you ever suggest to Mr. Stuart that his points of view

3    were correct?

4           MR. BERNHOFT:  Objection, leading.

02:53    5           THE COURT:  Sustained.

6    BY MR. JACOBS:

7    Q.  Let me rephrase the question.  Can you tell me, do you

8    recall telling Mr. Stuart anything specifically about his views?

9    A.  Well, I told him that -- I did mention this earlier, but I

02:54    10   told him that what he was trying to do, or he was attempting to

11   do, or telling me he wanted to do, and also dictating in the

12   office that that's the way it was going to be done, was

13   unlawful, it was fraudulent, and that he was taking risks way

14   beyond what he wanted to do, what he should be doing.  And I

02:54    15   told him I wouldn't do that, take those kind of risks, again,

16   because the penalties are so severe and it is so blatant that

17   there's no way that he was going to get away with it.

18   Q.  You told him all that?

19   A.  Yes, I did.

02:54    20   Q.  When you were telling him that, was that in person, over the

21   phone?  How were you communicating?

22   A.  That was face-to-face.  And I told him that more than once.

23   This would be in times after when I did not prepare returns

24   anymore when I would go back, we had similar discussions, that

02:55    25   you can't do that.

246

1    I, under normal circumstances -- I've had that happen

2 to me before with other clients, and I tell you that --

3    THE COURT:  Hold on one second.

4    Ask another question, please.

5 BY MR. JACOBS:

6 Q.  All right.  Let me ask you, did you ever have any e-mail

7 correspondence with Mr. Stuart?

8 A.  Yes, I did.

9 Q.  Okay.  And I'd like to show you what's been marked for

10 identification as Exhibit 113.  Mr. Walsh, do you recognize what

11 Exhibit 113 is?

12 A.  Yes, I do.

13 Q.  And what is that?

14 A.  That's an e-mail from Jim Stuart, Jr. to me.

15 Q.  And what's the date of that e-mail?

16 A.  March 24th of 2006.

17    MR. JACOBS:  Your Honor, I'd move into evidence

18 Exhibit 113.

19    THE COURT:  Is there any objection?

20    MR. BERNHOFT:  None.

21    THE COURT:  Received.

22    (Exhibit 113 offered and received.)

23 BY MR. JACOBS:

24 Q.  And can I ask, how many pages are in that document?

25 A.  Nine I think it says on top.

247

1    Q.   And I'd like to just have you read the body of the --

2         You have to stay within the white.  Now go right.

3    A.   Excuse me?

4    Q.   I'm sorry, I'm watching the agent.  He's trying to -- I'm

5    trying to get him to enlarge it.

6         I want you, if you could, read the text of the e-mail.

7    Can you read that?

8    A.   Sure.  It's addressed to me.

9         "I want to thank you for taking the time to come and

10   talk with me today.  Unfortunately, on this subject, we do not

11   agree.  I am adamant in stating that I will not be subjected,

12   willingly, to the tyranny imposed upon me be" -- I think it

13   meant "by" -- "the federal income tax system.  I am not just

14   sitting here doing nothing, hoping the ax doesn't fall, either.

15   I am becoming educated in the subject.

16        "Below is a portion from the book that has started

17   this off.  As we discussed, although you think I am subjecting

18   the company to some undue hardship, in reality, the company

19   itself can be subject to severe penalty from its employees.

20   Also attached is another excerpt describing this, as well as a

21   few things.  The last excerpt, however, describes how New Age is

22   liable.  Now, with this in mind, how is one to proceed?"

23        Signed, "Jim."

24   Q.   And I gather there's some additional material that came with

25   that e-mail?

248

1    A.   Yes.

2    Q.   Did you ever provide any material to Mr. Stuart?

3    A.   Regarding the tax?  Yes.  In discussion before this I

4    offered to him a copy of my Master Tax Guide.

02:59    5    Q.   Did he accept that?

6    A.   No.  And also I suggested that he could look up on the

7    Internet the Internal Revenue Code.  And he referred me to a

8    book called Cracking the Code.  And attached to, after his

9    e-mail to me, he's got reprinted some excerpts from the book

02:59    10   Cracking the Code, which is a book that -- I don't know if I

11   know how to describe it -- I don't agree with it.

12   Q.   That's all right.  Are you familiar with it?

13   A.   Yes.

14   Q.   Do you know who wrote it?

02:59    15   A.   Hendrickson, I believe.  I do know it because at a later

16   date I have had throughout this whole time, and currently I

17   have, a very good, friendly relationship with his mother whom I

18   agreed to continue to advise after the death of her husband.

19           MR. BERNHOFT:  Your Honor, I'd like to see a few

03:00    20   questions here if we could, please.

21           THE COURT:  Certainly.  Yes.

22   BY MR. JACOBS:

23   Q.   So you're familiar with Cracking the Code?

24   A.   Yes.

03:00    25   Q.   And do you know, is Mr. Hendrickson a recognized tax expert?

249

1    A.   No, they're not.  No, he's not.

2    Q.   And I'd like to show you what's been marked as Exhibit 115.

3    Do you recognize what that exhibit is?

4    A.   Yes, I do.

03:01  5    Q.   Did you provide this to Mr. Stuart?

6    A.   Yes, I did.

7    Q.   Do you know approximately when you would have provided this

8    to him?

9    A.   Its publication was April of 2006, so I would -- I'm sure it

03:01  10   was done -- I gave it to him in 2006.

11           MR. JACOBS:  Your Honor, I'd move into evidence

12   Exhibit 115.

13           THE COURT:  It's received.

14           (Exhibit 115 offered and received.)

03:01  15   BY MR. JACOBS:

16   Q.   And Mr. Walsh, what is Exhibit 115?

17   A.   It's a publication by the American Institute of CPAs and

18   it's for members in the local and small accounting firms.  And

19   it's an annual thing that they do, and it is called the IRS 2006

03:01  20   Dirty Dozen.  And it's a listing of the dozen illegal schemes.

21           THE COURT:  One second.  Please approach.

22           (At side bar on the record.)

23           THE COURT:  I'm curious about this exhibit and whether

24   or not this will raise any problems.  He's talking about general

03:02  25   illegal schemes.

250

1    MR. JACOBS:  It's specific.  It identifies specific

2  things and he gives it to Stuart and says look, the IRS has

3  identified these as illegal tax fraud schemes.

4    MR. BERNHOFT:  This does not say that these are

5  illegal tax fraud schemes.  He's interpreting it that way.

6    THE COURT:  That's why I'm concerned.

7    MR. JACOBS:  Well, can you possibly cover that in

8  cross-examination or something?  It's an adversarial system.

9    THE COURT:  But he can testify to what he gave him.  I

10  am concerned that he is interpreting this and talking about

11  what's legal and what's illegal.  That's what I'm concerned

12  about.

13    MR. JACOBS:  Okay.  I'll have him stick closer to the

14  text of the document.

15    THE COURT:  I'd also like to talk with the parties

16  after.  Has your witness gone back to Utah or is she still here?

17    MR. JACOBS:  No, she's flown back.

18    THE COURT:  Has she already left?

19    MR. JACOBS:  I believe so.

20    THE COURT:  Okay.  Thank you.

21    (End of discussion at side bar.)

22    THE COURT:  Ask another question, please.

23    MR. JACOBS:  Sure.

24  BY MR. JACOBS:

25  Q.  Mr. Walsh, I gather you provided this to Mr. Stuart?

251

1    A.  Yes, I did.

2    Q.  And I just -- there are a couple of sections that have been

3    highlighted.  I wonder if you could just -- hold on.  Let me

4    back up just a second.  What is the AICPA?

03:04  5    A.  That's American Institute of CPAs.  It's a national

6    organization for CPAs.  Professional organization.

7    Q.  And I'd just like to highlight the yellow portions and

8    enlarge those, just the yellow portions.

9         Can you read what that says on the document?

03:04  10   A.  "Zero wages.  In this scam, a taxpayer attaches to his or

11   her return either a Form 4852, which is a substitute W-2, or a

12   corrected form 1099 that shows zero or little wages or other

13   income.  The taxpayer may include a statement saying that he or

14   she is rebutting information submitted to the IRS by the payer."

03:05  15   Q.  And does that continue at the top?

16   A.  Yeah.  "An explanation on Form 4852 may cite statutory

17   language behind Internal Revenue Code 3401 and 3121, or may

18   include some reference to the paying company's refusal to issue

19   a corrected Form W-2 for fear of IRS retaliation.  The Form 4852

03:05  20   or 1099 is usually attached to a zero return."

21   Q.  That's all right.  I just wanted that portion of it.

22   A.  Okay.

23   Q.  Now, other than providing material to Mr. Stuart, did you

24   have any meetings with him in an attempt to convince him of your

03:06  25   point of view?

252

1    A.  Yes, I did.

2    Q.  And do you recall when those meetings began?

3    A.  They began in I believe 2003, 2004, and continued.

4    Q.  And for how long did they continue?

03:06  5    A.  To approximately 2009.

6    Q.  Could you describe Mr. Stuart's demeanor during those

7    meetings?

8              MR. BERNHOFT:  Objection, Your Honor.  We're talking

9    about an unspecified number of meetings over six years.

03:07  10              THE COURT:  Objection sustained.

11    BY MR. JACOBS:

12    Q.  Do you recall meeting with him with Allison Reese?

13    A.  Yes, I do.

14    Q.  Do you recall when that meeting was?

03:07  15    A.  I think it was in 2007.

16    Q.  Do you recall where that meeting was?

17    A.  At the business place.  In Delafield.

18    Q.  And do you recall what you told Mr. Stuart at that meeting?

19    A.  Yes.  I told him his activity was fraudulent and that he was

03:07  20    ruining -- was going to ruin the business and he was going to

21    ruin his sister's livelihood in retirement and his mother's

22    deferred compensation and, of course, his own, because it wasn't

23    going to continue, he wouldn't be able to get away with it.

24    Q.  Did Mr. Stuart respond to your statements?

03:08  25    A.  Yes.  He told me I was wrong and that I -- and he was right,

253

1    regardless of what I said.  He really didn't want to listen to

2    my point of view.  He said accountants like me and lawyers

3    are -- feed off of compliance work on businesses and

4    individuals, and we all really knew deep down that it was wrong

5    and it was not necessary to pay taxes and that -- but we just

6    keep our mouths shut and don't say anything because we're living

7    off of the compliance.

8    Q.  Now, do you know if Mr. Stuart is familiar with the

9    Internet?

10   A.  Yes, he is.

11   Q.  How do you know that?

12   A.  Well, because when I would go to the business for my

13   meetings or for helping to do Beverly with the work, he was

14   frequently on the Internet or, you know, working on his

15   computer.  I assume when he was working on his computer he

16   wasn't doing bookkeeping work, so it was the Internet.

17          MR. BERNHOFT:  Objection, Your Honor.  Lack of

18   foundation of foundation and personal knowledge.  Move the

19   strike.

20          THE COURT:  Overruled.

21   BY MR. JACOBS:

22   Q.  Do you know the last time you spoke to Mr. Stuart?

23   A.  I don't remember exactly.  It's probably a couple of years

24   ago.

25          MR. JACOBS:  Judge, I think I moved Exhibit 113 and

254

1    115 into evidence.

2              THE COURT:  They have been received.

3              MR. JACOBS:  And I have no further questions for the

4    witness.

5                              EXAMINATION

6    BY THE COURT:

7    Q.  Mr. Walsh, let me ask several questions before

8    cross-examination.  You were asked about the defendant's use of

9    the Internet.  Do you know for a fact that the defendant was on

10   the Internet?

11   A.  Yes, he did.  He did his research --

12   Q.  Just yes or no.

13   A.  Yes.

14   Q.  All right.

15              Counsel, you may cross.

16              MR. BERNHOFT:  Thank you, Judge.

17                           CROSS-EXAMINATION

18   BY MR. BERNHOFT:

19   Q.  Good afternoon, Mr. Walsh.

20   A.  Hello.

21   Q.  How are you?

22   A.  I'm doing fine.

23   Q.  Excellent.  My name is Bob Bernhoft, and I'm Mr. Jim

24   Stuart's attorney defending him in this federal criminal tax

25   action.  One moment, please.

255

1   A.   Sure.

2          (Brief pause.)

3   BY MR. BERNHOFT:

4   Q.   Mr. Walsh, are you familiar with the history of the

5   alternative minimum tax?

6   A.   Yes, I am.

7   Q.   Could you give me the basic outline of that history?

8   A.   It was a tax that was instituted, I don't know the exact

9   years, it was instituted or passed into law in order to capture

10  taxes that were being missed primarily by wealthy people or high

11  income people.

12  Q.   And isn't it true that initially when it was first passed it

13  was to capture what some people thought were abusive tax

14  positions taken by the super wealthy?

15  A.   That's correct too, yes.

16  Q.   I think the AMT was originally intended to capture only

17  .1 -- one-tenth of 1 percent of all American taxpayers.  Are you

18  familiar with that number?

19  A.   I'm not familiar with the number, but I agree with it.  It's

20  very likely.

21  Q.   And what happened with the AMT application as years passed

22  in its application?  Did it remain a net to capture super

23  wealthy income tax?

24  A.   No, it over time, because of inflation and rising wages and

25  other income from people, that remained static and the incomes

256

1    went up and so ultimately instead of covering just some small

2    number of people, it began to include more and more and more

3    people, yes.  It's very common.

4    Q.  And do you know what the current percentage of Americans

03:12  5    that are captured by the AMT?

6    A.  No, I don't.

7    Q.  Would Mr. Stuart have been the first client to have

8    expressed frustration over being captured by the AMT net?

9    A.  No, he would not have been.

03:12  10   Q.  It's fairly common that productive clients will question why

11   all of their deductions are eviscerated by the capturing of the

12   AMT; is that correct?

13   A.  That's correct.

14   Q.  There was a little Post-It note that you testified to that

03:13  15   was part of the tax package for a particular year, Mr. Walsh,

16   and on that Post-It note — and you've testified and read that

17   note — Mr. Stuart was asking you to get his tax bill as low as

18   possible.

19            Would Mr. Stuart have been the only client of yours

03:13  20   over your decades of career that has asked you to try and get

21   their tax bill as low as possible?

22   A.  No, he would not.

23   Q.  How many of your clients do you think have asked you to do

24   that over the decades that you've been practicing as a senior

03:13  25   partner CPA?

257

1  A.  Oh, that's impossible for me to answer.  But many people ask

2  that, yes.

3  Q.  Anything wrong with a client of yours, when you were a

4  practicing CPA, asking you to get their tax bills as low as

5  possible?

6  A.  No.

7  Q.  Mr. Walsh, you testified that you offered to give Jim Stuart

8  your Master Tax Guide.  Could you explain what a Master Tax

9  Guide is for the jury?

10  A.  It's a handbook that is published every year with all the

11  changes and basically all of the rules and regulations necessary

12  for you to keep updated on.  It's a reference manual for

13  preparing tax returns.  It's like a dictionary for taxes.

14  Q.  Fair to say that the underpinning authority for the Master

15  Tax Guide is the actual Internal Revenue Code?

16  A.  Yes, it is.

17  Q.  And as supplemented by the Code of Federal Regulations in

18  26 CFR?

19  A.  Uh-huh, yes.

20  Q.  All right.  Now, Mr. Walsh, you referenced a 2007 meeting

21  with Mr. Stuart where he and you exchanged views regarding tax.

22  And particularly you discussed Mr. Stuart's position and views

23  on tax; is that correct?

24  A.  Yes.  Yes.

25  Q.  And I think your testimony was, is that it was your

258

1  intention to persuade Mr. Stuart that he was wrong about his

2  legal conclusions regarding the tax.

3  A.  Yes.

4  Q.  All right.  Now, during that meeting with Mr. Stuart, did

03:15  5  you advise Mr. Stuart what section of the Internal Revenue Code

6  made him liable for the federal income tax?

7  A.  No, I didn't.

8  Q.  Did you advise Mr. Stuart what law or code section or

9  regulation required Mr. Stuart to file the Form 1040 to make a

03:15  10  personal return of income?

11  A.  I advised him that I had over 35 years of experience and

12  that I knew what I was talking about, and that I was -- had been

13  practicing for those years, and I was with an accounting firm

14  and I had all kinds of support to support me, and that I was

03:16  15  right and he was wrong.  And that if he needed any further

16  information, he should go to the Master Tax Guide rather than

17  the Internet and the Cracking the Code book for his information.

18  Q.  But let me re-ask the question again.  You did not advise

19  Mr. Stuart what code section or regulation required him to file

03:16  20  a Form 1040 to make a return of personal income?

21  A.  I did not.

22  Q.  Okay.  Turning to my first question.  I mean, what code

23  section does make Mr. Stuart liable for the federal income tax?

24  A.  I don't know off the top of my head.  I don't know.

03:16  25  Q.  All right.  And what code section or regulation requires

259

1    Mr. Stuart to file the Form 1040 to make a return of personal

2    income?

3    A.  I don't know.

4         MR. BERNHOFT:  No further questions.

5         MR. JACOBS:  I don't have any redirect.

6         THE COURT:  You may step down.  Please do not discuss

7    your testimony with anyone unless you're advised this case has

8    been completed.  Have a good afternoon.

9         (Witness excused at 3:17 p.m.)

10        THE COURT:  I hope Marco Island is warmer than

11   Milwaukee.

12        THE WITNESS:  It is.

13        (General laughter.)

14        MR. JACOBS:  Judge, I have another witness.  Will the

15   court take a break or not?

16        THE COURT:  Yes, we will take a very short break.

17        THE BAILIFF:  All rise.

18        (Jury out at 3:17 p.m., recess taken until 3:30 p.m.)

19        THE COURT:  Where do you stand with respect to your

20   witnesses?

21        MR. JACOBS:  Judge, I have two witnesses here.  And I

22   don't actually expect that they'll take the balance of the day,

23   but I would ask the court if we would break at the conclusion.

24   Those would be our last citizen witnesses.

25        THE COURT:  If we can go further -- again, because of

260

1   my calendar tomorrow, if we can go further.  I just talked with

2   the marshal and they've made personnel arrangements based upon

3   what we talked about earlier.  Can you get the other witnesses

4   here so we can proceed as far as we can?

5           MR. JACOBS:  Okay.

6           THE COURT:  All right.  Do that.  Bring them in.  You

7   have your coordinators here to relay the information?

8           (Jury in at 3:31 p.m.)

9           MR. JACOBS:  Your Honor, the United States would next

10  call Daniel Hau.  Mr. Hau, if you would come forward, approach

11  the witness stand, remain standing and be placed under oath.

12          THE REPORTER:  Raise your right hand, please.

13          DANIEL HAU, GOVERNMENT WITNESS, SWORN

14          THE REPORTER:  Please state your name and spell your

15  name for the record.

16          THE WITNESS:  Daniel Hau, H A U.

17          DIRECT EXAMINATION

18  BY MR. JACOBS:

19  Q.  Good afternoon, Mr. Hau.  Mr. Hau, can you tell me, where do

20  you currently live?

21  A.  I live in Franklin.  City of Franklin.

22  Q.  And what is your educational background?

23  A.  I have a Bachelor of Science from Marquette University.

24  Major in Accounting and Finance.

25  Q.  And are you a certified public accountant?

261

1    A.   Yes, I am.

2    Q.   And when did you obtain your CPA?

3    A.   I believe I passed the exam in 1970.  And I didn't become

4    officially accredited until I think '72, because there was an

03:32    5    experience requirement that I had to meet as well.

6    Q.   And by way of experience, could you briefly provide an

7    overview of your employment history after graduating from

8    Marquette?

9    A.   After Marquette I went to work for Peat Marwick Mitchell as

03:33    10   an auditor.  Peat Marwick Mitchell was one of the so-called

11   Big 8 firms at that time.  They have now morphed into KPMG, one

12   of the Big 4 CPA firms.  I was there for four years and then I

13   went to work for Milwaukee County, the Department of Audit,

14   where I eventually rose to the position of Acting Director of

03:33    15   the Department of Audit.

16        And after that I started my own practice.

17   Q.   And when was that, when did you start your own practice?

18   A.   1981.

19   Q.   And do you still have that practice today?

03:33    20   A.   Yes, I do.

21   Q.   And what is that practice called?

22   A.   Hau and Associates, SC.

23   Q.   Where is that business located?

24   A.   We have two offices.  We have an office at 1208 West Layton

03:34    25   Avenue right near the airport, and then we have a smaller office

262

1    in Pewaukee on Highway 164 and Capitol.

2    Q.  Would you describe the nature of the business?

3    A.  We do accounting and taxes for small businesses and

4    individuals.  Some of the businesses aren't so small anymore.

5    We have a couple of clients in the 15 to 20 million range in

6    sales.

7              I also do consulting.  We do some estate and trust

8    work.  I do some strategizing, some of the corporate and tax

9    strategizing work for our firm.  Selection of entity.  Those

10   types of things.

11   Q.  And as part of that, do you represent clients before the

12   IRS?

13   A.  Well, I've handled audits for clients that are being audited

14   by the IRS.

15   Q.  That's what I meant, I'm sorry.

16   A.  Yes.

17   Q.  And do you know approximately, on an annual basis, how many

18   tax returns you and your colleagues prepared through your firm?

19   A.  I believe it's somewhere around 1300 returns.

20   Q.  Are those individual returns?

21   A.  Those are the individual returns.  In addition to that we

22   do, I don't know, three to 400 various types of business

23   returns.  Could be more, I haven't counted lately.

24   Q.  All right.  Do you know an individual named James Stuart?

25   A.  Yes, I've met him on a few occasions.

263

1    Q.  Do you recognize him here today?

2    A.  Yes, I do.

3    Q.  And could you just identify him by where he's seated, what

4    he's wearing?

03:35  5    A.  Well, he's wearing a tie, he's to the right of the -- I

6    imagine those are two attorneys at the desk over there.

7    Q.  When you say to the right, I guess to his right, but to your

8    left?

9    A.  To my left, yes.  He's the closest one to me.

03:35  10            MR. JACOBS:  I'd ask the record reflect that the

11   witness has identified the defendant, Your Honor.

12            THE COURT:  Noted.

13   BY MR. JACOBS:

14   Q.  Do you recall when you first met Mr. Stuart?

03:35  15   A.  I believe it was in the fall of '80 -- or, excuse me, '80.

16   2007, 2008, I don't remember the exact date.  I would have to

17   look it up.

18   Q.  Is there something you were going to refer to that would

19   refresh your recollection?

03:36  20   A.  Yes, I have -- somewhere in this binder I have my

21   timesheets, and that would give me an idea when that happened.

22   Q.  Do you think if you looked at it it would refresh your

23   recollection?

24   A.  Yes.

03:36  25   Q.  Okay.  I'd like you to look at it, then put it away, and

264

1   then I'll ask you if that, in fact, does refresh your

2   recollection.

3   A.  It must have been in the fall of 2007.

4   Q.  Okay.  Do you recall the circumstances under which you first

5   met Mr. Stuart?

6   A.  Yes.

7   Q.  What was that?

8   A.  The son of one of the owners of a company that we used to do

9   work for, and had since gone out of business, called me up and

10   let me know that the company that he was now working for, or at

11   that time was working for, was looking for an accountant and

12   suggested I might want to give Mr. Stuart a call, which I did.

13   Q.  And did the son of the former client tell you what the name

14   of the business was?

15   A.  Yes, I believe he did.

16   Q.  And what was that?

17   A.  New Age Chemical.

18   Q.  Okay.  And again, if you need to refer to something to

19   refresh your recollection if you just let me know so at least

20   the record reflects that you're doing that.

21   A.  Okay.  I just confirmed the name of the company by looking

22   on my binder.

23   Q.  Sure.  Okay.  So based on that information, what, if

24   anything, did you do, Mr. Hau?

25   A.  Well, I met with Mr. Stuart.  He informed me that there was

265

1    a corporation that he was -- had terminated operation of the

2    business as a corporation and was now going to operate it as, I

3    believe it was an LLC.

4    Q.  Where did you meet with him?

5    A.  At his office.

6    Q.  And do you remember where that was?

7    A.  It's off of Highway 83, just off of Highway 94.

8    Q.  Do you know the city?

9    A.  It's just south of --

10   Q.  If there's something that you can look at --

11   A.  I can look it up.  I'm just drawing a blank.  Delafield,

12   yeah.  It's Delafield.

13   Q.  What was the nature of the work that Mr. Stuart wanted you

14   to do?

15   A.  Well, he wanted me to wrap up the corporate affairs to the

16   extent we could for the old entity.  And initially his intent

17   was to handle the partnership return for the period after the

18   corporation was basically closed down.

19   Q.  And what would be your role in closing down this

20   corporation?

21   A.  Well, I suppose I should mention the date here.  The normal

22   year-end of the entity had been September 30th.  He had, what,

23   overseen or did a transaction as of July -- effective July 31st

24   to transfer the assets and liabilities of the corporation to the

25   new entity.  And my role was to, first off, see that — at least

266

1    as I saw it — my role was to see that the books properly

2    reflected what the intention was, and then to do the corporate

3    tax return, and then to do the normal accounting for the

4    partnership or for the LLC whose fiscal year was September 30,

5    so for that two-month period, do some work.  And then, again, I

6    think the original intention was that I was going to do the

7    partnership return for the new entity.

8    Q.   Okay.  And do you recall what type of tax return were you

9    asked to prepare for the old entity, the one that was being

10   closed down?

11   A.   That was an S Corporation.  Corporation taxed as an

12   S Corporation.

13   Q.   What does that mean?

14   A.   Well, corporations can be taxed in two ways.  They can

15   either be taxed as a C Corporation, which means that the profits

16   of the entity are taxed at the corporate level and so the

17   corporation has to pay the tax.  Or it can be taxed as a, what's

18   called an S Corporation.  In that event the profits are --

19   there's no tax paid at the corporate level, generally speaking,

20   but the individual -- the income of the entity is "passed

21   through," is the term that's used, to the individuals that own

22   the stock in the corporation.

23   Q.   And does that S Corporation still have to file a tax return?

24   A.   Yes.

25   Q.   And what's the name --

267

1    A.  For as long as it's in business it needs to.

2    Q.  And what's the name of that tax return?

3    A.  1120S.

4    Q.  Okay.  And were you going to prepare an 1120S for the entity

5    that was closing down?

6    A.  Yes.

7    Q.  Now, did Mr. Stuart ask you to prepare his personal tax

8    returns?

9    A.  No, he did not.

10   Q.  Is that unusual or typical?

11           MR. BERNHOFT:  Objection.

12           THE COURT:  Sustained.

13   BY MR. JACOBS:

14   Q.  Did Mr. Stuart indicate why he didn't want you to prepare

15   his personal tax returns?

16   A.  My recollection is that he told me that some of the

17   positions that he was taking as it relates to his personal

18   return were not typically the ones that an accountant would

19   agree were acceptable to the IRS.

20   Q.  Did Mr. Stuart attempt to convince you of his perspective?

21   A.  I think he tried to explain to me his rationale for what he

22   was doing.  Whether he was trying to win me -- I can't say that

23   he was trying to win me over to prepare his personal return, but

24   he tried to explain to me his rationale for the positions that

25   he intended to take.

268

1    Q.  Do you recall what he told you?

2    A.  Well, the long and short of it is that he said that he did

3    not have to report -- or he didn't have to pay the taxes on the

4    income that was, in my view, attributable to him.

03:43  5    Q.  Did he tell you why?

6    A.  He did, but some of the explanations were not explanations

7    that made any real sense to me.

8    Q.  Do you remember what he said?

9    A.  Well, one of the things that he said was, he made a

03:43 10    distinction between James Stuart, the individual, and the Social

11    Security number that corresponded to James Stuart.  He said that

12    they were two different entities.  That the income that was

13    reported either on -- you know, on -- for example, on a K-1,

14    which is a form that's used on a 1120S, that that income

03:43 15    belonged to the Social Security number but not to James Stuart

16    the human being.

17    Q.  Did you make any effort to dissuade or persuade Mr. Stuart

18    that his views were not accurate?

19    A.  Yes, I did.

03:44 20    Q.  What did you do?

21    A.  Well, I didn't realize what -- the position he was taking

22    initially.  I think -- at the first meeting I think I started to

23    get some clue where -- that he was one of these people who felt

24    they didn't have to pay tax.  And so then I began to research

03:44 25    more thoroughly what the IRS position has been on this in the

269

1    past.  And I remember I did some research on-line and looked up,

2    you know, some articles about what the IRS had done and what the

3    Supreme Court had ruled on these types of matters.

4    Q.  Did you communicate that research to Mr. Stuart?

03:45  5    A.  Yes, I did.  I told him that the -- that people have tried

6    to take this position in the past, and that there were various

7    reasons why people felt they didn't have to pay tax, and that

8    they've been shot down in every case and that it just hasn't

9    held up.

03:45  10   Q.  Did you warn Mr. Stuart at all about the positions he was

11   taking?

12          MR. BERNHOFT:  Objection, leading.

13          THE COURT:  Sustained.

14   BY MR. JACOBS:

03:45  15   Q.  Did you say anything to Mr. Stuart about the positions he

16   was taking?

17   A.  Yes.

18   Q.  What did you say?

19   A.  I told him that -- I said I grasped that he felt there was

03:45  20   some constitutional issues and all of this to support his

21   position, but I told him that the IRS has a special place, an

22   IRS hell, for people who take these positions.

23   Q.  Had you located case law rejecting Mr. Stuart's position?

24   A.  I don't recall.  I do recall that I did find some articles

03:46  25   that -- I didn't look at the specific case law, but what the

270

1    decisions that have been rendered which was basically that those

2    people who had taken the position that they didn't have to pay

3    income taxes were defeated in their position.

4    Q.  And did you communicate that to Mr. Stuart?

5    A.  Yes, I did.

6    Q.  And do you know approximately when that would have been?

7    A.  This was in the fall of -- late fall of 2007, and then I

8    think even a little further into 2008.  Into early 2008.

9    Q.  Mr. Hau, did you ultimately prepare any tax returns for

10   Mr. Stuart?

11   A.  Yes, I did.

12   Q.  Do you recall what tax returns you prepared?

13   A.  Yes.  I prepared -- from referring to my notes, I see that

14   -- and from the file, I see that I prepared the Form 1120S for

15   him, for New Age Chemical, Inc.  I did not prepare the tax

16   return for the entity that followed, the new entity.

17   Q.  Let me hand you what's been marked for identification as

18   Exhibit 137.  Do you recognize what Exhibit 137 is?

19   A.  Yes.  This is our standard transmittal letter that

20   accompanies the tax returns that we provide to -- provide to the

21   client.  So, along with this would have gone the federal return,

22   the state return, and the copy for the client.  This is probably

23   our in-house copy of what we provided.  Or your copy of my copy.

24   Q.  Got you.  Just one second.  Let me give you my copy.

25                (Witness peruses document.)

271

1  BY MR. JACOBS:

2  Q.  Again, you recognize what 137 is?

3  A.  Yes.  This is a -- this is the same transmittal letter but

4  it's excerpts of what I had just looked at.  It's not the entire

5  return.

6  Q.  And for what period of time is this return?

7  A.  It's from October 1st, 2006, through September 30th, 2007.

8  Well, it actually goes through September 30th, even though the

9  transfer of assets took place on July 31st.

10  Q.  I see.

11          Your Honor, I'd move into evidence Exhibit 137.

12          THE COURT:  Is there any objection?

13          MR. BERNHOFT:  None.

14          THE COURT:  It's received.

15          (Exhibit 137 offered and received.)

16  BY MR. JACOBS:

17  Q.  And during that period of time -- I'm sorry, what's the

18  entity this pertains to?

19  A.  New Age Chemical, Inc.

20  Q.  And did New Age Chemical, Inc. make a profit or have

21  earnings for that period?

22  A.  Yes, it did.  Do you want to know how much?

23  Q.  Yeah, how much?

24  A.  Well, it's 277,000 on here, but I can't -- there may have

25  been some additional deduction, which I'd have to look up for

272

1   what's called Section 179 which is a deduction that would have

2   been passed through as well.

3   Q.  And did New Age Chemical, Inc. have to pay taxes on those

4   earnings?

5   A.  No.

6   Q.  Did anyone?

7   A.  The income was allocated or passed through to the

8   individual.  So it would have been Mr. Stuart and I believe his

9   sister was the other owner.

10  Q.  And is that reflected somewhere on the return you prepared?

11  A.  Yes, but it's not here.

12  Q.  And where would that be?

13  A.  It would be on Form K-1 that accompanies the tax return.

14  Q.  Let me hand you then what's been marked as Exhibit 138.  Do

15  you recognize what Exhibit 138 is?

16  A.  Yes, that's the K-1 for Mr. Stuart.

17          MR. JACOBS:  Your Honor, I'd move into evidence

18  Exhibit 138.

19          THE COURT:  Is there any objection?

20          MR. BERNHOFT:  None.

21          THE COURT:  It's received.

22          (Exhibit 138 offered and received.)

23  BY MR. JACOBS:

24  Q.  Can you explain to the jury what this exhibit is?

25  A.  This shows Mr. Stuart's share of income.  So he is -- share

273

1    of ordinary income is 194,766.  And this is also his share of

2    what the gain from the sale of goodwill to the new entity.

3              MR. JACOBS:  Excuse me one second.  I think we may

4    have a little technical glitch here.

5              (Brief pause.)

6              MR. JACOBS:  Sorry.

7    BY MR. JACOBS:

8    Q.  Can you tell me the amount of income attributable to

9    Mr. Stuart from New Age Chemical for this period of time?

10   A.  $194,766 of ordinary income and the capital gain, short-term

11   capital gain of 21,092.

12   Q.  And would Mr. Stuart be required to report this income on

13   his individual tax return?

14   A.  Yes.

15   Q.  For what year would he have to report this?

16   A.  For the year-ended December 31st 2007.

17   Q.  And did you prepare such a tax return?

18   A.  I didn't prepare his personal return ever.

19   Q.  Okay.  Now, was this corporate tax return and this schedule

20   K-1 for Mr. Stuart, was this provided to Mr. Stuart?

21   A.  Yes.

22   Q.  Who provided it to him?

23   A.  Well, I don't recall if we mailed it or hand delivered it.

24   I don't recall.  Or if he picked it up.  He may have picked it

25   up.  I don't recall.

274

1    Q.  Did you ever meet with Mr. Stuart to discuss this tax

2    return?

3    A.  I honestly don't -- I don't recall whether we had a final

4    meeting on the return itself.

03:54    5    Q.  Okay.

6    A.  I think I had told him what the results were.  I would

7    imagine I did but I don't specifically recall the conversation.

8    Q.  All right.  Now, did you ever have any disputes with

9    Mr. Stuart concerning how his name was capitalized?

03:54    10    A.  Yes.

11    Q.  And do you recall when you had that dispute?

12    A.  Well, we had prepared the original return I think on --

13    well, the original transmittal letter is dated January 31st.  We

14    sent the return out to him, and -- or it got to him somehow, I

03:54    15    don't remember exactly how, and then he objected to it because

16    apparently the name, his name was not all in caps and he

17    insisted that I revise the Form K-1 so that the name be all in

18    caps.

19    Q.  And did you do that?

03:55    20    A.  Yes.

21    Q.  And did you have any discussions with Mr. Stuart about why

22    he wanted his name capitalized?

23    A.  Well, I was -- I think he had talked about this somewhat

24    earlier in some of our earlier meetings, but I guess I didn't

03:55    25    realize the import of it.  And he said that if I didn't put the

275

1    name all in caps it would defeat the purpose of what he was

2    trying to accomplish.

3    Q.   Now, did you ultimately make that change?

4    A.   Yes.

5    Q.   And I guess that's what's reflected on the K-1 in

6    Exhibit 138.

7    A.   Correct.

8    Q.   Now, did you ever communicate with Mr. Stuart except in

9    person?

10   A.   Well, I think we had phone conferences at different times.

11   And there were some e-mails back and forth at some point.

12   Q.   And I'd like to show you what's been marked for

13   identification as Exhibit 140.  Do you recognize what

14   Exhibit 140 is?

15   A.   Yes.

16   Q.   And generically what is that?

17   A.   Well, he wrote me an e-mail basically stating that I didn't

18   understand --

19   Q.   Is it fair to say though this is an e-mail exchange between

20   you and Mr. Stuart?

21   A.   Yes.  He sent me an e-mail and then I responded.

22          MR. JACOBS:  Your Honor, I move into evidence

23   Exhibit 140.

24          THE COURT:  Is there any objection?

25          MR. BERNHOFT:  None, Your Honor.

276

1      THE COURT:  140 is received.

2      (Exhibit 140 offered and received.)

3  BY MR. JACOBS:

4  Q.  And now, your portion of the e-mail is up top.

5  A.  Right.

6  Q.  And I gather on the bottom is Mr. Stuart's e-mail.

7  A.  Yes.  I'm not sure we have all of Mr. Stuart's e-mail.  I

8  think this is -- there's another page here that's missing, I

9  believe.

10  Q.  Right.  I gather this e-mail has -- do you have two pages to

11  that e-mail?

12  A.  I only have one page here.

13  Q.  Oh, maybe I inadvertently -- give me just one second.

14      (Brief pause.)

15  BY MR. JACOBS:

16  Q.  At the bottom of yours is the beginning of an e-mail; is

17  that right?

18  A.  Yes.

19      MR. BERNHOFT:  Your Honor, based on the witness's

20  testimony I object to this document retrospectively.  Rule of

21  completeness.  106.

22  BY MR. JACOBS:

23  Q.  That is, you have your half of the e-mail --

24      THE COURT:  One second.  Do you wish to be heard at

25  side bar?

277

1    MR. BERNHOFT:  Please.

2    MR. JACOBS:  Judge, I just need a moment.  I just need

3  to get him the full document.

4    THE COURT:  All right, go ahead.

5    (Brief pause.)

6  BY MR. JACOBS:

7  Q.  Let me hand you what's been marked for identification as

8  Exhibit 139.  Is it correct that 139 is the initial e-mail from

9  Mr. Stuart that 140 is responding to?

10 A.  Yes.

11 Q.  They've just been broken into two separate documents,

12 correct?

13 A.  Correct.

14    MR. JACOBS:  Your Honor, I'd move into evidence then

15 Exhibit 139 and 140.

16    MR. BERNHOFT:  In conjunction, no objection.

17    THE COURT:  Received.

18    (Exhibit 139 offered and received.)

19 BY MR. JACOBS:

20 Q.  Okay.  Now, then maybe if you could explain the relationship

21 or the exchange between you and Mr. Stuart.  First of all,

22 what's the date of the exchange?

23 A.  February -- his e-mail to me is dated February 6, 2008.

24    MR. JACOBS:  Could you put on 139?  Thanks.

25 BY MR. JACOBS:

278

1  Q.  I'm sorry.  What's his date?  I apologize.

2  A.  The date of his e-mail to me is dated February 6, 2008.

3  Q.  And can you describe the substance of his e-mail to you?

4  A.  The substance of his e-mail is that I was not understanding

5  his position as relates to tax matters and he's explaining that

6  to me.

7  Q.  And then turning to 140, you respond to his e-mail, what's

8  the date of your response?

9  A.  February 7th.

10 Q.  And I wondered if you could read, first of all, the second

11 paragraph of your e-mail, Exhibit 140.  Can you read that out

12 loud?

13 A.  Yes.  "Because of the positions that you are taking on these

14 tax matters, I am obligated to ask that you acknowledge that I

15 have advised you that you, James Stuart, are required to pay

16 taxes associated with the Social Security number which bears

17 your name spelled out in capital letters, and/or most likely,

18 those funds which were established -- those trusts which were

19 established regarding the approximate 70 percent ownership which

20 does not involve Beverly."

21 Q.  Okay.  And the next paragraph?

22 A.  "Nonetheless, Hau and Associates can prepare the tax returns

23 for New Age, Ltd.  We intend to show the returns involving you

24 or the Social Security number which bears your name spelled out

25 in capital letters or those trusts which are not controlled or

279

1  set up by Beverly are self-employment income.  If I fail to

2  handle this matter in any other way it is my opinion that my CPA

3  license would be in jeopardy."

4  Q.  Now, Mr. Hau, what are you talking about?  "Associated with

04:01  5  the Social Security number which bears your name spelled out in

6  capital letters."

7  A.  Yes.

8  Q.  What do you mean?

9  A.  Well, that was the distinction that Mr. Stuart was making to

04:01  10  me.  Again, that if a K-1 said that there's a pass-through of

11  income to James Stuart and the reference on there is James

12  Stuart spelled in capital letters, that it -- that that does not

13  mean that he, the human being, has to pay taxes on that

14  pass-through.

04:02  15  Q.  And did you agree with that?

16  A.  No.

17  Q.  And did you communicate your disagreement to Mr. Stuart?

18  A.  Yes.  It's in this e-mail.

19  Q.  Now, this e-mail is dated February 7, 2008.  Did you

04:02  20  continue to do work with Mr. Stuart after you sent him this

21  e-mail in February of 2008?

22  A.  To the best of my recollection he responded with a letter

23  telling me that basically he was not going to work with me any

24  further.

04:02  25  Q.  And did he continue to work with you?

280

1    A.   No.  To the best of my recollection.  I mean, there may have

2    been some minor wrap-up of things; but no, no further services

3    he was asking me to do.

4              MR. JACOBS:  That's all I have for this witness,

5    Judge.

6              MR. BERNHOFT:  Can I have just one moment to confer?

7              THE COURT:  Certainly.

8              MR. BERNHOFT:  Thank you.

9              (Brief pause.)

10             MR. BERNHOFT:  Thank you, Judge.

11                         CROSS-EXAMINATION

12   BY MR. BERNHOFT:

13   Q.   Good afternoon, Mr. Hau.

14   A.   Good afternoon.

15   Q.   How are you?

16   A.   Good, I hope.

17   Q.   Okay.  It's going to be easy.

18             Could we leave that 140 exhibit up on the screen,

19   please?  Would that be all right?

20             MR. JACOBS:  140?

21             MR. BERNHOFT:  Please.  The one that's up there right

22   now.

23   BY MR. BERNHOFT:

24   Q.   Now, Mr. Hau, I'm Bob Bernhoft, I'm the attorney

25   representing Jim Stuart in this federal criminal tax case.  I

281

1   just have a couple of questions.

2            And if I could refer you to the exhibit that's been

3   marked and admitted 140.  Referring you to paragraph 2.

4   A.  Yes.

5   Q.  And you had read that into the record to the jury

6   previously.  And you're telling Mr. Stuart, you're memorializing

7   the fact that you've advised him that he's required to pay

8   taxes --

9   A.  Yes.

10  Q.  Okay.  -- associated with that Social Security number.

11  Would those be income taxes?

12  A.  Well, it's income taxes.  And I was concerned there was also

13  a question possibly about self-employment tax as it relates to

14  the new entity.  And I was advising him that in my opinion he

15  would most likely have to pay self-employment tax as well on any

16  pass-throughs from the new entity.

17  Q.  In addition to income tax.

18  A.  Yes.

19  Q.  And you testified, Mr. Hau, that you had had phone

20  discussions with Mr. Stuart about his position on tax as well as

21  e-mail exchanges in these letters?

22  A.  I don't recall how much discussion we had over the phone.

23  Most of the arguments that he posed were in person.

24  Q.  So these were primarily personal discussions respecting his

25  engagement with you on his tax position.

282

1    A.   Yes.  It was he and I in the room alone on those issues.

2    Q.   During these discussions or in any other written

3    correspondence or e-mails, did you advise Mr. Stuart what

4    section of the Internal Revenue Code makes him liable for the

5    income tax?

6    A.   No.

7    Q.   All right.  During any of these personal discussions or in

8    any other e-mail or written communications, did you advise

9    Mr. Stuart what code, section or regulation requires him to file

10   the Form 1040 to make a return of that income?

11   A.   No.  No.

12   Q.   Can you tell me, given the fact that he's taken the position

13   that he's not required to pay the income tax, did it occur to

14   you to make those advisements to him?

15   A.   No.

16   Q.   All right.  If it had occurred to you could you have told

17   him what section of the code made him liable for the tax?

18   A.   Perhaps if I had researched it I would have been able to.  I

19   did not.

20   Q.   But that would have required some research?

21   A.   Yes.  On my part it would.

22   Q.   All right.

23            No further questions.

24            MR. JACOBS:  I don't have any redirect, Your Honor.

25            THE COURT:  You may step down.  Please do not discuss

283

1    your testimony with anyone unless you're advised this case has

2    been completed.  Have a good afternoon.  You may leave those

3    there.

4              (Witness excused at 4:07 p.m.)

04:07  5              MR. JACOBS:  Your Honor, next we would call Joel

6    Nettesheim.

7              Sir, if you would step up to the witness stand, remain

8    standing and be placed under oath.

9              THE REPORTER:  Raise your right hand, please.

10             JOEL NETTESHEIM, GOVERNMENT WITNESS, SWORN

11             THE REPORTER:  Please state your name and spell your

12   name for the record.

13             THE WITNESS:  It's Joel Nettesheim.  It's J O E L,

14   middle initial G, Nettesheim is N E T T E S H E I M.

04:08  15                        DIRECT EXAMINATION

16   BY MR. JACOBS:

17   Q.  Good afternoon, Mr. Nettesheim.

18   A.  Good afternoon.

19   Q.  Sir, can you tell me where you currently live?  What city?

04:08  20   A.  Brookfield, Wisconsin.

21   Q.  And what is your educational background?

22   A.  I have a bachelor's of business administration degree from

23   the University of Wisconsin-Milwaukee.

24   Q.  And when did you receive that degree?

04:09  25   A.  1980.

284

1    Q.   And are you a certified public accountant?

2    A.   Yes.

3    Q.   And do you know when you received your CPA?

4    A.   Approximately 1983.

5    Q.   And how are you currently employed?

6    A.   I'm a CPA and principal at SVA Certified Public Accountants.

7    Q.   And SVA, was that formerly known as Suby Von Haden and

8    Associates?

9    A.   Correct.

10   Q.   And how long have you been there?

11   A.   Approximately 16, 17 years.

12   Q.   Would you just explain what your responsibilities are at

13   that firm?

14   A.   I'm one of the leaders of our Business Advisory Services

15   Group, and we work with clients performing the normal CPA duties

16   such as tax accounting as well as business consulting services.

17   Q.   In connection with that responsibility have you ever had

18   dealings with an individual named James Stuart?

19   A.   Yes.

20   Q.   Do you know when you first had dealings with Mr. Stuart?

21   A.   Quite awhile ago with a company called React, LLC.  It was a

22   company he was a partner in.

23   Q.   And do you know approximately when that would have been?

24   A.   Late '90s, early 2000.  I can't remember the exact date.

25   Q.   And what was the nature of your business relationship with

285

1    Mr. Stuart?

2    A.  With React?

3    Q.  Yes.

4    A.  Making sure the accounting was done properly.

5    Q.  And are you still doing that work for React?

6    A.  No, that company was sold.

7    Q.  And do you know approximately when that was?

8    A.  Let's call it maybe the late '90s.

9    Q.  Okay.  And would you recognize Mr. Stuart if you saw him

10   today?

11   A.  Yes.

12   Q.  Do you see him here in the courtroom today?

13   A.  Yes, I do.

14   Q.  Could you just identify him by where he's seated and what

15   he's wearing?

16   A.  Left side of the second table, and I'm color blind but I

17   think that's blue.

18   Q.  At least you got the left side.

19           Your Honor, I would ask that the court -- that the

20   record reflect the witness has identified the defendant

21   Mr. Stuart.

22           THE COURT:  Noted.

23   BY MR. JACOBS:

24   Q.  Did you do any other work for Mr. Stuart other than the work

25   in connection with React?

286

1    A.   I did some work for New Age Chemical Corporation.

2    Q.   And do you know when was the first time or when you started

3    doing work for New Age Chemical?

4    A.   Approximately I would say sometime, what, in 19 -- I mean,

5    excuse me, in 2008, where I was formally doing work.  I did some

6    business consulting before that but very minor.

7    Q.   And what was the nature of the work you did for New Age

8    Chemical?

9    A.   Prepared their final corporate return.

10   Q.   And do you know when that was you would have prepared the

11   final return?

12   A.   Assuming the last corporate year if I remember was September

13   30th, 2008, assuming that was the final fiscal year, that work

14   would have been done within six months after that year-end.

15   Q.   All right.  And was there someone in particular you

16   primarily dealt with on that work?

17   A.   In working with our accounting we usually worked with Bev on

18   the accounting and Jim on other matters.

19   Q.   Okay.  And Bev, that would be Beverly Schlipp?

20   A.   Yes.

21   Q.   And am I correct she's the minority owner of New Age

22   Chemical?

23   A.   Yes.

24   Q.   And Jim, that would be James Stuart.

25   A.   Correct.

287

1  Q.  And do you know their respective ownership interests in New

2  Age Chemical?

3  A.  It's about 70/30.  70 percent for Mr. Stuart and 30 percent

4  for Mrs. Schlipp.

04:12  5  Q.  Okay.  And as a result of that engagement did you prepare a

6  tax return for New Age Chemical?

7  A.  Corporation, yes.

8  Q.  I guess that's Inc., yes?

9  A.  Yes.

04:12  10  Q.  And you said you prepared their final return, what happened

11  to the business?

12  A.  The business was liquidated.

13  Q.  And did it just cease operating?

14  A.  As a corporation, yes.  It was -- the assets were

04:13  15  transferred over into a limited partnership.

16  Q.  Do you know the name of that limited partnership?

17  A.  New Age, Ltd. Partnership I believe is the official name.

18  Something close to that.

19  Q.  And do you know who are the owners of that limited

04:13  20  partnership?

21  A.  Yes, approximately -- - I think 1 percent I believe some

22  sort of a trust, 30 percent still with Bev, and then the rest to

23  Mr. Stuart, I believe.  Something like that.

24  Q.  And do you continue to do work for that limited partnership?

04:13  25  A.  I do accounting work still, yes.

288

1  Q.  And could you describe the nature of the work that you do

2  for the New Age Chemical, Ltd. Partnership?

3  A.  Sure.  They asked us just to make sure the accounting

4  records are properly closed out every year.  So we do our normal

5  accounting type work where we make year-end journal entries,

6  record depreciation and things like that.

7  Q.  And, now, the corporation, New Age Chemical, Inc., when that

8  closed out, do you know what type of structure it had for tax

9  purposes?

10 A.  It was an S Corporation.

11 Q.  And I know the jury's heard this a lot, but can you explain

12 your understanding what that means?

13 A.  S Corporation is what we call a pass-through entity in the

14 tax world whereby any earnings or profits generated by the

15 corporation don't get taxed at the corporate level, rather, they

16 get passed through and get taxed at the individual shareholders'

17 level.

18 Q.  And how do the shareholders know how much to report and pay

19 taxes on?

20 A.  They are given a K-1 that is part of the corporate tax

21 filing.

22 Q.  And what does the K-1 do?

23 A.  K-1 shows your proportionate share of the earnings or the

24 losses of the entity.

25 Q.  And is the shareholder who gets a K-1 required to report

289

1    those earnings on their own individual tax returns?

2    A.  They're supposed to use that and even include it on their

3    personal return, yes.

4    Q.  Now, you say that the corporation, New Age Chemical, Inc.,

5    that ended or was closed out?

6    A.  It was liquidated -- I think it was September 30th, 2008.  I

7    believe that was the final one.

8    Q.  And the assets of the business entity, where did they go?

9    A.  They were distributed out to the shareholders and then the

10   shareholders contributed them to the limited partnership.

11   Q.  Now, the limited partnership, the New Age Chemical, Ltd.,

12   what type of tax structure, what type of structure did it have

13   for tax purposes?

14   A.  Pardon me?  What was the question?

15   Q.  What kind of structure did it have for tax purposes?  How is

16   it treated by --

17   A.  It's taxed as a partnership.

18   Q.  And how is that?

19   A.  Similar to the S Corporation whereby the partnership -- at

20   the partnership entity level it does not pay tax on its annual

21   earnings or profits; rather, the shareholders, in this case the

22   members or the partners, pay tax on their proportionate share of

23   those earnings.

24   Q.  All right.  And, now, is there a specific form that an

25   S Corporation uses to report its earnings?

290

1    A.   Yes, it's a Form 1120S.

2    Q.   And is there a specific tax form that a partnership uses to

3    report its earnings?

4    A.   It's a Form 1065.

5    Q.   And, now, with a 1065 for a limited partnership, is there

6    some mechanism that the share -- or the partners are notified as

7    to what their earnings are that they have to report?

8    A.   A similar form as the S Corp, it's called a K-1 again.

9    Q.   Let me show you first what's been marked for identification

10   as Exhibit 132, I'm gonna say.  Bear with me one moment.

11            (Brief pause.)

12   BY MR. JACOBS:

13   Q.   Sir, do you recognize what Exhibit 132 is?

14   A.   Yes.  This is the final tax return.  I note the actual year

15   is September 30th, 2007.  I've been saying 2008.

16   Q.   Okay.  Did you prepare this return?

17   A.   Yes.

18   Q.   And do you know approximately when you would have prepared

19   it?

20   A.   Usually sign off on the date that I deliver it to the

21   client.  It says April 15th, 2008 here.

22   Q.   So your signature is on there.

23   A.   Yes.

24   Q.   Okay.

25            Your Honor, I'd move into evidence Exhibit 132.

291

1        MR. BERNHOFT:  No objection, Your Honor.

2        THE COURT:  Received.

3        (Exhibit 132 offered and received.)

4    BY MR. JACOBS:

5    Q.  And you mentioned -- did you provide this to the client?

6    A.  Yes.

7    Q.  And how did you provide it to the client?

8    A.  Don't recall.  It's either mail or personal delivery.

9    Q.  Does this tax return cover a full 12 months?

10   A.  Yes, it did.  It would say that if it didn't.  So on this

11   return it did cover the full months -- not necessarily means it

12   wasn't operating, it could have been only operating for 11

13   months, but this return says it was covered for a full 12

14   months.

15   Q.  And what are those 12 months?  What's the period?

16   A.  October 1st, 2006 through September 30th, 2007.

17   Q.  And did the New Age -- this is for the Inc., right?  New Age

18   Chemical, Inc., right?

19   A.  Correct.

20   Q.  Did it make money during that period of time?

21   A.  Yes, it did.

22   Q.  How much money did it make?

23   A.  Well, from a financial statement point of view it made

24   $285,000.

25   Q.  And were the shareholders of that corporation required to

292

1  report some or all of that earnings on their personal tax

2  returns?

3  A.  Well, the taxable portion of that which was a little bit

4  less, yes.

04:18  5  Q.  Is that reflected somewhere in that return how much and

6  which shareholders had to do that?

7  A.  I assume it is.  Let me double-check.

8  Q.  Sure.

9      (Witness peruses document.)

04:19  10  A.  Yes.  It's in here.

11  BY MR. JACOBS:

12  Q.  Okay.  And who and how much?  Can you tell?

13  A.  Yes.  For Bev -- there's a lot of different components of

14  the income that were allocated to her, but the ordinary income

04:19  15  portion is 79,822.

16  Q.  That's for Beverly Schlipp?

17  A.  Yes.  There's some other stuff on here but --

18  Q.  Okay.  And how about for --

19  A.  Mr. Stuart, 189,001.

04:19  20  Q.  Okay.  And what year would Mr. Stuart have had to report

21  that earnings, that income on his personal tax returns?

22  A.  On his 2007 Individual Income Tax Return.

23  Q.  Now, I believe you indicated this return was the final

24  return for the Inc., for the corporation?

04:19  25  A.  Correct.

293

1  Q.  Did you prepare any tax returns for the limited partnership

2  that succeeded that corporation?

3  A.  We weren't engaged to do that.

4  Q.  But you did some work for the limited partnership?

04:20  5  A.  Yes.

6  Q.  And what was that again?

7  A.  Generally, accounting work.  Making sure the year-end

8  financial informations were accurate.

9  Q.  And let me hand you what have been marked for identification

04:20  10  as Exhibits 134 -- I'm sorry, 135 and 136.  I'll say 135 and

11  136.

12        Judge, I wonder --

13        THE COURT:  The screens are blank right now.  They are

14  blanked at this point in time because nothing has been --

04:21  15  nothing has been specifically asked to be put up.

16        MR. JACOBS:  Okay.

17        (Brief pause.)

18  BY MR. JACOBS:

19  Q.  And there's 136.  Do you recognize what Exhibits 135 and 136

04:22  20  are?

21  A.  Yes.

22  Q.  Just generically, can you tell me what they are?

23  A.  The top copy are the financial statements for the years

24  ended December 31st, 2007 and 2008.  And the documents attached

04:22  25  to here appear to be various different types of work papers that

294

1   help to substantiate the financial statements.

2   Q.  And so -- and do these both pertain to New Age Chemical,

3   Ltd.?

4   A.  Correct.

04:23   5   Q.  And are these records that your firm prepared?

6   A.  I suspect they are.

7   Q.  And is that as part of your engagement with Mr. Stuart?

8   A.  Yes.

9       MR. JACOBS:  Your Honor, I'd move into evidence

04:23   10   Exhibits 135 and 136.

11      MR. BERNHOFT:  No objection, Your Honor.

12      THE COURT:  Received.

13      (Exhibits 135-136 offered and received.)

14   BY MR. JACOBS:

04:23   15   Q.  And I believe you indicated you and your firm did not

16   prepare tax returns for this entity New Age Chemical, Ltd. for

17   either 2007 or 2008; is that right?

18   A.  We were just engaged to prepare or to do these financial

19   accounting processes.

04:23   20   Q.  Were you engaged to do any other work using those records?

21   A.  Not that I can recall.

22   Q.  Sure.  Did you do any work for Beverly Schlipp?

23   A.  Yes.

24   Q.  What type of work did you do for Ms. Schlipp?

04:24   25   A.  We prepared her personal Individual Income Tax Returns.

295

1  Q.  And do you know for what year you do that?

2  A.  I could say we probably did it for 2008, 2009, 2010.  Don't

3  know about 2007.

4  Q.  Okay.  And as part of that, did you report on her tax

5  returns her share of the earnings from New Age Chemical, Ltd.?

6  A.  Yes.

7  Q.  And how did you figure out -- was there a return that you're

8  aware of filed for New Age Chemical, Ltd.?

9  A.  I'm not aware of a return that was filed, but it's pretty

10 easy for me to figure that out because I knew what the allocable

11 income to Beverly was for each of these years and, therefore, I

12 was able to easily put it on her return.

13 Q.  For example, the limited partnership, New Age Chemical,

14 Ltd., did it make money for its year ending December 31st, 2007?

15 I guess that's Exhibit 135.

16 A.  First of all, that's probably a short year, it's not a full

17 year.  But it did make money, yes.

18 Q.  Can you tell how much money the limited partnership made?

19 A.  $24,318.

20 Q.  And did Beverly Schlipp have to report some of that earnings

21 or profits on her personal tax returns?

22 A.  Correct.

23 Q.  How much did she have to report?

24 A.  I would say 30 percent of that which would be about 7500

25 bucks.  Eight grand.

296

1  Q.  Did someone else have to report the balance of those

2  earnings on their tax returns?

3  A.  Whoever the other shareholders were.

4  Q.  I guess partners.  Members?

5  A.  Partners.

6  Q.  Partners?  And who is that, do you know?

7  A.  Well, I'm not exact on the ownership.  As I said before, I

8  think there's a trust involved and I think Mr. Stuart is

9  involved or something like that.

10 Q.  And whoever that partner is, they had to report the income

11 from the limited partnership.

12 A.  Yes.

13 Q.  Did you prepare a K-1 to reflect that?

14 A.  No.

15 Q.  Did you prepare a K-1 for Beverly Schlipp?

16 A.  We may have put the numbers on a K-1 just to put it in her

17 tax file, or we would have just put it on, you know, a

18 handwritten sheet.  So it could have been done either way.

19 Q.  Why didn't you prepare a K-1 for the other partners?

20 A.  We weren't engaged to prepare the tax return.

21 Q.  How about for the year ending in 2008, did the business, the

22 New Age Chemical, Ltd. Partnership, did it make money in 2008?

23 A.  Yes, it did.

24 Q.  How much money did it make?

25 A.  $287,963.

297

1  Q.  And did Ms. Schlipp have to report some of those earnings on

2  her tax return?

3  A.  Approximately 30 percent of that.

4  Q.  And did you prepare a K-1 for her for that?

5  A.  We either prepared a K-1 or we did it manually.  You know,

6  just for tax simply indication we may have put the numbers on a

7  K-1 just to make it easier to prepare and review her return.

8  Q.  Were you aware of any tax return being prepared for that

9  limited partnership?

10  A.  Not that I'm aware of.

11  Q.  How about K-1s being prepared for that limited partnership?

12  A.  There may have been one for Bev but that would be all that

13  I'd say that I'd be aware of.

14  Q.  And are K-1s supposed to be filed with the IRS?

15  A.  With the entity return but not the shareholder return.  The

16  partner return.

17  Q.  And the K-1 you prepared, if you did prepare one for

18  Beverly, was that sent into the IRS?

19  A.  No.

20  Q.  Did you prepare a K-1 for the other partners in New Age

21  Chemical, Ltd. Partnership for 2008?

22  A.  No.  No.

23  Q.  Why not?

24  A.  I wasn't engaged to do so.

25  Q.  I mean, there's definitely earnings that the members -- the

298

1  partners have to report, correct?

2  A.  There definitely is allocable earnings to the other

3  partners.  Or partner or partners.

4  Q.  You said -- what were the total earnings for 2008?

5  A.  $287,963.

6  Q.  And so, how much did Ms. Schlipp report?

7  A.  I would say 30 percent of that.  What does that come out to,

8  about $90,000?

9  Q.  And the balance, you don't know who or whether that was

10  reported or not.

11  A.  Correct.

12          MR. JACOBS:  That's all I have for this witness,

13  Judge.

14                  CROSS-EXAMINATION

15  BY MR. BERNHOFT:

16  Q.  Good afternoon, Mr. Nettesheim.

17  A.  Good afternoon.

18  Q.  I'm Bob Bernhoft, I represent Jim Stuart in this case.

19          Just confirming, you still do accounting work for New

20  Age Chemical, Ltd.; is that correct?

21  A.  Correct.  Correct.

22  Q.  And could you explain a little more detail what sort of

23  accounting work you're still doing for New Age Chemical, Ltd.?

24  A.  Well, the company would like to make sure that their

25  accounting records are properly closed out at the end of the

299

1    year, and as accountants we can go and make sure the cash ties

2    out, the depreciation and the fixed assets tie out.

3            The various balance sheet items tie out, such as cash,

4    accounts receivable, fixed assets, accounts payable.  Things

5    like that.

6    Q.   And --

7    A.   What I mean by "tie out" is that they are correct.

8    Q.   And did you also do accounting work for New Age Chemical,

9    Incorporated before the dissolution and transfer of assets to

10   Limited?

11   A.   I did some consulting work over the years but my primary

12   where I was -- I was hired to do the September 30th, 2007

13   report, to do the final closeout tax return preparation.

14   Q.   And when you work with New Age Chemical, Ltd. and Beverly

15   Schlipp and Mr. Stuart, what sort of condition do you find --

16   general condition do you find the company's books and records

17   in?

18   A.   Very good.

19   Q.   And Ms. Schlipp is a good controller, good bookkeeper?

20   A.   Yes.

21   Q.   There's been some discussion on Mr. Jacobs' direct about New

22   Age Chemical, Ltd. and the fact that you were not engaged, your

23   firm was not engaged to file a partnership return; is that

24   correct?

25   A.   Yes.

1    Q.  You've also testified that under the vast majority of

2    circumstances a partnership as an entity does not have a tax

3    liability, the income is passed through to the partners; is that

4    right?

04:30   5    A.  Yes.

6    Q.  And it's taxable to the partners as income.

7    A.  Yes.

8    Q.  Is it particularly problematic if a partnership does not

9    file a partnership return given the fact that the pass-through

04:30   10   entity partnership, the income is taxed to the partners?

11   A.  It depends what you mean by problematic.  I mean, IRS would

12   like to see a form filed.

13   Q.  Is there some sort of a fine or penalty if the partnership

14   doesn't file that?

04:31   15   A.  Yes.  They have a penalty of approximately $150 per partner

16   per month for a maximum of six months.

17   Q.  All right.  Has it been your experience that in working with

18   New Age Chemical, Ltd. and Mr. Stuart and Bev Schlipp, that the

19   partnership and Mr. Stuart have authorized your firm and spent

04:31   20   money with your firm to do whatever work is required to make

21   certain that Ms. Schlipp has her allocable income determined

22   such that she can file a timely 1040 return?

23   A.  Absolutely.

24   Q.  There was discussion and testimony on direct about this

04:31   25   dissolution of New Age Chemical, Incorporated transfer of assets

301

1  to the shareholders and then the shareholders capitalizing or

2  transferring assets to the partnership.  Do you recall your

3  testimony about that?

4  A.  Yes.

04:32  5  Q.  When you were called upon to assist in accounting for the

6  dissolution asset transfer and then reconveyance or

7  capitalization of Limited, did Mr. Stuart and/or Ms. Schlipp,

8  did they provide you with any accounting work product that they

9  already had relative to the dissolution and transfer?

04:32  10  A.  Yes.  They have to present me with accounting information.

11  Q.  Right.  And do you recall, was that accounting information

12  performed by some other form?

13  A.  There was a preliminary closeout done by another CPA, yes.

14  Q.  Do you recall who that CPA was?

04:32  15  A.  It was Dan Hau.

16  Q.  Okay.  Did you find CPA Hau's work product useful in terms

17  of using it to go forward and do what needed to be done to do

18  this -- excuse me.

19  A.  It was good preliminary information.

04:32  20  Q.  It was good preliminary information.  Okay.

21  Did Jim Stuart ever talk to you about tax law in the

22  Internal Revenue Code?

23  A.  I don't remember -- he certainly did at times.  I don't

24  recall the discussions very well.

04:33  25  Q.  Okay.

302

1    A.  But I'm sure there were a few times.

2    Q.  Was there a time where he provided any materials relative to

3    what he had been researching?

4    A.  Yeah.  One time he did certainly give me some information.

04:33    5    Q.  Do you recall what that information was?

6    A.  It was definitely some paperwork and then a book, I believe.

7    Q.  Did you have opportunity to review the book or the

8    paperwork?

9    A.  Not really.  I maybe covered the first chapter but my

04:33    10    schedule is pretty busy so I didn't -- I wasn't able to get

11    through it.

12    Q.  Fair enough.  The discussions you had with Mr. Stuart about

13    tax, how would you characterize those discussions?  Were they

14    serious discussions?

04:34    15    A.  From what I recall clearly he knew something that I did not.

16    He was definitely spending some time investigating it, I could

17    tell that.

18    Q.  So you considered him to be a -- well, did you ever doubt

19    his sincerity?

04:34    20    A.  No.  I guess he was passionate about it.

21    Q.  During those engagements with Mr. Stuart, did you ever

22    advise Mr. Stuart what code section made him liable for the

23    federal income tax?

24    A.  I don't recall that I would have done that.  And if he did

04:34    25    ask it, regrettably I don't know if I could identify it.

303

1  Q.  You wouldn't be able to identify the liability section of

2  the code?

3  A.  No.  No.

4  Q.  Would you be -- would you have been able to tell Mr. Stuart

5  what code section or regulation required him to file the

6  Form 1040 to make a personal return of income?

7  A.  No, I'm not educated on that to tell you the truth on the

8  specific code sections you have to file.  I just know how to

9  prepare returns and give tax advice.

10             MR. BERNHOFT:  All right.

11             I have nothing further, Your Honor.  Thank you.

12             THE COURT:  Is there any redirect?

13             MR. JACOBS:  No, Your Honor.  Oh wait.  I'm sorry, I

14  apologize.  I got distracted for a minute.

15                    REDIRECT EXAMINATION

16  BY MR. JACOBS:

17  Q.  Mr. Nettesheim, Mr. Bernhoft asked you about the accounting

18  records of New Age Chemical, Ltd., did they include any tax

19  returns?

20  A.  For the Limited?

21  Q.  Yes.

22  A.  No.

23  Q.  Am I correct the reason that a partnership files a 1065 and

24  the K-1s is to notify the government the earnings that the

25  partners have to report on their individual returns?

1    A.  I would agree.

2    Q.  Sort of like why employers file W-2s for their employees?

3    A.  Yes.

4    Q.  And if that return is not filed is the government made aware

5    of the earnings that the partners have to report?

6    A.  No, they would not know.

7              MR. JACOBS:  Nothing further, Judge.

8              MR. BERNHOFT:  No recross, Your Honor.

9              THE COURT:  You may step down.  Please do not discuss

10   your testimony with anyone unless you're advised this case has

11   been completed.

12              (Witness excused at 4:36 p.m.)

13              THE COURT:  Have a good evening.

14              MR. JACOBS:  Judge, could I be heard at side bar?

15              THE COURT:  Certainly.

16              (At side bar on the record.)

17              MR. JACOBS:  Judge, that's the last of our citizen

18   witnesses.  The remaining witnesses are the case agent and the

19   summary witness who has to prepare a summary of the tax

20   calculations based on the evidence at trial.

21              THE COURT:  All right, the case agent can testify

22   today then.

23              MR. JACOBS:  I wonder if we could use the restroom.

24              THE COURT:  All right, we'll take a break.

25              (End of discussion at side bar.)

305

1          THE COURT:  We're entering our last stretch for the

2    day so we can -- we'll take a break at this time.  We'll resume

3    shortly.

4          THE BAILIFF:  All rise.

04:37    5          (Jury out at 4:37 p.m.)

6          (Recess taken at 4:38 p.m., until 4:57 p.m.)

7          (Jury in at 4:57 p.m.)

8          THE COURT:  You may proceed.

9          MR. JACOBS:  For our next witness, Your Honor, the

04:58   10    United States calls Special Agent Matthew Rech.  Mr. Rech.

11          THE REPORTER:  Raise your right hand, please.

12          MATTHEW RECH III, GOVERNMENT WITNESS, SWORN

13          THE REPORTER:  Please state your name and spell your

14    name for the record.

04:58   15          THE WITNESS:  My name is Matthew J. Rech III.  Last

16    name is spelled R E C H, with three Roman numerals.

17                    DIRECT EXAMINATION

18    BY MR. JACOBS:

19    Q.  Mr. Rech, how old are you?

04:59   20    A.  I'm 43.

21    Q.  And where are you currently employed?

22    A.  I'm employed as a special agent for the Internal Revenue

23    Service in Milwaukee.

24    Q.  How long have you worked for Internal Revenue Service?

04:59   25    A.  It will be six years this February.

306

1    Q.   Would you tell me what your educational background is?

2    A.   I have a Bachelor of Arts in Criminology and Law Studies

3    from Marquette University.  I have a Masters in Business

4    Administration from Devries University.  And I completed some,

5    approximately six or seven classes in the Masters of Tax Program

6    at University of Wisconsin-Milwaukee.

7    Q.   Would you explain -- I'm sorry, what's your current position

8    with the Internal Revenue Service?

9    A.   I'm employed as a special agent.

10   Q.   And what are your responsibilities as a special agent?

11   A.   Criminal enforcement of Title 26 -- of Title 18, Section 26

12   of the Internal Revenue Code, enforcing the criminal violations

13   of the Internal Revenue Code and other financial crimes, fosters

14   a confidence in the tax system and promotes compliance.

15   Q.   Have you been a special agent your entire time with the IRS?

16   A.   That's correct.

17   Q.   In connection with that responsibility are you familiar with

18   an individual named James Stuart?

19   A.   Yes, I am.

20   Q.   And do you see him here today in court?

21   A.   Yes, I do.

22   Q.   Would you identify him by where he's seated and what he's

23   wearing?

24   A.   He's the individual with a blue suit seated on the far left

25   of the defense table.

307

1       MR. JACOBS:  I'd ask the record reflect the witness

2   has identified the defendant James Stuart.

3       THE COURT:  Noted.

4   BY MR. JACOBS:

5   Q.  And how did you first become familiar with Mr. Stuart?

6   A.  (No response.)

7   Q.  Let me try to rephrase that.  Were you assigned to an

8   investigation of Mr. Stuart?

9   A.  Yes, I was.

10  Q.  And when was that?

11  A.  July 29th of 2008 is when the case originated.

12  Q.  And as part of that assignment did you receive copies of

13  correspondence between Mr. Stuart and the IRS?

14  A.  Yes, I did.

15  Q.  Now, in connection with your investigation did you conduct a

16  search warrant, a federal search warrant at the business

17  premises of New Age Chemical in Delafield, Wisconsin?

18  A.  Yes, sir, I did.

19  Q.  When was that?

20  A.  It was on the day of January -- February 19th.  February

21  19th of 2009.

22  Q.  And as a result of that search warrant did you seize records

23  from that business premises?

24  A.  Yes, sir, we did.

25  Q.  Can you describe just generally what was seized?

308

1    A.  There was paper records regarding what's commonly known as

2    check stubs, some W-2s with Mr. James Stuart's name and some

3    1099s in his name as well, Form 1099s.

4    Q.  All right.  I'd like to show you a series of records and

05:02  5    then I'm going to ask you some questions about them.  I'm going

6    to hand you what have been marked for identification -- I'm

7    going to do these in groups if that's all right.  I'm going to

8    start with Exhibits 150 through 156.

9          Look at each of those folders and then I'll ask you

05:03  10   some questions about the items in them.  I should note I believe

11   152 has already been admitted so I won't be handing you that

12   one.  So 150, 151, 153, 154, 155, and 156.

13          (Witness peruses documents.)

14   A.  I've completed a review, sir.

05:06  15   BY MR. JACOBS:

16   Q.  Okay.  And are each of those exhibits records pertaining to

17   Mr. Stuart that you seized at the business premises of New Age

18   Chemical in February of 2009?

19   A.  Yes, sir.

05:07  20          MR. JACOBS:  Your Honor, I'd move into evidence

21   Exhibits 150, 151, 153, 154, 155, and 156.

22          MR. BERNHOFT:  No objection, Your Honor.

23          THE COURT:  Received.

24          (Exhibits 150, 151, 153, 154, 155 and 156 offered and

05:07  25   received.)

309

1    MR. JACOBS:  And, Your Honor, I'd ask permission to be

2    able to publish certain of those documents to the jury.

3         THE COURT:  Proceed.

4    BY MR. JACOBS:

05:07   5    Q.  First of all, I'd like to draw your attention to

6    Exhibit 150.  What is that?

7    A.  This is a Form 1099 Miscellaneous.

8    Q.  Can you describe to whom it pertains and what it reflects?

9    A.  It pertains to -- its recipient's name is James Stuart, 3675

05:08  10   Kettle Court East, Hartland, Wisconsin, 53029.  It's for the

11   year 2005.  The payer's name is New Age Chemical, Incorporated,

12   located at 3765 Kettle Court East, Delafield, Wisconsin, 53018.

13   In box number 7 it lists non-employee compensation of $53,000 --

14   $53,600 and zero cents.

05:08  15   Q.  And is this income that Mr. Stuart should have reported on

16   his 2005 income tax return?

17   A.  Yes, sir.

18   Q.  And did you find other documents reflecting income for

19   Mr. Stuart for the year 2005 at the New Age Chemical?

05:08  20   A.  Yes, sir.

21   Q.  And in particular I'd like to turn your attention to 156.

22   The fifth page of 156.  I think I have it up on the screen.  Can

23   you explain to the jury, what is that?

24   A.  This is a Form W-2, a wage and tax statement for the tax

05:09  25   year 2005.  The employer's name is New Age Chemical,

310

1    Incorporated, located at 3764 Kettle Court East, Delafield,

2    Wisconsin, 53018.  The employee's name, address and zip code is

3    James A. Stuart, Jr., at 2410 Hirshman Lane, Hartland,

4    Wisconsin, 53029.

5            The remaining boxes, box 1 lists an entirety of wages

6    for the year of 125,114.84.  And then it also lists income tax

7    withheld in box 2 of 18,786.90.  Taxable Social Security wages

8    of 90,000.  Social Security tax withheld, $5,580.  Medicare

9    wages and tips of 107,078.18.  And box number 6 lists the

10   Medicare tax withheld of 1,552.62.

11           There's also items in box 14, SH dash HE, of

12   18,036.66.  And taxable F of 6,178.18.

13           Down below it lists information regarding the State of

14   Wisconsin, and box 16 mirrors box 1, and box 17 has a state

15   income tax withheld of 6,067.91.

16   Q.  Now, I'm correct, this form has been redacted so that

17   Mr. Stuart's full Social Security number doesn't appear on it,

18   correct?

19   A.  Yes, sir.

20   Q.  And when you seized it his full Social Security number was

21   there?

22   A.  Yes, sir.

23   Q.  And as well as on the previous Form 1099 that we were

24   looking at, Exhibit 150.  Correct?

25   A.  Yes.

311

1    Q.  And did you -- Exhibit 151.  Explain to the jury what is

2    Exhibit 151.

3    A.  Exhibit 151 is an additional Form 1099 Miscellaneous.  The

4    payer's name is New Age Chemical, Inc., 3765 Kettle Court East,

5    Delafield, Wisconsin, 53018.  The recipient's name is James

6    Stuart, Jr., the address of 2410 Hirshman Lane, Hartland,

7    Wisconsin, 53029.  Again, it's a Form 1099 Miscellaneous for the

8    year 2006.

9           In box 7 it lists non-employee compensation of $40,200

10   and zero cents.

11   Q.  Now, would you look at Exhibits 153 and 154.  Do you have

12   them there?

13   A.  Yes.

14   Q.  I won't bring them up on the screen.  Can you explain to the

15   jury what are those items?

16   A.  I'll start with Exhibit 153?  153 is entitled at the top,

17   "The New Age Chemical, Incorporated Check Register."  What it

18   lists is the names of each employees, their wages, and their

19   withholdings for each period of the payroll period.  It appears

20   to be every two weeks.  And it started pay date of January 14th,

21   2005.

22          And the report goes to, I wanna say, 3/31 of 2006.  It

23   appears to be the employer copy of what would be commonly known

24   or given to employees as a check stub that lists their

25   compensation and any tax withholdings, be that federal, Social

312

1    Security, Medicare, or state tax withholdings, and then

2    subsequent net pay for each employee during that time period.

3    Q.  And was Mr. Stuart, James Stuart listed in that payroll

4    check register?

5    A.  Yes, he is.

6    Q.  And does it reflect wage payments to him during that period?

7    A.  Yes, it does.

8    Q.  And, now that covers only until, what's the end of that

9    check register?

10   A.  It lists to March 31st of 2006.

11   Q.  And what's Exhibit 154?

12   A.  Exhibit 154 on top is entitled, New Age Chemical, Ltd.

13   Journal Detail Report sorted by journal ID, posting date and

14   reference number.

15   Q.  Can you explain to the jury what is that?

16   A.  This was received in the search warrant based on -- we had

17   -- a computer individual made a copy of their computer hard

18   drive and these were subsequently looked at.  I guess they could

19   be called the books of original entry.  There's a general

20   journal which includes various accounts payable to each --

21   several individuals and/or vendors.  So it would be books of

22   original record for this time period as a journal detail report.

23   Q.  In what period of time did that journal detail report cover?

24   A.  If I remember entries posted here, October 3rd of 2006.  In

25   the detail report the final entries on the final page are dated

313

1    December 18th of 2007.

2    Q.   Do those records reflect payments to Mr. Stuart?

3    A.   Yes, they do.

4    Q.   And how frequent are the payments to Mr. Stuart reflected in

05:16  5    that record?

6    A.   Appear to be approximately every two weeks.

7    Q.   Now I want to show you what have been marked for

8    identification as Exhibits 157 through 166.  Do you want to look

9    at those and then I'll ask you some questions.

05:17  10   A.   Yes, sir.

11        (Witness peruses documents.)

12   A.   I'm finished with my review, sir.

13   BY MR. JACOBS:

14   Q.   Thank you.  Can you tell me generically what are all those

05:22  15   exhibits?

16   A.   Well, there's -- they break down into two separate

17   categories, sir.

18   Q.   Okay.  What are the two categories?

19   A.   There's categories of -- the Form 1120S, the U.S. Income Tax

05:22  20   Return for S Corporations beginning I guess in the tax year

21   ending 2003 through 2007 for an entity titled, New Age Chemical,

22   Incorporated at 3765 Kettle Court East, Delafield, Wisconsin,

23   53018.  Again, they're in order here and it begins -- they're a

24   fiscal year taxpayer so the very first tax return that is placed

05:22  25   here is ending September 30th, 2003, and the last one was

314

1  September 30th, 2007.  It included the period ending 2003,

2  period ending 2004, 2005, 2006, and 7.

3  Q.  And what's the other category of documents?

4  A.  The other category of documents is a Form 1120S, Schedule

05:23  5  K-1 which is entitled the Shareholder's Share of Income, Credits

6  and Deductions.

7      And the shareholder's name for each one of these K-1s

8  is James A. Stuart, Jr. at 2410 Hirschman Lane, at Hartland,

9  Wisconsin, 53029.  And the corporation's name is New Age

05:23  10  Chemical, Incorporated at 3765 Kettle Court East, Delafield,

11  Wisconsin, 53018.

12      Again, these K-1s are for each of those years, of

13  fiscal year ending September 30th, '03, 2003, through September

14  30th, 2007.  And I reviewed each one of the actual 1120S's, the

05:24  15  U.S. Income Corporate Tax Return for S Corporations, and each

16  one of them have that secondary form, that K-1 enclosed within.

17  Q.  All of these tax returns were found at New Age Chemical when

18  you searched it in February of 2009?

19  A.  Yes, sir.

05:24  20      MR. JACOBS:  I move Exhibits 157 through 166 into

21  evidence.

22      MR. BERNHOFT:  No objection, Judge.

23      THE COURT:  They're received.

24      (Exhibits 157-166 offered and received.)

05:24  25  BY MR. JACOBS:

315

1    Q.  Just by way of example, Special Agent Rech, I put up on the

2    screen Exhibit 162.  Just explain to the jury what, for example,

3    162 is?

4    A.  Exhibit 162 is a Schedule K-1 from a Form 1120S for the tax

05:25    5    year beginning October 1st, 2004 and ending September 30th,

6    2005.  The corporation's name is New Age Chemical, Incorporated,

7    3765 Kettle Court East, Delafield, Wisconsin, 53018.  Box G

8    lists the shareholder's name, address of James A. Stuart, Jr.,

9    at 2410 Hirschman Lane, Hartland, Wisconsin, 53029.

05:25    10           Part 3 of this K-1 lists in box 1 the ordinary

11    business income for the year in question of 94,409.  Box 9 has a

12    net Section 1231 gain or loss -- this appears to be a loss -- of

13    $14,097 and zero cents.  Box 11 has a Section 179 deduction of

14    17,387.  Box 15 has a slash A and B, alternative minimum tax,

05:26    15    AMT items.  Box A says negative $3,321 and zero cents.  Box B

16    has a negative $3,445 and zero cents.

17    Q.  Now, previously -- I want to show you what was previously

18    admitted into evidence as Exhibit 17.

19           Just give me a second.

05:27    20           Again, this is Exhibit 17 entitled, Filing History For

21    New Age Chemical, Inc. 2002 to 2010.  And do you see the bottom

22    two rows, Stuart's ownership percentage and Stuart's income per

23    K-1?

24    A.  Yes, I do, sir.

05:27    25    Q.  And were you able to compare the K-1s that you found at New

316

1    Age Chemical to that table and verify that those amounts are

2    correct?

3    A.  I did.  Do you want me to validate it now?

4    Q.  No.  Have you done it prior to coming here today?

5    A.  Yes, sir.

6    Q.  So that's an accurate summary of the earnings attributable

7    to Mr. Stuart for those years in question.

8    A.  Yes.

9    Q.  Okay.  Now, just briefly, after you -- no, let me stop.

10         Now, did you attempt to determine how much Mr. Stuart

11   had been paid during the years 2005 through 2007?

12   A.  Yes, I did.

13   Q.  And what records did you use to determine that?

14   A.  I used some of the -- a couple of the exhibits are currently

15   up here.  Shall I list the names?

16   Q.  Why don't you just describe what you did.

17   A.  Some of the records I used were the check register reports

18   that were listed that I found at the search warrant that listed

19   the -- commonly called a pay stub for each of the employees.

20   Mr. Stuart was on that list all the way through the first

21   quarter of 2006, on the check registry report.

22         I also used documents that was -- I previously

23   described in here.  That was the 1099 for 2005 and 2006, and the

24   form, I believe it was in the last packet, of the W-2 form for

25   2005 as well.

317

1    Q.  Did you use the journal on -- New Age Chemical's journal of

2    payments to Mr. Stuart?

3    A.  I did, as well.

4    Q.  And did you obtain any records from financial institutions?

05:29    5    A.  Yes, sir.

6    Q.  What financial records did you obtain?

7    A.  For the 2005 tax year I obtained records from the bank,

8    Chase Bank, that was the corporate bank of New Age Chemical

9    listing direct deposits from that bank in amounts, and I matched

05:29    10    them up to Waukesha State Bank documents, bank statements that

11    were in the name of Mr. James Stuart for the direct deposits

12    that listed payroll deposits to his account in the year 2005.

13         Also in the year 2005, there was 1099 income that was

14    also direct deposited into Mr. Stuart's Waukesha State Bank

05:30    15    accounts.

16    Q.  And were you able to trace payments from New Age Chemical to

17    Mr. Stuart's personal bank account?

18    A.  Yes, sir.

19    Q.  And where did he maintain his bank account?

05:30    20    A.  At Waukesha State Bank.

21         MR. JACOBS:  And, Your Honor, I'd like to read a

22    portion of the stipulation the parties have reached into the

23    record and then introduce the records associated with that.

24         THE COURT:  Proceed.

25         TRIAL STIPULATION NO. 7 ADMITTED

318

1          MR. JACOBS:  Paragraph 7 of the stipulation by the

2     parties reads as follows:

3          "If a representative of Waukesha State Bank, were

4     called to testify, he or she would testify that the following

5     exhibits are business records of the bank.  The representative

6     of the bank would further testify that these records were

7     contemporaneously generated by persons with knowledge of the

8     information reflected in the records and/or received by the bank

9     in the regular course of its business activity and created

10    and/or received by the bank as a regular practice as part of the

11    bank's regularly conducted activity.  The parties further

12    stipulate and agree that these exhibits can be admitted at the

13    trial in this case."

14         And these are Exhibits 71 through 89.  They consist

15    of:

16              A signature card for an account ending in 3604;

17              The monthly statements for that account for the years

18    2005, 2006, 2007;

19              Deposit tickets and deposit items into that account;

20              They include a signature card for an account ending in

21    3402 in the name of James A. Stuart, Jr.;

22              The 2006 monthly statement, and the 2007 -- I'm sorry,

23    a monthly statement in 2006 dated September 9, 2006, and the

24    2007 monthly statements for the account ending in 3402;

25              They include the deposit tickets and items for that

1   account.

2           They include a signature card for Account Number 7435

3   which is in the name of the New Age Chemical, Ltd. Drawing

4   Account for the benefit of the Delafield Trust signed by James

05:32   5   A. Stuart, Jr.

6           They include the 2007 monthly statements for that

7   account;

8           The deposit tickets and items for that account.

9           They include a signature card for account number

05:32   10   ending in 9605 in the name of James A. Stuart, Jr.;

11           Checks made to cash from account number 3402;

12           Checks made to cash from account number 3604;

13           Checks made payable to cash from account number 7435.

14           They also include a loan application and supporting

05:32   15   documentation for a loan number ending in 9692;

16           The signature card for account number 0413, and;

17           A copy of check 1519, dated August 6, 2005;

18           A loan application and supporting documentation dated

19   April 2, 2003, for a loan number ending in 2913;

05:33   20           And then certificates of deposit with account numbers

21   ending in 9605 and 1210.

22   BY MR. JACOBS:

23   Q.   And why did you need those accounts, Special Agent Rech?

24   What did you use those for?

05:33   25   A.   The Waukesha State Bank accounts were the cash inflows from

320

1    the compensation Mr. Stuart received that went into his bank

2    account.

3    Q.   Now, based on that information did you prepare summaries of

4    the payments -- compensation payments that Mr. Stuart received

5    from New Age Chemical for the years 2005, 2006 and 2007?

6    A.   Yes, I did.

7    Q.   Let me hand you then what have been marked for

8    identification as Exhibits 171, 172, and 173.

9         (Witness peruses documents.)

10   A.   I'm finished, sir.

11   BY MR. JACOBS:

12   Q.   Okay.  And do you recognize what each of those three

13   exhibits is?

14   A.   Yes, I do.

15   Q.   Can you explain what are they, generally?

16   A.   The exhibits starting with Exhibit 171 is a summary of the

17   2005 income payments for New Age Chemical to James A. Stuart.

18   First payment date is beginning on January 14th of 2005.

19        And it's important to note that the payments all the

20   way through August 31st of that year, 2005 -- excuse me, the

21   payments through August 12th of 2005, in that year, have federal

22   withholding that was also listed.

23   Q.   Let me just stop you there.  Are each of those the same type

24   of document?

25   A.   Yes, sir.

321

1  Q.  And each of them are derived from the records that you just

2  described and have been admitted here at trial?

3  A.  Yes, sir.

4  MR. JACOBS:  Your Honor, I move into evidence 171,

5  172, and 173.

6  MR. BERNHOFT:  No objection, Your Honor.

7  THE COURT:  They're received.

8  (Exhibits 171-173 offered and received.)

9  BY MR. JACOBS:

10  Q.  I'll bring up 171 to start with.  I'm going to just start

11  with the upper portion of that exhibit.

12  Again, can you explain to the jury what's summarized

13  on Exhibit 171.

14  A.  171 is a summary of the 2005 income payment from New Age

15  Chemical to James A. Stuart.  The gross wages beginning on

16  August 14th of 2005 through August 12th of 2005 have federal

17  withholding that was removed in the far right column that's

18  listed.

19  In September 15th of 2005 through December 22nd of

20  2005, in the column listed 1099 earnings, is a list of numbers

21  that equal 53,600 and zero cents.  The gross wage column equals

22  100,900 and zero cents.  The federal withholding for 2005 is

23  18,786.90.  The bottom column lists a total income payments for

24  2005 from January 14th, 2005 through December 22nd, 2005 is

25  $154,500 and zero cents.

322

1    Q.  Now, why are there multiple columns?  We have a date.  Why

2    is there a third and a fourth column with different numbers?

3    What's the difference?

4    A.  The third and the fourth column, as listed in the previous

05:38   5    item, the check registers that I found in the search warrant,

6    listed -- the pay went directly from a W-2 wage earner to listed

7    to a 1099 earner, and at that date there was no wages that we --

8    removed that we could see on the pay stub.

9    Q.  No wages that were removed?

05:38   10   A.  Excuse me.  No withholdings that were removed from the 1099

11   earnings from each of the pay stubs for that time period.

12          And then the fourth column is the cumulative total of

13   the federal withholding that was listed from the W-2 wages that

14   were listed on those, commonly referred to as the check stub

05:38   15   information that I had located in the search warrant.

16   Q.  And do you know, were these payments made to Mr. Stuart in

17   checks?

18   A.  The entirety of these were made by direct deposits into one

19   of his personal accounts at Waukesha State Bank.

05:39   20   Q.  And do you know, were they made directly by New Age Chemical

21   or were they processed by a third party?

22   A.  Processed by a third party.

23   Q.  And who was that?

24   A.  Payroll Data Services.

05:39   25   Q.  And so this is 2005.  If we turn to Exhibit 72.  Can you

323

1  explain what is -- first of all, what is Exhibit 72?

2  A.  Exhibit 172 is entitled, "The Summary of 2006 Income

3  Payments From New Age Chemical to James A. Stuart, Jr."

4  Q.  And can you explain what's reflected on this summary?

5  A.  This summary has items 1 through 24 with the correlating

6  dates for the year.  It starts out I guess you could say in the

7  fifth column over from the left is entitled, "1099 Earnings,"

8  but also has a header of "Direct Deposit Payroll."  Those six

9  items were also directly deposited into Waukesha State Bank and

10  were titled as 1099 earnings at aforementioned check stubs

11  located at the search warrant.

12       The total of that, if you go down to the bottom

13  column, is $40,200 and zero cents.

14       The next column over with information has a header of

15  "Payroll Check Information," and the column entitled, "Check

16  Number" with the various check numbers from the New Age Chemical

17  accounts, business accounts.  And finally, the final column has

18  the amount of the checks that were written out of that account.

19  For a bottom total of $130,670 and zero cents.

20       Cumulatively, the $40,200 and zero cents and the

21  $130,670 and zero cents come to the bottom total of total income

22  payments for $170,870 and zero cents.

23  Q.  Okay, now, you said the direct deposits, where did they go?

24  A.  The direct deposits went into a personal account, James A.

25  Stuart at Waukesha State Bank.

324

1  Q.  And the checks, were you able to trace those?

2  A.  Yes, I was.

3  Q.  Where did they go?

4  A.  Various personal accounts at Waukesha State Bank of

5  Mr. Stuart.

6  Q.  Now, do you know, off of what account were these checks

7  written?

8  A.  There was -- I believe in this year there was two accounts.

9  There was an account that was entitled -- it had a header under

10  New Age Chemical of a Payroll Account, and then after that they

11  were just out of another business account that New Age Chemical

12  had, business checking account.

13  Q.  And did you do a similar analysis for the year 2007?

14  A.  Yes, I did.

15  Q.  And that's Exhibit 173?  Can you describe the progression of

16  payments during 2007 to Mr. Stuart?

17  A.  The payments start January 11, 2007.  From January 11th,

18  2007, through item number 16 of July 31st of 2007, the payments,

19  total checks for deposit at Waukesha State Bank of the various

20  amounts, equal $139,440 and zero cents.

21       After 8/14/2007 to the end of December 14th, 2007, the

22  payroll checks get deposited into a Waukesha State Bank that's

23  entitled, "The New Age Chemical, Ltd. Drawing Account."

24  Q.  And in total then, how much was paid to Mr. Stuart during

25  2007 by New Age Chemical?

325

1    A.  The entirety of that final column is $87,890 and zero cents.

2    The two columns, after being added together, equal total income

3    payments for 2007 of $227,330 and zero cents.

4    Q.  And were there any income tax withholdings from those

05:44    5    payments?

6    A.  There was none.

7    Q.  Were there any withholdings from Medicare taxes?

8    A.  There was none.

9    Q.  Social Security taxes?

05:44    10    A.  There was none.

11    Q.  How about state income taxes?

12    A.  There was none.

13    Q.  How about for the year 2006, Exhibit 172, was there any

14    withholdings for that year?

05:44    15    A.  There was none.

16    Q.  Does the IRS have any record of any payments to the IRS on

17    Mr. Stuart's behalf for those years for income taxes or payroll

18    taxes?

19    A.  There was for 2005.

05:44    20    Q.  Yes.

21    A.  Not for 2006 or 2007.

22    Q.  Now, have you ever met Mr. Stuart, Special Agent Rech?

23    A.  Yes.  I have.

24    Q.  And when was that?

05:45    25    A.  It was in November of 2008.

326

1   Q.  And can you describe the circumstances under which you met

2   Mr. Stuart?

3   A.  I and a partner went out to do an initial interview at

4   Mr. Stuart's residence.  That's on Hirschman Lane in Hartland,

05:45  5   Wisconsin.  And upon arriving at the door we knocked on the

6   door, and that individual, Mr. Stuart, answered the door.  He

7   would not identify himself, and stated we were trespassing on

8   land that was not hypothecated to the public.

9         He also stated that the individual we were looking for

05:46  10   does not exist; that individual is a separate entity that has a

11   Social Security number but that it was not him.

12         And then he repeated that if we needed any information

13   that this land was hypothecated, he directed us to the Waukesha

14   County deed office.

05:46  15         This was after presenting my credentials.

16   Q.  And subsequent to searching New Age Chemical, did your

17   office receive some correspondence from Mr. Stuart?

18   A.  Yes.

19   Q.  Let me just show you what's been marked as Exhibit 170.

05:47  20   Special Agent Rech, do you recognize what Exhibit 170 is?

21   A.  I do, sir.

22   Q.  Is that, in fact, a letter sent from James Stuart to the

23   IRS?

24   A.  Yes, sir.

05:47  25         MR. JACOBS:  Your Honor, I move into evidence

327

1    Exhibit 170.

2              MR. BERNHOFT:  No objection, judge.

3              THE COURT:  Received.

4              (Exhibit 170 offered and received.)

5    BY MR. JACOBS:

6    Q.  I wonder, first of all, it's obviously identified to a

7    specific individual, do you know who that individual is?

8    A.  Yes, Francine L. Evans was my Special Agent in charge who is

9    now retired.

10   Q.  And I wondered if you could read the letter.  It's not too

11   long.

12   A.  Yes.  It's addressed again to Ms. Francine Evans, Special

13   Agent In-Charge, dated November 19th, 2009, to the Internal

14   Revenue Service, 600 North Robert Street, St. Paul, Minnesota,

15   55101.

16             "Greetings Ms. Evans:  February 19, 2009, a group of

17   persons purporting to act under the authority of the

18   Commissioner as agents of the IRS conducted a search of a

19   business located adjacent to 3765 Kettle Court East in

20   Delafield, Wisconsin and seized private property under the guise

21   of alleged violations of Title 26 U.S.C. Sections 7201 and

22   7206(1).  The aforesaid act was performed without any prior

23   notice or opportunity to defend given to me at the

24   administrative agency level.  Because the IRS is an agency of

25   the United States, and because I am entitled to administrative

328

1    due process, I, not being a U.S. citizen subject to the

2    jurisdiction of IRS, am requesting that you, in your capacity as

3    special agent in charge of criminal investigation of IRS,

4    provide in writing and in a timely manner, a specification of

05:49   5    the issues the IRS relied upon to conduct the aforesaid search

6    and seizure.

7          "Thank you very much for your cooperation in this

8    matter.

9          "Respectfully, James Arthur Stuart, Jr., in my

05:49  10    capacity as a Wisconsin national only.

11          "Mailing location, care of non-domestic mail at 3215

12    Golf Road, number 105, near Delafield, Wisconsin, zip code

13    53018.

14    Q.  And what's the date of that letter?

05:49  15    A.  The date of the letter is November 9th, 2009.

16    Q.  Are you familiar with other correspondence Mr. Stuart has

17    sent to the IRS?

18    A.  Yes, I am, sir.

19    Q.  I know some of that was reviewed earlier today with

05:50  20    Ms. Morgan, but I'd like to turn your attention to what's been

21    marked for identification as Exhibit 59.

22          And, Your Honor, pursuant to paragraph 3 of the

23    stipulation I'd move Exhibit 59 into evidence.

24          THE COURT:  It's received.

05:51  25          (Exhibit 59 offered and received.)

329

1   BY MR. JACOBS:

2   Q.   And turning your attention -- what's the date of this

3   correspondence, Special Agent Rech?

4   A.   January 22nd, 2009.

05:51   5   Q.   And to whom is it directed?

6   A.   It's directed to the United States Treasury Department,

7   Attention Secretary, and then it has an asterisk mark.

8   Q.   And can you just read the first paragraph of the letter?

9   A.   "Greetings, Secretary of the Treasury, served party:  Please

05:52   10   find enclosed formally served instruments that expressly

11   canceled United States citizenship and nationality, in marks,

12   i.e., so-called dual citizenship," end of paragraph, "from

13   inception.  As a matter of law, such has been recognized and

14   accepted by the executive department of the United States of

05:52   15   America and the government de facto of my country of domicile."

16   Q.   And I'd like to just draw your attention to a couple other

17   parts of this document.  This middle paragraph beginning with

18   "accordingly."  Can you read that?

19   A.   "Accordingly, I hereby formally request a hearing to review

05:53   20   these matters; however, if I do not hear from you or your office

21   within 30 days, it will be my understanding that you find that I

22   am not a 'taxpayer'," in quotation, "as defined by the Internal

23   Revenue Code, Title 26, Section 7701.  If I do not hear from

24   you, I will consider this matter concluded, and retroactively I

05:53   25   understand that my income was/is without the United States.

330

1    Moreover, at this time please forward any bona fide contracts

2    that you believe I have with the United States; and further,

3    note that I formally protest the currency of the United States,

4    see attached documentation incorporated hereto as actual

05:53    5    notice."

6    Q.  How many pages is this document?

7    A.  There's two pages and the third page is blank.  My third

8    page is blank.  But there's two pages, the first page, and then

9    there's a second page that appears to have two Notary Publics

05:54    10    from the State of Wisconsin on it.

11    Q.  And what's the title of the second page of this document?

12    A.  "Documentation of National Status in Regard to James Arthur

13    Stuart, Jr."

14    Q.  And then the third page?

05:54    15    A.  My third page, sir, is blank.

16    Q.  Let me move on to a different letter.  Let me show you next

17    what's been stipulated as correspondence from Mr. Stuart sent to

18    the IRS.

19           This is Exhibit 44.  And based on paragraph 3 of the

05:55    20    stipulation, Your Honor, I'd move Exhibit 44 into evidence.

21           THE COURT:  Received.

22           (Exhibit 44 offered and received.)

23           THE WITNESS:  I've reviewed it, sir.

24    BY MR. JACOBS:

05:56    25    Q.  Okay.  Let me just bring that up.  How many pages is that

331

1    letter?

2    A.   14 pages, sir.

3    Q.   And is it signed and dated?

4    A.   Yes, sir, there's a signature on the numbered page 9.

05:57    5    Q.   And what's the date?

6    A.   July 11th, 2007.  There's additional dates on the following

7    page as well.  Appears to be another letter entitled,

8    "Affidavit," with a date of July 11th of '07, as well.

9    Q.   Let's just start with the paragraph beginning at the bottom

05:57    10    of the first page.  Can you read that?  I'm going to skip to the

11    top.  Do you have the first page?  That Exhibit 44.

12    A.   Yes, sir.

13    Q.   Okay.  Paragraph numbered 2.

14    A.   "As the man, being a corporation sole and acting in the

05:58    15    capacity as Steward who has loaned" -- Steward is spelled

16    S T E W A R D -- "who has loaned his consciousness and physical

17    capacity to and acts in the capacity as the Office of Trustee

18    for the James A. Stuart, Jr. Trust has recently learned the

19    government between the taxpayer and the United States Government

05:58    20    USG," in parentheses, "a municipal corporation is complex and

21    confusing.  When filing the initial 2005 income tax return the

22    man, being a sovereign human being, erroneously believed that he

23    was the taxpayer, however, has since learned the truth of the

24    relationship between the Trust and the USG and, therefore, is

05:59    25    amending and refiling the Form 4852 filing for the year 2005."

332

1    Q.  Why don't you continue with paragraphs 3, 4 and 5.

2    A.  Paragraph 3.  "The taxpayer is James A. Stuart, Jr.," in

3    parentheses, "Trust, which is also the entity in possession of a

4    Social Security number," in parentheses, "hereinafter SSN.

05:59    5         "4.  Said Trust engages in employment for compensation

6    for personal services actually rendered.

7         "5.  Said Trust has an employment relationship with

8    New Age Chemical, Ltd.," parentheses, "previously New Age

9    Chemical, Inc., hereinafter SSNI, in Wisconsin."

06:00    10   Q.  All right.

11        THE COURT:  That will have to be the last word for

12   today.  It is now 6:00 p.m.  Our day is at a close.

13        Members of the jury, you may take your notebooks with

14   you to the jury room.  Please have a good evening and, of

06:00    15   course, do not discuss this case or allow anyone to discuss this

16   case with you.  Keep an open mind.  Do not do any research and,

17   of course, that means you cannot do any blogging or any such

18   media during the course of this trial as it may relate to this

19   case.

06:00    20        THE BAILIFF:  All rise.

21        (Jury out at 6:00 p.m.)

22        THE COURT:  Be seated, please.

23        I just want to get an update from you respecting how

24   much additional time the government believes it will need with

06:01    25   this witness and what it projects will be the case in chief with

333

1    regard to your last summary witness.

2         MR. JACOBS:  Judge, I would expect no more than 20

3    minutes with Special Agent Rech, and that our summary witness I

4    expect should take a half an hour.

06:01  5         THE COURT:  All right.  And that being so I would

6    imagine you will be able to conclude your testimony no later

7    than 10:00 o'clock.

8         MR. JACOBS:  Yeah.  Starting at 8:30, am I right,

9    Judge?

06:02  10        THE COURT:  Yes.  All right.  So the defense should be

11   prepared at that time.

12        MR. BERNHOFT:  Your Honor, could I have about four,

13   five minutes to counsel with my client?  I'd like to make a

14   scheduling advisement to the court.  I think it would be

06:02  15   beneficial to everybody.

16        THE COURT:  All right, very well.  We'll take a short

17   break.

18        (Recess taken at 6:02 p.m., until 6:06 p.m.)

19        THE COURT:  We'll go back on the record.

06:07  20        MR. BERNHOFT:  Your Honor?

21        THE COURT:  Yes.

22        MR. BERNHOFT:  I've consulted with my client and

23   conferred with my colleague, and I wanted to give the court an

24   advance advisement that my client is not going to be taking the

06:07  25   stand and testifying in his own defense.  And the defense has no

334

1    other witnesses to call for its defense in chief.  The defense's

2    intention is to rise on the record and rest upon the close of

3    all evidence for the prosecution's case in chief and then the

4    admission of remaining stipulated evidence, et cetera and the

5    administrative business that we have.

6            THE COURT:  All right.

7            MR. BERNHOFT:  So that's my advisement to the court.

8            THE COURT:  Mr. Stuart, you've heard your attorney

9    state that he has conferred with you and you have decided that

10   you do not wish to testify at the conclusion of the government's

11   case.

12           THE DEFENDANT:  That's correct.

13           THE COURT:  Do you understand that you have an

14   absolute right to testify in this case?

15           THE DEFENDANT:  Yes, sir, I do.

16           THE COURT:  And do you understand that no one can take

17   that right away from you and you must make the decision for

18   yourself as to whether you wish to testify?

19           THE DEFENDANT:  Yes, I do.

20           THE COURT:  Do you believe that you are proceeding in

21   that regard freely and voluntarily?

22           THE DEFENDANT:  Yes, I am.

23           THE COURT:  Has anyone used any threat, force or

24   intimidation to get you to waive your right to testify in this

25   case?

1          THE DEFENDANT:  No, there's not been.

2          THE COURT:  Very well.  The court does find that the

3    defendant James A. Stuart, Jr. has knowingly and voluntarily

4    waived his right to testify in this proceeding.  However,

5    inasmuch as the government has not rested its case,

6    circumstances may change, the court will check once again at the

7    end of the government's case at side bar to confirm whether or

8    not you have changed your mind, and that way it will not be

9    necessary for the jury to leave the courtroom and we can proceed

10   with dispatch.  All right?

11          THE DEFENDANT:  That sounds fair to me.

12          THE COURT:  Very well.  Is there anything else at this

13   time?

14          MR. BERNHOFT:  Your Honor, in terms of, assuming as is

15   highly likely that even upon the close of the government's

16   evidence that we'll go to side bar and confer again and confirm,

17   in terms of further scheduling I think Mr. Jacobs is taking

18   Special Agent Rech for another 20 minutes, I probably have 15

19   minutes of cross, and then we have the comp witness for the

20   government.  What were the court's thoughts in terms of jury

21   instruction charging conference and the closing argument for our

22   scheduling purposes?

23          THE COURT:  Well, at the very least it will be

24   necessary for us to break at 12:00 o'clock for another case

25   involving a boat, an admiralty proceeding.

336

1      MR. BERNHOFT:  Admiralty law.

2      THE COURT:  Yes.  Yes.  So it depends on whether or

3  not we have some time before noon to confer.

4      I'm curious, therefore, whether there are any issues

5  respecting the instructions that you know of at this point in

6  time.  And if you need to look at the instructions as currently

7  crafted what I will do is hand you another set of instructions

8  so you can look at them overnight and tell me tomorrow morning

9  if you see anything in the instructions as crafted that needs

10  attention.  And if so, we will discuss them off the record to

11  make sure that we're all in agreement or any disagreements are

12  known.  We will then go on the record and summarize any matters

13  that need attention or any objections that may be stated.

14      All right?

15      MR. BERNHOFT:  What is the court's inclination in

16  terms of giving that in terms of closing argument and

17  preparation by counsel to close?

18      THE COURT:  Well, I would envision having closings

19  tomorrow afternoon.  Unless there is something that will drag

20  this matter out until the next day.  I will tell you as it

21  stands right now my calendar is open for the balance of the day

22  on Wednesday, but Thursday it gets more dicey.

23      MR. JACOBS:  Judge, at least what I was thinking

24  Mr. Bernhoft was saying, we just want to make sure at least we

25  get the lunch hour to prepare for closings because it could be

337

1    we could be ready technically before lunch but it would be

2    cramped, and so at least give us least enough time to --

3              THE COURT:  Well, I have an hour and a half for lunch.

4              MR. JACOBS:  Yes.  But that we won't do closings

5    before lunch.

6              THE COURT:  Oh, definitely not.  No.

7              MR. JACOBS:  Okay.  Maybe I was misreading but -- you

8    know, I think we've done a pretty good job cramming this into a

9    relatively short period of time.

10             THE COURT:  I appreciate it, believe me.

11             MR. JACOBS:  Thank you, Judge.

12             MR. BERNHOFT:  Thank you, Judge.

13             THE COURT:  All right.

14             THE BAILIFF:  All rise.

15             (Proceedings concluded for the day at 6:12 p.m.)

16                         *    *    *

17

18

19

20

21

22

23

24

25

338

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF WISCONSIN

3

4        I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5  Reporter for the United States District Court, Eastern District

6  of Wisconsin, do hereby certify that I reported the foregoing

7  proceedings, and that the same is true and correct in accordance

8  with my original machine shorthand notes taken at said time and

9  place.

10 Dated this 16th day of December, 2011,

11 Milwaukee, Wisconsin.

12

13 _____
              Official Court Reporter
14            United States District Court

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2   WITNESS   EXAMINATION                          PAGE

 3   KRISTY MORGAN, GOVERNMENT WITNESS
```
```
 4        CROSS-EXAMINATION BY MR. BERNHOFT................  69

 5        REDIRECT EXAMINATION BY MR. JACOBS..............  120

 6   DAVID SCHWARZ, GOVERNMENT WITNESS

 7        DIRECT EXAMINATION BY MR. JACOBS................  136

 8   BEVERLY SCHLIPP, GOVERNMENT WITNESS

 9        DIRECT EXAMINATION BY MR. JACOBS................  152

10   TRIAL STIPULATION NO. 6

11        ADMITTED........................................  160

12        CROSS-EXAMINATION BY MR. BERNHOFT...............  184

13   ALLISON REESE, GOVERNMENT WITNESS

14        DIRECT EXAMINATION BY MR. JACOBS................  189

15        CROSS-EXAMINATION BY MR. BERNHOFT...............  217

16        REDIRECT EXAMINATION BY MR. JACOBS..............  220

17   PATRICK WALSH, GOVERNMENT WITNESS

18        DIRECT EXAMINATION BY MR. JACOBS................  223

19        EXAMINATION BY THE COURT........................  255

20        CROSS-EXAMINATION BY MR. BERNHOFT...............  255

21   DANIEL HAU, GOVERNMENT WITNESS

22        DIRECT EXAMINATION BY MR. JACOBS................  261

23        CROSS-EXAMINATION BY MR. BERNHOFT...............  281

24   JOEL NETTESHEIM, GOVERNMENT WITNESS

25        DIRECT EXAMINATION BY MR. JACOBS................  284
```

340

1         CROSS-EXAMINATION BY MR. BERNHOFT................ 299

2         REDIRECT EXAMINATION BY MR. JACOBS.............. 304

3     MATTHEW RECH III, GOVERNMENT WITNESS

4         DIRECT EXAMINATION BY MR. JACOBS................ 306

5     TRIAL STIPULATION NO. 7

6         ADMITTED....................................... 318

7

8                              * * * * *

9                       E X H I B I T S

10    NUMBER              DESCRIPTION          OFFERED  ADMITTED

11    20     111605 IRS-Stuart letter...................... 70       70

12    21     Undated letter from Stuart to IRS responding .. 72      72

13           to 11/16/05 IRS letter

14    22     1/9/06 IRS-Stuart letter...................... 73       73

15    23     1/24/06 Stuart submission to IRS.............. 75       75

16    24     3/9/2006 Stuart submission to IRS............. 78       78

17    25     4/11/06 Stuart letter to IRS.................. 236      236

18    26     6/28/06 Stuart response to IRS................ 122      122

19    26     6/28/06 Stuart response to IRS................ 236      236

20    28     8/2/06 Stuart letter to IRS................... 103      103

21    28     8/2/06 Stuart letter to IRS................... 236      236

22    29     8/28/06 Stuart letter to IRS.................. 105      105

23    33     10/6/06 Stuart letter to IRS.................. 109      109

24    36     4/10/07 Stuart letter to IRS.................. 110      110

25    44     7/11/07 Notice and Demand "Trust"............. 331      331

341

45    7/25/07 Stuart letter to IRS................... 118    118

47    8/6/07 Stuart to IRS letter................... 119    119

51    9/26/07 Stuart letter to IRS.................. 132    132

52    12/3/07 Stuart letter to IRS.................. 130    130

59    1/22/09 Stuart-Secy of Treasury letter........ 329    329

60    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

61    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

62    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

63    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

64    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

65    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

66    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

67    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

68    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

69    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical

342

70    JPMorgan Chase Bank record(s) for New Age ..... 161    161
      Chemical
113   3/24/06 Stuart-Walsh e-mail.................... 247    247
115   Article 2006 IRS Dirty Dozen.................. 250    250
132   New Age Chem Form 1120S and state tax returns . 292    292
      FYE 9/30/07
135   12/31/08 New Age Chem, Ltd. Year-end .......... 295    295
      books/records
136   12/31/08 New Age Chem, Ltd. Year-end .......... 295    295
      books/records
137   New Age Chemical Form 1120S FYE 9/30/07........ 272    272
138   Stuart K-1 FYE 9/30/07......................... 273    273
139   2/6/08 Stuart-Hau e-mail....................... 278    278
140   2/7/08 Hau-Stuart e-mail....................... 277    277
150   2005 Form 1099................................. 309    309
151   2006 Form 1099................................. 309    309
152   Correspondence between Stuart/New Age and ..... 140    140
      PDS.
153   2005-2006 Check Register Reports............... 309    309
154   10/13/2006 through 12/14/2007 Journal Detail .. 309    309
      Report
155   Withholding Statement.......................... 309    309
156   2005 Form W-3.................................. 309    309
157   9/30/03 Form 1120S............................. 315    315
158   9/30/03 Schedule K-1........................... 315    315

343

1  159  9/30/04 Form 1120S............................ 315    315

2  160  9/30/04 Schedule K-1........................... 315    315

3  161  9/30/05 Form 1120S............................ 315    315

4  162  9/30/05 Schedule K-1 for Stuart................ 315    315

5  163  9/30/06 Form 1120S............................ 315    315

6  164  9/30/06 Schedule K-1 for Stuart................ 315    315

7  165  9/30/07 Form 1120S............................ 315    315

8  166  9/30/07 Schedule K-1........................... 315    315

9  170  11/9/09 Stuart-Evans correspondence........... 328    328

10  171  2005 summary of payments to Stuart............ 322    322

11  172  2006 summary of payments to Stuart............ 322    322

12  173  2007 summary of payments to Stuart............ 322    322

13  1001  4/5/06 86C letter............................. 80     80

14  1002  4/11/06 IRS Appeals Office letter to Mr. And .. 82     82

15        Mrs. Stuart

16  1003  4/11/06 Stuart letter to IRS.................. 83     83

17  1004  5/16/06 2654C letter.......................... 91     91

18  1005  5/19/06 Stuart letter......................... 94     94

19  1006  6/13/06 letter from Stuart.................... 96     96

20  1007  6/26/06 2645C letter.......................... 97     97

21  1008  7/3/06 2644C letter........................... 98     98

22  1009  7/21/06 Stuart letter......................... 100    100

23  1012  8/9/06 2644C letter........................... 104    104

24  1014  9/12/06 2645C letter.......................... 107    107

25  1017  6/8/07 NAChem letter to Parizek............... 113    113

344