UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF WISCONSIN

3    ----------------------------------------------------------------

4    UNITED STATES OF AMERICA,          )
                                        )
5                    Plaintiff,         )    Case No. CR 10-288
                                        )    Milwaukee, Wisconsin
6         vs.                           )
                                        )    December 7, 2011
7    JAMES A. STUART, JR.,              )    8:30 p.m.
                                        )         VOLUME 3 of 3
8                    Defendant.         )

9    ----------------------------------------------------------------

10                   **TRANSCRIPT OF JURY TRIAL**
              BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11              UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:     Office of the US Attorney
14                                 By: MATTHEW L. JACOBS
                                   517 E Wisconsin Ave- Rm 530
15                                 Milwaukee, WI 53202
                                   Ph: 414-297-4106
16                                 Fax: 414-297-1738
                                   matthew.jacobs2@usdoj.gov
17   For the Defendant
     JAMES A. STUART, JR.:         The Law Office of Robert G
18   (Present)                     Bernhoft SC
                                   By: ROBERT G. BERNHOFT
19                                 207 E Buffalo St - Ste 600
                                   Milwaukee, WI 53202
20                                 Ph: 414-276-3333
                                   Fax: 414-276-2822
21                                 rgbernhoft@bernhoftlaw.com

22
     U.S. Official Reporter:       JOHN T. SCHINDHELM, RMR, CRR,
23                                 johns54@sbcglobal.net

24   Proceedings recorded by computerized stenography, transcript
     produced by computer aided transcription.
08:46 25

                                                                  345

1                 P R O C E E D I N G S (8:46 a.m.)

2               THE COURT:  Good morning.  Last night I handed you

3      instructions and I'm wondering whether or not you had a chance

4      to look at them.

08:47 5               MR. JACOBS:  I have.

6               THE COURT:  Defense counsel is not here.

7               MR. TOLLEFSON:  Your Honor, he just went to blow his

8      nose.  He'll be right back.

9               THE COURT:  All right.  We'll wait a couple moments.

08:48 10              (Mr. Bernhoft enters the courtroom after a brief

11     pause.)

12                       INSTRUCTION CONFERENCE

13              THE COURT:  The Court has handed you instructions that

14     are proposed in this case.  Have you had a chance to look at

08:48 15     them?

16              MR. BERNHOFT:  I have, Your Honor.

17              THE COURT:  Are there any issues respecting the

18     instructions as tendered?

19              MR. BERNHOFT:  I have several issues, Your Honor.

08:48 20              THE COURT:  All right.

21              MR. BERNHOFT:  First I think "prior inconsistent

22     statement — defendant" should be removed, with Mr. Stuart not

23     testifying.

24              THE COURT:  Absolutely.

08:48 25              MR. BERNHOFT:  And then I am concerned about the 4.03

346

1    unanimity.  I'm just turning to that now.  I mentioned this to

2    Mr. Jacobs the other day.  The unanimity on specific acts

3    instruction.  I object to the examples in there.

4            I mean, I think it's analogous to sort of a defense

08:49   5    theory of instruction where, as the cases say, the court sort

6    of, quote-unquote, "mouths the theory of the prosecution."

7            I think the first paragraph is crystal clear as to

8    what the jury's obligation is to find unanimity on at least one

9    of the specific acts, and I object to those examples.  I don't

08:49   10   like them, I think it muddies the water.  To me it's confusing.

11   I like that first paragraph, it's crystal clear.

12           THE COURT:  Mr. Jacobs?

13           MR. JACOBS:  Judge, my submission which included those

14   examples was based on the guidance from the Seventh Circuit's

08:50   15   Pattern Jury Instructions.  While the first paragraph may be

16   clear to lawyers, at least the committee suggests giving

17   examples so that the jury understands what that means.  So I

18   believe -- I think it's accurate and a good way to explain the

19   concept of unanimity to the jury.

08:50   20           THE COURT:  I'll look at it with the defense concern

21   in mind.

22           MR. BERNHOFT:  Thank you, Your Honor.

23           And one last issue, again, assuming when the

24   government rests its case in chief and the Court does a

08:50   25   confirming voir dire of Mr. Stuart respecting his right to

1    testify, we would request Pattern Instruction 3.01, Defendant

2    Does Not Testify.

3              THE COURT:  Mr. Jacobs?

4              MR. JACOBS:  I think that's correct, Your Honor.

08:51    5              THE COURT:  It will be added.

6              MR. BERNHOFT:  Thank you, Judge.  That's all I have.

7              THE COURT:  Mr. Jacobs?

8              MR. JACOBS:  Judge, I don't have any further comments

9    on the jury instructions.

08:51    10              THE COURT:  Very well.  Are you otherwise ready to

11    proceed?

12              MR. JACOBS:  Yes.

13              MR. BERNHOFT:  Yes.

14              THE COURT:  Bring out the jury, please.

08:52    15              (Jury in at 8:52 a.m.)

16              THE COURT:  Good morning.  Please be seated.

17              You may continue.

18              (Brief pause.)

19              THE COURT:  You may proceed.

08:54    20              MR. JACOBS:  Thank you.

21              Your Honor, I believe when I left off I had

22    Exhibit 41 -- I think that's where I left off.  And I wonder if

23    I could display that to the jury.

24         MATTHEW RECH III, GOVERNMENT WITNESS, PREVIOUSLY SWORN

25                   CONT'D DIRECT EXAMINATION

348

BY MR. JACOBS:

Q.   Special Agent Rech, I don't recall specifically where I left off yesterday with Exhibit 41, so would you remind us all what is Exhibit 41?

A.   Excuse me, sir, I think it might have been Exhibit 44.

Q.   44?

A.   Possibly?

Q.   Sorry.  I'll go to 44.  Do you have Exhibit 44 with you there?

A.   I do, sir.

Q.   Okay.  Would you tell the jury, what is Exhibit 44?

A.   Exhibit 44 is a Notice and Demand from James A. Stuart, Jr., in parentheses, "Trust," 2410 Hirschman Lane, Hartland, Wisconsin, 53029.  And it's addressed to the Internal Revenue Service, Department of the Treasury, regarding a W-2 for the tax year 2005, income for tax year 2005.  And it begins "To Whom It May Concern."

Q.   What is the date of that document?

A.   On page 9 it's signed and dated July 11, 2007.

Q.   I'd like to -- I think we had read the bottom of page 1, beginning on paragraph 2.  I'd like to then turn to page 2.  And if you could read -- again, this may be repetitive, but to put it in some context, would you read the paragraphs 3 through 11.

A.   Paragraph 3.

        "The taxpayer is James A. Stuart, Jr.," in parentheses

349

1    "trust," "which is also the entity in possession of a Social

2    Security number," in parentheses, "hereinafter SSN."

3            "Number 4.  Said trust engages in employment for

4    compensation for personal services actually rendered.

08:57   5            "5.  Said trust has an employment relationship with

6    New Age Chemical, Ltd.," in parentheses, "previously New Age

7    Chemical, Inc.," in parentheses, "hereinafter SSNI, in

8    Wisconsin."

9            "6.  Said trust is an indentured trust, created by the

08:58   10   Social Security Administration," in parentheses, "hereinafter

11   SSA," also in parentheses, "See: Attached SSA indenture."

12           "7.  The James A. Stuart Jr. Trust performs its

13   actions through its trustee.

14           "8.  The person serving said Trustee's cognitive

08:58   15   capacity is a Kingdom of Israel based stewardship," parentheses,

16   "see:  Attached affidavit."

17           "9.  Said stewardship is also a corporation sole by

18   nature.

19           "10.  Said stewardship is bound under the law of

08:58   20   consecration by a prior covenant with God," in parentheses, "the

21   King of Kings.

22           "11.  The law of consecration requires recognition

23   that by His creation of this earth and everything on it, God,"

24   in parentheses, "the Creator," owns everything."

08:59   25   Q.  Okay.  And if we continue to the third page of this

350

1    document, if you could read paragraph 22.

2    A.   "22.   SSA created a Social Security account number,"

3    parentheses, "SSN," "which may serve as a taxpayer

4    identification number," parentheses, "hereinafter TIN," "so that

5    together they uniquely identify said Trust from any other person

6    that may have a similar name," parentheses, "like the man," end

7    parentheses; "thus eliminating the possibility of confusing the

8    man with the Trust; though the Trust's name has some

9    similarities to the man's name, one can never confuse the Trust

10   with the man when the Trust's name is accompanied by its SSN.

11          "The SSN also cannot be misconstrued as if it were,"

12   in quotations, "the man's number," end quotations, "because

13   God's law requires that his covenant children cannot be

14   numbered."

15   Q.   Thank you.  Now next I'd like to show you what's been marked

16   for identification as Exhibit 175.

17          Special Agent Rech, do you recognize what Exhibit 175

18   is?

19   A.   Yes, I do.

20          MR. JACOBS:  Your Honor, I'd like to read into the

21   record a portion of the stipulation reached by the parties.

22          THE COURT:  Proceed.

23                TRIAL STIPULATION NO. 13

24          MR. JACOBS:  Paragraph 13 of the stipulation provides

25   that:

351

1    "If a representative of the Wisconsin Department of

2    Motor Vehicles were called to testify, he or she would testify

3    that the following exhibits are official records maintained by

4    the DMV in the ordinary course of its operation.  The

5    representative of the DMV would further testify that these

6    records were contemporaneously generated by persons with

7    knowledge of the information reflected in the records and/or

8    received by the DMV in the regular course of its business

9    activity and created and/or received by the DMV as a regular

10   practice as part of the DMV's regularly conducted activity.  The

11   parties further stipulate and agree that these exhibits can be

12   admitted at the trial in this case."

13          And in this regard, Your Honor, Exhibit 175, which is

14   identified as the driver's license renewal application for James

15   A. Stuart Jr., dated September 6, 2006.  I would move

16   Exhibit 175 into evidence.

17          THE COURT:  It's received.

18          (Exhibit 175 offered and received.)

19   BY MR. JACOBS:

20   Q.  And Special Agent Rech, if I can draw your attention to the

21   second page of Exhibit 175, can you tell the jury what is that?

22   A.  It's a State of Wisconsin Driver's License Renewal

23   Application.

24   Q.  And who is it for?

25   A.  James A. Stuart, Jr., 2410 Hirschman Lane, Hartland,

352

1    Wisconsin, 53029.

2    Q.  And is it dated?

3    A.  Yes, sir.

4    Q.  And what's the date on that?

09:02  5    A.  September 12th, 2006.

6    Q.  And does it reflect that there is a Social Security number

7    provided by Mr. Stuart when applying for his driver's license?

8    A.  Yes, it does.

9    Q.  Now, I note on the copy I've displayed here there's a black

09:03  10   box; is that how the original document looks?

11   A.  (No response.)

12   Q.  Up near Social Security number.  I'm sorry.

13   A.  No, sir.

14   Q.  That's just been redacted for purpose of trial?

09:03  15   A.  Correct.

16   Q.  And am I correct that instead there is the full handwritten

17   Social Security number for Mr. Stuart reflected on his driver's

18   license application?

19   A.  Yes.

09:03  20   Q.  Next, Special Agent Rech --

21        I'm sorry, Judge, next I'd like to read into the

22   record another portion of the stipulation entered into by the

23   parties.  That is --

24        I actually have three separate paragraphs I'd like to

09:04  25   read into and introduce records associated with that

353

1     stipulation.

2              THE COURT:  Proceed accordingly.

3                      TRIAL STIPULATION NO. 9

4              MR. JACOBS:  Paragraph 9 of the stipulation provides

5     that:

6              "If a representative of the Wisconsin Department of

7     Revenue were called to testify, he or she would testify that the

8     following exhibits are true and accurate copies of the Wisconsin

9     Income Tax Returns, each of which is accompanied by a copy of

10    the U.S. Income Tax Return, received by the Wisconsin Department

11    of Revenue for James A. Stuart, Jr., for the indicated years."

12             Exhibit 92 is the 2001 (sic) Wisconsin 1, Form 1,

13    Income Tax Return in the name of James A. Stuart, Jr. and

14    Marjorie Stuart.

15             Exhibit 93 is the 2004 Wisconsin 1 Income Tax Return

16    in the names of James A. Stuart, Jr. and Marjorie Stuart.

17             Exhibit 94 is the 2005 Wisconsin 1 Income Tax Return

18    in the name of James A. Stuart, Jr.

19             Exhibit 95 is the Notice of Amount Due issued to James

20    A. Stuart on the assessment of additional tax for 2005 dated

21    July 10, 2006.

22             And, Your Honor, I would move into evidence

23    Exhibits 92, 93, 94 and 95.

24             THE COURT:  Is there any objection?

25             MR. BERNHOFT:  None, Your Honor.

354

1          THE COURT:  They're received.

2          (Exhibits 92-95 offered and received.)

3                    TRIAL STIPULATION NO. 10

4          MR. JACOBS:  And then paragraph 10 indicates that:

5          "The representative of the Department of Revenue would

6     further testify that the following exhibits are true and

7     accurate copies of the described documents issued or received by

8     the Department of Revenue on or about the indicated date.  The

9     parties further stipulate and agree that these exhibits can be

10    admitted at the trial in this case."

11         That is, Exhibit 96, a Department of Revenue notice of

12    the amount due issued to James A. Stuart, Jr. on the assessment

13    of additional tax for 2005 dated July 10, 2006.

14         Exhibit 97, Stuart letter appealing Department of

15    Revenue notice of amount due dated July 13, 2006.

16         Exhibit 98, Department of Revenue Notice of Action on

17    Petition for Redetermination filed by Stuart dated October 30,

18    2006.

19         And I would move into evidence Exhibits 96, 97, and

20    98.

21         MR. BERNHOFT:  No objection, Your Honor.

22         THE COURT:  Received.

23         (Exhibits 96-98 offered and received.)

24                    TRIAL STIPULATION NO. 11

25         MR. JACOBS:  Paragraph 11 provides:

1      "If a representative of the Wisconsin Tax Appeals

2   Commission were called to testify, he or she would testify that

3   the following exhibits are true and accurate copies of the

4   described pleadings or other submissions to the Commission in

09:06   5   connection with the *James A. Stuart, Jr. vs. Wisconsin

6   Department of Revenue*, Docket No. 06-I-282.  The parties further

7   stipulate and agree that these exhibits can be admitted at the

8   trial in this case."

9          Those are Exhibits 99, Stuart motion for Determination

09:06   10   of Status, dated December 11, 2006, with cover letter.

11          Exhibit 100, Stuart submission to Tax Appeals

12   Commission, treated as amended Petition for Redetermination,

13   dated February 9, 2007.

14          Exhibit 101, Department of Revenue Answer to Amended

09:07   15   Petition For Redetermination, dated February 27, 2007.

16          Exhibit 102, Department of Revenue Notice of Motion

17   and Motion for Summary Judgment with cover letter, supporting

18   affidavit, and exhibits, dated March 5, 2007.

19          Exhibit 103, Department of Revenue Brief in Support

09:07   20   Motion for Summary Judgment, dated March 5, 2007.

21          Exhibit 104, Tax Appeals Commission Briefing Order,

22   dated March 13, 2007.

23          Exhibit 105, Stuart response with cover letter,

24   attachments, memorandum of law, and exhibits, dated March 20,

09:07   25   2007.

356

1    And Exhibit 106, the Department of Revenue Reply

2    Brief, dated April 2, 2007.

3    Exhibit 107, Stuart Reply to Department of Revenue

4    Reply with cover letter, dated April 26, 2007.

09:07    5    And Exhibit 108, Wisconsin Tax Commission Ruling and

6    Order in *Stuart vs. Wisconsin Department of Revenue*,

7    Docket No. 61-I-682, dated June 7, 2007.

8    And, Your Honor, with that I would move into evidence

9    Exhibits 99 through 108.

09:08    10    MR. BERNHOFT:  No objection, Your Honor.

11    THE COURT:  Received.

12    (Exhibits 99-108 offered and received.)

13    BY MR. JACOBS:

14    Q.  Special Agent Rech, I'm handing you what's been marked for

09:08    15    identification as Exhibit 108, the last of those documents I

16    moved into evidence.  Can you take a look at that document.

17    (Witness peruses document.)

18    A.  All right.

19    BY MR. JACOBS:

09:09    20    Q.  Do you recognize what that is?

21    A.  Yes.

22    Q.  What is it?

23    A.  It's a State of Wisconsin Tax Appeals Commission, with James

24    A. Stuart, Jr. being the petitioner, versus Wisconsin Department

09:09    25    of Revenue being the respondent, and it's entitled "A Ruling and

357

1    Order."

2    Q.  I'd like to turn your attention to the third page of that

3    document, paragraph 2.

4    A.  Is that third page including the cover page?

09:10  5    Q.  Yes.  It's the second page of the decision; am I right?

6    A.  Correct.

7    Q.  Okay, could you read paragraph 2?

8    A.  "Under date of July 13th, 2006, petitioner filed with the

9    Department an objection to the assessment, which the Department

09:10  10   treated as a timely petition for redetermination.  In his

11   objection, petitioner asserted that his 2005 wages did not

12   constitute," in quotation, 'wages,' end quotation, "reportable

13   as income for federal or Wisconsin income tax purposes."

14   Q.  And in this document who is the petitioner that they're

09:10  15   referring to?

16   A.  The petitioner is James A. Stuart, Jr.

17   Q.  And if you would turn to the third page of the decision,

18   paragraphs 14 and 15.  Can you read those paragraphs to the

19   jury?

09:11  20   A.  Yes.

21        "14.  Petitioner filed a Wisconsin Individual Income

22   Tax Return for the year at issue as a full-year Wisconsin

23   resident.  On that return, petitioner reported his federal

24   adjusted gross income as totaling $631.00 which included no wage

09:11  25   income.  Robertson affidavit, EX4.

358

1    "15.  Attached to petitioner's 2005 Wisconsin Income

2    Tax Return were a 2005 IRS Form 4852, Substitute Form W-2 and a

3    corrected 2005 IRS Form 1099-MISC," miscellaneous, "apparently

4    prepared by petitioner, that reported zero income paid to him by

09:12    5    New Age Chemical for that year."  In parentheses, "Robertson

6    affidavit, EX4," end parentheses."

7    Q.  And if you could turn to the sixth page of the decision and

8    read the bottom paragraph.

9    A.  "In his petition and subsequent filings, petitioner relies

09:12    10    on a litany of tired tax protestor legal arguments, apparently

11    to delay or avoid paying state income taxes for the year at

12    issue.  These arguments and ones like them have been

13    consistently rejected in prior cases before the Commission and

14    the courts.  They are groundless and frivolous, and have never

09:13    15    prevailed in Wisconsin, nor, as far as the Commission is aware,

16    in any court in the country.

17    "See *Tracy v. Department of Revenue*, 133 Wis.2d 151,"

18    in parentheses, "CT APP 1986," end parentheses, "COV Department

19    of Revenue, WTAC Docket No. 05-I-79," in parentheses, "December

09:13    20    12th, 2005," end parentheses."

21    Q.  And then finally if you turn to the last page, or page 7, I

22    should say, and if you could read the first full paragraph on

23    that.

24    A.  "There is no genuine issue of material fact in this case,

09:14    25    and the Department is entitled to summary judgment as a matter

1    of law.  In addition, in light of the well-established authority

2    cited above, petitioner's claims are groundless, frivolous, and

3    a waste of state resources.  Petitioner is therefore subject to

4    an additional assessment in the amount of $300.00 pursuant to

5    Wisconsin Statute, Section 73.01(4)(am)."

6    Q.  Do you have the last page?  I think it's the last page of

7    that document.

8    A.  Yes.

9    Q.  What does that indicate?

10   A.  The last page has the title of Wisconsin Tax Appeals

11   Commission, 5005 University Avenue, Suite 110, Madison,

12   Wisconsin, 53705.  And it's entitled "Notice of Appeal

13   Information."

14        And underneath that it states "Notice of rights for

15   rehearing or judicial review, the times allowed for each, and

16   the identification of the party to be named as respondent."

17        MR. JACOBS:  And, Your Honor, I'd like to read into

18   the record another paragraph of the stipulation in this case,

19   paragraph 12.

20        THE COURT:  Proceed.

21             TRIAL STIPULATION NO. 12

22        MR. JACOBS:  Paragraph 12.

23        "The representative of the Wisconsin Tax Appeals

24   Commission would further testify that the petitioner, James A.

25   Stuart, Jr., did not file either a petition for rehearing or for

360

1    judicial review of the decision of the Wisconsin Tax Appeals

2    Commission in *Stuart vs. Wisconsin Department of Revenue*,

3    Docket No. 61-I-682, entered on June 7, 2007."

4    BY MR. JACOBS:

09:15    5    Q.   There are a few additional documents I'd like to show you,

6    Special Agent Rech.

7            First, Your Honor, if I could read a portion of the

8    stipulation again into the record in connection with one of

9    these exhibits.  This is paragraph 17.

10                   TRIAL STIPULATION NO. 17

11           MR. JACOBS:  "If a representative of Lake County

12   Publications, Delafield, Wisconsin, were called to testify, he

13   or she would testify that Exhibit 174 is a true and accurate

14   copy of a letter from Jim Stuart that was received by and

09:16   15   published in the opinion section of the December 21st, 2006

16   edition of the Lake County Reporter.  The parties further

17   stipulate and agree that this exhibit can be admitted at the

18   trial in this case."

19           And, Your Honor, I would move Exhibit 174 into

09:16   20   evidence.

21           MR. BERNHOFT:  No objection.

22           THE COURT:  Received.

23           (Exhibit 174 offered and received.)

24   BY MR. JACOBS:

09:16   25   Q.   Special Agent Rech, do you have there Exhibit 174?

361

1    A.   Yes, I do.

2    Q.   And let me -- I'd like you to -- how many pages is that

3    exhibit?

4    A.   Two pages.

09:17    5    Q.   And can you read the first part on the first page?

6    A.   It's entitled, "Obligation to Pay Income Tax Merely a Myth."

7         "To the editor:  Although I certainly sympathize with

8    Mr. Art Schaafsma in his letter expressing his frustration at

9    the taxing mechanism in this country, his frustration is not

09:17    10   productive unless he, and all of us, are willing to stop burying

11   our noses," in quotation, 'Desperate Housewives,' end quotation,

12   "and other entertaining past-times and start paying attention to

13   the workings of government.

14        "The fact is, most of us do not even owe the income

09:18    15   tax, but if you do not know the law, you will think you do.  Our

16   Constitution affords many lawful means of taxation, however, the

17   unapportioned direct income tax is not one of them.  It all

18   comes down to jurisdiction, and in this case, the jurisdiction

19   of the federal government within the states and over its

09:18    20   sovereign citizens.

21        "To simplify it further, the federal government only

22   has jurisdiction in federal areas and not in areas owned by the

23   sovereign states.  A federal zone is:  Washington, D.C., Guam,

24   Puerto Rico, military bases, et cetera.  People deriving money

09:18    25   from a federal source are considered privileged and subject to

362

1    the income tax, as well.  But, those who do not derive their

2    earnings from a federal source, and work for a for-profit

3    company, are most certainly not subject to this insidious tax.

4    The same goes for the state income tax.

5        "In Article I, Section 10, of the Constitution of the

6    United States of America, it clearly says that a state cannot

7    demand payment of debt in anything other than gold or silver

8    which our federal government conveniently confiscated in the

9    1930s leaving us with fiat notes worth nothing.

10        "Now, knowing that, the knowledgeable sovereign

11    citizen, instead of complaining and paying up, should be asking

12    the State of Wisconsin," quotations, 'How can I pay you this tax

13    when there is no gold or silver to the pay you with?'"  End

14    quotations.  "This would force the states to then go to the

15    federal government and demand the restoration of gold and

16    silver.

17        "Then we would look at no more inflation, more

18    responsible methods of raising revenue, and overall prosperity.

19    The reason we don't know these simple truths can be traced back

20    to our state-run school systems, where absolutely no emphasis is

21    placed on civics or the Constitution.

22        "The fact that most do not owe the income tax is a

23    truth, but if no objection is raised, then in the eyes of the

24    government, there is no objection, and we can continue to

25    voluntarily pay a tax we do not owe forever.  If you want to

363

1    know the truth you must seek it out for yourself.

2          "Don't ask your accountant or a lawyer, because they

3    derive their lucrative incomes at your expense.

4          "Jim Stuart, Delafield."

5    BY MR. JACOBS:

6    Q.   Next, Special Agent Rech, I want to hand you what have been

7    marked for identification as Exhibits 147, 148, and 149.

8          (Witness peruses documents.)

9    A.   Okay.

10   BY MR. JACOBS:

11   Q.   Do you recognize what each of those exhibits is?

12   A.   I do.

13   Q.   Okay.  And is each of those -- has each of those been

14   certified by the Secretary of Treasury as being an authentic

15   record of the absence of records?

16   A.   Yes.

17   Q.   For example, what is 147?

18   A.   147 is entitled a "Certification of Lack of Record for the

19   Taxpayer Identification Information," who's listed James A.

20   Stuart, Jr. of 3215 Golf Road, unit 254, Delafield, Wisconsin,

21   53018.  And description of information is the U.S. Individual

22   Income Tax Return, Form 1040 for the periods December 31st,

23   2006, December 31st, 2007, December 31st, 2008, December 31st,

24   2009, and December 31st, 2010.

25          MR. JACOBS:  Your Honor, I'd move the IRS Certificate

364

1    of Lack of Record in Exhibit 147 into evidence.

2           THE COURT:  Is there any objection?

3           MR. BERNHOFT:  None, Your Honor.

4           THE COURT:  Received.

09:23   5           (Exhibit 147 offered and received.)

6    BY MR. JACOBS:

7    Q.  And what is 148?

8    A.  148 is a Certification of Lack of Record.

9    Q.  For what taxpayer is that?

09:23  10    A.  Taxpayer name is New Age Chemical, Incorporated.

11    Q.  And for what periods does it certify a lack of record?

12    A.  September 30th, 2008, September 30th, 2009, September 30th,

13    2010.

14    Q.  Does it indicate what records are not on file with the IRS?

09:24  15    A.  Yes.

16    Q.  What are those?

17    A.  U.S. Corporation Income Tax Return, Form 1120.

18           MR. JACOBS:  Your Honor, I'd move that Certificate of

19    Lack of Record for New Age Chemical, Inc. into evidence,

09:24  20    Exhibit 148.

21           MR. BERNHOFT:  No objection, Judge.

22           THE COURT:  Received.

23           (Exhibit 148 offered and received.)

24    BY MR. JACOBS:

09:24  25    Q.  And finally, Exhibit 149, Special Agent Rech, what is that?

A.   It's a Certificate of Assessments, Payments and Other

Specified Matters.

Q.   For what entity does it pertain to?

A.   New Age Chemical, Ltd., James A. Stuart, Jr., general

partner.

Q.   And what records does it indicate that the IRS has no record

of?

A.   The Form 1040 for the U.S. Partnership Return of Income for

tax period September 2007.

Q.   Is that right, Form 1040?

A.   I'm sorry, Form 1065.

Q.   What's a Form 1065?

A.   A Form 1065 is an information return that a partnership has

to file that lists the earnings of the partnership for the

specified year.

Q.   And according to those records does the IRS have any record

of receiving partnership returns for the entity called New Age

Chemical, Ltd. for the years 2007 through 2010?

          (Witness peruses documents.)

A.   No record of return for those years.

          MR. JACOBS:  Your Honor, I'd move that Certificate of

Lack of Record, Exhibit 149, into evidence.

          MR. BERNHOFT:  No objection, Your Honor.

          THE COURT:  Received.

          (Exhibit 149 offered and received.)

1      MR. JACOBS:  Your Honor, I'd like to read an

2  additional portion of the stipulation into the record, that is,

3  paragraph 16.

4                TRIAL STIPULATION NO. 16

5      MR. JACOBS:  It provides that:  "If a representative

6  of the United States Department of State were called to testify,

7  he or she would testify that the following exhibits are official

8  records maintained by the State Department in the ordinary

9  course of its operation.  The representative of the State

10 Department would further testify that these records were

11 contemporaneously generated by persons with knowledge of the

12 information reflected in the records and/or received by the

13 State Department in the regular course of its business activity

14 and created and/or received by the State Department as a regular

15 practice as part of its official activity.  The parties further

16 stipulate and agree that these exhibits can be admitted at the

17 trial in this case."

18      And those are Exhibits 179 and 180.  179 is the

19 certified copy of passport application for James A. Stuart, Jr.,

20 and Exhibit 180 is the Certification of Absence of Public

21 Record, of a Certificate of Loss of Nationality for James A.

22 Stuart.

23      And I would move Exhibits 179 and 180 into evidence,

24 Your Honor.

25      MR. BERNHOFT:  No objection, Judge.

367

1          THE COURT:  They're received.

2          (Exhibits 179-180 offered and received.)

3          MR. JACOBS:  Your Honor, then I would like to read

4    into the record paragraph 18 of the stipulation which provides:

5                    TRIAL STIPULATION NO. 18

6          MR. JACOBS:  "If a representative of the Waukesha

7    County Treasurer were called to testify, he or she would testify

8    that the following exhibits are official records maintained by

9    the Waukesha County Treasurer in the ordinary course of its

10   operation.  The representative of the Waukesha County Treasurer

11   would further testify that these records were contemporaneously

12   generated by persons with knowledge of the information reflected

13   in the records and/or received by the Waukesha County Treasurer

14   in the regular course of its business activity and created

15   and/or received by the Waukesha County Treasurer as a regular

16   practice as part of the Waukesha County Treasurers's regularly

17   conducted activity.  The parties further stipulate and agree

18   that these exhibits can be admitted at trial in this case."

19          And among those documents I would move into evidence

20   would be Exhibits 206, 207, and 208:

21          The 2006 Waukesha County Real Estate Property Tax Bill

22   for the property located at 2410 Hirshman Lane in Hartland,

23   Wisconsin;

24          The 2005 Waukesha County Real Estate Property Tax Bill

25   for that same property;

368

1          And the 2004 Waukesha County Real Property Tax Bill

2     for that same property.

3          And move Exhibits 206, 207, and 208, Your Honor.

4          MR. BERNHOFT:  No objection.

09:29   5          THE COURT:  Received.

6          (Exhibits 206-208 offered and received.)

7     BY MR. JACOBS:

8     Q.  And Special Agent Rech, I'd like you to just briefly look at

9     Exhibits 206, 207, and 208.

09:30  10          (Witness peruses documents.)

11     BY MR. JACOBS:

12     Q.  And are you familiar with those three exhibits?

13     A.  Yes.

14     Q.  Can you explain to the jury what those reflect?

09:30  15     A.  206 is a tax bill details of the real property tax bill of

16     2410 Hirschman Lane, with two transactions posted in 2007.  One

17     transaction tax was paid $3,272.06, and -- that was on January

18     31st, 2007.  There was also a transaction on July 18th of 2007

19     for a payment of $3,228.54.

09:31  20     Q.  And so that reflects that the 2006 property taxes for

21     Mr. Stuart's home was paid in 2007?

22     A.  Yes.

23     Q.  And then 207, does that reflect that the 2005 real estate

24     taxes for Mr. Stuart's home in Hartland were paid in 2006?

09:31  25     A.  Yes.

369

1    Q.  And then finally, Exhibit 208 reflect that the 2004 real

2    estate taxes for Mr. Stuart's home were paid in 2005.

3    A.  Yes.

4           MR. JACOBS:  Judge, that's all I have for this

09:32    5    witness.

6                        CROSS-EXAMINATION

7    BY MR. BERNHOFT:

8    Q.  Good morning, Special Agent Rick.

9    A.  Good morning, sir.

09:33    10          MR. BERNHOFT:  Mr. Jacobs, is it possible for sake of

11   convenience to put up 59?  Otherwise I can go up to the Elmo.

12          MR. JACOBS:  Is that a letter?

13          MR. BERNHOFT:  Yes.  It's a notarized document.

14   Thank you very much.

09:33    15   BY MR. BERNHOFT:

16   Q.  Special Agent Rick, on the screen there's Exhibit 59 that's

17   been admitted as evidence in the case.  Can you take a look at

18   those notary signatures down there about two-thirds of the way

19   down the page?

09:33    20   A.  I see it.

21   Q.  And can you tell me who notarized this -- first of all, just

22   again for the record can you tell me what that document is?

23   A.  I see a "Re notice pursuant to Title 26 U.S.C.,

24   Section 6001, request for due process."

09:34    25   Q.  All right.  And I believe in the upper left-hand corner this

                                                              370

1    is a document that Mr. Stuart sent to the Secretary of the

2    Treasury in Washington, D.C.; is that correct?

3    A.  Yes, sir.

4    Q.  Thank you.  And who notarized this document for Mr. Stuart?

5    A.  It says Rich Schlipp.

6    Q.  Do you know who Richard Schlipp is?

7    A.  Yes, sir.

8    Q.  And who is Richard Schlipp?

9    A.  Husband of Beverly Schlipp.

10   Q.  And Beverly Schlipp is Mr. Stuart's sister and 30 percent

11   owner of New Age?

12   A.  Yes, sir.

13   Q.  Thank you.  Now, Special Agent Rech, on direct you testified

14   briefly about how you came to investigate Jim Stuart; is that

15   correct?

16   A.  Yes, sir.

17   Q.  And you had mentioned something about the case being

18   referred to you.  Can you describe that in a bit more detail

19   precisely how you came to have the Stuart file for

20   investigation?

21   A.  There's many ways that we as special agents have cases and

22   one of them would be a referral, what is known as the Civil

23   Division of the Internal Revenue Service, as opposed to myself

24   who is a member of the Criminal Investigative Division of the

25   Internal Revenue Service.  The Civil Division is a division that

371

1    typically handles what most people would describe as audits,

2    personal or individual, and oftentimes they would refer a case

3    for potential criminal investigation to our office.

4    Q.   And is that, in fact, the referral mechanism that led you to

5    have the Stuart file for investigation?

6    A.   That's correct.

7    Q.   And which division of civil did it come from?  Was it SB/SE,

8    Small Business/Self-Employed?

9    A.   I believe so, yes.

10   Q.   Special Agent Rech, did you have any interaction with the

11   Frivolous Correspondence Unit, IRS, Ogden, Utah?

12   A.   Yes, sir.

13   Q.   And could you describe your interactions with the Frivolous

14   Correspondence Unit in Ogden?

15   A.   I placed one phone call to the FRV.  I do not know -- I

16   cannot recall the date of that phone call.

17   Q.   Could you explain that acronym you just used for the jury's

18   sake?

19   A.   The Frivolous Return Center?

20   Q.   Right.  Okay.  And why did you place that call?

21   A.   I saw a document that was stamped with what I believed was a

22   Frivolous Return Center stamp.

23   Q.   And so what was your purpose in then calling the FRP (sic)

24   in Ogden, Utah?

25   A.   To see if they had any information regarding this file or

1    any other additional documentation and to direct, if there was,

2    to my attention.

3    Q.  And did they have either additional information or

4    additional documents?

09:37    5    A.  The documents were continued to send to me from that -- from

6    that division.  I don't know if it was a result of that phone

7    call, sir.

8    Q.  All right.  What other way would they decide to send you

9    documents respecting the Stuart investigation?

09:37    10    A.  Upon initiation of this investigation by criminal

11    enforcement I placed what would be called a criminal enforcement

12    position lock on the case according to his name and Social

13    Security identification number.  So any correspondence that

14    would be -- that would come to the service center would be sent

09:38    15    to my attention.  If it had his identifiable properties on it,

16    it would come to me.

17    Q.  Could you describe in a bit more detail precisely -- well,

18    withdraw that.

19          This -- isn't that referred to as placing a 914 freeze

09:38    20    code on Mr. Stuart's file?  Is that fair?

21    A.  That would be the official code number, correct.

22    Q.  Right.  And where do you place that freeze code?

23    A.  Do you mean what division?

24    Q.  No.  What are you doing with that freeze code?  What are you

09:38    25    looking at when you put that code identifier so everybody else

1   in the IRS knows that you have the case in the Criminal

2   Investigation Division?

3   A.  Well, we submit a form and it gets entered in that the

4   freeze code gets identified so that -- I guess as I described --

5   any information that would come in regarding that taxpayer would

6   be directed to me, in his case.  Or that if anybody else looked

7   at the file they would have the ability to know that this case

8   was a current criminal investigation coded file.

9   Q.  All right.  Thank you.

10         Your Honor, may I approach the Elmo to query the

11   witness?

12         THE COURT:  You may.

13         MR. BERNHOFT:  Thank you.

14   BY MR. BERNHOFT:

15   Q.  Special Agent Rech, I'm going to hand you a copy of what's

16   been admitted as Exhibit 44 to refresh your memory about this

17   exhibit.  Could you take a look at that, please.

18   A.  Sure.

19   Q.  Thank you.

20         (Witness peruses document.)

21   BY MR. BERNHOFT:

22   Q.  And what is that document, Special Agent Rech?

23   A.  There's several documents.

24   Q.  Can you tell me what the face page says?  Is it fair to say

25   that's a letter from Jim Stuart to somebody?

09:39
09:39
09:39
09:40
09:41

374

1    A.   That's correct, sir.

2    Q.   And who is he sending that document to?

3    A.   To the Internal Revenue Service, Department of Treasury.

4    Q.   Thank you.  Could I have that back, please?

5    A.   Sure.

6    Q.   Thank you.  Special Agent Rech, I'm going to direct your

7    attention to page 5 of this notice and demand from Jim Stuart.

8    And I'm just going to ask you to take a look briefly at -- for

9    context.  This is page 5 of Exhibit 44.  I'm going to go down

10   and ask you to look at paragraphs 45 and 46.

11          And Special Agent Rech, could you read paragraph 45 to

12   the jury, please?

13   A.   "45.  The James A. Stuart, Jr. Trust, through the actions of

14   its Trustee, and after failing to find a competent tax

15   professional to advise the Trust of any tax liability it might

16   have, has repeatedly asked the IRS for its help in computing

17   said tax liability as the trustee finds the IRC to be

18   incomprehensible and beyond the scope of understanding for a

19   person of average intelligence."

20   Q.   And could you continue on with paragraph 46, Special Agent

21   Rech.

22   A.   "46.  The Trust has therefore informed the IRS that it

23   wishes to comply with any and all lawful statutes as they may

24   relate to an income tax liability on the part of the Trust."

25   Q.   Thank you, Special Agent.

375

 1      I'm going to refer your attention next, Special Agent

 2   Rech, to page 6 of this same letter from Jim Stuart to the IRS.

 3   And could you take a look at that, Special Agent, and if you

 4   would read, please, paragraph 56 for the jury.

09:43   5   A.   "56.  As the Trust finds the IRC to be incomprehensible, and

 6   is unable to find a tax professional that is qualified, or able

 7   to assist, the Trust has repeatedly turned to the IRS, as the

 8   collection and enforcement agency for the Department of

 9   Treasury, to assist with explanations as to where in the IRC a

09:44  10   tax may be due on the part of the Trust, and if such tax is, in

11   fact, due, which form the Trust is to use to file a return."

12   Q.   And could you continue, please, with that short paragraph

13   57?

14   A.   Yes.  "57.  As of the date of this notice and demand, the

09:44  15   IRS has failed to, or refuses to, respond to, or assist the

16   Trust, as the Trust has repeatedly requested it to."

17   Q.   And lastly, Special Agent, would you please read paragraph

18   58 for the jury.

19   A.   "The James A. Stuart, Jr. Trust alleges that the IRS's

09:44  20   failure, or refusal, to assist the Trust in its determination of

21   any potential income tax liability that may be due, after the

22   Trust has repeatedly requested such assistance, is because of

23   the fact that no income tax liability is due from the Trust,

24   and, therefore, no meaningful and lawful assistance is able to

09:45  25   be given."

376

1    Q.   Thank you, Special Agent.

2              Your Honor, I'm going to go back to the podium,

3    please.

4              THE COURT:  Very well.  Will you need the laptop?

09:45    5              MR. BERNHOFT:  No, sir.

6    BY MR. BERNHOFT:

7    Q.   Now, Special Agent Rech, you've testified that you were the

8    lead case agent on the Stuart investigation, correct?

9    A.   Yes, sir.

09:45    10   Q.   And you had opportunity to examine books and records of New

11   Age Chemical pursuant to items seized during the execution of a

12   search warrant by yourself and other agents of the Internal

13   Revenue Service?

14   A.   Yes, sir.

09:45    15   Q.   Well, let me back up and ask you a question.  Do you, as a

16   Criminal Investigation Division special agent, have authority by

17   which you can summons books, records, computer data from

18   entities and individuals?

19   A.   Yes, sir.

09:46    20   Q.   And where would that authority come from?

21   A.   Authority is coming from the Commissioner, a directive.  The

22   Commissioner which delegates it to the other -- I'm not sure the

23   directive number, but it's -- I can read my pocket minder for

24   the entire --

09:46    25   Q.   Well, let me see if we can get there with the questions.

377

1    And not a trick question.

2              26 U.S.C. of the Internal Revenue Code has a section

3    7602, is it fair to say that that section provides summons

4    authority for Internal Revenue Service agents such as yourself?

09:46   5    A.  I would like to the look at the section, if I may, to

6    confirm that, but --

7    Q.  One moment, please.

8              May I approach the witness, Your Honor?

9              THE COURT:  You may.

09:47   10   BY MR. BERNHOFT:

11   Q.  It's a big book.  I'm getting there.  I'm at 7520.  Special

12   Agent, if you could take the code there.  If you thumb a few

13   pages over you'll be able to find 7602.

14             (Witness peruses document.)

09:47   15   A.  Section 7602.

16   BY MR. BERNHOFT:

17   Q.  And what's that section titled, Special Agent?

18   A.  "Examination of Books and Witnesses," subtitle A, "Authority

19   to Summon," et cetera.

09:48   20   Q.  Right.  And that would be the authority by which a special

21   agent such as yourself could issue an administrative summons

22   under that section and request books and records and documents

23   and things from a person or an entity; is that correct?

24   A.  Yes.  It actually lists the secretary and the delegation

09:48   25   powers.

378

1    Q.   Right.  And then the secretary delegates that authority

2    downward to certain classes of IRS employees including special

3    agents.

4    A.   Yes, sir.

09:48    5    Q.   You've testified that there was an execution of a search

6    warrant at the New Age Chemical property.  I believe you

7    mentioned that was in February of 2009?

8    A.   Yes, sir.

9    Q.   Wouldn't it have been possible to obtain all that tax and

09:48    10   financial information through means other than the execution of

11   a search warrant?

12   A.   Not in its entirety.

13   Q.   What would not have been able to have been obtained by you

14   or your office through other less intrusive means?

09:49    15   A.   The actual books and records, the computer -- copied images

16   of the computers.

17   Q.   Well, you could have summonsed the corporation's books and

18   records, correct?

19   A.   I attempted to.

09:49    20   Q.   You did.  And when did you attempt to do that?

21   A.   In November of 2008.

22   Q.   All right.  And did you issue such 7602 summonses to New Age

23   Chemical?

24   A.   I actually went to Mr. Stuart's residence and attempted

09:49    25   to --

379

1          THE COURT:  Please approach.

2             (At side bar on the record.)

3          THE COURT:  I'm curious whether or not there's going

4    to be any indication that he invoked his Fifth privilege.

5          MR. JACOBS:  I don't know that's what he did.  I think

6    he's going to describe what he did earlier.  But he said that

7    entity wasn't here.

8          THE COURT:  Okay.

9          MR. BERNHOFT:  I'm sensitive to that.  I can back out

10   of this and move on.

11         THE COURT:  All right.

12            (End of discussion at side bar.)

13   BY MR. BERNHOFT:

14   Q.  Special Agent, I'm going to turn to a different subject and

15   I think we're almost done.

16            In the course of your investigation you've testified

17   that you had opportunity to examine a lot of Jim Stuart's

18   business and personal and financial affairs; is that correct?

19   A.  Yes, sir.

20   Q.  In your opinion was Mr. Stuart living large?

21   A.  It's an objective statement, sir.  Could you describe what

22   exactly you mean by "living large"?

23   Q.  Sure.  Was he a big spender?

24   A.  In some respects.

25   Q.  What respects?

380

1    A.  Well, a big spender, if you look at the assets or -- I know

2    he paid off some mortgages, some loans.  Bought I believe over

3    $100,000 in gold.

4    Q.  And the gold was for an investment purpose, I assume?

5    A.  I don't know, sir.

6    Q.  Any big restaurant bills in your examination of his personal

7    finances?

8    A.  I do not recall any.

9    Q.  Was he a big clothes horse, lots of fancy clothes?

10   A.  I only saw Mr. Stuart once during the course of the

11   investigation, that was at his door in the morning.

12   Q.  Okay.  Go ahead.  I'm sorry.

13   A.  He did have a classic Corvette that I had found, I believe

14   it was a 1950s, I don't know the exact year, but it was a

15   classic Corvette.

16   Q.  Okay.

17          One moment, please, Judge.

18          THE COURT:  Certainly.

19          (Brief pause.)

20          MR. BERNHOFT:  That's all I have, Judge.

21          MR. JACOBS:  I don't have any redirect, Your Honor.

22          THE COURT:  You may step down.

23          THE WITNESS:  Thank you, sir.

24          (Witness excused at 9:52 a.m.)

25          MR. JACOBS:  Your Honor, the United States would next

381

1    call Kathleen Bashaw.  Ms. Bashaw, if you would come forward.

2          Let me clean up the witness stand.

3          THE REPORTER:  Raise your right hand, please.

4          KATHLEEN BASHAW, GOVERNMENT WITNESS, SWORN

5          THE REPORTER:  Please state your name and spell your

6    name for the record.

7          THE WITNESS:  Kathleen Bashaw, K-A-T-H-L-E-E-N.

8    Bashaw, B, as in boy, A-S-H-A-W.

9                    DIRECT EXAMINATION

09:54  10   BY MR. JACOBS:

11   Q.  Want some water or anything?

12   A.  I think I'm okay.

13   Q.  Ms. Bashaw, can you tell me what city you currently live in?

14   A.  Milwaukee.

09:54  15   Q.  How long have you lived in Milwaukee?

16   A.  Approximately 9 1/2, 10 years.

17   Q.  Would you tell me what your educational background is?  How

18   far did you go in school?

19   A.  I have a bachelor's and I went to school for accounting and

09:54  20   finance.

21   Q.  Where did you go to school?

22   A.  University of Wisconsin-Eau Claire.

23   Q.  And when did you graduate?

24   A.  I graduated in 2002.

09:54  25   Q.  And are you a Certified Public Accountant?

382

1    A.  I am, yes.

2    Q.  When did you receive your CPA?

3    A.  In 2008.

4    Q.  How are you currently employed?

5    A.  I work Internal Revenue Service.

6    Q.  In what capacity do you work for the IRS?

7    A.  I'm an internal revenue agent.

8    Q.  How long have you had that position?

9    A.  Just over nine years.

10   Q.  As part of that job did you receive some training through

11   the IRS?

12   A.  Yes.

13   Q.  Would you describe to the jury the training you've received

14   through the IRS?

15   A.  Pretty much the first three years of the job we kind of --

16   do kind of steppingstone to understand the big picture of

17   general businesses.  So we started out with the basic 1040,

18   understanding the Schedule A, to then going to a Schedule C, to

19   then -- and during this period we would go to training, learn

20   about those schedules and so forth, and then come back and do

21   on-the-job audits to kind of experience those things.  Then we'd

22   go back for further training which then continued to

23   corporations, Form 1120's, and then Form 1120S's and

24   partnerships.

25   Q.  You mentioned that after the training you would do some

383

1    practical work.  Could you describe the type of audits you would

2    perform as part of your job?

3    A.  Basically, at this point -- after, you know, going through

4    the training process, my focus is mostly on auditing businesses.

5    So I go out to the business, make sure everything is reflective

6    to what the tax return shows.  And then I look at their books

7    and records and make sure that they are properly going from

8    their in-house accounting to tax accounting so everything is

9    properly reflected on the tax return and I basically just

10   determine if that was done properly or not.

11   Q.  Do you know approximately how many businesses you've audited

12   during your nine-year career with the IRS?

13   A.  I would say it kind of varies because it can be all

14   different types of businesses and carry into the shareholders

15   and partners and so forth, but I would say about 500.

16   Q.  Now, Ms. Bashaw, have you sat here through the entire trial

17   in this case?

18   A.  Yes.

19   Q.  And have you had access to the exhibits that have been

20   introduced in court here?

21   A.  Yes.

22   Q.  And were you asked to conduct an analysis after listening to

23   the testimony and reviewing the exhibits?

24   A.  Yes.

25   Q.  And could you just describe generally what were you asked to

384

1    do?

2    A.  I was asked to determine what the tax amount would be based

3    on these three years, 2005, 2006, 2007, due and owing for

4    Mr. Stuart.

5    Q.  And did you prepare a chart summarizing your analysis in

6    this matter?

7    A.  Yes.

8    Q.  Let me give you a copy of what has been marked for

9    identification as Exhibit 210.  And is Exhibit 210, does that

10   reflect the analysis you conducted?

11   A.  Yes.

12   Q.  And is all of the information in Exhibit 210, does it derive

13   from evidence received during the trial in this matter?

14   A.  Yes.

15           MR. JACOBS:  Your Honor, I would move into evidence

16   Exhibit 210.

17           MR. BERNHOFT:  No objection, Your Honor.

18           THE COURT:  Received.

19           (Exhibit 210 offered and received.)

20           MR. JACOBS:  And if I could be allowed to provide a

21   paper copy to the jury, Judge.  It's easier to work.  I can work

22   from here then.

23           THE COURT:  You may proceed.

24           (Exhibit 210 handed to the jury.)

25   BY MR. JACOBS:

385

1  Q.  Okay, Ms. Bashaw, why don't we -- perhaps you could just

2  describe generally Exhibit 210.  Can you just describe the

3  process that this reflects?

4  A.  Sure.  I tried to kinda break this down in the way you would

5  see it on the basic Form 1040 that you all would file, in order

6  to make it somewhat hopefully clear for everybody to look at.

7          So pretty much shows the income.  And then any

8  deductions that I was able to generally come up with as far as

9  what had flowed through from K-1s, and then to itemized

10  deductions or standard deduction, whichever one was applicable

11  per the particular year.

12  Q.  Okay.  And then you made a tax calculation?

13  A.  Yes.  And then I made a tax calculation.

14  Q.  Well, why don't we focus on the year 2005, the left-hand

15  side.  And could you run down the column for 2005.  I gather

16  there are two columns under 2005, and explain what each row

17  under that column -- what that reflects and where that

18  information came from.

19  A.  Okay.  The wages from New Age Chemical, that comes from

20  that -- in the evidence that was provided during Matt Rech's

21  testimony there was all the payments that were made from New Age

22  Chemical to Mr. Stuart.  And that then corresponds to the actual

23  checks that went through and so forth.  So that's where that

24  amount came from.  But it also was reflected in Beverly

25  Schlipp's testimony that this was meant for compensation, the

386

1    payments that were made to him.  And also, New Age had prepared

2    a W-2 which this also corresponds to.

3          And then we've got taxable interest and ordinary

4    dividends.  Those two items actually just came from the 2005 tax

5    return that had been filed.  And -- or shown in evidence as to

6    have been filed.  And those were the two items that Mr. Stuart

7    had reported, so included those items.

8          The other income 1099, that again is -- comes from the

9    same things as from what was discussed in the wages above.  It

10   was from that -- again, that schedule that was provided in the

11   evidence that showed payments.  And this -- I know there was

12   1099s that had been prepared so I just included that there.

13         And then we've got New Age K-1, capital gain/loss,

14   basically this is -- the K-1 as has been mentioned throughout

15   the testimonies is -- shows the flow-through amounts from New

16   Age Chemical to the shareholder, his 70 percent share.

17         So the items New Age K-1 for capital gains, ordinary

18   income, Section 179 deduction, these all flowed through from

19   those -- from that K-1.  And that had been provided in evidence.

20         And specifically, like the capital loss, there was a

21   $14 ,000 loss that flows through the K-1.  Well, the capital

22   loss gets then treated through to the individual as if it's

23   theirs and he's entitled to take 1500 as a deduction without

24   having capital gains to offset the full amount.

25         And then the ordinary income is the -- as shown on the

387

1  K-1 in evidence, is the flow-through amount that was allocated

2  to him for ordinary income.

3       And then the Section 179 deduction, this is basically

4  an election to expense part of what would be depreciable assets

5  up front.  And so I flowed that through to him.

6       And then we've got another deduction which is domestic

7  production activity deduction, and that also flows through from

8  the K-1.  And so this -- oh, I'm sorry, that's not in 2005 and I

9  guess I'm staying focused on 2005.  But, anyway.

10       And then, so we've got the adjusted gross income of

11  230,653.

12       And then we go to the itemized deduction.  On the 2005

13  return he had taken a standard deduction, but from evidence that

14  was shown, which included property tax bills and also mortgage

15  interest paid, I did an analysis on that and the calculation of

16  what his itemized deduction would be, which was greater than the

17  standard deduction, so for that reason I gave the itemized

18  deduction here.

19       So which then -- the personal exemption because of the

20  level of his income, as a married/filing separate, that's how

21  the 2005 return that was put in evidence shows he had filed, he

22  is -- he's no longer able to take a deduction based on the

23  calculation for the exemption.

24       So we had taxable income of 216,946.  And then that

25  is total tax of 62,870.

388

1          Then there was some withholding that took place in

2    2005 from that W-2 that had been presented in evidence.  And, so

3    that's 18,786, which would then leave 44,084 that has not been

4    paid.

5    Q.  Now, how you get from total tax from taxable income, there

6    are just tax tables in the federal tax law that tell you if you

7    make this amount of income this is the tax applicable to that?

8    A.  Yes.

9    Q.  So that's just a mechanical calculation?

10   A.  Yes.

11   Q.  Now, I think you mentioned something about checks.  Am I

12   right that in 2005 all of those payments to him were made by

13   direct deposit?

14   A.  Yes.  Yes.  Yes.

15   Q.  And I think maybe you through a Payroll Data Services or

16   some payroll company?

17   A.  Yes.

18   Q.  And that's the entity that would have generated the W-2 and

19   the 1099 you're referring to?

20   A.  Yes.

21   Q.  Now, did you do that same analysis for 2006 and 2007?

22   A.  Yes.

23   Q.  Okay.  I gather there was some slightly more technical

24   adjustments here.  As you mentioned --

25   A.  Yes.

1    Q.   Let me just give one moment here.

2              (Brief pause.)

3              MR. JACOBS:  Do you want to take a minute, Judge?

4              THE COURT:  Yes, take a short recess.  We'll return to

5    the jury room for a couple of moments.

6              THE BAILIFF:  All rise.

7              (Jury out at 10:08 a.m.)

8              THE COURT:  Counsel?  Mr. Bernhoft and Mr. Jacobs, I

9    noticed one juror who has been using a listening device was not

10   using his listening device a few moments ago.

11             Counsel?  You should listen in.  No pun intended.

12             I noticed one juror who has some listening -- some

13   hearing problems was not using his infrared listening device.  I

14   don't know whether or not he missed anything critical during the

15   trial.  Therefore, what I would like to do is to have that juror

16   come out to answer a few questions as to whether or not he was

17   able to hear sufficiently all of the testimony.  If not, we will

18   take steps to see to it that he can hear what was said.

19             THE BAILIFF:  He said for the first hour he heard.

20             MR. JACOBS:  So from the beginning of her testimony

21   then?

22             THE COURT:  I will ask.  Would you agree or disagree?

23             MR. JACOBS:  That's fine with me, Judge.

24             MR. BERNHOFT:  Agree.

25             THE COURT:  All right.  We'll wait till your client

390

1    comes back and then make the inquiry.

2              (Discussion off the record.  Recess then taken at

3    10:10 a.m., until 10:20 a.m.)

4              THE COURT:  All right, let's go back on the record.

5              Be seated, please.

6              As indicated earlier, I will have the juror who has

7    been using the infrared listening device come back to the

8    courtroom alone to answer questions respecting what, if

9    anything, he was unable to hear, and whether or not he would

10   like any portion of the proceedings read to him in the event he

11   was having difficulty hearing some portion of the proceedings

12   because of a malfunction of the listening device.

13             Is that acceptable to the parties?

14             MR. JACOBS:  Yes, Your Honor.

15             MR. BERNHOFT:  Yes, Your Honor.

16             THE COURT:  Before we do that, I'd like to revisit a

17   matter which arose earlier in the case, and that is a

18   discussion -- actually a request by the defense for materials

19   under 18 U.S.C. Section 3500.

20             The court notes that when Ms. Morgan from the Internal

21   Revenue Service/Ogden, Utah office completed her testimony the

22   defense requested transcripts of proceedings where she may have

23   given testimony.  I believe there was testimony that there were

24   approximately 60-plus times that the witness had testified for

25   the government.

391

1    The court concluded after hearing from the parties

2    that the Jencks Act, and 3500 in particular, does not apply to

3    this proceeding and that the government was under no obligation

4    to supply transcripts of testimony given previously by the

5    witness.

6         Notwithstanding that, I'd like some clarification and

7    further discussion.  First, I'd like to ask the defense whether

8    there was any prior request for transcripts of this witness's

9    testimony.

10        MR. BERNHOFT:  No, Your Honor.  We were -- we did not

11   know -- initially the government had indicated that the IRS

12   Service Center witness would come from Kansas City, and then

13   apparently there was -- I think Mr. Jacobs can clarify -- a

14   last-minute substitution.  So we were not aware of who the

15   witness was until, I believe, Monday.

16        THE COURT:  All right.

17        MR. BERNHOFT:  Of this week.

18        THE COURT:  Number two, Mr. Jacobs, do you have any

19   transcripts of that witness's prior testimony?

20        MR. JACOBS:  No, Your Honor.

21        THE COURT:  Have you been provided with any

22   information as to whether or not the government has transcripts

23   of that witness's prior testimony?

24        MR. JACOBS:  I don't know.  I've never made inquiry

25   whether in some other trials there's a transcript because she's

1    testified in another trial and it went up on appeal and a

2    transcript was prepared.  So I have no knowledge of that.

3           THE COURT:  Do you have any indication that the

4    proceedings where Ms. Morgan testified were sealed proceedings

5    such as -- well, sealed proceedings where transcripts would not

6    otherwise be available to the public?

7           MR. JACOBS:  I have no knowledge of that.

8           THE COURT:  All right.

9           In light of what I have just heard I reaffirm my

10   earlier decision not to require the government to produce

11   transcripts of Ms. Morgan's prior testimony.

12          There are several cases which apply to such matters.

13   One is *United States vs. Baker* at 358 F.2d at page 18.  It's a

14   1966 Seventh Circuit decision which included a finding at page

15   20 as follows:

16          "A transcript of a witness's testimony in a prior

17   trial does not come within the language of the Jencks Act.  We

18   doubt that a court reporter falls within the category of an

19   agent of a government.  This would be tantamount to construing

20   the language as meaning government employees.  A federal

21   commissioner or indeed a federal judge might be said to be an

22   employee of the government, but it hardly could have been

23   Congress's intent that a judge's shorthand notes or a transcript

24   thereof would have to be produced upon demand.

25          "But assuming a court reporter in a separate trial

393

1    does come within the wording of the act, in the instant case

2    there was no request or demand by defendant's counsel for such

3    transcript prior to trial.  The government has no obligation to

4    transcribe stenographic notes of testimony in a criminal trial

5    just in case some of the witnesses might later (sic) called upon

6    to testify in a related trial.  Such a practice would create a

7    heavy and in our opinion unnecessary burden.

8           "We hold that under these circumstances of the instant

9    case in the absence of a demand or request for such a transcript

10   prior to the trial and a showing that a defendant was unable to

11   pay the court reporter for such a transcript, the government had

12   no duty to have such transcripts available.  We hold there was

13   no error in this respect."

14          Cert was sought and denied in the Baker case.

15          Further note is made of decisions by the Fourth

16   Circuit in *United States vs. Anthony Collins*, 52 Fed.Appx 622

17   from the Fourth Circuit, where among other things the court

18   said:  "However" -- and this is at page 1.

19          "A transcript was not in the government's possession.

20   Although the transcript was a matter of public record to which

21   the defense had access, the government is not required to

22   produce transcripts of witnesses who testified previously if the

23   evidence in question is available to the defendant from other

24   sources."

25          The Ninth -- I'm sorry, the Eighth Circuit ruled in

1    *United States of America vs. Edwin Mull*, M U L L, which appears

2    at 40 Fed.Appx 300, that's also 2002 WL 337912, and there it

3    said, at page 2:

4            "The Jencks Act protects information in the

5    government's file from being subject to discovery until after a

6    witness has testified.  Thus, documents which are matters of

7    public record are not subject to the Jencks Act because they are

8    discoverable even before a witness testifies at a defendant's

9    trial."

10           With that, we can move forward.  I'll ask the bailiff

11   to bring out the juror.

12                (Juror No. 7 brought into the courtroom.)

13                THE COURT:  Be seated, please.  You may be seated.

14                Are you able to hear at this time?

15                JUROR NO. 7:  Yes, thank you.

16                THE COURT:  At some point during the proceeding this

17   morning I noted that your listening device was not being used.

18   So I'd like to begin by inquiring whether you at any point

19   during today's proceeding were unable to understand testimony

20   that was being given because you were not able to hear?

21                JUROR NO. 7:  No, I could hear fine.  That's why I

22   didn't say anything.  When I took them off I could hear.  So I

23   figured at the next break I would just -- but it was fine.

24                THE COURT:  Good.  That's all we wanted to know.

25                JUROR NO. 7:  Thank you.  Thank you.

395

1          THE COURT:  All right.  Would you bring out the rest

2     of the jury.

3          If it goes out again let me know.

4          JUROR NO. 7:  Okay, I will.  Thank you very much.

10:32    5          THE BAILIFF:  All rise.

6          (Jury in at 10:32 a.m.)

7          THE COURT:  You may continue.

8     BY MR. JACOBS:

9     Q.  Ms. Bashaw, I was asking you about your analysis for 2006

10:32    10   and 2007.  I gather there are at least one or more -- slightly

11    more technical adjustments you made in that analysis?

12    A.  Yes.

13    Q.  And could you by way of example -- you had started to talk

14    about what's reflected on one of the rows as a New Age K-1 DPA

10:33    15   deduction; what is that?

16    A.  Domestic production activity.  And it's a deduction that's

17    allowable based on the income produced in a company that does

18    domestic manufacturing or any sorts of activities domestically.

19    And so that flows through from the K-1 and basically it's a

10:33    20   calculation from what's provided on the K-1 to then come to the

21    number of $6,303 in 2007.

22    Q.  And that was the only year in which that deduction applied?

23    A.  Yes.

24    Q.  So am I correct that all of the income information derives

10:34    25   from the records in court, the direct deposit records,

1    Mr. Stuart's bank records receiving those deposits, the checks

2    that were introduced into court, the W-2 and the 1099s

3    introduced in court?

4    A.   Yes.

10:34    5    Q.   And then the tax calculation is just an application of a

6    mathematical formula to the taxable income number?

7    A.   Yes.

8    Q.   Okay.

9         That's all I have for this witness, Your Honor.

10:34   10                    CROSS-EXAMINATION

11   BY MR. BERNHOFT:

12   Q.   Good morning, Ms. Bashaw.  I just have one question.  What

13   was the tax rate that you applied to achieve the total tax due

14   calculations on Exhibit 210?

10:35   15   A.   The tax rate that was --

16   Q.   Yes.

17   A.   I believe it was probably 35 percent but it's a calculation

18   that was off of the standard rates for the IRS taxes --

19   Q.   But you thought it was 35 percent?

10:35   20   A.   That's what I would recollect it to be but I -- I'm not

21   100 percent sure.

22   Q.   Okay.

23         No further questions.

24         MR. JACOBS:  I don't have any redirect, Your Honor.

10:35   25         THE COURT:  You may step down.  Please do not discuss

1    your testimony with anyone unless you're advised this case has

2    been completed.  Have a good day.

3                THE WITNESS:  Thank you.

4                (Witness excused at 10:35 a.m.)

10:35    5                THE COURT:  Mr. Jacobs?

6                MR. JACOBS:  Judge, with the exception of verifying

7    that all of the exhibits I intended to move into evidence have,

8    in fact, been received — and I reserve my right to confirm that

9    — the government has no further evidence to offer and would rest

10:36   10    its case in chief.

11                THE COURT:  All right, what we'll do is take another

12    break.  We have to go down our list of exhibits.  There were a

13    lot of exhibits so we want to make sure all of the exhibits are

14    accounted for.  And we will let you know where we stand in that

10:36   15    regard and you'll have to return to us after that's done.  You

16    can leave those in your chairs.  Or put them into your

17    notebooks.

18                THE BAILIFF:  All rise.

19                (Jury out at 10:36 a.m.)

10:37   20                THE COURT:  Be seated, please.

21                What I'd like to do is have you review the exhibits

22    with the clerk and just satisfy yourselves that everything has

23    been accounted for.  And also, please take note of any need to

24    redact portions of various exhibits inasmuch as Social Security

10:37   25    numbers or other personal identifiers that are not essential to

398

1    the case and may be subject to disclosure and misuse is

2    eliminated or blocked out.  When you've done that we'll give the

3    government a chance to rest formally.

4         But before we do all of that we need to go back to

5    something that we talked about earlier, and that is whether or

6    not Mr. Stuart still is of the view that he does not wish to

7    testify in this case.

8         Mr. Stuart, earlier we discussed whether or not you

9    would like to testify and you indicated to the court, after

10   consultation with counsel, that you are aware of your right to

11   testify and that you are knowingly and voluntarily declining to

12   testify and that no person has used any force, threat or

13   intimidation to get you to waive your right to testify in this

14   case.  Does that remain true?

15        THE DEFENDANT:  That's true.

16        THE COURT:  And you agree totally with what your

17   attorney has said and you reaffirm everything you said

18   previously regarding your right to testify and the waiver.

19        THE DEFENDANT:  Yes, I do.

20        THE COURT:  Very well.  We'll proceed accordingly.

21   We'll take a break and the defense can formally rest if all

22   exhibits have been accounted for on both sides and the jury will

23   be fully apprised.

24        After all of that is done we will talk briefly about

25   the instructions.  I know that there was an issue respecting the

1    instructions.  One second here.

2         (Brief pause.)

3         THE COURT:  We'll make sure that we're all on the same

4    page and we'll talk about how much time you will need for

5    closings, et cetera.  I would like to work out all of the

6    logistics during our break inasmuch as I have another proceeding

7    starting at 12:00 o'clock that may take about an hour or so.

8    And I know you want time to prepare.  All right?  So we'll

9    resume after you've had a chance to confer with the clerk and

10   all the exhibits are accounted for.

11        MR. JACOBS:  Thank you, Judge.

12        (Recess taken at 10:40 a.m., until 10:57 a.m.)

13        THE COURT:  Be seated, please.  Have the parties had a

14   chance to review with the clerk all of the exhibits that have

15   been offered?

16        MR. JACOBS:  Yes, the government has, Your Honor.

17        MR. BERNHOFT:  Yes for the defense, Your Honor.

18        THE COURT:  Are you satisfied that all the exhibits

19   offered have been properly accounted for and/or have been

20   received?

21        MR. JACOBS:  The government is, Judge.

22        MR. BERNHOFT:  The defense is satisfied.

23        THE COURT:  All right.  With that, are you prepared to

24   close in front of the jury, Mr. Jacobs?

25        MR. JACOBS:  That is, to rest, Your Honor.

400

1       THE COURT:  And Mr. Bernhoft, is that correct?

2       MR. BERNHOFT:  Prepared to do closing argument?

3       THE COURT:  No, to close your case.

4       MR. BERNHOFT:  Oh, yes.  Yes, Judge.

5       THE COURT:  After that we'll release the jury until

6  approximately 1:30.  Will that provide you with sufficient time

7  to prepare?

8       MR. BERNHOFT:  For the defense, Judge, I would

9  respectfully request that we begin closing argument at 3 p.m. to

10 allow both Mr. Jacobs and myself adequate time to prepare to

11 close.

12      THE COURT:  Mr. Jacobs?

13      MR. JACOBS:  I mean, that's fine with me, Judge.

14      THE COURT:  I'd rather not -- how much time do you

15 think you'll need for your closing arguments?  Mr. Jacobs?

16      MR. JACOBS:  I would estimate 45 minutes for my

17 initial closing and 10 minutes for my rebuttal.

18      THE COURT:  And Mr. Bernhoft?

19      MR. BERNHOFT:  30 to 45 minutes for my closing

20 argument, Judge.

21      THE COURT:  I think we probably should start a little

22 earlier.  Let do it at, say, 2:30 -- or 2:00 or 2:30.

23      MR. BERNHOFT:  2:30 would be great, Judge.

24      THE COURT:  All right, 2:30.  All right, we'll bring

25 them back.

1          THE BAILIFF:  All rise.  Court's in session.

2          (Jury in at 11:00 a.m.)

3          THE COURT:  Be seated, please.

4          Counsel?

5          MR. JACOBS:  Yes, Your Honor, the government having

6     confirmed that all of the exhibits it's moved in have been

7     received, it rests its case in chief.

8          THE COURT:  Very well.  Mr. Bernhoft?

9          MR. BERNHOFT:  Your Honor, the defense rests.

10          THE COURT:  Very well.  We'll proceed accordingly.

11          Members of the jury, with that it is now necessary for

12    the Court and counsel to prepare for closing arguments which

13    will take place this afternoon.  In order to give the parties

14    adequate time to prepare and to also give you a chance to

15    stretch your legs and not remain cooped up in the jury room, we

16    will break until 2:30.  I also have another proceeding and,

17    quite frankly, would like a chance to eat lunch.

18          So, with that, we will break until approximately 2:30.

19    As usual, please do not discuss this case with anyone.  Do not

20    do any research.  Do not do any blogging or any type of social

21    media that might affect your ability to proceed in accordance

22    with the law as I've explained it and will explain during the

23    final instructions.  Have a good lunch and please come back

24    refreshed.

25          Let me also ask that before you leave, speak with the

1   bailiff regarding your ability to deliberate after hours, that

2   is, whether or not you are able to deliberate after 6:00 o'clock

3   tonight if necessary.  You can decide for yourselves whether you

4   should deliberate after 6:00 p.m.  Ordinarily we will break at

5   about 6:00 p.m., but I will give you a chance to weigh in on

6   that subject.  And if you do deliberate after 6:00 p.m. we will

7   provide food for you.

8           You should also take into account whether or not you

9   are parked in a location that will require you to move your

10  vehicles, and in order to accommodate you I will go so far as to

11  make sure that you can get inside this building to park your

12  cars if necessary so that you have a warm convenient lighted

13  place to park if necessary.

14          So please talk with the bailiff about those matters

15  and he will report back to us the result of your conversation.

16  All right?

17          We will break until 2:30.

18          THE BAILIFF:  All rise.

19          (Jury out at 11:03 a.m.)

20          THE COURT:  Be seated, please.

21              CONTINUED JURY INSTRUCTION CONFERENCE

22          THE COURT:  We talked briefly about the instructions

23  earlier this morning, and I'd like to ask you to look at them

24  once more to satisfy yourselves that the instructions are in a

25  form that you find acceptable.  And if not, I would like you to

403

1    state for the record the objections that you have to the

2    instructions as proposed.

3             (No response.)

4             THE COURT:  Do you need a couple of moments?

5             MR. BERNHOFT:  Please, Judge.

6             THE COURT:  All right.  We'll break for, say about

7    five or ten minutes?

8             MR. BERNHOFT:  Oh, I just need 30 seconds.  I just

9    have to find my note, please.

10            THE COURT:  All right.

11            MR. JACOBS:  Judge, am I correct, I think the Court

12   had said it would add the jury instruction that Mr. Bernhoft

13   requested?

14            THE COURT:  I'm sorry, repeat that?

15            MR. JACOBS:  Am I correct, I think the Court was going

16   to add 3.01?

17            THE COURT:  Yes.  Let me -- I'm going to get the

18   reprinted set of instructions.

19            (Recess taken at 11:05 a.m., until 11:15 a.m.)

20            THE COURT:  Have you had a chance to review the

21   instructions as currently crafted?

22            MR. JACOBS:  I have, Your Honor.

23            THE COURT:  Do you have any comments, Mr. Jacobs?

24            MR. JACOBS:  Your Honor, again, I believe that the

25   unanimity instruction that the government submitted was

404

1    appropriate.  I note the Court has eliminated the specific

2    descriptions of the unanimity examples.

3              THE COURT:  But for that is there anything else?

4              MR. JACOBS:  No, there is not.

5              THE COURT:  Does the defense wish to be heard

6    respecting one or more of the instructions?

7              MR. BERNHOFT:  No, Your Honor.  The jury instructions

8    as promulgated that I've reviewed I have no objection.  I did

9    have one comment, I noticed in the first draft there was a

10   single page, use of electronic technology?

11             THE COURT:  Oh, yes, I forgot to add that.

12             MR. BERNHOFT:  But just adding that one to the package

13   and I have no objection to these instructions.

14             THE COURT:  Well, I have been giving them that

15   instruction in various forms throughout so that will only be a

16   further reminder of the fact that they cannot use any electronic

17   means to assist them.  I will add that.

18             I note the government's objection and I've concluded

19   that if it appears that there is any difficulty -- that the jury

20   has any difficulty I will reconsider that second paragraph.  But

21   I do not see the second paragraph as essential, even though it

22   may be helpful.

23             Let me further state that I have given instructions

24   similar to the one the government tendered.  But in light of the

25   defense objection I've concluded under the circumstance that it

405

1    will avoid any unnecessary issues, and also I am satisfied that

2    the instruction as crafted is sufficient under the circumstance

3    to provide the jury with essential guidance in deliberations.

4         All right.  I will see you at 2:30.

11:17   5         Let me add, we've made arrangements for the jurors to

6    park so they won't be overly concerned getting out of here for

7    their security.  I do that to make sure that jurors are relaxed

8    and are able to focus their deliberations on the law and the

9    instructions and the evidence as they find it.  All right.

11:17   10        MR. JACOBS:  Thank you, Judge.

11        THE COURT:  So we will go after hours.

12        Let me also state that the front doors of the

13   courthouse are locked at 5:00 o'clock.  But, to make sure that

14   this defendant has a public trial in all respects, there will be

11:18   15   a sign, as we've had posted previously in this case, indicating

16   that people can go to the Jackson Street entrance, which is to

17   your right and slightly behind you, to enter the building.

18   There will be security and that will include the usual

19   magnetometers that people will have to use to get in or out of

11:18   20   the building.  When you exit tonight that's the exit you use if

21   we go after 5:00 o'clock.

22        MR. JACOBS:  Thank you, Judge.

23        (Recess taken at 11:18 a.m., until 2:33 p.m.)

24        THE COURT:  Are you ready to proceed?

02:35   25        MR. JACOBS:  Yes, Your Honor.

1      MR. BERNHOFT:  Yes.

2      THE COURT:  All right.  I have handed out the jury

3  instructions.  I will ask the jurors to leave them face down

4  until arguments have been completed.

5      MR. JACOBS:  Judge, if I could just, I meant to

6  mention this, they redacted -- our office redacted the exhibits

7  we had entered and in doing that they realized that one of the

8  exhibits wasn't correctly copied so I just have a replacement.

9  It's Exhibit 59.

10      I wanted to -- I think it's in the court's file but I

11  at least wanted to note that the original exhibit that was

12  filed, that this is a corrected copy for the court's record.

13      MR. BERNHOFT:  Your Honor, may I bring up one point?

14      THE COURT:  Surely.

15      MR. BERNHOFT:  I had intended to display the good

16  faith instruction on the Elmo during a particular portion of my

17  closing argument.  Will that be permitted?

18      THE COURT:  You can use the Elmo.

19      MR. BERNHOFT:  Thank you.

20      THE COURT:  Bring them in, please.

21      Mr. Martin, you left your phone downstairs.  It's at

22  the security desk.

23      THE BAILIFF:  All rise for the jury.

24      (Jury in at 2:37 p.m.)

25      THE COURT:  Please be seated.  You have instructions

407

1    in your seats, I do ask that you turn them face down while the

2    attorneys argue.  You will be able to look at them after

3    arguments have been completed.

4            You may proceed, Counsel.

5                    GOVERNMENT CLOSING ARGUMENT

6            MR. JACOBS:  May it please the Court, Mr. Bernhoft,

7    Mr. Stuart, ladies and gentlemen of the jury.  Again, my name is

8    Matthew Jacobs.  And as I indicated at the beginning, I

9    represent the plaintiff in this case, the United States of

10   America, the prosecution in a criminal case, and we're at that

11   point in the trial where all of the evidence you're to rely upon

12   to perform your function is in.  It consists of the testimony of

13   the witness, the documents, the numerous exhibits that have been

14   brought in, the stipulations that have been read into the

15   record, summaries that have been presented in the case.  And

16   this is my opportunity, as a party here, to discuss with you why

17   the evidence establishes certain facts and why those facts

18   establish the defendant James Stuart's guilt of the charges in

19   the indictment.

20           You will recall that the indictment in this case

21   charges Mr. Stuart with three crimes, three violations of

22   federal law:  He's charged with tax evasion for the years 2005,

23   2006, and 2007.

24           The federal statute that describes that crime, 26

25   U.S.C. Section 7201, tax evasion, reads as follows:

408

1       "Any person who willfully attempts in any manner to

2   evade or defeat any tax imposed by the Internal Revenue Code or

3   the payment thereof shall be guilty of an offense against the

4   United States."

5       And at the end of the arguments of counsel — myself

6   and Mr. Bernhoft — the judge will read to you instructions to

7   explain to you, how do you determine, how do you perform your

8   function.  You have this federal statute, what does it mean?

9   What do you have to decide to determine if the government has

10  satisfied its burden to establish the defendant's guilt beyond a

11  reasonable doubt?

12      And you'll be told that the elements of tax evasion,

13  there are basically three of them:

14      That there was a federal income tax due and owing by

15  Mr. Stuart for each of the years -- this is for each offense, so

16  each of the years.

17      "That Stuart intended to evade or defeat the

18  ascertainment, assessment, computation, or payment of that tax;

19  and that Stuart willfully did some act in furtherance of the

20  intent to evade tax or payment of the tax."

21      So these are what are called essential elements.

22  Those are the specific propositions that the government has to

23  prove beyond a reasonable doubt to establish the defendant's

24  guilt of tax evasion.  And we have to prove that with respect to

25  each count separately, for 2005, 2006, and 2007.

409

1    Okay.  So let's begin with tax due.  What evidence was

2    introduced at trial to establish that Mr. Stuart had a tax due

3    to the federal government for 2005, 2006, and 2007?

4    You'll recall the testimony of Revenue Agent Bashaw,

5    Kathleen Bashaw, she was the last witness the government called.

6    She was an agent for the IRS, has worked there for nine years.

7    And she provided to you a summary, Exhibit 210, that takes the

8    income, the earnings that Mr. Stuart had in those years, 2005,

9    2006, and 2007, takes those earnings, plus his share of the

10   earnings from his business, New Age Chemical, some deductions

11   he's entitled to — maybe when you file your tax returns, you

12   know, deductions may be for interest or real estate taxes, I

13   think she mentioned.  After reducing for those, comes up with a

14   taxable income, and she presented to you a calculation of the

15   tax due that Mr. Stuart had for each of those years:  2005,

16   2006, 2007.

17   If you look at Exhibit 210 — I'm not sure if it's up

18   here or not, but just to the -- yes.  Here's Exhibit 210.  And

19   again, she did for each year, she laid out here's the wages he

20   paid, the compensation he received.  You may recall that there

21   were some checks that his sister Beverly Schlipp said yes, she

22   wrote these as compensation to him.  In the early years there

23   were some direct deposits from a payroll company called Payroll

24   Data Services into his bank account.  So that's income.

25   And then she did the calculation and determined that

1    he had tax due in each of these years.  And then on -- that's

2    actually an earlier version of it.  She also noted that in 2005

3    some taxes had been withheld, about $18,000, so the actual tax

4    due was lower than that, I think it was about $44,000 in 2005.

5    I inadvertently put in an earlier version.

6            So let's go back to the previous slide.  And there was

7    evidence that supported Ms. Bashaw's testimony.  You'll recall

8    that in the evidence came the testimony of Special Agent Rech.

9    Special Agent Rech had conducted a search warrant at New Age

10   Chemical in February of 2009, and from that he had obtained

11   records from them.  He had their journals, their payroll

12   accounts.

13           He also went to banks and got bank records from them

14   for checks, he got records from Mr. Stuart's account.  And

15   again, he had a summary of the payments that Mr. Stuart had

16   received in 2005, 2006, and 2007.

17           Then, you'll also recall that into evidence were

18   introduced a W-2 that had been issued to Mr. Stuart in 2005 by

19   Payroll Data Services for that first part of the year when he

20   was being paid as a W-2 wage earner and there was some

21   withholding in 2005.

22           Then there were some Forms 1099 introduced that were,

23   A, found at New Age Chemical, but were also filed with the

24   corporate tax returns that New Age Chemical filed and those

25   reflexed the earnings of New Age Chemical and that portion of

411

1    the earnings that Mr. Stuart was responsible for had to report

2    as income and paid taxes on.

3              And if we could skip ahead two slides.

4              Again, those are the summaries prepared by Special

5    Agent Rech.  He laid out each of the payments, either the direct

6    deposits or the checks that New Age Chemical paid Mr. Stuart for

7    compensation.

8              I think that's 171, so that's for 2005.

9              The next year, Exhibit 172, is 2006.  I can't read

10   that from here.

11             And then the next slide for 2007.

12             So, in evidence are the summaries of the payments,

13   either direct deposits or checks, made to Mr. Stuart that formed

14   the basis of Ms. Bashaw's testimony about, look, here's the

15   income he had in these years and here's the taxes he owed.

16             Would you go to the next slide, please.

17             Again, as I mentioned, and I'll just quickly run

18   through these, there were those Schedule K-1s that Mr. Stuart

19   had.  They were attached to the corporate tax return for New Age

20   Chemical for each of the years in question for 2005, 2006, and

21   2007.  But they were also found at his business.  And each of

22   those K-1s told Mr. Stuart:  Mr. Stuart — with his Social

23   Security number, it's been redacted out here — in the year

24   ending in 2007, you had $189,000 of earnings from the company

25   that you are responsible for reporting.

02:45
02:45
02:45
02:45
02:45
02:46

1    Move to the next slide.  No.  Okay.

2    I guess we ran through it already.  But there was a

3  K-1 for each of the years.  For the year ending in 2006 --

4    And if you can move one slide back -- right.

5    For the year that ends in 2005, Mr. Stuart, you had

6  $94,000 of earnings from your company you've gotta report.  It's

7  like a partnership.  The company doesn't pay for it, pay the

8  taxes on it, you have to pay the taxes on it.  So then in 2005,

9  2006 and 2007 he received a K-1 saying not only do you have to

10  pay taxes on the wages you got, but because you're the owner of

11  this business you have to pay taxes on your share of the

12  earnings of this business.  So there is the tax due.

13    And you'll recall that we know there's a tax due and

14  not paid because the records reflect that in 2005, you may

15  recall Mr. Stuart filed a return in which he said he didn't have

16  any wages, he didn't have any income from his business, he had

17  about $631 in interest and dividends, so he didn't owe any

18  taxes.  And actually he tried to get back the withholdings of

19  his income taxes that had been done while he was being a W-2

20  wage-earner through Payroll Data Services, and he also tried to

21  get back not just the withholding, he also tried to get back the

22  Medicare taxes and the Social Security taxes that had been

23  withheld from those payments as well.

24    Now, so that evidence establishes that Mr. Stuart had

25  a tax due for each of those years.

413

1         And if we could move past --

2         As I say, the summary of the taxes; the summary of the

3    payments; the K-1s for Mr. Stuart found at his business as well

4    as filed with the IRS.

5         And so, you may recall, we looked at how does

6    Mr. Stuart know he's supposed to file tax returns?  How does he

7    know he's supposed to report his wages, report his income,

8    report his earnings from his business?  Well, we know because

9    he's done it in the past.

10        And we introduced into evidence the returns that

11   Mr. Stuart filed for 2002, 2003, 2004.  And on those returns, he

12   filed them jointly with his wife, and he reported wages from New

13   Age Chemical; he reported his share of the earnings from New Age

14   Chemical; he reported the taxes he owed; and he paid taxes on

15   it.  So the evidence establishes that he knows he's required to

16   report that income, he's required to report those taxes, and

17   he's required to pay those taxes.  So when he doesn't do that in

18   2005, 2006, 2007, we know that he's doing it intentionally.

19   He's aware of it.  He's aware of his duty and he's not doing it.

20        And again, in those years in question we introduced

21   evidence of the income he was reporting.  He was reporting wages

22   from New Age Chemical, income from the business, there was some

23   capital gains in one year.  Again, he was reporting taxes owed

24   for each of those years.

25        And -- okay, again, I'm sorry.  Okay.

414

1    So, again, the second element is that Mr. Stuart --

2    another element we have to prove is that he willfully performed

3    affirmative acts in his attempt to evade the payment of those

4    taxes.  And what are those affirmative acts?  What did he do so

5    that he wouldn't have to pay his payroll taxes?

6    Now, one thing he did was, he filed that 2005 tax

7    return in which he said, "I only have $631 in interest and

8    dividends."  So he filed a false tax return.  He lied about the

9    income; he concealed the wages and the income he had from his

10   business, and he lied about his tax obligations.

11   So one, he filed a false tax return for 2005.  But

12   after that, he simply stopped filing altogether.  And, in fact,

13   Mr. Stuart didn't file for 2006, 2007, 2008.  Didn't file for

14   2009 or 2010.  Didn't file returns for any of those years.  But

15   the failure to file itself, that's not an affirmative act.  It's

16   evidence of intent, it's evidence that he's trying to avoid

17   paying taxes but, as the court will instruct you, that alone,

18   just failing to file a tax return, that's a -- I guess -- I was

19   raised a Catholic, that's a sin of omission, not a sin of

20   commission.  So that that's not an affirmative act.

21   But nonetheless, Mr. Stuart committed affirmative

22   acts, the evidence shows, to help him evade his taxes.  Because

23   maybe you'll recall, in 2005 he was receiving his salary through

24   Payroll Data Services and they were withholding taxes.  You may

25   recall David Schwarz, I think he was the second witness to

415

1   testify, and they were discussing the services they were

2   provided, and that Mr. Stuart's status changed.  He changed

3   himself -- he didn't want to have any withholdings so he changed

4   himself from a W-2 wage-earner that they were going to withhold

5   taxes from his salary and pay those over to the federal

6   government, to an independent contractor so that they wouldn't

7   withhold payroll taxes.

8         So, again, that's an affirmative act that he does

9   because he doesn't want to pay taxes.  He knows he's supposed

10   to, he's done it in the past, but he doesn't want to.  So he

11   changes his status so they won't withhold on him.  And so they

12   change from a W-2 wage-earner in 2005, in the mid year, to a

13   1099 where he gets the full amount of his compensation without

14   any withholding.

15         But it gets -- it goes on.  There's more affirmative

16   acts.  Because he didn't like the fact that the 1099 was being

17   filed with the federal government because then the federal

18   government knew he had this income.  So he did some more.  And

19   you may recall, first he was telling Mr. Schwarz that he wanted

20   him to reverse the 1099 because he didn't like the fact that the

21   federal government was getting information about his income.  So

22   he directed I think his sister, the testimony was, to stop

23   paying him through Payroll Data Services because they were

24   either going to withhold and issue a W-2 or they were going to

25   not withhold but issue a 1099 and tell the federal government,

416

1    well, he did receive all this income he's supposed to be paying

2    taxes on.  So he said pay me directly through New Age Chemical.

3           So again, that furthered his efforts to avoid paying

4    taxes because it would conceal the income he was getting from

5    New Age Chemical.  And so in the middle of 2006 he starts

6    getting checks directly from New Age Chemical, and it's almost

7    the best of all worlds.  There is no withholding.  There is no

8    W-2 filed with the federal government and no withholding, and

9    there's no 1099 so the federal government doesn't know about

10   that compensation he's receiving either.  So again, that

11   furthers his efforts to evade the taxes, evade having to pay

12   those taxes.  IRS won't know about the money he's receiving.

13          And then finally, in 2007 he goes even further.  In

14   2007 he changes how his compensation is paid for him because

15   it's being paid for him in his own name.  And so if you look at

16   the books and records of New Age Chemical, which might be in

17   good order, they'll reflect, hey, we did issue these checks to

18   him, these payroll checks to him and they're going to him in his

19   own name, so if the government heads ahold of those they'll know

20   how much money he's being paid.  So he changed it so the checks

21   aren't being paid to him anymore, they're paid to New Age

22   Chemical, Ltd. Drawing Account.

23          And he doesn't even put them into his own personal

24   bank account.  He opens a new bank account, opens a new bank

25   account in the name of Delafield Trust because again, he's

417

1    trying to insulate himself, conceal his income from third

2    parties, from the IRS, so they won't know how much he's being

3    paid.  He gets the checks issued to somebody else and they go

4    into this new bank account for the benefit of the Delafield

5    Trust.

6         And you can see it in the forms that are introduced.

7    In early 2005 there's a W-2 issued by Payroll Data Services for

8    the first part of the year when he's a W-2 wage-earner.  And

9    again, it's issued to Mr. Stuart.  It said for that first part

10   of the year he's paid $125,000, and they withheld $18,786.  But

11   Mr. Stuart doesn't like that.  So he has himself changed to a

12   1099.  And when you go to the 1099 for that same year 2005, he

13   gets another $53,600, but boom, no withholding.

14        So his plan is working.  Not having to have any

15   withholding, the IRS doesn't have my money, I don't have to pay

16   the taxes.

17        We move into 2006 and he's still getting the 1099 from

18   Payroll Data Services.  So in the first part of 2006 he receives

19   $40,200 but, again, no withholding.

20        So again, you can see how his plan, his scheme is

21   developing.  And that's a theme that runs through this case, is

22   that Mr. Stuart's plan, his scheme, his strategy to avoid,

23   evade, and not have to pay any taxes develops over time.

24   Because maybe the first one isn't working so it continues to

25   develop.

418

1       So then he stops being paid through Payroll Data

2  Services and then stops getting these 1099s issued.

3       What else does he do?  Because he's aggressive.  And I

4  know in Mr. Bernhoft's opening he talked about what kind of

02:55   5  person is a tax cheat.  Are they going to communicate directly

6  with the IRS or are they going to try to stay below the radar?

7       And I think Mr. Stuart tried a little of both.  I

8  think there was testimony about both.  But definitely he's in

9  the IRS's face.  He's aggressive.  You know, there's some people

02:56  10  who take the passive approach and there's some people who take

11  the in-your-face, I'm gonna stake out a position, and I'm gonna

12  get in your face and I'm gonna say "I'm not paying taxes."

13       And you see it here with Mr. Stuart, what does he do?

14  First he files an amended — this is in late November of 2005 I

02:56  15  believe the testimony was — he files first an amended 1040X.

16  And he asks for all of the taxes that he paid in 2002, saying it

17  turns out I don't have any wages, I don't have any earnings, and

18  I want all those taxes back.  And he's aggressive.  He's -- as I

19  think the testimony demonstrated, his demeanor is -- he's

02:56  20  bullying them.  He's in the face of the IRS.  He's telling them,

21  he's demanding results, he wants his money back.  That's his

22  approach.  That's the scheme that he's gonna try.

23       And so again, how do we know that he's acting

24  intentionally, that he's acting willfully?  Well, we know

02:57  25  because he continues to act in spite of all of the information

419

1   he received that he is wrong.  And he receives it from numerous

2   sources.

3        For example, we see the IRS itself.  It responds to

4   his claim and it tells him, your claim, in July of 2006, in

5   responding to his November 2005 amended tax return, the IRS

6   tells him:  "There is no basis to allow any part of your claim.

7   The income you received in 2002 is clearly wages and is taxable,

8   and you must file a lawsuit to pursue your claim."

9        You know, the IRS is dealing with 140 million tax

10  returns.  They get this claim, sort of off the wall, I don't

11  have any wages, and they respond:  "It's baseless.  If you want

12  to pursue this, file a lawsuit."  But that's not Mr. Stuart.

13       The IRS continues to respond to his filings because he

14  files, again, amended returns for 2003 and 2004.  And, of

15  course, he filed his 2005 tax return where he reported virtually

16  no income, just the interest and dividends, and again asked for

17  a refund of all the withholdings.

18       And the IRS consistently tells him -- and it's

19  important because when you have to judge someone's willfulness,

20  whether they're acting intentionally, you look at:  what

21  information did they have; what advice were they given; who was

22  giving them the advice, and how did they act in response to it.

23       And you see the IRS sends him -- consistently sends

24  him letters.

25       In March of '07, about his 2002 amended return.

420

1        In April of 07, about his 2003 amended tax return.

2        In June of '07, about his 2005 tax return.

3        And the IRS consistently tells Mr. Stuart:  "Your

4    information is frivolous; there's no basis in law; it's been

5    repeatedly rejected by courts as without merit; and there's

6    potential for criminal prosecution."

7        And as you'll see in those letters --

8        Just scroll forward.

9        For example --

10       Why don't you scroll forward one more.

11       Again, the letter tells him:  "Our office has

12   completed review of your claim for refund of taxes."  This is

13   his first letter.  "There's no basis to allow it."  Tells him

14   how to pursuit it.  If he wants to take that position, pursue it

15   in court but we're telling you your position is frivolous.

16       If you could scroll forward again.

17       Then they send him letters telling him --

18       If you could scroll again.  One more.  One more.  I'm

19   sorry.  Maybe you could back up one.  I'm sorry.  Could you

20   highlight the first paragraph.

21       Again, the IRS tells him his claim is frivolous.  But

22   they also tell him, look, seek advice, get competent accounting

23   or legal advice.  Because again, the IRS is dealing with 140

24   million taxpayers.  They're not going to do legal research for

25   each individual taxpayer.  The IRS tells him his position is

421

1    frivolous, advises him to get legal counsel, and they do provide

2    him some citations to the Internal Revenue Code.

3              And if you could scroll forward.

4              Because if you look at Exhibit, I think it's 40 --

5              If you can go forward.

6              They tell him:  "General information on filing

7    requirements can be found here in the United States Code, Title

8    26."  That's the Internal Revenue Code.  So they cite to him the

9    law where he can look for it.  And again, they recommend "go

10   find competent legal help about your positions."  And, in fact,

11   I think from the testimony here Mr. Stuart had competent

12   accounting and legal help, or at least competent accounting

13   help, in the form of Patrick Walsh, Daniel Hau, his niece.

14             Scroll forward.

15             And the IRS also sent him a pamphlet.  And if you

16   looked at the pamphlet here, it's called "Why Do I Have to Pay

17   Taxes?"  It addresses some of the issues that Mr. Stuart is

18   raising in his filings.

19             If you could just scroll forward to the next page.

20             And it talks about various scams that people have

21   tried, various tax scams not to pay taxes, and it explains the

22   truth as to each one of those.  So it addresses them head-on and

23   tells him "these are frivolous, you can't do that."  But

24   again --

25             If you could scroll forward.

422

1          -- Mr. Stuart doesn't listen to that because he's

2     bent -- he's staked out his position and no one's gonna convince

3     him to the contrary.

4          THE COURT:  One second, I think you need to flip

5     your --

6          MR. JACOBS:  No, that's right.  The sticky is

7     upside-down.

8          THE COURT:  All right.

9          MR. JACOBS:  Now, again, I think in opening

10    Mr. Bernhoft suggested that Mr. Stuart was just -- he was -- "I

11    am tax curious, I guess I'd say."  You know, he's just confused

12    and curious and just wants information.  But the evidence

13    demonstrates that's not the case at all.  Because we can see

14    what actually Mr. Stuart's motives are.  We can see them because

15    in corresponding with Patrick Walsh he provided some notes.

16          If you just scroll forward I think it will be there.

17          For example, what does Mr. Stuart tell his accountant?

18    This was in 2004 when his accountant, Mr. Walsh, was preparing

19    his 2003 tax return.  What does he tell him at that point?

20          He says:  "Pat, info for taxes, of react K-1, form

21    will change.  Be as creative as you want here and get my tax

22    bill as low as possible."

23          So we know what his motive is.  This isn't confusion.

24    This isn't "I'm uninformed."  This is "I don't want to pay

25    taxes."  And so far it's not working, I guess.

423

1    So that was into '04.  So then, in '05, when Mr. Walsh

2  is preparing his -- this is early 2005, Mr. Walsh is preparing

3  Mr. Stuart's 2004 tax return, he sends him another note and he

4  says:  "Here is all my stuff for the 2004 taxes.  I remember

5  last year how I got caught up in the AMT tax and the whole thing

6  makes me furious."

7          Fair enough.

8          "See what you can do about my not getting caught up in

9  it this year.  I want to take every deduction you can think of

10  and will take my chances on an audit."

11          So we see what Mr. Stuart's motive here is.  This is

12  early '05.  Spring of '05 I think Mr. Walsh said when he's

13  preparing his tax return.  And, in fact, it's just a

14  progression.  First "be as creative as you can be."  Next is

15  "take any reductions you can, I'll take my chances on an audit."

16  And come November of '05, what is it?  "I don't even have any

17  wages.  I want all my taxes back."

18          And the next year, after Mr. Walsh refuses to go

19  along, he just files a tax return reporting 500 or $6 00 worth

20  of interest and income.  You can see this is a progression, I

21  don't want to pay any taxes, apparently it's not working, so now

22  I'm just going to go off the grid.

23          You see the same thing --

24          I'm gonna come back to that.  We see -- well --

25          You may also recall that after Mr. Stuart -- well,

424

1    after Mr. Walsh refused to prepare Mr. Stuart's tax returns,

2    Mr. Stuart went to Daniel Hau — Mr. Hau, an accountant also in

3    this area, a very experienced accountant in this area.  And

4    again, you see that Mr. Stuart is getting specific direct advice

5    from people telling him you have to pay taxes.  And Mr. Stuart's

6    coming up with a variety of ideas, one of which concerns the

7    distinction between James Stuart in all caps and the James

8    Stuart with just initial capital letters.

9         But even then, Mr. Hau, when the issue comes up, tells

10   Mr. Stuart point blank, tells him:  "Because of the positions

11   that you are taking on these tax matters, I am obligated to ask

12   you that you acknowledge that I have advised you that you, James

13   Stuart, are required to pay taxes associated with the Social

14   Security number which bears your name spelled out in capital

15   letters."

16        Again, Mr. Stuart isn't interested in advice.  He

17   isn't interested in being informed.  He doesn't -- he's been

18   told "seek competent advice."  "Seek competent advice from

19   accountants."  That's what the IRS tells him.  And so when he

20   does that, and when he gets the advice he doesn't like, when it

21   doesn't agree with his strategy, he rejects it.  And that's how,

22   again, we know he's acting intentionally.  So --

23        I'll come back to that.

24        So then how do we -- so we start to assess who else

25   gave Mr. Stuart advice and how did he respond to it?  So, let's

1    start with Patrick Walsh.  You may recall Mr. Walsh, I think

2    he's in his mid 70s, he's been an accountant I think he said for

3    35 years, was the managing partner of a large accounting firm

4    here in Wisconsin.  More than that, he's a long-time friend of

5    the Stuart family, a long-time advisor and consultant.  I

6    believe he testified that the defendant's father trusted and

7    relied upon him so much that he asked Mr. Walsh to look after

8    his family, continue to give them advice.  And he prepared

9    Mr. Stuart's tax returns for many years.

10        But when it finally came to the 2005 tax return, and

11   Mr. Stuart decided he wasn't going to have any withholding,

12   wasn't going to pay any taxes, what did Mr. Walsh say?  He told

13   him "it's unlawful."  He didn't mince words.  He said, "This is

14   fraudulent.  You're going to get yourself in trouble.  You're

15   never going to get away with this.  I can't prepare your tax

16   returns if you're gonna keep this up."  Again, competent

17   accounting advice.  But, of course, it's not advice Mr. Stuart's

18   going to accept, because it doesn't comport with his strategy,

19   how am I gonna not pay taxes.

20        And, in fact, Mr. Walsh indicates that he offered to

21   provide him his Tax Master Guide.  "If you want to look through

22   it you can, but I'm telling you, I've been an accountant for 35

23   years, you have to do these things."  But Mr. Stuart wouldn't

24   accept it.

25        Mr. Walsh met repeatedly with Mr. Stuart trying to

426

1      convince him.  And how did Mr. Stuart respond to that?  He told

2      -- I think he told Mr. Walsh that he was stupid, that he had

3      bought in, that he was really essentially part of the scam

4      because he was making his money out of it.  Just rejected that

5      advice.

6               Mr. Walsh met with Mr. Stuart on several occasions.

7      In one occasion Mr. Walsh met with Mr. Stuart even with

8      Mr. Stuart's niece.  And you will recall Allison -- Allison

9      Reese, I think it's Putland now -- again, another woman with an

10     accounting degree, is a director of accounting of a company, is

11     the defendant's niece, learns of what the defendant is doing,

12     and what does she do?  First, she does research.  She goes to

13     the Internet, goes to the Internal Revenue Service's website,

14     looks up cases identifying the claims that Mr. Stuart is making,

15     and goes to meet with him in person.  Tries to provide him with

16     information.  But, of course, Mr. Stuart doesn't want it because

17     it comes from the IRS.  He's got another source from the

18     Internet.  So he's going to rely upon that because he won't take

19     advice that's contrary to his position.  They're not competent

20     unless they'll agree with his ideas.

21               And, in fact, what does he tell his niece, the one

22     with the college degree in accounting?  That she's brainwashed;

23     that she's stupid.  That's how he responds to competent

24     accounting advice in this area.  He rejects it out of hand.

25     It's just straight arrogance because it doesn't agree with what

427

1    he wants to do.

2         In addition, he's taking the same position with the

3    Wisconsin Department of Revenue.  And you can read in their

4    decision here --

5         If you could scroll forward.

6         -- they describe --

7         I don't know if that's -- if you go forward or not, if

8    that's already -- no, maybe get back and just highlight it.  No,

9    just on the second page, the yellow.  If you would enlarge the

10   yellow on the second page.  Thank you.

11        And we know, again, Mr. Stuart -- I think at some time

12   in one of the documents identifies him a citizen of the Country

13   of Wisconsin.  He's obviously not paying their taxes either

14   because, as they indicate, what does Mr. Stuart do with his

15   state tax returns?  He again reports the $631 and says -- that

16   his wages did not -- that wages he got in 2005 don't constitute

17   wages and he doesn't have any taxes.

18        If you can move to the next page and enlarge.

19        Right.  That he only reported, again, the $631.

20        And, of course, he attaches one of these IRS Forms

21   4852 Substitute Form W-2 that corrects it to say he has no

22   wages.

23        Okay.  So there.  He files that with the State of

24   Wisconsin.  And he ends up in a legal action in front of the

25   Wisconsin Tax Appeals Commission.  And how -- and how -- so they

428

1    issue a decision.  This decision is issued in June of --

2           If you could just highlight that.  Yes.  Thank you.

3    No, just the top.  Thank you.

4           June 2007.  And the Tax Appeals Commission -- now

5    that's a court.  How do you decide what the law is?  You go to

6    court and the court tells you what the law is.  Right?  And the

7    court tells him:  "In light of the well established authority

8    cited above, petitioner's claims are groundless, frivolous, and

9    a waste of state resources."

10          They tell him.  He gets an appeal decision in 2007.

11   Is that good enough for him?  No.  Does he begin filing tax

12   returns?  Does he file for 2007 or 2006, 2007 or even after that

13   2008?  No.  Again, because it doesn't comport with what he wants

14   to do with the strategy he has, he rejects that as well.  But he

15   doesn't even appeal this decision.

16          And again, you can tell Mr. Stuart knows that

17   educated, experienced, trained individuals in the areas of taxes

18   and tax law — you know, Patrick Walsh, Daniel Hau, his niece,

19   the Wisconsin Tax Appeals Commission, they all tell him his

20   arguments are frivolous, they reject them.  So what does he do?

21   He sends a letter and puts it in the paper and he --

22          I think if you scroll forward it will be -- I think if

23   you still scroll forward -- maybe not though.

24          You know, he describes -- and I have to say this is a

25   little different than some of the other arguments because, as I

429

1    say, Mr. Stuart is sort of -- you know, he's changing and

2    developing.  He issues a letter when he says, "The Constitution

3    clearly says that states cannot demand payment of debt in

4    anything other than gold or silver which our federal government

5    conveniently confiscated in the 1930s, leaving us with fiat

6    notes worth nothing."

7            But, more specifically --

8            If you can scroll forward one more.

9            He says, "Don't ask your accountant or lawyer, because

10   they derive their lucrative incomes at your expense."

11           So again, what does he say?  He's advised to seek

12   competent counsel.  And how does Mr. Stuart respond to that?

13   Every counsel he gets tells him what he's doing is unlawful,

14   fraudulent, incorrect.  The Wisconsin Tax Appeals Commission.

15   Because all that competent counsel is telling him he's wrong.

16   So what he says is "don't talk to lawyers or accountants."  Yes,

17   don't talk to the people who have the education, training and

18   experience, rely on what you can find on the Internet.

19           So again, that's how we know it's willful; that this

20   isn't someone who is confused and trying to find answers.  And

21   you look at his correspondence --

22           If you could scroll forward again, please.

23           I'll make a side point here.  Because you may recall

24   that in some of Mr. Stuart's correspondence he talks about the

25   man James A. Stuart and the Trust James A. Stuart in all capital

430

1    letters, and how the Trust in all capital letters has a Social

2    Security number but how the man does not.  And you'll see that

3    in his correspondence.  But ironically when it's to his

4    advantage --

5            Do you want to redact that?  Thanks.

6            (Brief pause.)

7            MR. JACOBS:  But there is Mr. Stuart, obviously not

8    the Trust because I assume the Trust doesn't drive, but there's

9    Mr. Stuart with a date of birth of 1943, white male, blue eyes,

10   brown hair, 200 pounds, six feet tall, obviously not the legal

11   entity Trust.  There he is in September of 2006.  So when it's

12   convenient for him he's got a Social Security number, but when

13   it's gonna make him pay taxes, well, no, it's this Trust that

14   has a Social Security number.

15           If you could scroll forward again.

16           Again, we see that progression of checks paid to

17   Mr. Stuart.

18           Why don't you just scroll through these.  Thank you.

19           Including the ones in '07 when he, again, starts

20   putting those checks into his New Age Chemical drawing account

21   that he opened at Waukesha State Bank.

22           If you right click, and then up at the top go to zoom.

23           I think I mentioned this earlier.  This was part of

24   the affirmative acts.  Obviously the slides are not in perfect

25   order.

431

1    That he opens the account in 2007 so that he can

2    receive checks payable to someone other than himself and put

3    him -- put them into an account he controls but not in his own

4    name to conceal his income.  He opens this account for the

5    benefit of the Delafield Trust.

6        Why don't you scroll through.

7        This is the Amended Tax Return that he filed.  First

8    in '02, again, reducing all of his income.  These are in

9    evidence.  Then his 2005 tax return.  And again, where he

10   attaches the W-2, his own W-2, where he says he actually had no

11   wages in '05.  He makes up his own W-2 in April of '06.

12       Keep scrolling through.  Maybe if you could back up

13   one.  Two.  I'm sorry.  Significantly -- maybe even one more.

14   I'm sorry.

15       On one of the tax returns he includes one of these

16   forms, a Form 4852, Substitute For Return.  And this is where

17   because a W-2 or a 1099 has already been issued for him, that

18   says he had this income and had these withholdings, he's trying

19   to convince the IRS that that one's wrong; that that's not my

20   wages, those aren't -- you know, I need this money that was

21   withheld from my wages paid back to me.  And he files one of

22   these Forms 4852.  And where have we heard of that form before?

23       If you could scroll forward.

24       You may recall that Mr. Walsh, he gave Mr. Stuart

25   something from a professional accounting association he belongs

432

1    to, and it specifically tells him.  It says -- it describes

2    scams that tax protestors and tax defiers are concocting.  And

3    in this scam a taxpayer attaches to his or her return either a

4    Form 4852, Substitute for W-2, or Corrected Form 1099.  And it

03:17  5    says, "The taxpayer may include a statement saying he or she is

6    rebutting information submitted to the IRS by the payer."

7         That's exactly what he's doing.  And Mr. Walsh tells

8    him "This is an identified scam."  This is unlawful.  I'm

9    showing you.  Here's evidence of this."  But Mr. Stuart doesn't

03:18  10   want to hear of it.

11        And it talks about citing to statutory language behind

12   IRC 3401 and 3121, and references to the company's refusal to

13   issue a corrected Form W-2 for fear of IRS retaliation.  And you

14   see that same language in Mr. Stuart's correspondence with the

03:18  15   IRS.  He's doing this exact scam that Mr. Walsh talked to him.

16   And again, you saw Mr. Walsh testify.  You heard his background,

17   his long-time relationship with the Stuarts.  And you hear how

18   explicitly he was with Mr. Stuart, how his long-term

19   relationship.  But did Mr. Stuart listen?  No.

03:18  20        Just scroll forward.

21        Again, the documents given to Mr. Stuart by Mr. Walsh

22   even describe a bunch of frivolous arguments:  You know, that

23   wages are not income; that the 16th Amendment concerning

24   Congressional power to lay taxes on income was never ratified.

03:19  25   Again, these are the scams that Mr. Stuart is picking up

433

1    himself.  But he's been warned early on that this is fraudulent

2    and frivolous — not just by the IRS, but by his long-term,

3    long-time close family friend and consultant.  But he's not

4    listening.

03:19  5         Now, you also have evidence that Mr. Stuart is acting

6    willfully because his claims, they sort of morph over time, they

7    sort of develop over time.  He's trying out different things.

8    For example, this is a letter early on in '06.

9         I think if you just scroll forward it will go.

03:20 10         He talks about early on in his request to get a 2002

11   refund.  In his initial claims he's saying that -- he's

12   submitting the 4852, and he can't understand why he's not

13   getting it.

14         Could you scroll forward?  Could you just scroll

03:20 15   forward again?  No, keep going.

16         And what does he tell him?  He says, "Affiant," and

17   this is Mr. Stuart, "works as a nonprivileged executive for New

18   Age Chemical, a private sector, for profit, manufacturing firm

19   incorporated in the State of Wisconsin in the year 1985 that is

03:20 20   not a governmental instrumentality.  Affiant's earnings are paid

21   to him in exchange for his time and labor and are not identified

22   within the limited definitions of--" and, again, there are those

23   sections that were in the IRS's dirty dozen that Mr. Walsh gave

24   him, "3401 and 3121.  Affiant received no such wages from New

03:21 25   Age Chemical."

434

1        So initially his claims are the money I'm receiving

2   are not wages.  Okay?  And again, that's the argument that the

3   Wisconsin Tax Appeals Commission rejected.

4        Scroll forward.

5        Then as the letters progress, this is March of 2006.

6        Scroll forward.

7        And again, is this someone who is looking for answers,

8   who doesn't really know, who is confused, or is this someone who

9   has staked out a position and is in the face of the IRS and says

10  you're wrong and I'm right?  Because here's what he says:  "With

11  the above statute in mind, I hereby demand that I either receive

12  my refund, receive a satisfactory explanation as to why the

13  refund is denied, or an answer to my letter requesting

14  administrative appeal and request for cure.  It is my opinion

15  that the IRS is skating on thin ice regarding this matter and

16  appears to be willfully denying my claim, which is an act with

17  dire repercussions."

18       You know, as I say, some people fly under the radar,

19  some people get into people's faces to get what they want.

20       And so if you scroll forward, you see again how

21  Mr. Stuart's --

22       He says, "The company has listed payments as wages.

23  I'm rebutting that claim."  He says, "Now, I am not employed in

24  a trade or business, nor am I an officer of a corporation.  The

25  amounts listed in the W-2 are incorrect."

435

1    So not only are his payments not wages, he's not

2    employed as a trade or business.  And we continue on with

3    Mr. Stuart.  He says --

4        I think it keeps going.

5    Now, this is a little harder because it's a little

6    longer.  But again, the tone is significant.  The last sentences

7    say:  "Therefore, there is nothing for you to research--"  He's

8    not looking for the IRS to do any research; he's telling them

9    what the answer is.  "--as justification for my actions are

10   clearly spelled out in the code.  I therefore demand that the

11   claimed refund stated on my 1040 be returned to me immediately.

12   This stalling game is a ruse to discourage honest, law abiding

13   citizens who are following the law to the letter and I will have

14   no part of it as I will not be discouraged.  I consider this

15   money in effect stolen from me by my employer and I want it

16   back."

17       So again, this isn't I don't understand it, I'm

18   operating under some mistake; no, "I've staked out my position

19   and I'm sticking to it."

20       You see again as his correspondence continues.  He

21   says, "Now knowing" -- now, again, he's not claiming confusion,

22   he's asserting his own personal knowledge -- "that the IRC

23   actually does say" -- or "what the IRC actually does say about

24   who owes income taxes, it is clear that such tax does not apply

25   to me."

436

1        Again, this is not I am tax curious, this is I don't

2   understand, this is I disagree.  You're wrong and I am right.

3   You're stupid.  You're brainwashed, you know, because you went

4   to school; you didn't learn it on the Internet.

5        And you listen to Mr. Stuart again.  He obviously

6   treats other third parties, but how he responds to the IRS.

7            And if you scroll on.

8        And again, he says things like "I, James A. Stuart,

9   Jr., swear that I am a natural person residing in the City of

10  Delafield in Waukesha County in our Country of Wisconsin."

11       He says, you know, with that premise -- and as you see

12  these premises -- how is the IRS to convince him to the

13  contrary?  If his premises are, here, here's my position, I live

14  in the Country of Wisconsin.

15       And again, you see that again, where he starts with a

16  fanciful, fictionalized premise and then demands answers from

17  the IRS.

18       As his correspondence continues, he says:

19       "James A. Stuart, Jr. attests that he is a living

20  human being who has loaned his consciousness to, and is acting

21  in the capacity of, the Office of Trustee of the James A.

22  Stuart, Jr. Social Security Trust.

23       "James A. Stuart, Jr., through his own independent

24  study, attests that it is the James A. Stuart, Jr. Trust that

25  has received income, and not the natural man, James A. Stuart,

1    Jr.

2            "James A. Stuart, Jr., though, through his own

3    independent study, attests that he is not, nor has he ever been,

4    in the possession of a Social Security number--"

5            I guess except the one he used to get a driver's

6    license.

7            "--a Social Security number or a Social Security card,

8    therefore has no TIN, and that said instrument and TIN belong to

9    the James A. Stuart, Jr. Social Security Trust account."

10           So now he moves on.  You know, we're done with wages I

11   received -- or the monies I received aren't wages, that the

12   employer I had is not a business -- a trade or business.  You

13   know, that's not doing it for him.  Obviously the Wisconsin Tax

14   Appeals Commission told him that's all frivolous, so he moves on

15   to something as a premise.  He says there's two of me, there's

16   the James with not all caps and there's a James with all caps

17   and it's the Trust that's an artificial entity that I loaned my

18   consciousness to.  And then he says, with that premise explain

19   to me what I'm supposed to do.

20           And as the judge will instruct you, when evaluating

21   someone's good faith beliefs, it's really a subjective

22   evaluation.  Did the person really in good faith believe this?

23   Did he believe that he wasn't obligated to pay taxes?  Did he

24   genuinely sincerely believe it?  And that's a subjective

25   evaluation.

438

1    But you can look at objectively how outrageous the

2    claims are to determine if someone really did genuinely believe

3    it.  Because I think your common experience would tell you, if

4    you go outside and you're dealing with someone who is

5    competent -- and that's the case here -- and someone just says

6    to you the sky is green.  I'm telling you, the sky is green, as

7    passionately as they want to.  But it's such an outrageous

8    claim, no matter how passionately, no matter how aggressively,

9    no matter how forcefully, no matter how much in rejection of all

10   else of science of anything else and they continue to say the

11   sky is green, but you know, your common sense, your common

12   experience tells you they don't really believe that because it's

13   outrageous.  It's so objectionably unreasonable no competent,

14   reasonable person could genuinely believe it.  They're just

15   arrogant, they're just bullying.

16   You remember Beverly Schlipp, his sister?  And she

17   testified.  You know, she didn't want to do this.  And I think

18   there was even some reference to her husband.  She didn't want

19   to sign the checks.  And how did Mr. Stuart respond to that?  He

20   just threatened her.  He said I'm the majority owner, I own 70

21   percent, you don't sign them I'll fire you.  He's a bully.

22   You know, his niece in accounting tries to help him,

23   brings him printed material that she's done research, the

24   woman's got a degree in accounting.  She's brainwashed, she's

25   stupid.  That's the kind of arrogance.  You know, won't listen

439

1    to reason because it doesn't get him not to pay taxes.

2         So then you start with that premise.  And then you

3    demand.  He says I'm not in possession of a taxpayer

4    identification number or Social Security number and has loaned

5    his consciousness and physical capacity to and acts in the

6    capacity of.

7         And so with that as a faulty premise, no amount of

8    research or logic -- you know, if people won't listen, you

9    cannot convince them.  And that's what's demonstrated here.

10   That's how you know this is not a good faith genuinely held

11   belief; this is just arrogance.

12        And you look on -- look on to Mr. Stuart's further

13   correspondence.  He says he's confused.  "Coupled with confusion

14   and incomprehensibility of the Internal Revenue Code."  He says,

15   "As encouraged by the IRS, the Trust" -- the Trust.  You know,

16   he's talking kinda like the third person.  But in the third

17   person as the Trust -- "has sought advice from a reputable tax

18   practitioner, an attorney, and a payroll service.  When the

19   Trust presented the understanding" -- "so again, when the Trust

20   presented the understanding of who the taxpayer was, it being

21   the Social Security numbered James A. Stuart, Jr. Trust--"

22        So he goes to professionals and he says, okay, you

23   understand, the taxpayer is this Trust which whom I've lent my

24   physical capacity and consciousness, "--and asked questions as

25   to whether they as professionals in their respective fields

440

1    understood the IRC, each of these entities declined to provide

2    advice."

3          Well, man bites dog.  No surprise there.  A guy walks

4    in the door and explains the theory under which he's loaned his

5    consciousness to an artificial entity that has a Social Security

6    number and accountants and lawyers and a payroll service don't

7    want to give advice.  Again, because Mr. Stuart says you play by

8    my rules, you accept my premise or you're not competent.  And

9    that's how he says in his further letters, I can't find

10   competent counsel because no one will agree with my premise.

11         You start reading his letters.  And he talks about how

12   the Social Security Administration created a Social Security

13   account number which may serve as a taxpayer identification

14   number.  But he says, "There's some" -- "The Trust's name had

15   some similarities to the man's name.  One can never confuse the

16   Trust with the man and the Trust name is accompanied by its SSN.

17   The SSN also cannot be misconstrued as if it were the man's

18   number because God's law requires that his covenant children

19   cannot be numbered."

20         And again, as I've said, obviously maybe if it helps

21   him avoid paying taxes, but if he needs a driver's license he

22   has no problem using his Social Security number.

23         "No living being has ever been issued a SSN."  Now

24   it's even broader.  It's not even just him.  He now says, "No

25   human being has ever been issued an SSN and most certainly is

441

1    not numbered.  The human being who has loaned his consciousness

2    and physical capacity to, and acts within the Office of Trustee

3    for James A. Stuart, Jr. Trust, has no SSN."

4            He continues in his correspondence.

5            And again, you can tell it's sort of developing.  Sort

6    of like the letter in the newspaper when he's talking about

7    gold.  And he says, again -- let's go with just the last

8    sentence:

9            "Because the IRS owed the debt prior to the Trust

10   receiving the debt instrument, the IRS must first pay real money

11   to the Trust as a ratio of 21.95 Federal Reserve notes to every

12   one silver dollar, before the Trust can pay any tax on income

13   purportedly earned, because until this event occurs, no income

14   has been received."

15           So again, there's a new twist developing.  And he's

16   kind of reformulating, restructuring his strategy here.  And he

17   says, "The Trust is fully aware of the nature of the statutes

18   created by the United States Government, a corporation,

19   hereinafter referred to as the USG, and how these statutes have

20   been used since the bankruptcy of the United States was declared

21   in 1983."

22           THE COURT:  Correction.  Read that again.  The last --

23   the number.

24           MR. JACOBS:  "1938."  I was gonna say I wasn't alive

25   then.  I actually was alive in 1983, I was not alive in 1938.

1    And maybe some of you were.  I don't recall ever reading about

2    the bankruptcy being declared of the United States in 1938.  But

3    it fits into his alternate universe that he's pitching.  You

4    know, he's trying to avoid paying taxes so he's going for broke.

03:32

5         "The Trust believes that at the time it was decided by

6    the bankers and USG not to inform the people of the United

7    States of America of the bankruptcy."  This is why I have not

8    heard about it.  "It was not made known to them the fact that

9    under bankruptcy, they had purportedly lost all of their

03:33   10   constitutional rights and were now under the jurisdiction to

11   have compelled performance to repay the debt to the bankers."

12        I don't know where he's going.  But it's not -- it's

13   not a claim of mistake or confusion or, you know, the Internal

14   Revenue Code is really complicated.  Where does it say I have to

03:33   15   file a return or where does it say this?  It's not that.  You

16   can tell his claims have gone well beyond that.  It's I know

17   what the answers are; in fact, I'm not even listening to anybody

18   else who suggests contrary answers.  And it's -- it's just

19   fanciful.  It's a premise that doesn't allow for a response and

03:33   20   then gets angry and demands a response and tells the IRS it's on

21   thin ice because it can't respond because, of course, it's

22   impossible to respond to the arguments.

23        So the Judge will instruct you:  "The term 'willfully'

24   means the voluntary and intentional violation of a known legal

03:34   25   duty."  Mr. Stuart's prior history shows that he was aware of

1    his legal duty to do it.  His actions in filing a false tax

2    return, in changing his status from a W-2 wage earner to a 1099,

3    to paying himself directly from the company — you know, it

4    really reflects that he knows he's wrong because if he really

5    believed it he wouldn't have to make any of these changes.  But

6    he knows he's wrong so he's gotta take steps to avoid

7    withholding on the wages that are supposed to be withheld, to

8    avoid his income being reported to the Internal Revenue Service.

9    He knows he's wrong so he's gotta do things so the IRS doesn't

10   find out about his income so he doesn't have to pay taxes.

11          In other words, "Acting with a specific intent to

12   avoid paying a tax imposed by the income tax laws or to avoid

13   assessment of a tax that it was the legal duty of the defendant

14   to pay to the government, and that the defendant knew that it

15   was his legal duty to pay."

16          And again, his prior history.  His efforts alone

17   demonstrate that he's doing it intentionally.  His decision not

18   even to file tax returns at all after 2005 until the present

19   time.

20          And the Court will instruct you that in a case like

21   this that good faith can be a defense under some circumstances.

22   I mean, it's always a defense if you can satisfy it.  That is,

23   "A defendant does not act willfully if he believes in good faith

24   that he is acting within the law, or that his actions comply

25   with the law.  Therefore, if the defendant actually believed

444

1    that what he was doing was in accord with the tax statutes, he

2    cannot be said to have had the criminal intent to willfully

3    evade taxes.  This is so even if the defendant's belief was not

4    objectively reasonable, as long as he held the belief in good

5    faith.  However, you may consider the reasonableness of the

6    defendant's belief together with all the other evidence in the

7    case in determining whether the defendant held the belief in

8    good faith."

9          And that's what it tells you.  Because anyone can

10   stand there and adamantly declare the sky is green.  But to the

11   extent it is objectively unreasonable, that's some evidence that

12   he cannot genuinely hold it; it's just to his advantage to

13   assert it.

14         And the Court will further instruct you:

15         "A person's opinion that the tax laws violate his

16   constitutional rights does not constitute a good faith

17   misunderstanding of the law.  Furthermore, a person's

18   disagreement with the government's tax collection systems and

19   policies does not constitute a good faith misunderstanding of

20   the law."

21         So, when we review the evidence, what the evidence

22   shows, it shows that the defendant had a history of filing,

23   reporting his income, paying taxes.  He obviously wasn't happy

24   about it.  He advised his accountant to be creative.  He advised

25   him to take any deductions, he would take his chances with an

445

1    audit.  Perhaps Mr. Walsh wasn't the aggressive, creative type

2    of accountant Mr. Stuart wanted, so he moved on to simply

3    declaring his wages weren't income; that his employer wasn't a

4    trade or business; that he wasn't a U.S. citizen; that the IRS

03:37   5    didn't have jurisdiction over him; that there was a trust that

6    actually was -- he had loaned his consciousness to that actually

7    was receiving the income.

8         And he did that despite being told repeatedly by

9    relatives, by long-time friends, by very experienced, educated

03:37   10   accountants, by numerous accountants, by the Wisconsin Tax

11   Appeals Commission.  And his response was, I think he told his

12   sister Beverly Schlipp, "If the IRS sends correspondence don't

13   open it, send it back to them."  Again, that's not someone who

14   is confused and wants information, that's someone who, again,

03:38   15   has staked out their position.  They've decided that they're not

16   gonna listen, they're going to have it their way, and that no

17   matter all the educated, trained, experienced people, we're

18   going to reject them.  And he's going to advise other people,

19   "Don't listen to lawyers and accountants, they're in on it too."

03:38   20        When you look at that evidence, it establishes --

21             Just scroll forward.

22             And again, obviously the tax due for each of the

23   years --

24             Scroll one more.  I guess I didn't have them in order

03:38   25   very well.  I'm sorry.

446

1    But you look at the evidence.  It establishes that for

2   the years 2005, 2006 and 2007 Mr. Stuart had an income tax

3   obligation to the United States for each of those years; that he

4   attempted to evade his responsibility, a known responsibility

03:38    5   for those taxes; and that he committed affirmative acts:  filing

6   false tax returns, changing his employment status, changing

7   being paid through a payroll service to being paid through

8   checks from his company, and then having those checks issued

9   under a different name than his own.  That he took those

03:39   10   affirmative steps to willfully evade his income taxes.  And that

11   he acted willfully.  And not in some good faith misunderstanding

12   or confusion about what the law is, but in a selfish, arrogant

13   I'm right/you're wrong.  And that that evidence establishes that

14   Mr. Stuart is, in fact, guilty of each of the three counts with

03:39   15   which he's been charged, and your verdict should reflect that

16   finding.

17    Thank you.

18    THE COURT:  We will take a break at this time.

19    THE BAILIFF:  All rise.

03:39   20    (Jury out at 3:39 p.m.)

21    THE COURT:  Please be seated.

22    CONTINUED JURY INSTRUCTION CONFERENCE

23    THE COURT:  As I listened to the arguments, it

24   appeared to me that it may be appropriate to add an additional

03:40   25   instruction, Pattern Instruction 3.07, which reads:

447

1      "You have heard a witness or witnesses give opinions

2   about matters requiring special knowledge or skill.  You should

3   judge this testimony in the same way that you judge the

4   testimony of any other witness.  The fact that such a person has

5   given an opinion does not mean that you are required to accept

6   it.  Give the testimony whatever weight you think it deserves

7   considering the reasons given for the opinion, the witness's

8   qualifications and all of the other evidence in the case."

9           Your comments are invited.

10          MR. JACOBS:  The instruction is fine with me, Your

11   Honor.  I didn't -- I don't think I requested it but it's fine

12   with me.

13          MR. BERNHOFT:  Defense agrees.

14          THE COURT:  All right.  What I will do is collect the

15   instructions that are in the jury box so that they can be

16   revised in accordance with our discussion.  I ordinarily have

17   these in the hands of the jurors but rather than delay matters

18   while these are being revised I will -- or if they can be done

19   by the time I read the instructions fine, but otherwise we'll

20   hand them to the jurors after they go into the jury room to

21   deliberate.  All right?

22          We'll give you a short break and then we'll proceed.

23          THE BAILIFF:  All rise.

24          (Recess taken at 3:42 p.m., until 4:12 p.m.)

25          THE COURT:  Are you ready to proceed?

448

1    MR. BERNHOFT:  Yes.

2    THE COURT:  They're finishing up the exhibits.

3    THE BAILIFF:  All rise.

4    (Jury in at 4:14 p.m.)

5    THE COURT:  Be seated, please.  Counsel, you may

6    continue.

7    MR. BERNHOFT:  Thank you, Judge.

8                    DEFENDANT CLOSING ARGUMENT

9    MR. BERNHOFT:  Your Honor, Mr. Jacobs, Mr. Rech,

10   ladies and gentlemen of the jury:

11   This is my final opportunity to speak with all of you

12   about the testimony and evidence in this case prior to the Court

13   instructing you on the law and you retire to the jury room to

14   continue this discussion amongst yourselves and to deliberate on

15   the fate of Mr. Stuart.

16   Now, the prosecution will have the last word after I'm

17   finished, and Mr. Jacobs will be able to make a rebuttal

18   argument.  So with the utmost respect I'd ask you to pay careful

19   attention to what we discuss now, and keep that close to mind

20   during Mr. Jacobs' rebuttal argument because again this is my,

21   again, last opportunity to speak with you.

22   You'll recall I had the privilege of speaking with you

23   all at the very beginning of the case in opening statement.  And

24   I surveyed what my best view of the testimony and evidence that

25   would come out in this trial and I made certain representations

449

1    about what the testimony and evidence would show.  And I think

2    as we move forward you'll see that those good faith estimates,

3    or informed opinions about what the testimony and evidence would

4    show, matched up quite well with what actually came out here

5    during the trial testimony and in the documents.

6         As I mentioned during opening statement, some of the

7    most important evidence in this case is Mr. Stuart's letters to

8    the IRS.  And I represented to you that all of these letters

9    would come in, and that Mr. Stuart made certain important

10    statements in his letters to IRS and, in fact, he did.

11         Now, Mr. Stuart told the IRS that he stood ready to

12    pay any tax and file any form the law required him to.  He told

13    the IRS he couldn't find the code section in the Internal

14    Revenue Code that made him liable for the tax, and if he was

15    wrong about that to show him where he was wrong, to show him the

16    law.  That's a reasonable position.  It's a reasonable position

17    because I think every American would be entitled to know that,

18    and every American taxpayer is entitled to know what section of

19    the code makes them liable for the tax and what law requires

20    them to file the Form 1040.

21         Now, Kristy Morgan, you'll recall Ms. Morgan was the

22    IRS witness from Ogden, Utah, the Service Center there, the

23    Frivolous Correspondence Unit, she testified that the IRS

24    doesn't discuss tax law.  I mean, if that's true perhaps they

25    should.

450

1    Ms. Morgan testified that it cost a lot of money to

2    answer those pesky taxpayer letters.  Even if that's true, I

3    don't think it would have been very difficult for IRS to draft

4    one of those form letters and simply identify the code section

5    that imposes the liability, the law that requires the filing of

6    a 1040, and the code section that subjects the money that

7    Mr. Stuart made from New Age Chemical to withholding taxes.

8    They can do that in a form letter.  In all events that didn't

9    happen.

10    Now, the other thing is this issue of frivolity.  And

11    I would submit that rather than calling Mr. Stuart frivolous and

12    that they weren't going to talk to him anymore, they could have

13    just simply showed him the law.  And then that burden would have

14    fallen to Mr. Stuart to respond accordingly.  I believe the

15    testimony in this case shows that he was very sincere in his

16    beliefs, and that he would have responded appropriately based on

17    the statements of compliance, if you will, that he made in his

18    letters.

19    I believe the testimony and evidence shows that

20    Mr. Stuart was serious about this, that he was a serious man.

21    By all accounts and from the testimony and evidence he's an

22    intelligent man, and he was having a serious engagement with IRS

23    over fundamentally important issues.

24    The other thing Mr. Stuart told the IRS, very

25    importantly, is that he wasn't questioning the legality of the

451

1    Internal Revenue Code.  I made that representation in opening

2    statement, and indeed we cited to the letter that showed where

3    Mr. Stuart said exactly that.  I'm not questioning the legality

4    of the Internal Revenue Code.  I do not want to be

5    misunderstood.  I'm questioning the IRS's interpretation of the

6    code as it applies to me.  And he was very clear about that in

7    his letters.

8         In not one single letter does Mr. Stuart say that the

9    Internal Revenue Code is unconstitutional or violates his

10   constitutional rights.  Not one single letter with any such

11   statement.  He does in a couple of letters cite to the

12   Constitution for what he believes is his constitutional right

13   for an answer from IRS, and that's very clear in the letters,

14   but not one place in one single letter does he say, boy, you

15   know, the Internal Revenue Code is unconstitutional, the tax

16   laws are constitutional, I have a problem with that.  And he

17   never -- there's not one single letter where he says that the

18   Internal Revenue Code is illegal.  It's not there.

19        Now, importantly, when asked to interpret Mr. Stuart's

20   beliefs — and that's what these witnesses were doing, they were

21   trying to interpret Mr. Stuart's beliefs — several witnesses

22   trying to recall conversations from many years ago testified

23   that they thought they recalled that Mr. Stuart believed that

24   the tax laws were unconstitutional, but that's not what his

25   letters say.  And I submit to you that Mr. Stuart's letters are

452

1    the best evidence of what he was doing and thinking during those

2    time periods.  These letters form snapshots in time.  They are

3    not subject to -- or colored by the passage of time and fading

4    memories.  They're also not colored by personal bias or other

5    motive.  The letters stand for themselves.

6          Now, you heard testimony from Beverly Schlipp, and

7    this is Mr. Stuart's sister and Beverly's daughter Allison Reese

8    who is Mr. Stuart's niece.  And that was some interesting

9    testimony.  I think it's fair to say that there's a bit of a

10   family feud going on here.  And family feuds are never pretty,

11   and they're not fun.

12         Now, we can all certainly appreciate Ms. Schlipp's and

13   Ms. Reese's concern that Mr. Stuart's beliefs and actions might

14   harm the company.  After all, Ms. Schlipp was gainfully employed

15   with New Age, owns 30 percent of the company, et cetera.  And we

16   can understand that.  But there's obviously also some company

17   control issues going on here, and I'd like you to consider that

18   and think about that when you put their testimony in context and

19   when you weigh their testimony.  By the way, Beverly Schlipp's

20   30 percent interest in New Age will one day pass to her daughter

21   Allison Reese.  Again, these family feud things aren't fun, they

22   are never pretty, and there's other issues going on here that I

23   think you should consider.

24         But at the end of the day, regarding their testimony

25   and some of the animosity that you heard, the evidence showed

453

1    that Mr. Stuart treated Beverly pretty doggone well.  Provided

2    gainful employment at New Age Chemical for over 23 years, even

3    though the mere fact that she had a minority interest didn't

4    entitle her to work there.  She wasn't entitled to work at New

5    Age Chemical.  She wasn't entitled to receive a salary check in

6    addition to her 30 percent profit K-1s.  And also Mr. Stuart

7    gainfully employed Richard Schlipp.  And so for the Schlipps for

8    some period of time they had an aggregate family income of over

9    $100,000.

10         So, some of that testimony was a little bit nasty.

11   But I think the evidence shows that at the end of the day

12   Mr. Stuart treated Beverly Schlipp fairly well considering that

13   he didn't have to ever hire her or pay her anything.  But the

14   passage of time, and perhaps other motives, does tend to color

15   testimony.

16         You'll also recall that I let you know -- or I

17   previewed in opening statement that several CPAs would testify

18   in this case, and they did.  And that was CPAs Walsh, Patrick

19   Walsh, Dan Hau and Joel Nettesheim.  And they testified here.

20   And you'll recall I mentioned that you might be surprised that

21   at these CPAs' testimony and I think you were.  I was a little

22   bit surprised about certain portions of their testimony as well.

23         But, in fact, not one of these CPAs, or Allison Reese

24   for that matter, ever advised Mr. Stuart what law made him

25   liable for the income tax, what law required him to file the

454

1   1040 form, and what code section subjected the money he made to

2   withholding.  In fact, not one of them knew the law.  Not one of

3   them knew the code section that imposes the tax liability,

4   requires the filing of a 1040, or subjects money someone makes

5   to withholding taxes.  There was a combined CPA experience up

6   here approaching 80, 90 years.  And they seemed to be very

7   competent, fine professional men.  I have no truck with them or

8   their testimony.  But the fact is, not one of them could cite

9   the code section that imposed the liability that required the

10  filing of the form.

11         Now, the Court will instruct you on the prosecution's

12  burden to prove to you beyond all reasonable doubt that

13  Mr. Stuart acted willfully.  The Court will instruct you that to

14  act willfully, Mr. Stuart must have intentionally violated a

15  known legal duty.  I'm just gonna step over to the Elmo here

16  real quick, and we're going to put this on the board for you.

17         Now, this is a copy of the actual jury instruction

18  page that you'll receive on the willfulness instruction.  And

19  I'm going to read that for you and you can follow along.

20         "Definition of willfully.  The term 'willfully' means

21  the voluntary and intentional violation of a known legal duty;

22  in other words, acting with the specific intent to avoid paying

23  a tax imposed by the income tax laws or to avoid assessment of a

24  tax that it was the legal duty of the defendant to pay to the

25  government, and that the defendant knew it was his legal duty to

455

1    pay."

2              And I'm not exactly certain how Mr. Stuart was

3    supposed to know that he had a specific legal duty to pay the

4    tax and file the form when his CPAs didn't know what the law

5    was.  Because legal duties arise from law, not from a 40-year

6    accountant saying, you know, Jim, if you persist in this bad

7    things will happen to you.  That's not law.  That's a statement

8    of raw power.  In America we're governed by law.

9              All these CPAs could tell him to do -- would -- could

10   tell him about what he was doing and his beliefs was that bad

11   things would happen and he should file the form and pay the tax.

12             The funny thing about that is, the more the CPAs

13   couldn't tell him what the law was the more Mr. Stuart believed

14   it.  And that affects someone psychology.  If you're kinda

15   thinking that there's something funny about something and you

16   start asking questions and your CPA professionals can't tell you

17   what the law is, you start to believe it more.  And this is the

18   evolution of Mr. Stuart's thinking.  And as I mentioned in

19   opening statement, you are called upon to look into his heart

20   and mind and judge him, and judge the evolution of his thinking

21   and his experience.  It's a very difficult thing to do, but it's

22   your charge.

23             Now, the prosecution's own evidence showed, along with

24   the CPA testimony, that there was no concealment on the New Age

25   books and records.  All the money Mr. Stuart made, whether it

456

1    was W-2 income, draw checks, operating account checks was

2    faithfully recorded by Beverly Schlipp in the New Age books and

3    records. Now, I have to ask you something, we talked a bit

4    about this in opening statement. Use your common experience, is

5    this what a tax cheat does? That if all Mr. Stuart was about

6    was cheating the IRS out of money, he didn't have to do that.

7    There was many other smarter and simpler ways to try and cheat

8    the government. He didn't need to pay his pesky sister to keep

9    the books and records. He could have hung out in the back

10    office at New Age Chemical and he could have done whatever he

11    wanted to do. He didn't have to hire and pay her.

12          And the other thing is, Mr. Stuart didn't have to hire

13    all these CPAs. You know, he hires these CPAs, Mr. Nettesheim

14    from Suby Von Haden, a very respectable accounting firm, he's

15    still providing accounting work for New Age Chemical, and

16    Mr. Stuart doesn't have to do that. If he wanted to be a tax

17    cheat, he'd sit in the back room and he wouldn't have any books

18    and records. And he certainly wouldn't show in the books and

19    records all of the things he was doing.

20          And, you know, again by all accounts Mr. Stuart is an

21    intelligent man. I mean, he knew these letters, for example, to

22    Payroll Data Service are available. These are public letters.

23    I mean, it's an odd way to commit affirmative acts of tax fraud,

24    to write letters to people and tell them what your views are in

25    a public forum. And then he writes a letter to the editor

457

1    opinion in the Lake County newspaper for anybody who picks up

2    the newspaper and wants to read it.  I mean, if that's a tax

3    conspiracy it's a conspiracy of full disclosure.  It's not the

4    actions of a tax evader.

04:30  5    Well, and just to double back a little bit.  It goes

6    without saying that a tax evader doesn't write a bunch of

7    letters to the IRS and say here I am.  He writes a letter to the

8    Secretary of Treasury.  Writes a letter to then IRS Commissioner

9    Evenson.  Announces his very unconventional views and beliefs.

04:31 10    Asks for the law.  I mean, talk about putting a target on your

11    back.  I mean, he was -- you know, that was an invitation for

12    IRS enforcement.  And I believe it's evidence of the sincerity

13    of his belief.  If you don't care about something you wouldn't

14    take those risks.  The fact of his engagement with IRS is

04:31 15    powerful evidence of his sincerity.  People don't do those sorts

16    of things, not people I know.  In my entire life experience I

17    have not met people that would want to engage at that level.

18    And again, if the whole motive here was to cheat the government

19    out of some money, boy, there were about 150 smarter ways to do

04:31 20    that.

21    So, going back to the CPAs, Mr. Stuart writes the

22    letters to the IRS.  Unresponsive.  There's a code section,

23    couple code sections on government 40, Exhibit 40.  Mr. Jacobs

24    referenced that in his initial closing argument.  You can look

04:32 25    at that.  Those aren't the sections -- they don't purport to be

458

1    the code sections that make a man or woman liable for the income

2    tax.  You can look at it for yourself.  And it's certainly no

3    code sections there mandating the filing of a 1040.

4           So, you can't get answers from IRS.  He engages CPAs.

5    In an animated discussion and by all accounts, particularly from

6    Mr. Nettesheim's testimony, Mr. Stuart was serious.  These were

7    serious discussions.  This wasn't a joke.  I can think of a

8    million other ways to have fun.  Mr. Stuart was serious about

9    this.

10          So, the CPAs don't give him answers.  Turns out they

11   don't know the answers.  And this changes Mr. Stuart.  And it

12   changes the tone and the content of his letters.  And you see it

13   in the letters.

14          It's clear that he performs additional research, and

15   frankly he delves down deep into some very, very complicated

16   legal theories and areas.  I'm not going to opine on the legal

17   nature of the specific law regarding these areas but, you know,

18   there's real law there.  This is federal jurisdiction.  We're

19   talking about estates and trusts and artificial entities.  Style

20   manuals on the meaning, the legal meaning of all-caps

21   designations.  Citizenship which is a very complicated area of

22   law.  Goes back to Grotius eight, nine hundred years ago,

23   international law, public and private.  That's some pretty dense

24   stuff.

25          And why is he doing that?  He's doing that because the

459

1    system he's trying to engage is not giving him answers.  And so

2    he figures I have to have a different way of communicating.  He

3    also declares his status.  I mean, at the end of the day if the

4    system you're trying to engage or the person you're trying to

5    engage is not responsive to you, is not taking you seriously,

6    and you believe that that's the case, you try and figure out a

7    different way to communicate with them.  And so Mr. Stuart

8    declares his status as a Wisconsin national.

9          You know, all this stuff is easy to mock.  It's easy

10   to be snarky about all this stuff.  But I don't have pretended

11   to have walked a mile in Jim Stuart's shoes.  But you're called

12   upon to figure out what that's like.  Easy to mock.  Easy to

13   make fun.

14         You know, in talking about beliefs, I think there was

15   a guy named Copernicus who had the audacity to think and suggest

16   that the world was round instead of flat.

17         In talking about federal case law and cases, just

18   because a court says, hey, you know, you're wrong about the law,

19   that doesn't mean you're a bad person.  That doesn't mean you

20   have criminal intent.  I don't want to be trite but, I mean,

21   slavery was legal in this country for about 150-200 years, and

22   there were people who said that's wrong.  Just because a court

23   interprets your legal position and says, ah, under today's

24   controlling authority there's no support for that, that doesn't

25   make you a person with bad intent if you want to continue to

460

1    believe the things that you believe.  That does not condemn you.

2    And thank goodness it doesn't.

3            And, you know, the prosecution focused heavily on the

4    most unconventional letters.  I understand that.  We're

5    advocates.  We've got a job to do.  But I don't know how

6    relevant all that is.  As we discussed in opening statement,

7    you're not called upon to determine whether Mr. Stuart was right

8    about his beliefs, you're not called upon to approve of him

9    holding the beliefs, you're not called upon to determine whether

10   you'd have done it that way or that was stupid.  And frankly,

11   you're not called upon to determine whether he's right or wrong

12   or otherwise.  But you are called upon, based on the oath you've

13   all taken, to put aside your personal feelings regarding both

14   Mr. Stuart and any aversion you might have for his beliefs.  And

15   that's a tough call.  That's a rough go.  But you have to.

16   Frankly, I imagine that many of you were put off by some of the

17   more esoteric writings and memos that Mr. Stuart wrote.

18   Probably more than a little put off in certain cases.  But as I

19   said in opening statement, crazy ain't criminal.  All you gotta

20   do is turn on the television and watch the news.  I mean, if

21   crazy were criminal half the country would be in federal prison.

22   Crazy ain't criminal.

23           Now, as we discussed in opening statement, you're

24   charged with determining whether Mr. Stuart sincerely believed

25   what he says he did.  And I advised you and suggested to you in

461

1    opening statement that that formed the core issue of this case.

2    And I think it's clear that it does.  Because we don't dispute

3    that Mr. Stuart filed the 1040X returns.  We don't dispute as a

4    matter of law that he had income tax liability.  That's why

04:37    5    there was virtually no questions for any of those witnesses.

6    That's not in dispute.  Dozens and perhaps more than 100

7    document were stipulated to.  We're not disputing the evidence

8    here in terms of that.  The real meat and potatoes of this case

9    is to determine whether Mr. Stuart sincerely believes what he

04:37   10    says he believed.

11    Another thing, you know, in addition to what I believe

12    is a fair good mountain of evidence showing the sincerity of

13    Mr. Stuart's beliefs, and I've surveyed a lot of that just now,

14    not one single witness testified that Mr. Stuart wasn't sincere.

04:37   15    Not one.  You heard that Mr. Stuart was adamant about his

16    beliefs.  You heard that Mr. Stuart was passionate about his

17    beliefs.  You heard some other testimony that, you know, he

18    wasn't a good listener.  But not one single witness testified

19    that they thought that this was some sort of a joke; that

04:38   20    Mr. Stuart didn't actually passionately believe what he says he

21    believed.  Not one witness.

22    And you heard from CPA Nettesheim.  And he's still

23    doing -- Jim Stuart still pays CPA Nettesheim to do accounting

24    for New Age Chemical.  And CPA Nettesheim testified that he

04:38   25    never doubted Mr. Stuart's sincerity.  In spite of the fact that

462

04:38 Mr. Nettesheim seemed to be kind of a little bemused by some of Mr. Stuart's stated beliefs. I mean, he's a practicing tax professional and he's a CPA. I'm sure he wasn't real excited about having those discussions with Mr. Stuart, but he doesn't have any dog in this hunt and I think you can credit his testimony. Never doubted Jim Stuart's sincerity.

Thanks for your patience.

Excuse me one moment.

(Brief pause.)

04:39 MR. BERNHOFT: I wanted to remark on one thing in terms of your charge and your duty. Make no mistake, that your verdict here has no effect on the IRS's ability to collect whatever taxes Mr. Stuart owes to the IRS after this case. This is part of the deal that you're not being called upon to approve of his beliefs or determine whether he's right. This is a 04:39 federal criminal trial, and you're called upon to determine whether Mr. Stuart is a federal criminal with bad intent. The IRS is going to have its day with Mr. Stuart after this trial regarding his civil taxes.

04:40 That's a fair outline of what I had to say. I wanted to thank each and every one of you for your attention. Mr. Jacobs and I are trial lawyers, and I know I can speak for him as well, and the Court, that you've been extremely attentive, individually and collectively, and these disputes 04:40 between citizens like Mr. Stuart and the government and the

1    prosecution and the IRS don't get resolved unless good people

2    pay attention.  And this stuff is important.  I thank you for

3    it.  I thank you for your commitment and your time and attention

4    here.

04:40    5          Now, after Mr. Jacobs completes his rebuttal

6    argument -- Mr. Jacobs is going to go next, he's going to say a

7    few words, and then you're going to retire to the jury room to

8    deliberate.  And with utmost respect I ask you to return not

9    guilty verdicts across the board on these three tax evasion

04:41    10    counts.

11          Thank you very much for your time.

12                GOVERNMENT REBUTTAL ARGUMENT

13          MR. JACOBS:  Mr. Bernhoft is correct that because I

14    represent the plaintiff in this case and that the burden is on

04:41    15    the plaintiff the United States to prove Mr. Stuart's guilt

16    beyond a reasonable doubt, I get to speak to you last.  And

17    that's how it should be in our system, the criminal justice

18    system.  We're obligated to prove the essential elements beyond

19    a reasonable doubt, and the evidence in this case did that.

04:41    20          There were a couple of remarks that Mr. Bernhoft made,

21    something about some family feud and nasty testimony.  I think

22    he said that when Beverly Schlipp passes away her interest is

23    going to pass to Allison Reese.  I don't know if that's true or

24    not, there's no evidence one way or the other that that's the

04:42    25    case, but if the suggestion is that she altered her testimony

464

1  because she's hoping that she's going to get her mother's

2  interest in the company, I'd like you to at least consider her

3  demeanor, her mother's demeanor when they testified, and whether

4  that's a fair assessment of Allison Reese and her motivations in

04:42  5  this case.

6  And he said something about -- Mr. Bernhoft said

7  something about Mr. Stuart didn't need to pay his pesty sister.

8  Again, you heard the testimony and saw the demeanor again.

9  Whether that assessment is called for, some suggestion that they

04:42  10  sculpted their testimony because of some family feud, I don't

11  believe the evidence supports that type of an inference.

12  Mr. Bernhoft said Mr. Stuart just kept saying show me

13  the law. Now, first of all, the letters are in evidence and you

14  can review them and review whether those letters reflect an

04:43  15  individual asking IRS to show him the law, or whether they

16  reflect an individual who says to the IRS I'll tell you what the

17  law is and you're gonna do things my way because he is

18  bull-headed, close-minded, and doesn't care what anyone who

19  happens to be experienced and educated about matters has to say.

04:43  20  I think a fairer read on that evidence is, like he

21  would have listened. You know, repeatedly a long-time family

22  friend, an accountant with 35 years of experience, who

23  Mr. Stuart's father had asked to help and advise the family, the

24  business, and work with Mr. Stuart's mother after his father

04:43  25  passed away, told him what he was doing was unlawful and

465

1    fraudulent, and he rejected it out of hand.  His own niece,

2    who's got a degree in accounting, told him he was wrong and got

3    him material and he dismissed it and wouldn't look at it.

4         You know, is this someone who is looking, show me the

5    law?  You know, who tells his sister "if the letters come from

6    the IRS don't open them, send them back."  Writes "don't talk to

7    lawyers or accountants."  Tells his niece she's brainwashed and

8    stupid.  Is that someone who is looking for answers or is that

9    someone who has staked out a position and is going to fight it

10   to the end?  I think Ms. Reese testified he said he wanted to be

11   a martyr.

12        And, yes, in his letters he repeatedly says "I'm not a

13   tax protester.  I'm not questioning the law."  You know, that's

14   convenient.  That's a convenient thing to say, right?  You just

15   keep saying, you know, I'm not robbing you, as you're stealing

16   someone's money.  It's easy to say that.  You look at someone's

17   actions.  You don't judge them by their -- you surely shouldn't

18   judge Mr. Stuart by just his words, look at his actions.  How

19   did he treat educated individuals.

20        You know, books are just analyses about topics, law,

21   written by people.  So when people tell you things based on

22   their teaching -- their learning, their education and

23   experience, that's how you gain knowledge.  And so Mr. Stuart's

24   outright just rejection of it, you know, demonstrates an

25   unwillingness to learn.  He is close-minded.  He doesn't care.

466

1    And that's what willfulness is.  It's unlawful behavior in the

2    face of educated, knowledgeable people telling you what you're

3    doing is wrong.  That's how you know it's not a good faith

4    belief.

5    You know, Mr. Bernhoft mentioned Mr. Nettesheim, and I

6    would say that a fair assessment of his situation is he decided

7    not to question Mr. Stuart's behavior and go along and try to

8    help Ms. Schlipp file the returns she knew she had to file and

9    try to get her K-1s and simply not to engage Mr. Stuart.  We saw

10   what happened when people did engage him, right?  They weren't

11   working with him anymore.  Mr. Hau was terminated.

12   And Mr. Stuart says just because a court says you're

13   wrong doesn't make you a bad person.  You know, you're not here

14   really to assess whether Mr. Stuart is a good or a bad person.

15   We're not -- the evidence isn't whether he's good or bad.  The

16   question is whether when faced with authoritative determinations

17   of the law you just ignored it.  So when the Wisconsin court --

18   the tax -- I'm sorry, the Tax Appeals Commission tells him his

19   positions are frivolous, I mean, that's what establishes the

20   law, our courts, and he still ignores it and still doesn't file

21   tax returns.  That's how you know it's not a good faith belief.

22   You can't just say "I don't care what the courts say, I still

23   don't believe it" and allege that somehow that's a good faith

24   belief and what you're doing complies with the law because

25   they've told you what the law is.  That's what courts do.

467

1    Again, it's not whether he's a good or a bad person.

2         And crazy ain't criminal.  No, this isn't an issue of

3    crazy or I think he said kooky in opening.  This isn't a

4    question of crazy or kooky.  This is arrogance.  This is

5    self-serving arrogance.  He didn't want to pay taxes.  We saw it

6    in those notes.  You see what his motivation is.  This is just

7    morphing into that.  It's just a more aggressive version of

8    that.

9         And his closed-mindedness, his arrogance, his

10   unwilling to listen, his bullying of his sister, this is just

11   the same thing, he's just trying to bully everyone into his way

12   of thinking.  Well, that's not how the law works.

13        Mr. Stuart was well informed of the law and made an

14   intentional decision to disregard it.  And that, coupled with

15   the evidence, I gather, as Mr. Bernhoft said, there's no dispute

16   that he has income tax liability, establishes that Mr. Stuart

17   is, in fact, guilty of three counts of tax evasion as charged in

18   the indictment.

19        Thank you.

20                    FINAL JURY INSTRUCTIONS

21        THE COURT:  Members of the jury, you every seen and

22   heard all the evidence and the arguments of the attorneys.  Now

23   I will instruct you on the law.

24        You have two duties as a jury.  Your first duty is to

25   decide the facts from the evidence in the case.  This is your

468

1    job, and yours alone.

2         Your second duty is to apply the law that I give you

3    to the facts.  You must follow these instructions, even if you

4    disagree with them.  Each of the instructions is important, and

5    you must follow all of them.

6         Perform these duties fairly and impartially.

7         And with batteries.  These rechargeable batteries are

8    eight years old.

9         (Brief pause.)

10        THE COURT:  Do not allow sympathy, prejudice, fear or

11   public opinion to influence you.  You should not be influenced

12   by any person's race, color, religion, national ancestry, or

13   sex.

14        Nothing I say now, and nothing I said or did during

15   the trial, is meant to indicate any opinion on my part about

16   what the facts are or about what your verdict should be.

17        The evidence consists of the testimony of the

18   witnesses, the exhibits admitted in evidence, and stipulations.

19        A stipulation is an agreement between both sides that

20   certain facts are true or that a person would have given certain

21   testimony.

22        Certain things are not evidence.  I will list them for

23   you:

24        First, testimony that I struck from the record, or

25   that I told you to disregard, is not evidence and must not be

469

1    considered.

2         Second, anything you may have seen or heard outside of

3    the courtroom is not evidence and must be entirely disregarded.

4    This includes any press, radio, or television reports you may

5    have seen or heard.  Such reports are not evidence and your

6    verdict must not be influenced in any way by such publicity.

7         Third, questions and objections by the lawyers are not

8    evidence.  Attorneys have a duty to object when they believe a

9    question is improper.  You should not be influenced by any

10   objection or by my ruling on it.

11        Fourth, the lawyers' statements to you are not

12   evidence.  The purpose of these statements is to discuss the

13   issues and the evidence.

14        Some of you have heard the phrases "circumstantial

15   evidence" and "direct evidence."  Direct evidence is the

16   testimony of someone who claims to have personal knowledge of

17   the commission of the crime which has been charged, such as an

18   eyewitness.  Circumstantial evidence is the proof of a series of

19   facts which tend to show whether the defendant is guilty or not

20   guilty.  The law makes no distinction between the weight to be

21   given either direct or circumstantial evidence.  You should

22   decide how much weight to give to any evidence.  All of the

23   evidence in the case, including the circumstantial evidence,

24   should be considered by you in reaching your verdict.

25        You are to decide whether the testimony of each of the

470

1    witnesses is truthful and accurate, in part, in whole, or not at

2    all, as well as what weight, if any, you give to the testimony

3    of each witness.

4         In evaluating the testimony of any witness, you may

5    consider, among other things:  the witness's intelligence; the

6    ability and opportunity the witness had to see, hear, or know

7    the things that the witness testified about; the witness's

8    memory; any interest, bias, or prejudice the witness may have;

9    the manner of the witness while testifying; and the

10   reasonableness of the witness's testimony in light of all of the

11   evidence in the case.

12        You should use common sense in weighing the evidence

13   and consider the weight in light of your own observations in

14   life.

15        In our lives, we often look at one fact and conclude

16   from it that another fact exists.  In law we call this

17   "inference."  A jury is allowed to make reasonable inferences.

18   Any inference you make must be reasonable and must be based on

19   the evidence in the case.

20        The indictment charges that the offense was committed

21   "on or about" a certain date.  The government must prove that

22   the offense happened reasonably close to that date but is not

23   required to prove that the alleged offense happened on that

24   exact date.

25        It is proper for an attorney to interview any witness

471

1    in preparation for trial.

2           You may find the testimony of one witness or a few

3    witnesses more persuasive than the testimony of a larger number.

4    You need not accept the testimony of the larger number of

5    witnesses.

6           You've heard a witness give opinions about matters

7    requiring special knowledge or skill.  You should judge this

8    testimony the same way that you judge the testimony of any other

9    witness.  That a witness has given an opinion does not mean that

10   you are required to accept it.  Give the testimony whatever

11   weight you think it deserves considering the reasons given for

12   the opinion, the witness's qualifications and all of the other

13   evidence in the case.

14          The defendant has an absolute right not to testify.

15   The fact that the defendant did not testify should not be

16   considered by you in any way in arriving at your verdict.

17          The indictment in this case is the formal method of

18   accusing the defendant of an offense and placing the defendant

19   on trial.  It is not evidence against the defendant and does not

20   create any inference of guilt.

21          The grand jury charges:

22          Allegations common to all counts.

23          1.  At all times relevant to this indictment:

24          James A. Stuart, Jr., Stuart, was a resident of

25   Hartland, Wisconsin, which is in the state and Eastern District

472

1    have of Wisconsin.

2         B.   Stuart was employed by and the majority owner of

3    New Age Chemical, Incorporated, New Age Chemical.

4         New Age Chemical was a Wisconsin corporation with its

04:56   5    principal place of business located in Delafield, Wisconsin,

6    which is in the State and Eastern District of Wisconsin.

7         D.   Stuart received income from New Age Chemical both

8    in the form of compensation and distributions.

9         2.   Stuart willfully attempted to evade and defeat the

04:56   10   assessment and payment of the federal income taxes he owed to

11   the United States for each of the years 2005 through 2007 by

12   concealing and attempting to conceal from all proper officers of

13   the United States his true and correct income, and by the

14   following acts:

04:56   15        A.   In September 2005, Stuart changed his employment

16   status at New Age Chemical from an employee, from whose wages

17   income taxes had been withheld, to an independent contractor.

18   As a result, income taxes were no longer withheld from

19   compensation payments New Age Chemical made to Stuart.

04:57   20        B.   In April 2006, Stuart directed New Age Chemical to

21   stop paying compensation to him through a parole service and to

22   issue compensation checks to him directly and not to withhold

23   income taxes from such payments.  The parole service used by New

24   Age Chemical had issued Forms W-2 wage and tax statements, when

04:57   25   Stuart was paid as an employee, and Forms 1099, miscellaneous

473

1    income statements, when Stuart was paid as an independent

2    contractor, reflecting New Age Chemical's payments to Stuart.

3         C.   In August 2007, Stuart directed New Age Chemical

4    to issue compensation checks to him payable to New Age

5    Chemical, Ltd. Drawing Account.

6         D.   In August 2007, Stuart opened a bank account in

7    the name of New Age Chemical, Ltd. Drawing Account for the

8    benefit of the Delafield Trust, into which he deposited checks

9    he received from New Age Chemical.

10        E.   Stuart submitted documents to the IRS falsely

11   indicating that he had no wages, no income, and no tax

12   liabilities for the years 2005 through 2007.

13        Count two.

14        The grand jury further charges that:

15        On or about April 17, 2006, in the State and Eastern

16   District of Wisconsin, and elsewhere, James A. Stuart Jr. did

17   willfully and knowingly attempt to evade and defeat a large part

18   of the income tax due and owing by him to the United States of

19   America for the calendar year 2005, by the affirmative acts

20   described above in paragraph 2 of this indictment and by

21   preparing and causing the preparation of a false and fraudulent

22   2005 U.S. Individual Income Tax Return, Form 1040, for himself,

23   which return the defendant filed with the Internal Revenue

24   Service wherein it was stated that he had taxable income for

25   said calendar year of zero dollars and that the amount of total

474

1    tax due and owing thereon was zero dollars, whereas, as Stuart

2    then and there well knew and believed, he had taxable income for

3    2005 substantially greater than the amount reported and that, as

4    a result, the actual amount of income tax due and owing to the

5    United States of America by the defendant for 2005 was

6    substantially greater than the amount reported.

7              All in violation of Title 26, United States Code,

8    Section 7201.

9              Counts two and three.

10             The grand jury further charges:

11             For the calendar years 2006 and 2007, in the State and

12   Eastern District of Wisconsin and elsewhere, James A. Stuart,

13   Jr. had and received taxable income in the approximate amounts

14   indicated below, upon which there was owing to the United States

15   of America income taxes, including self-employment taxes, in the

16   amounts indicated.  Knowing and believing the foregoing facts,

17   Stuart did willfully attempt to evade and defeat the income tax

18   due and owing by him to the United States of America for the

19   calendar years 2006 and 2007 by failing to file with the

20   Internal Revenue Service a federal income tax return for these

21   years on the date indicated, as required by law, by failing to

22   pay said income taxes due to the Internal Revenue Service; and

23   by the affirmative acts described above in paragraph 2 of this

24   indictment.

25             Count two.  Column 1.

475

1                    Two.  Tax year, 2006.

2                    Taxable income, column 3, $235,130.

3                    Column 4, income tax due, $68,921.

4                    Column 5, tax return due date, April 16, 2007.

05:02    5           Count three.

6                    Column 2, 2007.

7                    Column 3, $400,912.

8                    Column 4, $126,422, income tax due.

9                    Tax return date, April 15, 2008.

05:02    10          All in violation of Title 26, United States Code,

11       Section 7201.

12                   The defendant is presumed to be innocent of each of

13       the charges.  This presumption continues during every stage of

14       the trial and your deliberations on the verdict.  It is not

05:02    15       overcome unless from all the evidence in the case you are

16       convinced beyond a reasonable doubt that the defendant is guilty

17       as charged.  The government has the burden of proving the

18       defendant -- let me repeat.  The government has the burden of

19       proving the guilt of the defendant beyond a reasonable doubt.

05:03    20          This burden of proof stays with the government

21       throughout the case.  The defendant is never required to prove

22       his innocence or to produce any evidence at all.

23                   If any reference by the court or by counsel to matters

24       of evidence does not coincide with your recollection, it is your

05:03    25       recollection which should control during your deliberations.

476

1       The indictment charges the defendant with three counts

2   of violating Title 26, United States Code, Section 7201, which

3   is commonly referred to as tax evasion.  These charges concern

4   the defendant's federal income taxes for the years 2005, 2006,

05:04   5   and 2007.

6       Section 7201 of the Internal Revenue Code, 26 U.S.C.,

7   provides that, quote, "any person who willfully attempts in any

8   manner to evade or defeat any tax imposed by," paren, "the

9   Internal Revenue Code," "or by" -- "or" -- repeat -- "or the

05:04   10   payment thereof," end of quote, shall be guilty of an offense

11   against the United States.

12       To sustain a charge of tax evasion as charged in the

13   indictment, the government must prove the following

14   propositions:

05:04   15       First, on April 15, or date of a legal extension, of

16   the year following the tax year, federal income tax was due and

17   owing by the defendant.

18       Second, the defendant intended to evade or defeat the

19   ascertainment, assessment, computation or payment of the tax;

05:05   20   and

21       Third, the defendant willfully did some act in

22   furtherance of the intent to evade tax or payment of the tax.

23       If you find from your consideration of all of the

24   evidence that each of these propositions has been proved beyond

05:05   25   a reasonable doubt, then you should find the defendant guilty.

477

1    If, on the other hand, you find from your

2 consideration of all the evidence that any of these propositions

3 has not been proved beyond a reasonable doubt, then you should

4 find the defendant not guilty.

5    The term "willfully" means the voluntary and

6 intentional violation of a known legal duty; in other words,

7 acting with the specific intent to avoid paying a tax imposed by

8 the income tax laws or to avoid assessment of a tax that it was

9 the legal duty of the defendant to pay to the government, and

10 that the defendant knew it was his legal duty to pay.

11    When the phrase "the defendant knew" is used in these

12 instructions, it means that the defendant realized what he was

13 doing and was aware of the nature of his conduct, and did not

14 act through ignorance, mistake or accident.  Knowledge may be

15 proved by the defendant's conduct, and by all of the facts and

16 circumstances surrounding the case.

17    A defendant does not act willfully if he believes in

18 good faith that he is acting within the law, or that his actions

19 comply with the law.  Therefore, if the defendant actually

20 believed that what he was doing was in accord with the tax

21 statutes, he cannot be said to have had the criminal intent to

22 willfully evade taxes.  This is so even if the defendant's

23 belief was not objectively reasonable, as long as he held the

24 belief in good faith.  However, you may consider the

25 reasonableness of the defendant's belief together with all the

478

1    other evidence in the case in determining whether the defendant

2    held the belief in good faith.

3            A person's opinion that the tax laws violate his

4    constitutional rights does not constitute a good faith

5    misunderstanding of the law.  Furthermore, a person's

6    disagreement with the government's tax collection systems and

7    policies does not constitute a good faith misunderstanding of

8    the law.

9            You have heard evidence of acts of the defendant other

10    than those charged in the indictment.  You may consider this

11    evidence only on the question of defendant's knowledge, intent,

12    and absence of mistake.  You should consider this evidence only

13    for these limited purposes.

14            If you find beyond a reasonable doubt that the

15    defendant had a tax liability for a particular year, then I

16    instruct you as a matter of law, that tax was due and owing on

17    April 15, or other date set by law or legal extension, of the

18    following year.

19            If the defendant has incurred a tax liability, it

20    exists from the date the return is due.  A taxpayer's tax

21    liability exists independent of any administrative assessment.

22    It is not necessary that a taxpayer receive a tax assessment

23    before he is charged with a criminal violation of willful

24    attempt to evade or defeat income tax.

25            Failure to file a tax return, without any additional

479

1    act, does not establish the crime of willful attempt to evade or

2    defeat income tax.

3         The indictment alleges that the defendant committed

4    certain specific acts in furtherance of his intent to evade and

5    defeat the assessment and computation of his tax for the years

6    2005, 2006, and 2007.  The government need not prove that each

7    and every specific alleged act was committed by the defendant.

8    However, the government must prove that the defendant committed

9    at least one of the specific acts which was alleged in that

10   count.  In order to find that the government has proved the

11   defendant committed a specific act, the jury must unanimously

12   agree on which specific act that the defendant committed.

13        It is not necessary for the United States to prove

14   everything alleged in count one of the indictment.  It is only

15   necessary to prove so much as establishes the elements of the

16   offense charged in each count.

17        The three counts of the indictment charge the

18   defendant with having committed separate offenses.

19        Each count and the evidence relating to it should be

20   considered separately, and a separate verdict should be returned

21   as to each count.  Your verdict of guilty or not guilty of an

22   offense charged in count one should not control your decision as

23   to the other counts.  The defendant is not on trial for any act

24   or conduct not alleged in the indictment.

25        The punishment provided by law for the offenses

480

1    charged in the indictment is a matter exclusively within the

2    province of the court and should not be considered by you in any

3    way in arriving at your verdict.

4           During your deliberations, you must not communicate

5    with or provide any information to anyone by any means about

6    this case.  You may not use any electronic device or media, such

7    as telephones, cell phone, smart phone, iPhone, Blackberry or

8    computer; the Internet, any Internet service, or any text or

9    instant messaging service; or any Internet chat room, blog, or

10   website such as Facebook, My Space, Linkedin, You Tube or

11   Twitter, to communicate to anyone any information about this

12   case or to conduct any research about this case until I accept

13   your verdict.

14          Let me add a couple of things that are not written

15   down.  I mentioned earlier that two people will be released from

16   this case.  That will occur momentarily.  I also mentioned that

17   those who are released or may be released may be called back

18   into service.  One or more of you may not be able to continue

19   with deliberations.  It's happened before.  People have gotten

20   sick.  And just in case that occurs, those people who have been

21   released may be called back to deliberate with the others so

22   that this case can be concluded.  Hence, if you are one of the

23   two people released, what I said about communication applies

24   even though you've been released unless you hear that this case

25   has gone to verdict.  And we will get your contact information

481

1    to advise you whether or not the case has gone to verdict so

2    that you will no longer have to stand by and remain ready to

3    return to court.

4         So do not let the fact that you will be walking out

05:14   5    shortly cause you to breathe in such a way as you will spill

6    over into somebody's ear or iPhone or whatever you have seen or

7    heard in this courtroom during your jury service.

8         With that said, upon retiring to the jury room select

9    one of your number as your foreperson who will preside over your

05:15   10   deliberations.  In determining who will serve as your foreperson

11   you should consider the ability of that person to conduct your

12   deliberations in a fair manner with due regard for the right of

13   each jury member to be heard.

14        A verdict form has been prepared for you.  It reads:

05:15   15   United States of America, Plaintiff, vs. James A.

16   Stuart, Jr., Case No. 10-CR-288.  Verdict.

17        With respect to the offense charged in count one, tax

18   evasion, we, the jury, duly impaneled and sworn in the

19   above-entitled action, find the defendant, James A. Stuart, Jr.,

05:15   20   there's a space for your decision, guilty or not guilty.  The

21   same language is set out with regard to each of the counts.

22        You should take the verdict and when you have reached

23   a unanimous agreement on the verdict your foreperson will date

24   and sign the form to state the verdict upon which you agree.

05:16   25   The verdict must represent the considered judgment of

482

1    each juror.  In order to return a verdict it is necessary that

2    each juror agree thereto.  Your verdict must be unanimous.  It

3    is your duty as jurors to consult with one another and to

4    deliberate with a view to reaching an agreement if you can do so

5    without violence to individual judgment.  Each of you must

6    decide the case for yourself, but do so only after an impartial

7    consideration of the evidence with your fellow jurors.  While

8    consulting with fellow jurors, keep in mind that any notes that

9    were taken during the course of the trial are entitled to no

10   greater weight than the memory or impression of each juror as to

11   what the testimony may have been.

12        Also, in the course of your deliberations do not

13   hesitate to re-examine your own views and change your opinion if

14   convinced it is erroneous.  But, do not surrender your honest

15   conviction as to the weight or effect of evidence solely because

16   of the opinion of your fellow jurors or for the mere purpose of

17   returning a verdict.

18        You are not partisans, you are judges of the facts.

19   Your sole interest is to ascertain the truth from the evidence

20   in the case.

21        If you need to communicate with me after you retire to

22   the jury room, the only proper way is in writing, signed by the

23   foreperson, or if your foreperson is unwilling to do so, by some

24   other juror and given to the bailiff.

25        You will note from the oath about to be taken by the

483

1    bailiff that he, as well as other persons, is forbidden to

2    communicate in any way or manner with any member of the jury on

3    any subject touching on the merits of the case.

4         Bear in mind also that you are never to reveal to any

5    person how the jury stands numerically or otherwise until after

6    you have reached a unanimous verdict.

7         Let me add, and I mentioned this Monday, if any person

8    is away from the table you may not deliberate.  So if people

9    have to go out for a smoke break, anyone's in the restroom, you

10   cannot deliberate.  Everybody should participate in all

11   discussions.

12        There's also a bell on the wall.  It's a little green

13   button near the water cooler.  If you push it, it sounds like

14   the Avon commercial in the back.  So if we hear Avon calling we

15   will know that you either have a verdict or there's an issue you

16   would like us to address and we will respond as promptly as we

17   can.  Now, it may very well be that the parties will not be in

18   the courtroom when you ring the bell, and if that is so we will

19   have to wait until everyone gets here to discuss any issues that

20   you raise.

21        You will have the instructions with you in the jury

22   room.  We will also provide you with documents that have been

23   received in evidence and those will be sent in shortly.  We

24   cannot ordinarily read back testimony.  That is something that's

25   problematic.  We do not have a transcript of this trial prepared

484

1    at this point.  So you should keep that in mind as well.  It's

2    our duty to try to provide you with all the tools you need to do

3    your work.  And with the instructions and the evidence and the

4    arguments, you have tools at your disposal.  You will also have

5    food available in due course if you need it.

6              I think that covers the waterfront.  Can you swear in

7    the -- oh, before we do that we have to release our other

8    jurors.

9              Do the parties wish to come forward, please?

10   Mr. Stuart?

11             (At side bar on the record.)

12             THE COURT:  As an initial matter I'd like to ask the

13   parties whether you are satisfied with the instructions which

14   have been given to the jury.

15             MR. BERNHOFT:  Yes, Judge.

16             MR. JACOBS:  Yes, I am, Judge.

17             THE COURT:  All right.  Are there any other issues

18   that we need to address at this point in time?

19             MR. BERNHOFT:  Not from the defense perspective, Your

20   Honor.

21             MR. JACOBS:  Nothing from the government, Judge.

22             THE COURT:  All right.  We have here the numbers of

23   each of the jurors.  Do you want to select?

24             THE DEFENDANT:  One?

25             THE COURT:  Two.  It's up to you.

485

1          (Defendant selects alternate jurors.)

2          THE COURT:  Number 4 and number 16.  Show them who

3    those people are.

4          All right, we will have the bailiff release 4 and 16

05:22  5    and then we will swear the bailiff.

6          There are no motions at this time; is that correct?

7          MR. BERNHOFT:  Yes, no motions for the defense.

8          MR. JACOBS:  Nothing from the government, Judge.

9          THE COURT:  Very well.

05:24  10          (End of discussion at side bar.)

11          THE COURT:  I have been in communication with our

12    landlord, GSA, and the heat is still on, so it should be fairly

13    comfortable in the jury room.  We have an air cleaner in there

14    as well, but it's very noisy.  But if things become

05:24  15    uncomfortable again, Avon.

16          We'll be with you in just a moment.  The clerk has to

17    get some paperwork for the jurors who are being released.

18          Please note the bailiff has just advised that the

19    front door will be alarmed in four minutes, which means you have

05:25  20    to leave by going to the left and out the Jackson Street or east

21    door where security is posted.

22          THE BAILIFF:  All rise, please.

23          THE CLERK:  Jurors number 4 and 16.  Your original

24    number.

05:26  25          THE COURT:  Thank you very much for your jury service.

486

1          (Alternates discharged.)

2          THE COURT:  Be seated for a moment, please.

3          About this time I suspect Mr. Hill will be enjoying

4     his jury service.  Our bailiff was called to jury duty in state

5     court.

6          (Brief pause.)

7          THE CLERK:  Please raise your right hand.

8          (Bailiff sworn.)

9          THE COURT:  Please rise.

10          (Jury out for deliberations at 5:29 p.m.)

11          THE COURT:  Be seated, please.

12          Before leaving the courtroom I do ask the attorneys or

13     paralegals or associates to just recheck the exhibits that are

14     being sent to the jury room so that you are satisfied that only

15     the exhibits which have been received and properly redacted are

16     being made available for the use of the jury.  If any issue

17     arises I will return to the courtroom and we will resolve the

18     issue.

19          Next, please give to the clerk contact information so

20     that you can be called if the jury has a question or a verdict

21     has been reached.  I would certainly suggest that you be as

22     close as possible so that there's not any inordinate delay in

23     the proceedings if something should occur.

24          I envision that the jury will be here no later than

25     9:00 o'clock tonight because that's when the heat goes off.  All

487

1    right?  They will be asked to return tomorrow at 8 -- well, I'll

2    make it 9:00 o'clock if they have to continue with

3    deliberations.  And we will contact you with the view that you

4    will be here within say 30 minutes of any verdict if one is

5    reached tomorrow.  All right?  Is that fair and reasonable under

6    the circumstance?

7              MR. BERNHOFT:  Yes, Judge.

8              MR. JACOBS:  Fine with me, Judge.

9              THE COURT:  All right.  We'll take a break and I'll

10   hopefully hear nothing from you.

11              (Trial adjourned for deliberations at 5:32 p.m., until

12   7:56 p.m.)

13              MR. RESLER:  Judge, could I just mention something for

14   the record?  I told Mr. Bernhoft this.  I'm gonna give your

15   clerk a ride home tonight.  She happens to be a neighbor of

16   mine, and obviously I don't want her husband to have to come

17   down to get her.  I told Mr. Bernhoft that.  Just so you're

18   aware.

19              THE COURT:  She is a professional and she would not

20   discuss any case because she has been on my staff for what,

21   about 14 -- 13, 14 years?

22              THE CLERK:  Yes.

23              THE COURT:  And she expects to be here beyond this

24   case.

25              THE BAILIFF:  All rise.

488

1           (Jury in at 7:58 p.m.)

2           THE COURT:  Be seated, please.  Have you reached a

3    verdict?

4           THE FOREPERSON:  Yes, Your Honor.

07:58   5    THE COURT:  Would you please hand it up?

6           (Verdict tendered to the court.)

7           THE COURT:  Would the clerk publish the verdict.

8                          VERDICT

9           THE CLERK:  Verdict in United States District Court

07:58  10   Eastern District of Wisconsin, Case No. 10-CR-288, United States

11   of America vs. James A. Stuart, Jr.

12          With respect to the offense charged in count one, tax

13   evasion, we, the jury, duly impaneled and sworn in the

14   above-entitled action, find the defendant, James A. Stuart, Jr.,

07:59  15   guilty.

16          With respect to the offense charged in count two, tax

17   evasion, we, the jury, duly impaneled and sworn in the

18   above-entitled action, find the defendant, James A. Stuart, Jr.,

19   guilty.

07:59  20   With respect to the offense charged in count three,

21   tax evasion, we, the jury, duly impaneled and sworn in the

22   above-entitled action, find the defendant, James A. Stuart, Jr.,

23   guilty.

24          Dated at Milwaukee, Wisconsin, this 7th day of

07:59  25   December, 2011, signed by the foreperson.

489

1          THE COURT:  Starting with the foreperson and moving to

2    the right and then across the back of the jury box to the left,

3    was this and is this now your verdict as to each of the counts?

4          A JUROR:  Yes, Your Honor.

5          THE COURT:  Next?

6          A JUROR:  Yes, Your Honor.

7          A JUROR:  Yes.

8          A JUROR:  Yes, Your Honor.

9          A JUROR:  Yes, Your Honor.

10         A JUROR:  Yes, Your Honor.

11         A JUROR:  Yes.

12         A JUROR:  Yes.

13         A JUROR:  Yes, Your Honor.

14         A JUROR:  Yes, Your Honor.

15         A JUROR:  Yes.

16         A JUROR:  Yes, Your Honor.

17         THE COURT:  Thank you all.  You may return to the jury

18    room at this time.  We thank you for your attentiveness and also

19    for the fact that you gave up parts of your lives for the

20    purposes of justice in our community.  It is imperative that

21    citizens serve as jurors, and oftentimes they really don't want

22    to do so, but it is part of our system of government, an

23    important part of our system of government and justice, and we

24    appreciate what you've done.

25         You may return to the jury room for further

490

1    instructions.

2            THE BAILIFF:  All rise.

3            (Jury discharged at 8:00 p.m.)

4            THE COURT:  Be seated, please.

08:01  5            Does either side wish to be heard?

6            MR. JACOBS:  I have nothing, Your Honor.

7            MR. BERNHOFT:  I have nothing, Your Honor.

8            THE COURT:  Very well.  The clerk will docket the

9    verdict in this matter and provide dates and times for further

08:01  10   proceedings and submissions.

11           THE CLERK:  The presentence report shall be disclosed

12   by February 29th.

13           Any objections should be submitted to Pretrial

14   Services by March 21st.

08:01  15           And any motions and sentencing memoranda shall be

16   filed by April 11th.

17           And a sentence date of April 26th at 2:00 o'clock.

18           THE COURT:  Is that satisfactory?

19           MR. JACOBS:  That's fine with me, Your Honor.

08:02  20           MR. BERNHOFT:  Yes, Your Honor.

21           THE COURT:  The court does remind Mr. Stuart that the

22   conditions of release that were set initially will remain in

23   effect.  Therefore, it is imperative that you not travel except

24   as may be approved by Pretrial Services.  It will be necessary

08:02  25   for you to report to Pretrial Services as directed and to assist

491

1        in the preparation of the presentence report.

2                Let me inquire also -- let's see.

3                The clerk set a date of April 26 -- no, disclosure --

4        no, that's fine.  We're fine with Rule 32.  We are meeting the

5        requirements of Rule 32 so we don't need to get any waivers.

6                Is there anything else at this time?

7                MR. JACOBS:  Not for the government, Judge.

8                MR. BERNHOFT:  Not for the defense, Your Honor.

9                THE COURT:  All right.  Let me just verify whether or

10       not there are any motions that need to be addressed.

11               MR. BERNHOFT:  None for the defense, Your Honor.

12               MR. JACOBS:  Nothing for the government, Your Honor.

13               THE COURT:  Very well.  We'll proceed accordingly.

14       Have a good evening.  You are to leave by the usual door, the

15       one you just entered.  All right.

16               (Jury trial concluded at 8:03 p.m.)

17                        *    *    *

18

19

20

21

22

23

24

25

492

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF WISCONSIN

 3

 4              I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

 5   Reporter for the United States District Court, Eastern District

 6   of Wisconsin, do hereby certify that I reported the foregoing

 7   proceedings, and that the same is true and correct in accordance

 8   with my original machine shorthand notes taken at said time and

 9   place.

10   Dated this 6th day of March, 2012,

11   Milwaukee, Wisconsin.

12

13   _____
                 Official Court Reporter
14               United States District Court

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2  INSTRUCTION CONFERENCE

 3        Instructions Discussed..........................   346

 4  CONTINUED JURY INSTRUCTION CONFERENCE

 5        Instructions Discussed..........................   403

 6  CLOSING ARGUMENT

 7        By Mr. Jacobs...................................   408

 8  CONTINUED INSTRUCTION CONFERENCE

 9        Instructions Discussed..........................   447

10  CLOSING ARGUMENT

11        By Mr. Bernhoft.................................   449

12  REBUTTAL ARGUMENT

13        By Mr. Jacobs...................................   464

14  FINAL JURY INSTRUCTIONS

15        Read By the Court...............................   468

16  VERDICT

17        Published By the Clerk..........................   489

18

19

20

21

22

23

24

25
```

494

```
 1   WITNESS    EXAMINATION                            PAGE
 2      MATTHEW RECH III, GOVERNMENT WITNESS
 3           Cont'd Direct Examination By Mr. Jacobs..........   348
 4      Trial Stipulation No. 13
 5           Read into the record and admitted................   351
 6      Trial Stipulation No. 9
 7           Read and admitted................................   354
 8      Trial Stipulation No. 10
 9           Read and admitted................................   355
10      Trial Stipulation No. 11
11           Read and admitted................................   355
12      Trial Stipulation No. 12
13           Read and admitted................................   360
14      Trial Stipulation No. 17
15           Read and admitted................................   361
16      Trial Stipulation No. 16
17           Read and admitted................................   367
18      Trial Stipulation No. 18
19           Read and admitted................................   368
20           Cross-Examination By Mr. Bernhoft...............   370
21      KATHLEEN BASHAW, GOVERNMENT WITNESS
22           Direct Examination By Mr. Jacobs................   382
23           Cross-Examination By Mr. Bernhoft...............   397
24
25                            *****
```

495

                        E X H I B I T S

NUMBER                 DESCRIPTION                OFFERED/ADMITTED

92    2003 Wisconsin 1 James/Marjorie Stuart Income Tax .....355

      Return

93    2004 Wisconsin 1 James/Marjorie Stuart Income Tax .....355

      Return

94    2005 Wisconsin 1 James/Marjorie Stuart Income Tax .....355

      Return

95    7/10/2006 Notice of Amount Due to J Stuart on 2005 ....355

      taxes

96    7/10/2006 DOR Notice of Amt Due........................355

97    7/13/2006 Stuart letter appealing DOR Notice of Amt ...355

      Due

98    10/30/2006 DOR Notice of Action on Petition for .......355

      Redetermination

99    12/11/2006 Stuart motion for Determination of Status...357

100   2/9/2007 Stuart submission to Tax Appeals Commission...357

101   2/27/2007 DOR Answer to Amended Petition for ..........357

      Redetermination

102   DOR Notice of Motion and Motion for Summary Judgment ..357

      w/attachments

103   3/5/2007 DOR Brief....................................357

104   3/13/2007 Tax Appeals Commission Briefing Order........357

105   3/20/2007 Stuart response w/attachments...............357

106   4/2/2007 DOR Reply Brief..............................357

496

107   4/26/2007 Stuart Reply to DOR..........................357

108   6/7/2007 Wis Tax Commission Ruling and Order...........357

147   Certificate of Lack of Record: Stuart, 2006-2010.......365

148   Certification of Lack of Record, New Age Chemical......365

149   IRS Certificates indicating no record of return .......366

      filed for New Age Chemical, Ltd: 2007-2010

174   Jim Stuart letter published in 12/21/2006 edition of ..361

      Lake County Reporter

175   James A Stuart Jr DL Renewal App 9/6/2006..............352

179   Certified copy of passport application for J Stuart....368

180   Certification of Absence of Public Record: ............368

      Certificate of Loss of Nationality For J Stuart

206   2006 Waukesha Cty Real Property Tax Bill Details.......369

207   2005 Waukesha Cty Real Property Tax Bill Details.......369

208   2004 Waukesha Cty Real Property Tax Bill Details.......369

210   Bashaw Analysis........................................385

497